**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MARSHALL COMMUNITY CREDIT UNION,**<br><br>*Plaintiff*,<br><br>v.<br><br>**FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC.**, and **FISERV, INC.**,<br><br>*Defendants*. | Case No. 1:26-cv-2858<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Marshall Community Credit Union ("**MCCU**"), represented by NERKO PLLC, HECHT PARTNERS LLP, and HOLZMAN LAW, PLLC, alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**"):

## PRELIMINARY STATEMENT

1. This action is about one of the world's largest providers of outsourced technology to financial institutions and its pattern of using false representations to induce financial institutions into trusting it with some of the most sensitive data a financial institution can hold.

2. MCCU is a not-for-profit credit union, serving employees throughout the schools, government entities and small businesses of Calhoun County and its surrounding area. Fiserv is one of the world's largest providers of outsourced technology to financial institutions, including MCCU.

3. Fiserv provides a variety of products and services to MCCU. Fiserv stores and processes MCCU's most sensitive information, including member names, account numbers, balances, transaction histories, and other personally identifiable information.

4. MCCU brings this action and seeks relief to prevent ongoing and irreparable harm caused by Fiserv's deficient and misrepresented cybersecurity practices. Fiserv falsely represents that it employs appropriate safeguards to protect the sensitive and confidential financial data of MCCU credit union members. Fiserv has failed to implement basic, industry-standard controls, leaving MCCU's systems and member information vulnerable to unauthorized access.

5. These risks are not hypothetical—they are present and continuing.

6. Under its Master Agreement, Fiserv pledged to protect MCCU's data with the same high-tech safeguards Fiserv uses for its own information, or at the very least, a reasonable standard of care and in full compliance with federal standards. But the reality was starkly different.

7. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls and expose member information to easy compromise. Yet Fiserv continues to sell these deficient systems, all while falsely assuring MCCU and its other financial-institution customers that everything is secure.

8. Fiserv's double standard makes its breaches unmistakable. For its own corporate data, Fiserv deploys layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For MCCU's systems, Fiserv withheld these protections. Instead, it relied on authentication methods so weak and susceptible to hacking that federal standards expressly do not permit their use.

9. MCCU cannot fix these security failures on its own. Fiserv controls the systems that store and process MCCU's data. As long as those systems remain inadequately secured, MCCU's systems remain unsecured and MCCU faces ongoing hacking risks. Each day that passes without proper controls compounds that risk.

10. Fiserv has converted its own security failures into an upsell opportunity. If MCCU sought to leave and transfer its data to a safer provider, Fiserv would demand seven-figure "early termination" and deconversion fees as the price of release. Fiserv's ultimatum is clear: pay the ransom, or leave your data exposed on systems Fiserv refuses to adequately secure.

11. In sum, Fiserv has attempted to monetize its own security failures by forcing financial institutions to choose between paying to escape unsafe systems or continuing to pay for ostensible services that do not provide proper protection.

12. This is Fiserv's business model. According to *The Wall Street Journal*, Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv has stopped making the financial investments needed to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate its customers and prevent them from disclosing security problems to other affected customers, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited small financial institutions and the customers they serve. *See Frustrated by the Tech Industry, Small Banks Start to Rebel*, The Wall Street Journal (April 11, 2019), https://www.wsj.com/articles/small-banks-rebel-against-the-most-

important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of *The Wall Street Journal* article.

13. MCCU brings this action to recover damages and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects MCCU's members.

## PARTIES

14. Plaintiff MCCU is a state-chartered, not-for-profit credit union organized under the laws of the State of Michigan. MCCU has a principal place of business at 839 W. Green Street, Marshall, Michigan 49068. MCCU is federally insured by the National Credit Union Administration ("NCUA") and subject to its regulations.

15. Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

16. Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

17. Fiserv, Inc. is Fiserv Solutions' parent corporation. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc., which is the sole member of Fiserv Solutions, LLC.

18. On information and belief, Defendants Fiserv, Inc. and Fiserv Solutions operate as an integrated enterprise, are agents of each other, and each defendant acted as the agent of the other defendant and within the scope of that agency. Among other things, Defendants maintain the same principal corporate headquarters, share common officers and employees, conduct business through interconnected corporate entities with common business functions and purposes, and communicate

with MCCU and store and process its information through a common fiserv.com domain name. At all relevant times, Defendants acted through one another, and through their officers, employees, agents, and representatives, in carrying out the conduct alleged herein, and acted with the other defendant's authority, knowledge, consent, and ratification of the conduct alleged herein.

**JURISDICTION AND VENUE**

19. This Court has original subject-matter jurisdiction over MCCU's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over MCCU's state-law claims under 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20. This Court also has subject-matter jurisdiction over MCCU's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties given that MCCU is a citizen of Michigan and each defendant is a citizen of Wisconsin, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

22. This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction, including by contracting to supply services to MCCU, a Michigan credit union headquartered in this district, and by storing, processing, and failing to safeguard the confidential information of MCCU and its Michigan members.

## FACTUAL BACKGROUND

23. MCCU is a not-for-profit, member-owned financial institution headquartered in Marshall, Michigan, serving members in Calhoun County and the surrounding communities. MCCU offers a range of banking and financial services for its community, including checking accounts, savings accounts, individual retirement accounts (IRAs), debit and credit cards, online and mobile banking, and loan products (such as home loans, car loans, and personal loans). MCCU was chartered in 1951 and today serves approximately 18,500 members and holds over $361 million in assets. MCCU is a community-focused financial institution offering personalized service and a wide array of financial services.

24. Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial-institution clients and provides technology to more than one in three U.S. financial institutions.

### *The Master Agreement and Fiserv's Many Assurances*

25. MCCU contracted with Fiserv for technology services under a Master Agreement with an execution date of November 29, 2011. The parties amended the agreement on January 7, 2015, and again on August 17, 2017. **Exhibit 2** contains true and correct copies of the Master Agreement and the two amendments.

26. Fiserv stores and processes MCCU's most sensitive information, including member names, dates of birth, Social Security Numbers, banking account numbers, balances, transaction histories, and other highly sensitive, personally identifying information, across various Fiserv systems, including its Portico core account processing system, its Corillian online banking platform, and the credit union's mobile banking application.

27. **Contractual Standard of Care**. Under the Master Agreement, Fiserv was required to meet the following standards of care:

a. Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (**Exhibit 2** at § 3(b).)

b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

(i) "protect the security and confidentiality of customer information" (as defined in the Gramm-Leach-Bliley Act ("GLB"));

(ii) "protect against any anticipated threats or hazards to the security or integrity of such information";

(iii) "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer"; and

(iv) "ensure the proper disposal of 'consumer information.'" (**Exhibit 2** at § 4(a).)

c. Section 4(a) of the Master Agreement further requires Fiserv to "take appropriate actions to address incidents of unauthorized access to Client's 'sensitive customer information' (as defined in GLB), including notification to Client as soon as possible of any such incident." (**Exhibit 2** at § 4(a).)

d. Section 4(e) of the ASP Services Exhibit to the Master Agreement contains Fiserv's services warranties, under which Fiserv represents and warrants that the services will conform to the specifications set forth in the Schedules, that Fiserv will perform the services accurately, that Fiserv personnel will exercise due care in the provision of

services, and that the functionality provided by the Fiserv System will enable MCCU to comply in all material respects with applicable federal regulations. (**Exhibit 2**, ASP Services Exhibit § 4(e).)

e. The Virtual Branch Services Schedule to the ASP Services Exhibit provides for Fiserv to furnish "Enhanced Authentication," beyond a baseline level of minimally acceptable authentication.

28. Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls, in addition to phishing-resistant multi-factor authentication.

29. Fiserv's *Cybersecurity Fact Sheet 2026*, *Standard Information Gathering Questionnaire*, and *SOC 1 Type 2 Report* assert that Fiserv employs a robust cybersecurity program, including the implementation of MFA as part of its security strategy. These documents outline Fiserv's commitment to industry standards and regulatory requirements, including National Institute of Standards and Technology ("NIST") and International Organization for Standardization ("ISO") frameworks.

30. Fiserv's *Cybersecurity Fact Sheet 2026* (a true copy of which is annexed hereto as **Exhibit 3**) states that Fiserv "has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications . . . . The policy and supporting standards have been designed to meet applicable industry and regulatory requirements, including . . . National Institute of Standards and Technology (NIST) Cyber Security Framework, 800-53, 800-63-3." (**Exhibit 3** at 1.)

31. In Fiserv's *Standard Information Gathering Questionnaire* (a true copy of which is annexed hereto as **Exhibit 4**), Fiserv was asked "Is Multi-Factor Authentication (MFA) utilized?" Fiserv responded, "Yes." (**Exhibit 4** at row H.3.)

32. As described in the *SOC 1 Type 2 Report: Fiserv Enterprise Technology* (a true copy of which is annexed hereto as **Exhibit 5**), Fiserv requires its employees accessing Fiserv's systems to use "two-factor authentication that includes a token-generated one-time code." (**Exhibit 5** at 121.)

33. Despite these contractual obligations, Fiserv failed to implement these equivalent protections for MCCU's confidential information. Instead, Fiserv deployed materially weaker controls.

***Multi-Factor Authentication and Industry Standards***

34. MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (such as a password), possesses (such as a device or token), or is (such as a biometric verification). MFA makes an account 99% less likely to be hacked.[1]

35. Not all MFA is created equal. Some forms, such as codes sent by email or text, do not establish possession of a particular device. Those forms provide inadequate security because they are susceptible to hacking by interception, SIM-swap, or account takeover.

36. Federal standards and supervisory guidance reinforce these differences. Codes sent by text message are not secure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation." *See*

[1] https://www.cisa.gov/topics/cybersecurity-best-practices/multifactor-authentication

*Implementing Phishing-Resistant MFA*, at 2-3 (a true copy of which is annexed hereto as **Exhibit 6**). Because text messages are fairly simple to intercept or redirect, a text message code is insufficient to satisfy the "what you have" factor. Text messages are transmitted without encryption, making them vulnerable to network-level compromise.

37. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial Institution Services and Systems*[2] adopts the *Digital Identity Guidelines* of NIST, which mandate: "Methods that do not prove possession of a specific device, such as . . . email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.[3] A true copy of the *Digital Identity Guidelines* is annexed hereto as **Exhibit 7.** The *Digital Identity Guidelines* further require that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

38. A July 2025 update to NIST's *Digital Identity Guidelines* (a true copy of which is annexed hereto as **Exhibit 8**) reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

(i) Access using only a password

(ii) Interception in transit or at intermediate mail servers

(iii) Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."[4]

---

[2] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf.
[3] https://pages.nist.gov/800-63-3/sp800-63b.html.
[4] https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63B-4.pdf.

39. Similarly, the Center for Internet Security ("CIS") states that phishing-resistant MFA methods (i.e., not email or SMS) are required for high-risk users and high-security environments.[5]

40. CISA, CIS, and NIST standards are routinely referenced by the FFIEC[6] and NCUA, and many of their standards are incorporated into NCUA guidance, examination procedures, and regulations. Section 501(b) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801-6809, tasks financial regulators (relevant here, the NCUA) with establishing administrative, technical, and physical safeguards for member records.

41. Pursuant to the GLBA, the NCUA enacted Guidelines for Safeguarding Member Information, 12 C.F.R. Part 748, Appendix A, which mandates that federally insured credit unions (such as MCCU) implement measures to protect the security, confidentiality, and integrity of consumers' personal information.

42. Specifically, credit unions are required to implement "access controls on member information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent employees from providing member information to unauthorized individuals who may seek to obtain this information through fraudulent means." Further, credit unions must "exercise appropriate due diligence in selecting its service providers; require its service providers by contract to implement appropriate measures designed to meet the objectives of these guidelines; and where indicated by the credit union's risk assessment, monitor its service providers to confirm that they have satisfied their obligations." This language reflects that in the ASP Services Exhibit that "functionality provided by the Fiserv System will enable

[5] CIS Critical Security Controls, Version 8.1, Control 6 (Access Control Management), Safeguards 6.3–6.5, Center for Internet Security (2024), available at https://www.cisecurity.org/controls/v8.
[6] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf

Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry[.]" (**Exhibit 2** at 10).

43. Part 748 explicitly recognizes that the security environment is constantly evolving and requires updating: "Each credit union should monitor, evaluate, and adjust, as appropriate, the information security program in light of any relevant changes in technology, the sensitivity of its member information, internal or external threats to information . . . ." In addition, credit unions must consider "the identified risks, commensurate with the sensitivity of the information as well as the complexity and scope of the credit union's activities" in this changing environment.

44. The NCUA ensures that credit unions are complying with federal regulations and best practices through references to external frameworks. The NCUA's Information Security Examination ("ISE") program, which refers to Part 748 among other federal regulations, "reference[s] industry security standards and frameworks from NIST and the Center for Internet Security, and CISA."[7] The NCUA's ISE and cybersecurity assessment programs also incorporate the FFIEC IT Handbook's *Information Security and Outsourcing Technology Services* booklets, which reference NIST and CIS standards. And as discussed above, the FFIEC references NIST, CISA, and CIS standards. These security guidelines are the framework that the NCUA uses to ensure credit union compliance with Part 748.

45. Additionally, the NCUA offers credit unions the Automated Cybersecurity Evaluation Toolbox ("ACET"), a voluntary tool that allows credit unions to "determine and measure their own cybersecurity preparedness over time."[8] The ACET tool explicitly incorporates "cybersecurity assessment tools from [CISA], Center for Internet Security (CIS), and [NIST]."

---

[7] *Id.*

[8] https://ncua.gov/regulation-supervision/regulatory-compliance-resources/cybersecurity-resources/acet-and-other-assessment-tools

46. The NCUA uses the NIST SP 800-53 and NIST Risk Management Framework to protect its own data, and expressly references NIST, CISA, and other external standards as those that it is bound to follow.[9]

***The Standard of Care and Safeguards That MCCU Actually Received***

47. Despite these contractual and regulatory obligations that adopted industry standards such as NIST, CIS, and CISA, Fiserv failed to implement these necessary protections for MCCU's confidential information. Instead, Fiserv deployed materially weaker controls than what it used for its own similar information—controls that fell below the industry and regulatory standards.

48. A risk assessment recently conducted by MCCU revealed that Fiserv is storing MCCU's confidential information on insecure systems that lack proper authentication and security controls to prevent unauthorized disclosure of confidential information.

a. Client360, the system where MCCU submits support tickets, change orders, and communications that can include confidential information and requests affecting system security, requires only a username and password to log in, with an email-based one-time passcode required on an intermittent basis. Proper multi-factor authentication is not in place.

b. Corillian, the online banking platform Fiserv provides for MCCU's members, does not require multi-factor authentication before individuals are authenticated to engage in high-risk transactions, including viewing member account and transactional history, and transferring funds out of accounts.

c. MCCU's mobile banking application (Mobiliti) also does not require multi-factor authentication. Like Corillian, the mobile application permits individuals to engage in

---

[9] https://ncua.gov/news/publication-search/cybersecurity/2025-cybersecurity-and-credit-union-system-resilience-report#ftn_5_ret.

high-risk transactions, including viewing member account and transactional history, and transferring funds out of accounts.

d. Multi-factor authentication has not been properly implemented or enforced in at least the following additional portals that store extraordinarily sensitive credit union and member information: Portico, Nautilus Essentials, Portico Reporting Analytics, Wisdom Accounting, and Loancierge.

49. On systems housing MCCU's confidential information, Fiserv has either required no MFA at all or relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. This practice therefore fails to meet the standard of care Fiserv owes MCCU under the Master Agreement.

50. Fiserv's failure to deploy promised safeguards has resulted in MCCU paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to MCCU's extraordinarily sensitive confidential information.

51. Moreover, the Fiserv systems that MCCU contracted for and necessarily rely upon frequently suffer from outages or other service-disrupting issues. In 2025 alone, MCCU submitted to Fiserv over 160 tickets regarding issues with Fiserv's systems. Over 120 have been submitted thus far in 2026. From the beginning of 2025 through approximately July 2026, the SecureNow service had 37 outages, Corillian had 32 outages, and Portico had 26. Because Client360, Fiserv's support ticket system, deletes history after a specified period, these numbers do not provide a full picture of the extent to which MCCU has had to navigate Fiserv's failures over the course of the parties' relationship.

52. These disruptions impact MCCU's ability to perform its day-to-day operations and require MCCU to devote substantial time and resources to mediate the issues. In fact, MCCU has had to develop and implement its own unique solutions to resolve Fiserv's poor programming practices. Portico ships with executable files that MCCU's internal security software flagged as malware. MCCU was forced to manually whitelist certain executables in order to keep the Portico system from being inoperable.

***Fiserv's Pattern: Known Security Gaps, False Assurances, and Active Concealment***

53. Fiserv has long known that the authentication controls on the systems it sells to financial institutions suffer from serious security defects. Yet Fiserv has continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remain secure. Fiserv's knowing and willful misconduct—a combination of knowledge of security problems, false assurances that its systems had certain security controls, and concealment of the absence of those controls—amounts to fraud.

54. Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed MCCU's member information to compromise by hackers and forced MCCU—and other institutions—to operate under hidden, avoidable risk.

55. In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[10]

56. Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

---

[10] "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

57. Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a fix.

58. Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

59. Fiserv's lackadaisical approach to cybersecurity persists to this day.

60. Beginning in early May of 2026, reports started appearing that a ransomware group known as Everest had claimed that it had breached Fiserv's systems. Fiserv did not respond to the reporting of this data breach either publicly or, upon information and belief, to its federally-regulated clients, such as MCCU.

61. Consistent with its obligations under federal regulations to monitor the performance of its service providers, MCCU requested that Fiserv provide information concerning the alleged

data breach and whether the data of MCCU's confidential information was accessed, in the Everest breach or otherwise.

62. Fiserv's counsel responded to MCCU's inquiry, providing responses based upon multiple layers of hearsay statements, identifying a third-party vendor of Fiserv as the party that was breached by Everest repeatedly over a five-month period (during which neither Fiserv nor the third-party vendor reported the breach of a system holding federally-protected confidential information). Fiserv's counsel further denied, without any objective proof, that MCCU's confidential information had been compromised in any way. Fiserv refused to provide further information in response to MCCU's follow-up inquiries.

63. While MCCU was seeking answers to its questions concerning the Everest data breach referred to above, news outlets began publicly reporting the existence of a second data breach involving Fiserv by the group known as "Cl0p." Those sources (which included Reuters) reported that Cl0p had exploited vulnerabilities in Fiserv's PTC Windchill and FlexPLM software, had stolen Fiserv's data and had been making ransom demands since mid-July 2026, before MCCU had made its inquiry about the Everest breach and before Fiserv's counsel's response.

64. When MCCU requested information concerning Cl0p's intrusion and its effect on MCCU's confidential information, it received a similar conclusory denial from Fiserv's counsel: The systems at Fiserv that were breached had nothing to do with the services provided to MCCU and its confidential information was not impacted.

65. As Fiserv's systems endure repeated attacks, questions have arisen concerning Fiserv's business strategy going forward, including whether it will continue providing services to financial institutions such as MCCU under agreements such as the Master Agreement. Fiserv continues to hold MCCU's confidential information on those systems, yet it has refused to tell

MCCU whether it will continue providing services under the Master Agreement or whether any contemplated transaction will impair performance of those services.

66. Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to another *Krebs on Security* article about additional security problems with Fiserv's online banking platform, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[11] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." Kinder's public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

67. For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

68. In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York (the "Court Credit Union"), discovered security problems with Fiserv's online-banking applications. In

---

[11] Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives—and the lines have blurred." See https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy, is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

particular, the Court Credit Union found that Fiserv's authentication controls were weak and could easily be bypassed, allowing Court Credit Union online banking accounts to be hacked.

69. This potential for hacking raised significant additional concerns for the Court Credit Union and its members—Federal judges, U.S. Marshals and court employees. A hacker of the Court Credit Union would be able to access nonpublic personal information and transaction history, such as a member's home address and usage patterns for a debit card. Such information could facilitate stalking, harassment, or other criminal conduct directed at those members.

70. The Court Credit Union decided to terminate its relationship with Fiserv largely on account of these security failures. Fiserv demanded an early-termination fee before it would permit the Court Credit Union to terminate its relationship.

71. The Court Credit Union sued Fiserv over the online-banking security failures that Fiserv refused to address and to challenge Fiserv's asserted early-termination fee when the Court Credit Union decided to exit Fiserv for a more secure system while undergoing a merger with another credit union. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, Case No. 1:22-cv-09329 (S.D.N.Y. 2022).

72. Fiserv resolved the case shortly after it was filed. But by prioritizing early-termination fees and leverage over the Court Credit Union instead of fixing security problems, Fiserv prolonged the exposure of the Court Credit Union's members—judicial personnel and U.S. Marshals—to the risk of hacking.

73. Other litigation raising security concerns includes: *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:19-cv-00624-RJC (W.D. Pa. 2019); *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025); *Self-Help Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 1:25-cv-01112-TDS-

LPA (M.D.N.C. 2025); *FiCare Federal Credit Union v. Fiserv Solutions, Inc. et al.*, Case No. 8:26-cv-00231-JLB-TGW (M.D. Fla. 2026); *POLAM Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-02352-JFW-DFM (C.D. Cal. 2026); *Educational & Governmental Employees Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 7:26-cv-02402-NSR (S.D.N.Y. 2026); and *Midwest Family Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-00234 (N.D. Ind. 2026).

74. In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv failed to do so, the credit union filed a motion for injunctive relief compelling Fiserv to return the records.

75. In response, Fiserv unequivocally represented to the Bessemer court that it had fully returned the credit union's records—a representation central to the court's denial of injunctive relief. Fiserv falsely represented to the court that it had provided the credit union with "a complete set of" the requested records. *See* Letter dated June 26, 2019, at 2 (a true copy of which is annexed hereto as **Exhibit 9**). Specifically, Fiserv's opposition to a preliminary injunction filed with the court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." *Id.*

76. The Bessemer court denied an injunction based on Fiserv's assurances that the credit union's records had been returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26.

77. Later, Fiserv provided the credit union with hundreds of records that Fiserv previously assured the Bessemer court it had already returned—confirming that Fiserv misled the credit union's counsel and the court.

78. Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv actively concealed defects from its clients. When Bessemer System Federal Credit Union reported security problems that allowed online banking accounts to be readily taken over by hackers, Fiserv demanded that the credit union "[r]efrain from dissemination or disclosure of any information or records relating to the 'security review' to third parties, including any clients . . . of Fiserv." Those threats and misconduct did not protect Fiserv's customers; they protected Fiserv's reputation and revenue.

### *Fiserv Defrauds Its Financial Institution Customers, Including MCCU*

#### *1. Fiserv Provides Financial Institutions a Fraudulent "Compliance Package" That Misrepresents the Security Controls on Fiserv's Systems*

79. As a regulated financial institution, MCCU must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv authored, assembled, and provided MCCU a 'Compliance Package' representing that Fiserv had implemented security measures sufficient to meet financial-institution regulatory requirements, on which MCCU relied in conducting its required oversight of Fiserv as a third-party vendor.

80. Fiserv updates its Compliance Package from time to time and assures MCCU that Fiserv continues to comply with evolving regulatory and industry requirements. MCCU relied on those recurring representations in continuing to use Fiserv's services and in foregoing other vendor options. The representations in Fiserv's Compliance Package were false and misleading.

81. Among the materials in Fiserv's Compliance Package is Fiserv's *Standard Information Gathering Questionnaire*. MCCU and other Fiserv customers use this questionnaire, as Fiserv knew and intended, to assess Fiserv's security posture and vendor risk.

82. The questionnaire asks: "Are information security policies, standards, and procedures based on accepted control standards, frameworks, and industry practices?"

83. Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv's cybersecurity and technology policy, standards, guides and procedures are based on established controls, frameworks, and industry practices, such as ISO 27001, NIST Cybersecurity Framework, and COBIT. These documents outline specific control objectives and requirements that align with industry standards and regulatory requirements, ensuring a robust security posture and effective risk management in addressing current and emerging threats.

84. Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

85. Indeed on January 20, 2026, Fiserv, through counsel, asserted in open court in data-security litigation from one of its other financial institution clients that NIST is not mandatory or binding on Fiserv, and that there is nothing in Fiserv's Master Agreement that requires Fiserv to adopt NIST standards. Fiserv's recent admissions revealed that Fiserv's prior representations concerning its alignment with the NIST standards did not reflect Fiserv's actual cybersecurity practices. Moreover, given Fiserv's position that its Master Agreement imposes no contractual obligation for Fiserv to incorporate or maintain alignment with the NIST standards, Fiserv's prior

representations concerning its compliance with NIST standards were extra-contractual statements of fact that are actionable as fraud.

86. The questionnaire also asks: "Is Multi-Factor Authentication (MFA) utilized?" Fiserv answered: "Yes."

87. That statement was false and misleading. As described above, Fiserv did not utilize MFA on many of its systems, and the authentication process used does not meet recognized standards for MFA.

88. Fiserv also provided MCCU with a *Fiserv Cybersecurity Fact Sheet 2026*, which again represented that "Fiserv has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard." *See* **Exhibit 3** at 1.

89. The *Fiserv Cybersecurity Fact Sheet 2026* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." *Id.* MCCU received the Cybersecurity Fact Sheet 2026 as part of the recurring Compliance Package described above and, at that time, relied on it, together with Fiserv's other recurring representations, in continuing to use Fiserv's services rather than seeking a different vendor.

90. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

91. Fiserv's *Global Data Ethics and Privacy Program Fact Sheet 2026* represents that Fiserv adopted privacy principles—regardless of location—which use "appropriate security safeguards" and "[r]ecognizes the importance of data privacy and holds [Fiserv] accountable to [its] data protection standards." Those statements were false and misleading. Fiserv has failed to use MFA adequately, leaving sensitive accounts exposed, and has failed to meet applicable industry and regulatory standards, including NIST standards.

***2. Fiserv's SOC Report & Derelict Chief Risk Officer***

92. Fiserv's compliance representations to MCCU rest heavily on its *SOC 1 Type 2 Report* (the "*SOC Report*"), which Fiserv furnishes to financial-institution customers as independent assurance that its security controls are adequate. Federal regulations require credit unions to obtain and review such audits in conducting vendor oversight. *See* 12 C.F.R. Part 748, App'x A § III.D.3. MCCU relied on the *SOC Report* in evaluating Fiserv's security posture and in fulfilling its own regulatory obligations.

93. Fiserv's current Chief Risk Officer (CRO), Joanne Sebby, served as a liaison to the Federal Financial Institutions Examination Council ("FFIEC"), which establishes the cybersecurity standards at issue in this litigation. A true and correct copy of the biography of Joanne Sebby on Fiserv's website, located at https://www.fiserv.com/en/about-fiserv/executive-leadership/joanne-sebby.html and accessed on April 17, 2026, is annexed hereto as **Exhibit 10**. Upon information and belief, Ms. Sebby has personal, first-hand knowledge of the cybersecurity standards promulgated by FFIEC, yet she failed to implement them at Fiserv or conduct other appropriate risk assessments to ensure Fiserv was protecting the highly sensitive information its customers entrusted to it.

94. As described in the SOC Report, the CRO is a member of Fiserv's Management Committee "responsible for leading the Enterprise Risk & Controls function." Under Fiserv's "Three Lines of Defense" governance model, the CRO occupies the Second Line of Defense: the executive directly responsible for the design, maintenance, and oversight of risk management practices, including the enterprise-level security controls applicable to all Fiserv products.

95. The failure of Fiserv's Chief Risk Officer to ensure Fiserv was compliant with FFIEC cybersecurity standards is consistent with Fiserv's broader pattern of disregard of known risks and concealment. Rather than making its systems compliant with the cybersecurity standards Fiserv's own Chief Risk Officer would be expected to know were appropriate to address hacking risks, Fiserv decided not to implement those standards.

### *3. Fiserv Publishes a False and Misleading Privacy Notice*

96. Fiserv, Inc. publishes and maintains a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions.[12] The Privacy Notice is maintained on an ongoing basis, and MCCU, at that time, relied on the Privacy Notice's representations, together with Fiserv's other recurring assurances, in continuing its relationship with Fiserv rather than seeking a different vendor.

97. In Section 6, Fiserv represents it has "in place appropriate security measures to prevent . . . personal data from accidentally being lost, used or accessed in an unauthorized way, altered or disclosed."

[12] A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

98. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent MCCU's data from being used or accessed in an unauthorized way.

99. Fiserv's misrepresentations and concealments harmed MCCU in a straightforward way: they deprived MCCU of material facts that would have altered MCCU's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

100. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

101. Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 65% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

102. Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

103. Fiserv's course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award

of punitive damages sufficient to have a deterrent effect on Fiserv, which has a market capitalization of approximately $24 billion.

104. As a direct result of Fiserv's misconduct, MCCU has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

***4. The Severe Impact on MCCU and Its Members***

105. The information entrusted to Fiserv includes highly sensitive personal and financial data. This is why federally insured credit unions are required to oversee their vendors to ensure that the credit union is meeting federal requirements and safeguarding its members' information. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems.

106. The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

107. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

108. Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of members' lives, including, for example, which members paid retainers to a divorce attorney, or which members received care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic.

109. Public reporting has recognized the hidden emotional toll of data breaches, a unique form of irreparable harm. While some victims report direct financial impacts, many more—50%—report emotional harm. Nearly one-third said a breach had affected their physical well-being, and nearly a quarter said their relationships were personally affected. Data breaches can expose diagnoses, medical procedures, and other highly sensitive personal information while leaving victims living with persistent anxiety: when will criminals use my data, and how? *See The Hidden Emotional Toll on Victims of Data Breaches*, The Wall Street Journal (Nov. 25, 2025), https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab. **Exhibit 11** is a true and correct copy of *The Wall Street Journal* article.

110. Criminals can also use MCCU's member information to fuel embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to MCCU:

> Businesses suffer most of the direct losses from . . . identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit . . . .
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend

> what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[13]

111. To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints—an average of 836,000 per year—related to various internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[14]

112. Stolen data can also be offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

113. Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

---

[13] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

[14] *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

114. In addition to member information that can be accessed, a hacked online banking account can be very valuable to cybercriminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

115. The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

116. Compounding this risk is the hacker practice known as "dwell," in which unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue their exploitation across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the hack going unnoticed until long after the initial breach, increasing the potential for further exploitation.

117. Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of a breach may not be immediately apparent. Indeed, in order to protect its member information, MCCU will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

***MCCU Delivers a Notice of Breach and Requests Information Pursuant to the Master Agreement: Fiserv Ignores Its Obligations***

118. Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely manner, MCCU sent Fiserv a Notice of Breach on May 19, 2026. A copy of the Notice of Breach is annexed hereto as **Exhibit 12**.

119. In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that Fiserv remedy those breaches, MCCU also exercised its right under the Master Agreement to request information concerning Fiserv's performance (or lack thereof). Specifically, MCCU's requests included:

a. Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

b. A summary of Fiserv's written information security plan for the services provided to MCCU within 30 days, as required by § 4(b) of the Master Agreement;

c. Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required by § 10(b) of the Master Agreement;

d. Copies of Fiserv's most recent security certifications for the service centers providing services to MCCU, as required by § 4(d) of the ASP Services Exhibit to the Master Agreement;

e. Copies of the independent audit reports of the Fiserv service centers providing services to MCCU, as required by § 4(h) of the ASP Services Exhibit to the Master Agreement;

f. Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 6(c) of the ASP Services Exhibit to the Master Agreement; and

g. Logs and forensic reports of logins to all web and application-based portals provided for or containing MCCU's information, including those identifying any specific MCCU members or employees whose accounts or information were placed at risk of compromise.

120. MCCU's Notice of Breach demanded that Fiserv agree, by 5:00 p.m. Eastern Time on May 26, 2026, to a consent injunction confirming that Fiserv would remediate the identified security problems, properly safeguard MCCU's information, cooperate with MCCU's investigation, and produce the requested records.

121. By letter dated May 26, 2026, Fiserv responded to the Notice of Breach through its outside counsel. A copy of Fiserv's response is annexed hereto as **Exhibit 13**.

122. Fiserv's response denied that Fiserv had breached any obligation under the Master Agreement and asserted that the security controls Fiserv provides to MCCU "comply with the Master Agreement and all laws and regulations applicable to Fiserv Solutions"—even though Fiserv admitted in the very same letter that it "has not completed its investigation of the security configurations in place for Marshall CCU with respect to each of the products identified" in the Notice of Breach. Fiserv cannot credibly certify the security and compliance of systems it concedes it has not finished investigating.

123. Far from refuting MCCU's security findings, Fiserv's response confirmed them:

a. Fiserv admitted that, for the Portico, Portico Reporting Analytics, and Loancierge systems, credit unions "can choose whether to authenticate through email delivery of one-time passcodes," confirming that an email passcode—a method that NIST SP 800-63B expressly prohibits for out-of-band authentication and that does not establish possession of a specific device—remains an authentication option Fiserv treats as acceptable for systems storing extraordinarily sensitive credit union and member information. Fiserv's response thus improperly attempts to shift to its credit union customers the burden of identifying and selecting compliant security settings that Fiserv was contractually obligated to provide in the first instance.

b. Fiserv admitted that possession-based, time-based one-time password ("TOTP") authentication became available only recently—for Portico in June 2025, for Portico Reporting Analytics in November 2025 (or December 2025; Fiserv's letter states both dates), and for Loancierge in February 2026—confirming that, for well over a decade of the parties' relationship, Fiserv stored and processed MCCU's confidential information on systems for which compliant, possession-based MFA was not even available.

c. Fiserv admitted that the multi-factor authentication feature on Client360 can be disabled by users through a "trust this browser" option, confirming that the control can be bypassed and does not provide consistent, compliant MFA for a system containing confidential information and security-affecting requests.

d. The authentication Fiserv describes for SecureNow—"delivery of OTPs"—is not the phishing-resistant, possession-based MFA required by federal standards and used by Fiserv to protect its own corporate data.

e. Fiserv asserted that "[t]here is no sensitive member or credit union information stored within Wisdom Accounting Suite," even though, upon information and belief, that system houses MCCU's general ledger, accounts payable, vendor, and account reconciliation information—confidential credit union financial information that the Master Agreement obligates Fiserv to protect.

f. Fiserv provided no security information at all for WireXchange—the system used in connection with wire transfers—conceding only that it "is reviewing the WireXchange configurations available to Marshall CCU" and would respond "in due course."

124. With respect to MCCU's requests for records, Fiserv's response referred MCCU to a previous August 28, 2025, summary of Fiserv's information security plan, while refusing to provide the invoice audit documentation required under Section 10(b) of the Master Agreement "unless and until Marshall CCU identifies the specific products and services for which it believes it was improperly invoiced and charged," arguing that a "blanket" request in the absence of a specified issue "is not a good faith request." MCCU's request for invoice audit documentation related to all of the Fiserv products and/or services used by MCCU was reasonable, and Fiserv was contractually obligated to fulfill MCCU's request under the Master Agreement.

125. To date, Fiserv has not provided the other records demanded in the Notice of Breach, including the logs and forensic reports of logins to the portals containing MCCU's information, the security certifications required by § 4(d) of the ASP Services Exhibit, the independent audit reports required by § 4(h) of the ASP Services Exhibit, and the Disaster Recovery Plan test results required by § 6(c) of the ASP Services Exhibit.

126. Fiserv also did not agree to the consent injunction or commit to remediate the identified security deficiencies. Instead, consistent with Fiserv's pattern of intimidating and attempting to silence customers and counsel who uncover its security problems, Fiserv's response accused MCCU's counsel of advancing "factually baseless claims" and threatened that pursuing MCCU's claims in litigation would be "inconsistent with [counsel's] obligations under Rule 11."

127. Fiserv's assertion that the Notice of Breach was "the first time" MCCU raised concerns regarding the security of Fiserv's products and services is also incorrect. As set forth in the Notice of Breach, MCCU previously identified problems with Fiserv's performance and submitted support tickets and other communications to Fiserv, which Fiserv has not addressed.

### *MCCU's Claims Are Timely, as Both the Statute of Limitations and the Contractual Limitations Period Have Been Tolled*

128. MCCU exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[15]

129. MCCU became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

130. MCCU previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

131. The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

132. Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading MCCU.

133. In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

134. Fiserv was actually aware of the material defects in its systems and of its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and actively concealed from MCCU the risks associated with the defects in its products and services and the fact that those defects caused damages and harm to MCCU.

135. Fiserv's purpose in concealing these facts was to induce MCCU to continue relying on its services and to delay MCCU's discovery of its claims. By concealing material information,

[15] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

Fiserv sought to avoid early detection of its misconduct and to prevent MCCU from initiating legal action within the applicable limitations period.

136. Fiserv committed tortious or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while failing to disclose known and foreseeable harms.

137. MCCU was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

138. Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing MCCU to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

139. For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

## FIRST CLAIM FOR RELIEF
**Breach of Contract: Monetary Damages**
**(Against Fiserv Solutions Only)**

140. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

141. The Master Agreement is a valid contract binding Fiserv Solutions.

142. In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice MCCU only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

143. MCCU has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

144. Fiserv Solutions has repeatedly and materially breached the Master Agreement, including by:

a. violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to avoid disclosure of MCCU's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

b. violating Section 4(a) of the Master Agreement by failing to implement and maintain an information security program that appropriately protects the security and confidentiality of MCCU's information, and by failing to take appropriate actions to address incidents of unauthorized access to MCCU's sensitive customer information, including by failing to properly notify MCCU of such incidents;

c. violating Sections 4(a), 4(b), and 10(b) of the Master Agreement, and Sections 4(d), 4(h), and 6(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to MCCU;

d. violating Section 6(a)(iii) of the Master Agreement, by failing to comply with all regulatory requirements;

e. violating Section 10(b) of the Master Agreement by refusing to provide MCCU with documentation supporting the amounts invoiced by Fiserv;

f. violating the services warranties in Section 4(e) of the ASP Services Exhibit to the Master Agreement, including the warranties of conformity to specifications and due care;

g. violating Section 6 of the Fiserv Privacy Notice, by failing to implement appropriate security measures to prevent unauthorized access, use, and disclosure of personal data;

h. repudiating its obligations, including by failing to provide adequate assurances of its performance in response to security incidents such as the Everest and Cl0p incursions; and

i. violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing MCCU to hacking and fraud risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

145. Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully inadequate and had led to significant fraud losses and hacking at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its

systems. Nor did Fiserv Solutions alert MCCU of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to MCCU's rights.[16]

146. Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that puts life savings and extraordinarily sensitive financial information of scores of consumers within the reach of hackers. By withholding basic safeguards from MCCU's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And MCCU is not alone: Fiserv's deficient approach to cybersecurity for its clients has also endangered countless other financial institutions and their customers. Fiserv's misconduct is actionable as an independent tort and is egregious, repeated, and directed at MCCU as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

147. As a direct and proximate result of Fiserv Solutions' contract breaches, MCCU has suffered and will continue to suffer damages and harm.

---

[16] New York law governs the Master Agreement. New York public policy bars parties from contracting away liability for gross negligence, even in business-to-business contracts signed by sophisticated parties. The limitation-of-liability clause in the Master Agreement therefore offers Fiserv no protection because its failure to fulfill its obligation to secure MCCU was, at a minimum, grossly negligent. In *Abacus Federal Savings Bank v. ADT Security Services, Inc.*, 967 N.E.2d 666, 670 (N.Y. 2012), New York's highest court held that a financial institution could recover full, uncapped damages from a security vendor whose gross negligence left the institution insecure. Fiserv's misconduct here is no less grave. The same principle applies, and the damages here are not subject to any contractual cap.

## SECOND CLAIM FOR RELIEF
**Rescission**[17]
**(Against Fiserv Solutions Only)**

148. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

149. MCCU may have the Master Agreement rescinded due to Fiserv's breaches. Fiserv's breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left MCCU in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

150. MCCU may have the Master Agreement rescinded because Fiserv misrepresented to MCCU the existence and nature of Fiserv's security controls. These representations were material to MCCU, and it reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations. The falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MCCU.

151. MCCU may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by MCCU have altered the essential nature of the Master Agreement, and MCCU has been unable to obtain its expected bargain from Fiserv.

152. MCCU has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

[17] As permitted by Fed. R. Civ. P. 8(a)(3), MCCU is demanding different types of relief, including in the alternative, on its claims.

## THIRD CLAIM FOR RELIEF
**Breach of Contract: Specific Performance**
**(Against Fiserv Solutions Only)**

153. MCCU repeats and re-alleges the allegations set forth in the foregoing paragraphs as if fully set forth here.

154. The Master Agreement is a valid contract binding Fiserv Solutions.

155. MCCU has performed or substantially performed its obligations under the Master Agreement, except for those, if any, that were waived or excused by Fiserv Solutions.

156. MCCU is ready, willing, and able to perform its remaining obligations until the contract terminates or is rescinded by an order of this Court.

157. Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to safeguard MCCU's confidential information.

158. Fiserv is capable of performing the Master Agreement, including by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

159. Fiserv Solutions has repudiated the Master Agreement, and absent relief will continue to breach the Master Agreement, by failing to provide adequate assurances of its performance, including in response to security incidents such as the Everest and Cl0p incursions.

160. The loss of confidentiality and risk of unauthorized access constitute irreparable harms not adequately compensable by money damages alone.

161. Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to perform its obligations to MCCU, including securing MCCU's confidential information as required by the Master Agreement.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Relief**
**(Against Fiserv Solutions Only)**

162. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

163. Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

164. **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy)**. MCCU is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent, intentional, fraudulent, tortious, or other conduct as to which an exculpatory or limitation-of-liability provision is against public policy.

165. **No Obligation to Pay Future Invoices**. MCCU disputes any obligation to pay any future invoices on the grounds that:

a. Fiserv's material breaches and repudiation excuse further performance by MCCU;

b. Fiserv's failure of consideration discharges MCCU's payment obligations;

c. Fiserv's prior material breach and repudiation bar enforcement of the Master Agreement's payment provisions; and

d. The Master Agreement is subject to rescission.

166. **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy)**. MCCU is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees, including those set forth in Sections 8(b),

8(c), 8(d), 10(b), and 10(c) of the ASP Services Exhibit to the Master Agreement, because of the following:

a. Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent performance, failure of consideration, commercial impracticability, and frustration of purpose.

b. The deconversion and other post-termination fees are not quantified in the Master Agreement—which instead refers only to Fiserv's unstated "then current" charges—and are therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

c. The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why MCCU may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce MCCU into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

## FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against Fiserv Solutions Only)**

167. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

168. Fiserv Solutions induced MCCU to pay it by issuing invoices. These invoices, delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

169. In reality, Fiserv Solutions had not performed as promised. Fiserv Solutions' invoices overstated the amounts MCCU owed, and Fiserv Solutions withheld material facts about the security deficiencies in its systems. Fiserv Solutions' systems were so insecure that they were not even minimally suitable for storing a regulated credit union's confidential information.

170. As a result of this misconduct, MCCU mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

171. Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require that Fiserv Solutions disgorge and make restitution of the amounts MCCU paid, with interest.

**SIXTH CLAIM FOR RELIEF**
**Defend Trade Secrets Act**
**(18 U.S.C. § 1836, *et seq.*)**

172. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

173. MCCU is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. MCCU's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

174. MCCU's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

175. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable through proper means by persons who could derive value from their disclosure or use.

176. MCCU has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement and Fiserv's Privacy Notice, and in accordance with the policies, procedures, and commitments announced by Fiserv.

177. MCCU has invested substantial resources in developing and protecting its trade secrets, including by maintaining policies and procedures applicable to all employees concerning the protection of such trade secrets, including MCCU's Confidentiality Policy, which requires its employees to sign confidentiality agreements and imposes restrictions on the use and storage of its trade secrets during and after an employee's term of employment.

178. MCCU's trade secrets provide it with economic advantages over its competitors. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by MCCU's competitors or others who could obtain economic value from their disclosure or use. For example, MCCU's compilation of confidential member financial information and detailed transactional history (which includes past loan payment history, savings account history, checking account overdraft history, and the regularity and amounts of deposits into savings accounts) allows MCCU to assess loan risk more accurately than competitors lacking that information and, in turn, to offer its members loans and savings products at highly competitive rates. MCCU's trade secrets thus provide it with a concrete competitive and economic advantage that would be lost if they were disclosed to or used by a competitor.

179. Fiserv knew or should have known that MCCU's information at issue constituted MCCU's trade secrets.

180. Fiserv misappropriated and continues to misappropriate MCCU's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to MCCU the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to MCCU, MCCU would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

181. At the time of Fiserv's use and disclosure of MCCU's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to MCCU to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

182. Fiserv's misappropriation of MCCU's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from MCCU.

183. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

184. Fiserv's misappropriation was willful and malicious, entitling MCCU to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

185. As a direct and proximate result of Fiserv's misappropriation of MCCU's trade secrets, MCCU has suffered and will continue to suffer damages and harm.

## SEVENTH CLAIM FOR RELIEF
**Fraud**

186. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

187. Fiserv fraudulently misrepresented its data security practices and knowingly concealed their profound deficiencies. Relying on these deceptive assurances, MCCU entrusted Fiserv with highly sensitive confidential information, a trust Fiserv intentionally violated.

188. As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect MCCU's confidential information.

189. As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement.

190. Likewise, statements in Fiserv's SOC Report were false and misleading when made. At the time Fiserv furnished the SOC Report to MCCU, Fiserv had not aligned its cybersecurity standards and practices with the representations in the SOC Report, including the NIST framework. Moreover, Fiserv does not comply with the NIST framework, including all associated updates.

191. Fiserv also fraudulently represented its "Enhanced Authentication" service to MCCU. As set forth above, "Enhanced Authentication" fails to provide MFA that meets baseline standards for authentication.

192. Statements in the *Fiserv Cybersecurity Fact Sheet 2026* further fraudulently represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for

MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

193. Moreover, Fiserv's failure to implement multi-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived MCCU about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded MCCU while placing thousands of MCCU's members at risk.

194. Even after being directly confronted about this fraud, Fiserv continues its deception. On May 19, 2026, counsel for MCCU sent a Notice of Breach to Fiserv explicitly identifying the failure to implement compliant multi-factor authentication despite receiving payment for such services. *See* **Exhibit 12**. Rather than implementing the promised security measures, Fiserv responded by disputing its breach—while admitting that it had not completed its own investigation of the security configurations in place for MCCU, admitting that prohibited email passcodes remain an authentication option on systems storing MCCU's confidential information, and threatening MCCU's counsel with Rule 11 sanctions for raising these security concerns. See **Exhibit 13**.

195. Fiserv's continued failure to provide multi-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold up its end of the bargain was intentional.

196. Further, independent of any specific misrepresentations made by Fiserv, MCCU reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate

measures to protect the confidentiality of MCCU's information, and MCCU is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to MCCU that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, their ability to safely store and process MCCU's information, and the security measures and services that have been provided to MCCU. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures; (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a security problem through litigation); and (d) Fiserv's failure to comply with its own policies, notices, and agreements. MCCU justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine MCCU's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by MCCU.

197. MCCU reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

198. Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to MCCU, and were made with the intent of misleading MCCU into relying upon them, and MCCU did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and

omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MCCU.

199. By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded MCCU, including fraudulently inducing MCCU to contract with, and continue to receive services from, Fiserv.

200. As a direct and proximate result of Fiserv's fraud, MCCU has suffered and will continue to suffer damages and harm.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Michigan Consumer Protection Act
### (Mich. Comp. Laws § 445.901, et seq.)

201. MCCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

202. The Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901, *et seq.*, prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1).

203. Fiserv was, at all relevant times, engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g), including by advertising, soliciting, offering for sale, selling, and providing services and property in Michigan. The services at issue—including the Corillian online banking platform, the mobile banking application, and the systems that store and process member account, transaction, and identity information—are services that Fiserv designed, marketed, and provided for the direct use and benefit of individual consumers: MCCU's members, who use those services primarily for personal, family, or household purposes, including managing their personal checking, savings, and loan accounts.

204. In the conduct of that trade or commerce, Fiserv engaged in unfair, unconscionable, and deceptive methods, acts, and practices prohibited by the MCPA, including, without limitation:

a. representing that its services have characteristics, uses, benefits, and qualities that they do not have—including representing that its systems are protected by multi-factor authentication and comply with NIST, FFIEC, and other federal standards—in violation of Mich. Comp. Laws § 445.903(1)(c);

b. representing that its services are of a particular standard, quality, or grade when they are of another, in violation of Mich. Comp. Laws § 445.903(1)(e);

c. failing to reveal material facts, the omission of which tends to mislead or deceive, and which facts could not reasonably be known by MCCU and its members—including the absence of compliant MFA and the known security defects in Fiserv's systems—in violation of Mich. Comp. Laws § 445.903(1)(s);

d. making representations of fact or statements of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws § 445.903(1)(bb); and

e. failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner—including Fiserv's affirmative representations in its Compliance Package, Cybersecurity Fact Sheet, Standard Information Gathering Questionnaire, SOC Report, and Privacy Notice—in violation of Mich. Comp. Laws § 445.903(1)(cc).

205. Fiserv's unfair, unconscionable, and deceptive acts and practices were material, were intended to and did induce reliance, and did in fact deceive MCCU, which relied on Fiserv's representations and omissions in entering into, continuing, and paying under the Master Agreement and in entrusting Fiserv with the confidential information of MCCU and its Michigan members.

206. As a direct and proximate result of Fiserv's violations of the MCPA, MCCU has suffered loss, including amounts paid for services that were not as represented, the costs of investigating and remediating Fiserv's security failures, and other actual damages.

207. Pursuant to Mich. Comp. Laws § 445.911, MCCU seeks a declaratory judgment that Fiserv's methods, acts, and practices violate the MCPA; an injunction prohibiting Fiserv from continuing those methods, acts, and practices; actual damages; and reasonable attorneys' fees.

## JURY TRIAL DEMAND

MCCU requests a trial by jury of all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, MCCU respectfully requests that the Court enter final judgment on the Complaint in favor of MCCU and against Fiserv and grant the following relief:

a. **Monetary damages**, including, without limitation, restitutionary, compensatory, consequential, incidental, reliance, statutory, and punitive damages—all in amounts to be determined at trial;

b. **Rescission of the Master Agreement**, unwinding the parties' relationship;

c. **Restitution and disgorgement**, restoring MCCU to the status quo ante, including, without limitation, recovery of amounts MCCU paid to Fiserv under the Master Agreement for services that were materially deficient, nonconforming, or rendered valueless by Fiserv's breaches and repudiation;

d. **Indemnification** of MCCU's losses;

e. **Declaratory relief** declaring the parties' respective rights and obligations in connection with the Master Agreement and declaring that Fiserv's methods, acts, and practices violate the Michigan Consumer Protection Act;

f. **Specific performance** compelling Fiserv to perform its obligations to MCCU, including properly safeguarding MCCU's confidential information;

g. **Preliminary and permanent injunctive relief** protecting MCCU against additional harm, including under Mich. Comp. Laws § 445.911(1);

h. **Costs of litigation**, including, without limitation, MCCU's attorneys' fees and costs under applicable law, including Mich. Comp. Laws § 445.911(2) and 18 U.S.C. § 1836(b)(3)(D), and the maximum pre-judgment and post-judgment interest allowed by law; and

i. **Any further relief** that may be necessary to achieve justice.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Charles J. Holzman*
Charles J. Nerko*
John C. Cleary*
Walter E. Swearingen*
**NERKO PLLC**
1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

David L. Hecht*
Lori G. Feldman*
Kristen L. Nelson*
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, NY 10017
888.421.4529
dhecht@hechtpartners.com
lfeldman@hechtpartners.com
knelson@hechtpartners.com

* Admission to the bar of this Court or admission *pro hac vice* to be filed

Charles J. Holzman
Michael Krempa
**HOLZMAN LAW, PLLC**
28366 Franklin Road
Southfield, MI 48034
248.352.4340
cholzman@holzmanlaw.com
mkrempa@holzmanlaw.com

*Attorneys for Plaintiff*
*Marshall Community Credit Union*

# EXHIBIT 1

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000

MARKETS

# Frustrated by the Tech Industry, Small Banks Start to Rebel

Community lenders say their tech providers aren't always helping them compete

*By Telis Demos* Follow *and Rachel Louise Ensign* Follow

*April 11, 2019 5:30 am ET*



Lead Bank, a Kansas City, Mo.-based community lender, is trying different ways to attract customers through technology. PHOTO: KATIE CURRID FOR THE WALL STREET JOURNAL

Lead Bank, a community lender in Kansas City, Mo., wanted to offer the payments app Zelle to its customers.

But it had a problem. A company called Fiserv Inc., which provides much of the bank's underlying technology, said Lead wouldn't be able to launch Zelle until June at the earliest. Big U.S. banks rolled out the service nearly two years ago.




Lead Bank has videoconferencing tablets and digital whiteboards for customers to use and an ATM that dispenses $1 bills. PHOTO: KATIE CURRID FOR THE WALL STREET JOURNAL

Fiserv and two competitors—Fidelity National Information Services Inc., FIS 0.26% ▲ known as FIS, and Jack Henry & Associates Inc.—are JKHY -0.28% ▼ little known outside the banking world, but their infrastructure now makes up much of the modern banking system's financial plumbing, especially for smaller banks. They provide the technology behind everything from keeping track of customer deposits to powering mobile apps. As the number of community banks has shrunk, the three companies

have grown, partly through acquisition of other tech providers, in both revenue and profit.

**Core Business**

Revenue for bank-technology providers is growing.

Fidelity National Information Services
Fiserv Jack Henry




Note: Calendar year revenue
Source: FactSet

These companies, known as "core providers," say they can affordably bring to small institutions big-bank technologies, including the newest tools such as open-data platforms and on-demand services.

But discontent is starting to simmer at the small banks that most depend on them. Smaller lenders and some industry groups say the service providers' onerous contracts and sometimes mediocre digital offerings have made it harder to keep up with big competitors. Executives at some small banks say they feel like they are becoming franchises of the core providers because they are so reliant on their technology. Firms are filing lawsuits, turning to financial-technology startups and trying to negotiate as a group for better contracts.



In an age of digital banking, having the right technology offerings can make the difference between gaining or losing a customer. PHOTO: KATIE CURRID FOR THE WALL STREET JOURNAL

"I've met with over 3,000 bank CEOs, and this came up time and again: the challenges and constraints they face with their core provider," said Rob Nichols, chief executive of the American Bankers Association, an industry group that represents large and small banks.

As far back as the 1960s, companies like these started selling systems that helped banks computerize paperwork. More recently, smaller banks have turned to these companies for websites, apps and other tasks.

In an age of digital banking, having the right technology offerings can make the difference between gaining or losing a customer, and large banks with flashy apps are increasingly popular. Midsize and local banks hold 13% of primary banking

relationships but capture only 7% of the customers who switch banks, according to consulting firm A.T. Kearney.

**Steady Growth**

Shares of bank-technology companies have risen alongside the popularity of mobile-payment systems.

**Share-price performance**




Source: SIX

The three biggest core providers today do business with 90% of U.S. banks with less than $1 billion in assets, according to financial-services research firm Celent.

They have become dominant through decades of consolidation, which has also broadened their focus beyond basic banking. FIS and Fiserv both said they would buy payments companies in two of the largest mergers and acquisitions transactions so far this year. Jack Henry is the smallest of the three companies by revenue and many of its clients are credit unions.

Some are trying to shake this up, including banks' main trade association. The ABA in January said it took the unusual step of investing directly in a startup called Finxact, which was founded by a veteran of the core-provider business. Among its features is that it is offered as a recurring subscription, rather than a multiyear contract.

**Local is Losing**

Share of industry assets, by bank asset size




Note: Data not adjusted for inflation
Source: FDIC

Another sticking point for smaller banks is the hefty fees embedded in the firms' long-term contracts.

Millington Bank, a New Jersey community lender, recently discovered that it would owe FIS more than $4 million if it sold itself, according to court documents. That is nearly an entire year of profits for the bank. The bank sued FIS. In March, the case was "stayed pending arbitration," according to a court filing.

Another community lender, Iowa Falls State Bank, sued Jack Henry in 2017, alleging the provider charged roughly $137,000—nearly 10% of the bank's annual profit—for access to the bank's own data as part of the bank's discussions with a new vendor, according to court filings. In the suit,

the bank described Jack Henry as "essentially holding [our] information for ransom." Jack Henry in a court filing denied the allegations, citing the bank's agreements with the firm. The lawsuit is ongoing.

"They're not building highways to the banks' data, they're building toll roads," said Aaron Silva, whose firm Paladin fs negotiates contracts with the companies on behalf of the banks. Mr. Silva has assembled dozens of banks into a coalition to negotiate as a group for better deals.

**Big Buys**

Two of the largest mergers and acquisitions this year were initiated by bank-technology companies.




Source: Dealogic

Core providers say long-term contracts can give small banks assurance that their providers will continue to support them. They also say fees reflect the level of investment into services and new products.

Virginia-based Union Bank and Trust recently built its own data warehouse that keeps a copy of all the information stored by its core processor FIS, the bank's Chief Information Officer Dean Brown said. That was difficult and expensive, but allowed the bank to develop its own tool for customers depositing checks from smartphones that has flexible limits.

"Once you've decided to join with a core, you're resigned to the fact that you're a fast follower," Mr. Brown said. Despite that, "we have a good relationship."

FIS said a bank's data ultimately belongs to the bank. The company recently launched a portal, called Code Connect, for banks to make their data available to other parties that can develop tools for banks.




Lead Bank, the Kansas City lender that is still waiting to offer Zelle, is trying different ways to attract customers through technology. For example, it is partnering with startup Self Lender Inc., which provides specialized loans to people with little credit history. It has also worked with Fiserv on adopting other digital tools.

Fiserv said it has updated its process to roll out Zelle to many banks at a

Lead Bank CEO Josh Rowland said community lenders 'are fighting a Walmart-sized battle' to keep up with big banks. PHOTO: KATIE CURRID FOR THE WALL STREET JOURNAL

time, and has hired more people to help support that effort across thousands of financial institutions.

Lead Bank's CEO Josh Rowland said community lenders "are fighting a Walmart-sized battle" to keep up with big banks.

"We're not going to wait around," Mr. Rowland said, "but it's harder than it feels like it should be."




The retail banking industry is undergoing another major shift, and the future looks high-tech, sophisticated, and, for big banks, very urban. So what has changed? Photo: Shaumbé Wright/The Wall Street Journal

Write to Telis Demos at telis.demos@wsj.com and Rachel Louise Ensign at rachel.ensign@wsj.com

*Appeared in the April 12, 2019, print edition as 'Tech Service Rankles Small Banks'.*

## Buy Side from WSJ

Buy Side is independent of The Wall Street Journal newsroom.



STUDENT LOANS

**Best Private Student Loans 2025: Top Lender Picks**



PERSONAL LOANS

**Best Debt Consolidation Loans**



MORTGAGES & HOME EQUITY LOANS

**Current Home Equity Loan Rates**



BANKING

**How to Choose the Best High-Yield Savings Account**



PET INSURANCE

Best Pet Insurance Companies of 2025



BEDROOM

The Best Linen Sheets for Cool and Comfortable Sleep

## Real Estate Insights

Content provided by realtor.com

Richard Gere Reveals Things He Misses Most About U.S. After Move to Spain

Socialite Candice Miller Reveals Glimpse Into Her Life in Miami After Husband Brandon's Suicide

EXCLUSIVE: Humble 'Fisherman's Shack' on Nantucket Sells for $2 Million Just Days After Listing

Natalie Portman Reveals Real Reason She Quit Los Angeles To Raise Her 2 Kids in France

Inside Homes of AI Guru Who Stole Taylor Swift's Self-Made Billionaire Title

Massachusetts' Most Expensive Home Is a $50 Million Apartment

# EXHIBIT 2

Master Agreement, as amended

Subject to Motion to Seal to be filed after conferring with Defendants' counsel

# EXHIBIT 3

Fiserv Cybersecurity Fact Sheet, 2026

Subject to Motion to Seal to be filed after conferring with Defendants' counsel

# EXHIBIT 4

Fiserv Standard Information Gathering (SIG) Questionnaire

Subject to Motion to Seal to be filed after conferring with Defendants' counsel

# EXHIBIT 5

SOC 1 Type 2 Report (SSAE 18) - Fiserv Enterprise Technology

Subject to Motion to Seal to be filed after conferring with Defendants' counsel

# EXHIBIT 6

# Implementing Phishing-Resistant MFA



October 2022

## OVERVIEW

This fact sheet is intended to provide for IT leaders and network defenders an improved understanding of current threats against accounts and systems that use multifactor authentication (MFA). MFA is a security control that requires a user to present a combination of two or more different authenticators (something you know, something you have, or something you are) to verify their identity for login. MFA makes it more difficult for cyber threat actors to gain access to networks and information systems if passwords or personal identification numbers (PINs) are compromised through phishing attacks or other means. With MFA enabled, if one factor, such as a password, becomes compromised, unauthorized users will be unable to access the account if they cannot also provide the second factor. This additional layer ultimately stops some of the common malicious cyber techniques, such as password spraying.

CISA has consistently urged organizations to implement MFA for all users and for all services, including email, file sharing, and financial account access. MFA is an essential practice to reduce the threat of cyber threat actors using compromised credentials to gain access to and conduct malicious activity on networks. However, not all forms of MFA are equally secure. Some forms are vulnerable to phishing, “push bombing” attacks, exploitation of Signaling System 7 (SS7) protocol vulnerabilities, and/or SIM Swap attacks. These attacks, if successful, may allow a threat actor to gain access to MFA authentication credentials or bypass MFA and access the MFA-protected systems.

This fact sheet provides an overview of threats against accounts and systems that use MFA and provides guidance on implementing phishing-resistant MFA, which is the most secure form of MFA. CISA strongly urges all organizations to implement phishing-resistant MFA as part of applying Zero Trust principles. **Note**: The Office of Management and Budget requires agencies to adopt phishing-resistant MFA methods. While any form of MFA is better than no MFA and will reduce an organization’s attack surface, phishing-resistant MFA is the gold standard and organizations should make migrating to it a high priority effort

## CYBER THREATS TO MFA

Cyber threat actors have used multiple methods to gain access to MFA credentials:

- **Phishing.** Phishing is a form of social engineering in which cyber threat actors use email or malicious websites to solicit information. For example, in a widely used phishing technique, a threat actor sends an email to a target that convinces the user to visit a threat actor-controlled website that mimics a company’s legitimate login portal. The user submits their username, password, as well as the 6-digit code from their mobile phone’s authenticator app.
- **Push bombing (also known as push fatigue).** Cyber threat actors bombard a user with push notifications until they press the “Accept” button, thereby granting threat actor access to the network.
- **Exploitation of SS7 protocol vulnerabilities.** Cyber threat actors exploit SS7 protocol vulnerabilities in communications infrastructure to obtain MFA codes sent via text message (SMS) or voice to a phone.
- **SIM Swap.** SIM Swap is a form of social engineering in which cyber threat actors convince cellular carriers to transfer control of the user’s phone number to a threat actor-controlled SIM card, which allows the threat actor to gain control over the user’s phone

## RECOMMENDED IMPLEMENTATIONS

Table 1 lists forms of MFA from strongest to weakest based on their susceptibility to the above cyber threats:

*Table 1: MFA Forms, Strongest to Weakest*

| Authentication Form | Overview | Threat |
|---|---|---|
| **Phishing-resistant MFA:**<br>• **FIDO/ WebAuthn authentication**<br>• **Public key infrastructure (PKI)-based** | Phishing-resistant MFA is the gold standard for MFA. See the [Phishing-Resistant MFA Implementations]() section for more information.<br>CISA strongly urges system administrators and other high-value targets to implement or plan their migration to phishing-resistant MFA. | Resistant to phishing.<br>Push bombing, SS7, and SIM swap attacks are not applicable. |
| **App-based authentication:**<br>• **One-time password (OTP)**<br>• **Mobile push notification with number matching**<br>• **Token-based OTP** | App-based authenticators verify a user's identity either by generating OTP codes or by sending "push" pop-up notifications to the mobile application.<br>In mobile push notification, the user accepts a "push" prompt sent to the mobile application to approve an access request. When numbers matching is implemented, there is an additional step between receiving and accepting the prompt: the user is required to enter numbers from the identity platform into the application to approve the authentication request. See CISA fact sheet [Implement Number Matching in MFA Applications]() for more information.<br>Token-based authenticators verify a user's identity by generating OTP codes that the user enters to prove possession of the token.<br>Authentication via app- or token-based OTP or mobile push with number matching are the best options for small- and medium-size business that cannot immediately implement phishing-resistant MFA. | Vulnerable to phishing attacks.<br>Resistant to push bombing.<br>SS7, and SIM swap attacks are not applicable |
| **App-based authentication:**<br>• **Mobile application push notification without number matching** | In standard mobile app push notification without number matching, the user opens and accepts a "push" prompt sent to the mobile application to approve an access request. There is no additional step between receiving and accepting the prompt. | Vulnerable to push bombing attacks as well as user error.<br>SS7 and SIM swap attacks are not applicable. |
| **SMS or Voice** | SMS or voice MFA works by sending a code to the user's phone or email. The user then retrieves this second factor code from their text or email inbox to use for login authentication.<br>This form of MFA should only be used as a last resort MFA option. However, it can serve as a | Vulnerable to phishing, SS7, and SIM swap attacks. |

| | | |
|---|---|---|
| | temporary solution while organizations transition to a stronger MFA implementation. | |

As part of long- and intermediate-term plans to apply Zero Trust principles, CISA encourages all organizations to implement phishing-resistant MFA. CISA recognizes that some applications or use cases may not allow for immediate implementation of phishing-resistant MFA. Organizations that have existing MFA systems that are not phishing-resistant should employ additional prevention and detection controls, such as number matching, as outlined in CISA fact sheet Implement Number Matching in MFA Applications.

CISA recommends that organizations identify systems that do not support MFA and develop a plan to either upgrade so these systems support MFA or migrate to new systems that support MFA. MFA support to business applications can often be added through integration with enterprise identity and single sign-on (SSO) systems. If this is not directly possible, there is technology available to integrate a wide variety of legacy system types with modern MFA and SSO. CISA recommends escalating any risks of any system that does not support MFA to the organization's senior leadership team.

## PHISHING-RESISTANT MFA IMPLEMENTATIONS

### FIDO/WebAuthn Authentication

The only widely available phishing-resistant authentication is FIDO/WebAuthn authentication. The FIDO Alliance originally developed the WebAuthn protocol as part of FIDO2 standards and is now published by the World Wide Web Consortium (W3C). WebAuthn support is included in major browsers, operating systems, and smart phones. WebAuthn works with the related FIDO2 standard to provide a phishing-resistant authenticator. WebAuthn authenticators can either be:

- Separate physical tokens (called "roaming" authenticators) connected to a device via USB or near-field comms (NFC), or.
- Embedded into laptops or mobile devices as "platform" authenticators.

In addition to being "something that you have," FIDO authentication can incorporate various other types of factors, such as biometrics or PIN codes. FIDO2-compliant tokens are available from a variety of vendors.

### PKI-based MFA

A less widely available form of phishing-resistant MFA is tied to an enterprise's PKI. PKI-based MFA comes in a variety of forms; a well-known form of PKI-based MFA is the smart cards that government agencies use to authenticate users to their computers. PKI-based MFA provides strong security and is sensible for large and complex organizations.

However, successfully deploying PKI-based MFA requires highly mature identity management practices. It is also not as widely supported by commonly used services and infrastructure, especially in the absence of SSO technologies. In most PKI-based MFA deployments, a user's credentials are contained in a security chip on a smart card, and the card must be directly connected to a device for the user to log into the system (with the correct password or PIN). The U.S. government's personal identity verification (PIV) card and common access card (CAC) are examples of PKI-based MFA.

## AREAS OF FOCUS FOR IMPLEMENTING PHISHING-RESISTANT MFA

### Prioritizing Implementation Phases

CISA recommends an organization's IT leadership consider the following questions to help prioritize the migration to phishing-resistant MFA into logical phases:

- **What resources do I want to protect from compromise?** For example, cyber threat actors often target email systems, file servers, and remote access systems to gain access to an organization's data. They also try to compromise identity servers like Active Directory, which would allow them to create new accounts or take control of user accounts.
- **Which users are high-value targets?** While the compromise of any user account can create a serious security incident, every organization has a small number of user accounts that have additional access or privileges, which are especially valuable to cyber threat actors. For example, if a cyber threat actor can compromise the account of a system administrator, they may be able to access any system and any data in the organization. Other examples of high-value targets are attorneys—who may have e-discovery permissions to read email, including deleted email, of staff members—or HR staff, who may have access to personnel records.

### Common Issues and Paths Forward

When starting their deployment of phishing-resistant MFA, organizations run into common stumbling blocks. Common issues and possible paths forward include:

- **Some systems may not support phishing-resistant MFA.** Perhaps the product is no longer supported by the vendor, or the vendor has not yet prioritized the work to implement phishing-resistant MFA. Regardless, CISA encourages organizations to first focus on the services that do support phishing-resistant MFA, e.g., most hosted mail and SSO systems support FIDO; these systems are good starting points because the data is valuable, and the vendors likely support FIDO.
- **It may be difficult to deploy phishing-resistant MFA to all staff members at once.** For example, it may be impractical to train, enroll, and support all users at the same time or there may be other operational considerations that prevent the organization from rolling out phishing-resistant MFA to some groups in the first phase. Consider which groups might be appropriate for an initial phase, e.g., help desk and IT system administrators. Later phases can expand from there, incorporating lessons learned from the earlier phases.
- **There may be concerns that users will resist a migration to phishing-resistant MFA.** IT security leadership should present the risks associated with not having MFA—or with deploying or maintaining potentially vulnerable MFA—to the organization's top leadership for approval. Should the organization's senior leadership decide that the risk of not using phishing-resistant MFA is too great, they are best positioned to manage cultural and communications challenges to implementation.

## RESOURCES

- For more information on MFA, see CISA's MFA webpage, CISA's MFA factsheet, and CISA's Capacity Enhancement Guide: Implementing Strong Authentication.
- See the FIDO Alliance's User Authentication Specifications for information on FIDO2 authentication specifications: FIDO Universal Second Factor (FIDO U2F), FIDO Universal Authentication Framework (FIDO UAF), and the Client to Authenticator Protocols (CTAP).

## DISCLAIMER

The United States Government through CISA of the Department of Homeland Security (DHS) does not endorse any commercial product or service. Any reference to specific commercial products, processes, or services by service mark, trademark, manufacturer, or otherwise is provided for informational purposes and does not constitute or imply their endorsement, recommendation, or favoring by CISA or DHS.

# EXHIBIT 7

# Withdrawn NIST Technical Series Publication

**Warning Notice**

The attached publication has been withdrawn (archived), and is provided solely for historical purposes. It may have been superseded by another publication (indicated below).

| **Withdrawn Publication** | |
|---|---|
| **Series/Number** | NIST Special Publication 800-63B |
| **Title** | Digital Identity Guidelines: Authentication and Lifecycle Management |
| **Publication Date(s)** | June 2017 (includes updates as of 03-02-2020) |
| **Withdrawal Date** | August 1, 2025 |
| **Withdrawal Note** | NIST SP 800-63B is withdrawn and superseded in its entirety by NIST SP 800-63B-4. |

**Superseding Publication(s)** *(if applicable)*

The attached publication has been **superseded by** the following publication(s):

| | |
|---|---|
| **Series/Number** | NIST SP 800-63B-4 |
| **Title** | Digital Identity Guidelines: Authentication and Authenticator Management |
| **Author(s)** | David Temoshok, et al. |
| **Publication Date(s)** | July 2025 |
| **URL/DOI** | https://doi.org/10.6028/NIST.SP.800-63B-4 |

**Additional Information** *(if applicable)*

| | |
|---|---|
| **Contact** | Applied Cybersecurity Division (Information Technology Laboratory) |
| **Latest revision of the attached publication** | |
| **Related Information** | https://csrc.nist.gov/pubs/sp/800/63/b/4/final<br>https://www.nist.gov/identity-access-management/nist-special-publication-800-63-digital-identity-guidelines |
| **Withdrawal Announcement Link** | |

Date updated: July 24, 2025

NIST NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY U.S. DEPARTMENT OF COMMERCE

NIST Special Publication 800-63B

# Digital Identity Guidelines

*Authentication and Lifecycle Management*

Paul A. Grassi
James L. Fenton
Elaine M. Newton
Ray A. Perlner
Andrew R. Regenscheid
William E. Burr
Justin P. Richer

**Privacy Authors:**
Naomi B. Lefkovitz
Jamie M. Danker

**Usability Authors:**
Yee-Yin Choong
Kristen K. Greene
Mary F. Theofanos

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-63b

National Institute of Standards and Technology
U.S. Department of Commerce

# NIST Special Publication 800-63B

# Digital Identity Guidelines

*Authentication and Lifecycle Management*

Paul A. Grassi
Elaine M. Newton
*Applied Cybersecurity Division*
*Information Technology Laboratory*

Ray A. Perlner
Andrew R. Regenscheid
*Computer Security Division*
*Information Technology Laboratory*

James L. Fenton
*Altmode Networks*
*Los Altos, Calif.*

William E. Burr
*Dakota Consulting, Inc.*
*Silver Spring, Md.*

Justin P. Richer
*Bespoke Engineering*
*Billerica, Mass.*

**Privacy Authors:**
Naomi B. Lefkovitz
*Applied Cybersecurity Division*
*Information Technology Laboratory*

Jamie M. Danker
*National Protection and Programs Directorate*
*Department of Homeland Security*

**Usability Authors:**
Yee-Yin Choong
Kristen K. Greene
*Information Access Division*
*Information Technology Laboratory*

Mary F. Theofanos
*Office of Data and Informatics*
*Material Measurement Laboratory*

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-63b

June 2017
INCLUDES UPDATES AS OF 03-02-2020; PAGE VIII

U.S. Department of Commerce
*Wilbur L. Ross, Jr., Secretary*

National Institute of Standards and Technology
*Kent Rochford, Acting NIST Director and Under Secretary of Commerce for Standards and Technology*

## Authority

This publication has been developed by NIST in accordance with its statutory responsibilities under the Federal Information Security Modernization Act (FISMA) of 2014, 44 U.S.C. § 3551 et seq., Public Law (P.L.) 113-283. NIST is responsible for developing information security standards and guidelines, including minimum requirements for federal systems, but such standards and guidelines shall not apply to national security systems without the express approval of appropriate federal officials exercising policy authority over such systems. This guideline is consistent with the requirements of the Office of Management and Budget (OMB) Circular A-130.

Nothing in this publication should be taken to contradict the standards and guidelines made mandatory and binding on federal agencies by the Secretary of Commerce under statutory authority. Nor should these guidelines be interpreted as altering or superseding the existing authorities of the Secretary of Commerce, Director of the OMB, or any other federal official. This publication may be used by nongovernmental organizations on a voluntary basis and is not subject to copyright in the United States. Attribution would, however, be appreciated by NIST.

National Institute of Standards and Technology Special Publication 800-63B
Natl. Inst. Stand. Technol. Spec. Publ. 800-63B, 79 pages (June 2017)
CODEN: NSPUE2

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-63b

Certain commercial entities, equipment, or materials may be identified in this document in order to describe an experimental procedure or concept adequately. Such identification is not intended to imply recommendation or endorsement by NIST, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.

There may be references in this publication to other publications currently under development by NIST in accordance with its assigned statutory responsibilities. The information in this publication, including concepts and methodologies, may be used by federal agencies even before the completion of such companion publications. Thus, until each publication is completed, current requirements, guidelines, and procedures, where they exist, remain operative. For planning and transition purposes, federal agencies may wish to closely follow the development of these new publications by NIST.

Organizations are encouraged to review all draft publications during public comment periods and provide feedback to NIST. Many NIST cybersecurity publications, other than the ones noted above, are available at http://csrc.nist.gov/publications.

**Comments on this publication may be submitted to:**

National Institute of Standards and Technology
Attn: Applied Cybersecurity Division, Information Technology Laboratory
100 Bureau Drive (Mail Stop 2000) Gaithersburg, MD 20899-2000
Email: dig-comments@nist.gov

All comments are subject to release under the Freedom of Information Act (FOIA).

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## Reports on Computer Systems Technology

The Information Technology Laboratory (ITL) at the National Institute of Standards and Technology (NIST) promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of concept implementations, and technical analyses to advance the development and productive use of information technology. ITL's responsibilities include the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security and privacy of other than national security-related information in federal information systems. The Special Publication 800-series reports on ITL's research, guidelines, and outreach efforts in information system security, and its collaborative activities with industry, government, and academic organizations.

## Abstract

These guidelines provide technical requirements for federal agencies implementing digital identity services and are not intended to constrain the development or use of standards outside of this purpose. These guidelines focus on the authentication of subjects interacting with government systems over open networks, establishing that a given claimant is a subscriber who has been previously authenticated. The result of the authentication process may be used locally by the system performing the authentication or may be asserted elsewhere in a federated identity system. This document defines technical requirements for each of the three authenticator assurance levels. This publication supersedes corresponding sections of NIST Special Publication (SP) 800-63-2.

## Keywords

authentication; credential service provider; digital authentication; digital credentials; electronic authentication; electronic credentials, federation.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## Acknowledgments

The authors gratefully acknowledge Kaitlin Boeckl for her artistic graphics contributions to all volumes in the SP 800-63 suite and the contributions of our many reviewers, including Joni Brennan from the Digital ID & Authentication Council of Canada (DIACC), Kat Megas, Ellen Nadeau, and Ben Piccarreta from NIST, and Ryan Galluzzo and Danna Gabel O'Rourke from Deloitte & Touche LLP.

The authors would also like to acknowledge the thought leadership and innovation of the original authors: Donna F. Dodson, W. Timothy Polk, Sarbari Gupta, and Emad A. Nabbus. Without their tireless efforts, we would not have had the incredible baseline from which to evolve 800-63 to the document it is today. In addition, special thanks to the Federal Privacy Council's Digital Authentication Task Force for the contributions to the development of privacy requirements and considerations.

## Requirements Notation and Conventions

The terms "SHALL" and "SHALL NOT" indicate requirements to be followed strictly in order to conform to the publication and from which no deviation is permitted.

The terms "SHOULD" and "SHOULD NOT" indicate that among several possibilities one is recommended as particularly suitable, without mentioning or excluding others, or that a certain course of action is preferred but not necessarily required, or that (in the negative form) a certain possibility or course of action is discouraged but not prohibited.

The terms "MAY" and "NEED NOT" indicate a course of action permissible within the limits of the publication.

The terms "CAN" and "CANNOT" indicate a possibility or capability, whether material, physical or causal or, in the negative, the absence of that possibility or capability.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## Table of Contents

**1 Purpose** ..... **1**
**2 Introduction** ..... **2**
**3 Definitions and Abbreviations** ..... **4**
**4 Authenticator Assurance Levels** ..... **5**
4.1 Authenticator Assurance Level 1 ..... 5
4.1.1 Permitted Authenticator Types ..... 5
4.1.2 Authenticator and Verifier Requirements ..... 6
4.1.3 Reauthentication ..... 6
4.1.4 Security Controls ..... 6
4.1.5 Records Retention Policy ..... 6
4.2 Authenticator Assurance Level 2 ..... 6
4.2.1 Permitted Authenticator Types ..... 7
4.2.2 Authenticator and Verifier Requirements ..... 7
4.2.3 Reauthentication ..... 8
4.2.4 Security Controls ..... 8
4.2.5 Records Retention Policy ..... 8
4.3 Authenticator Assurance Level 3 ..... 8
4.3.1 Permitted Authenticator Types ..... 9
4.3.2 Authenticator and Verifier Requirements ..... 9
4.3.3 Reauthentication ..... 10
4.3.4 Security Controls ..... 10
4.3.5 Records Retention Policy ..... 10
4.4 Privacy Requirements ..... 10
4.5 Summary of Requirements ..... 11
**5 Authenticator and Verifier Requirements** ..... **13**
5.1 Requirements by Authenticator Type ..... 13
5.1.1 Memorized Secrets ..... 13
5.1.2 Look-Up Secrets ..... 15
5.1.3 Out-of-Band Devices ..... 16
5.1.4 Single-Factor OTP Device ..... 19
5.1.5 Multi-Factor OTP Devices ..... 20
5.1.6 Single-Factor Cryptographic Software ..... 22

5.1.7 Single-Factor Cryptographic Devices ........ 22
5.1.8 Multi-Factor Cryptographic Software ........ 23
5.1.9 Multi-Factor Cryptographic Devices ........ 24
5.2 General Authenticator Requirements ........ 25
5.2.1 Physical Authenticators ........ 25
5.2.2 Rate Limiting (Throttling) ........ 25
5.2.3 Use of Biometrics ........ 26
5.2.4 Attestation ........ 28
5.2.5 Verifier Impersonation Resistance ........ 28
5.2.6 Verifier-CSP Communications ........ 29
5.2.7 Verifier-Compromise Resistance ........ 29
5.2.8 Replay Resistance ........ 30
5.2.9 Authentication Intent ........ 30
5.2.10 Restricted Authenticators ........ 30
**6 Authenticator Lifecycle Management ........ 32**
6.1 Authenticator Binding ........ 32
6.1.1 Binding at Enrollment ........ 33
6.1.2 Post-Enrollment Binding ........ 34
6.1.3 Binding to a Subscriber-provided Authenticator ........ 35
6.1.4 Renewal ........ 35
6.2 Loss, Theft, Damage, and Unauthorized Duplication ........ 35
6.3 Expiration ........ 36
6.4 Revocation and Termination ........ 36
**7 Session Management ........ 37**
7.1 Session Bindings ........ 37
7.1.1 Browser Cookies ........ 38
7.1.2 Access Tokens ........ 38
7.1.3 Device Identification ........ 38
7.2 Reauthentication ........ 39
7.2.1 Reauthentication from a Federation or Assertion ........ 39
**8 Threats and Security Considerations ........ 41**
8.1 Authenticator Threats ........ 41
8.2 Threat Mitigation Strategies ........ 45

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

8.3 Authenticator Recovery .... 47
8.4 Session Attacks .... 47
**9 Privacy Considerations .... 48**
9.1 Privacy Risk Assessment .... 48
9.2 Privacy Controls .... 48
Processing Limitation .... 48
9.3 48
9.4 Agency-Specific Privacy Compliance .... 49
**10 Usability Considerations .... 50**
10.1 Usability Considerations Common to Authenticators .... 51
10.2 Usability Considerations by Authenticator Type .... 53
10.2.1 Memorized Secrets .... 53
10.2.2 Look-Up Secrets .... 54
10.2.3 Out-of-Band .... 54
10.2.4 Single-Factor OTP Device .... 54
10.2.5 Multi-Factor OTP Device .... 55
10.2.6 Single-Factor Cryptographic Software .... 56
10.2.7 Single-Factor Cryptographic Device .... 56
10.2.8 Multi-Factor Cryptographic Software .... 56
10.2.9 Multi-Factor Cryptographic Device .... 57
10.3 Summary of Usability Considerations .... 57
10.4 Biometrics Usability Considerations .... 59
**11 References .... 62**
11.1 General References .... 62
11.2 Standards .... 63
11.3 NIST Special Publications .... 64
11.4 Federal Information Processing Standards .... 65

## List of Appendices

**Appendix A— Strength of Memorized Secrets .... 67**
A.1 Introduction .... 67
A.2 Length .... 67
A.3 Complexity .... 68

A.4 Randomly-Chosen Secrets .... 69
A.5 Summary .... 69

## List of Tables

Table 2-1 Normative and Informative Sections of SP 800-63B .... 3
Table 4-1 AAL Summary of Requirements .... 11
Table 8-1 Authenticator Threats .... 41
Table 8-2 Mitigating Authenticator Threats .... 45

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## Errata

This table contains changes that have been incorporated into Special Publication 800-63B. Errata updates can include corrections, clarifications, or other minor changes in the publication that are either editorial or substantive in nature.

| Date | Type | Change | Location |
|---|---|---|---|
| **2017-12-01** | Editorial | Updated AAL descriptions for consistency with other text in document | Introduction |
| | Editorial | Deleted "cryptographic" to consistently reflect authenticator options at AAL3 | §4.3 |
| | Substantive | Refined the requirements about processing of attributes | §4.4 |
| | Editorial | Make language regarding activation factors for multifactor authenticators consistent | §5.1.5.1, 5.1.8.1, and 5.1.9.1 |
| | Substantive | Recognize use of hardware TPM as hardware crypto authenticator | §5.1.7.1, 5.1.9.1 |
| | Editorial | Improve normative language on authenticated protected channels for biometrics | §5.2.3 |
| | Editorial | Changed "transaction" to "binding transaction" to emphasize that requirement doesn't apply to authentication transactions | §6.1.1 |
| | Editorial | Replaced out-of-context note at end of section 7.2 | §7.2 |
| | Editorial | Changed IdP to CSP to match terminology used elsewhere in this document | Table 8-1 |
| | Editorial | Corrected capitalization of Side Channel Attack | Table 8-2 |
| | Substantive | Changed the title to processing limitation; clarified the language, incorporated privacy objectives language, and specified that consent is explicit | §9.3 |
| | Editorial | Added NISTIR 8062 as a reference | §11.1 |
| | Editorial | Corrected title of SP 800-63C | §11.3 |
| 2020-03-02 | Substantive | Clarified wording of verifier impersonation resistance requirement | §4.3.2 |
| | Editorial | Emphasized use of key unlocked by additional factor to sign nonce | §5.1.9.1 |
| | Editorial | Provided examples of risk-based behavior observations | §5.2.2 |
| | Editorial | Removed redundant phrase and added missing conjunction | §5.2.3 |
| | Editorial | Updated URL for reference [Blacklists] | §11.1 |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 1 Purpose

*This section is informative.*

This document and its companion documents, Special Publication (SP) 800-63, SP 800-63A, and SP 800-63C, provide technical guidelines to agencies for the implementation of digital authentication.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 2 Introduction

*This section is informative.*

Digital identity is the unique representation of a subject engaged in an online transaction. A digital identity is always unique in the context of a digital service, but does not necessarily need to be traceable back to a specific real-life subject. In other words, accessing a digital service may not mean that the underlying subject's real-life representation is known. Identity proofing establishes that a subject is actually who they claim to be. Digital authentication is the process of determining the validity of one or more authenticators used to claim a digital identity. Authentication establishes that a subject attempting to access a digital service is in control of the technologies used to authenticate. For services in which return visits are applicable, successfully authenticating provides reasonable risk-based assurances that the subject accessing the service today is the same as the one who accessed the service previously. Digital identity presents a technical challenge because it often involves the proofing of individuals over an open network and always involves the authentication of individuals over an open network. This presents multiple opportunities for impersonation and other attacks which can lead to fraudulent claims of a subject's digital identity.

The ongoing authentication of subscribers is central to the process of associating a subscriber with their online activity. Subscriber authentication is performed by verifying that the claimant controls one or more *authenticators* (called *tokens* in earlier versions of SP 800-63) associated with a given subscriber. A successful authentication results in the assertion of an identifier, either pseudonymous or non-pseudonymous, and optionally other identity information, to the relying party (RP).

This document provides recommendations on types of authentication processes, including choices of authenticators, that may be used at various *Authenticator Assurance Levels* (AALs). It also provides recommendations on the lifecycle of authenticators, including revocation in the event of loss or theft.

This technical guideline applies to digital authentication of subjects to systems over a network. It does not address the authentication of a person for physical access (e.g., to a building), though some credentials used for digital access may also be used for physical access authentication. This technical guideline also requires that federal systems and service providers participating in authentication protocols be authenticated to subscribers.

The strength of an authentication transaction is characterized by an ordinal measurement known as the AAL. Stronger authentication (a higher AAL) requires malicious actors to have better capabilities and expend greater resources in order to successfully subvert the authentication process. Authentication at higher AALs can effectively reduce the risk of attacks. A high-level summary of the technical requirements for each of the AALs is provided below; see Sections 4 and 5 of this document for specific normative requirements.

**Authenticator Assurance Level 1**: AAL1 provides some assurance that the claimant controls an authenticator bound to the subscriber's account. AAL1 requires either single-factor or multi-factor authentication using a wide range of available authentication technologies. Successful

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

authentication requires that the claimant prove possession and control of the authenticator through a secure authentication protocol.

**Authenticator Assurance Level 2**: AAL2 provides high confidence that the claimant controls authenticator(s) bound to the subscriber's account. Proof of possession and control of two different authentication factors is required through secure authentication protocol(s). Approved cryptographic techniques are required at AAL2 and above.

**Authenticator Assurance Level 3**: AAL3 provides very high confidence that the claimant controls authenticator(s) bound to the subscriber's account. Authentication at AAL3 is based on proof of possession of a key through a cryptographic protocol. AAL3 authentication requires a hardware-based authenticator and an authenticator that provides verifier impersonation resistance; the same device may fulfill both these requirements. In order to authenticate at AAL3, claimants are required to prove possession and control of two distinct authentication factors through secure authentication protocol(s). Approved cryptographic techniques are required.

The following table states which sections of the document are normative and which are informative:

**Table 2-1 Normative and Informative Sections of SP 800-63B**

| Section Name | Normative/Informative |
|---|---|
| 1. Purpose | Informative |
| 2. Introduction | Informative |
| 3. Definitions and Abbreviations | Informative |
| 4. Authenticator Assurance Levels | Normative |
| 5. Authenticator and Verifier Requirements | Normative |
| 6. Authenticator Lifecycle Management | Normative |
| 7. Session Management | Normative |
| 8. Threat and Security Considerations | Informative |
| 9. Privacy Considerations | Informative |
| 10. Usability Considerations | Informative |
| 11. References | Informative |
| Appendix A — Strength of Memorized Secrets | Informative |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 3 Definitions and Abbreviations

See SP 800-63, Appendix A for a complete set of definitions and abbreviations.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 4 Authenticator Assurance Levels

*This section contains both normative and informative material.*

To satisfy the requirements of a given AAL, a claimant SHALL be authenticated with at least a given level of strength to be recognized as a subscriber. The result of an authentication process is an identifier that SHALL be used each time that subscriber authenticates to that RP. The identifier MAY be pseudonymous. Subscriber identifiers SHOULD NOT be reused for a different subject but SHOULD be reused when a previously-enrolled subject is re-enrolled by the CSP. Other attributes that identify the subscriber as a unique subject MAY also be provided.

Detailed normative requirements for authenticators and verifiers at each AAL are provided in Section 5.

See SP 800-63 Section 6.2 for details on how to choose the most appropriate AAL.

FIPS 140 requirements are satisfied by FIPS 140-2 or newer revisions.

At IAL1, it is possible that attributes are collected and made available by the digital identity service. Any PII or other personal information — whether self-asserted or validated — requires multi-factor authentication. Therefore, agencies SHALL select a minimum of AAL2 when self-asserted PII or other personal information is made available online.

## 4.1 Authenticator Assurance Level 1

*This section is normative.*

AAL1 provides some assurance that the claimant controls an authenticator bound to the subscriber's account. AAL1 requires either single-factor or multi-factor authentication using a wide range of available authentication technologies. Successful authentication requires that the claimant prove possession and control of the authenticator through a secure authentication protocol.

### 4.1.1 Permitted Authenticator Types

AAL1 authentication SHALL occur by the use of any of the following authenticator types, which are defined in Section 5:

- Memorized Secret (Section 5.1.1)
- Look-Up Secret (Section 5.1.2)
- Out-of-Band Devices (Section 5.1.3)
- Single-Factor One-Time Password (OTP) Device (Section 5.1.4)
- Multi-Factor OTP Device (Section 5.1.5)
- Single-Factor Cryptographic Software (Section 5.1.6)
- Single-Factor Cryptographic Device (Section 5.1.7)
- Multi-Factor Cryptographic Software (Section 5.1.8)
- Multi-Factor Cryptographic Device (Section 5.1.9)

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

### 4.1.2 Authenticator and Verifier Requirements

Cryptographic authenticators used at AAL1 SHALL use approved cryptography. Software-based authenticators that operate within the context of an operating system MAY, where applicable, attempt to detect compromise (e.g., by malware) of the user endpoint in which they are running and SHOULD NOT complete the operation when such a compromise is detected.

Communication between the claimant and verifier (using the primary channel in the case of an out-of-band authenticator) SHALL be via an authenticated protected channel to provide confidentiality of the authenticator output and resistance to man-in-the-middle (MitM) attacks.

Verifiers operated by government agencies at AAL1 SHALL be validated to meet the requirements of FIPS 140 Level 1.

### 4.1.3 Reauthentication

Periodic reauthentication of subscriber sessions SHALL be performed as described in Section 7.2. At AAL1, reauthentication of the subscriber SHOULD be repeated at least once per 30 days during an extended usage session, regardless of user activity. The session SHOULD be terminated (i.e., logged out) when this time limit is reached.

### 4.1.4 Security Controls

The CSP SHALL employ appropriately-tailored security controls from the *low* baseline of security controls defined in SP 800-53 or equivalent federal (e.g., FEDRAMP) or industry standard. The CSP SHALL ensure that the minimum assurance-related controls for *low-impact* systems, or equivalent, are satisfied.

### 4.1.5 Records Retention Policy

The CSP shall comply with its respective records retention policies in accordance with applicable laws, regulations, and policies, including any National Archives and Records Administration (NARA) records retention schedules that may apply. If the CSP opts to retain records in the absence of any mandatory requirements, the CSP SHALL conduct a risk management process, including assessments of privacy and security risks, to determine how long records should be retained and SHALL inform the subscriber of that retention policy.

## 4.2 Authenticator Assurance Level 2

*This section is normative.*

AAL2 provides high confidence that the claimant controls authenticator(s) bound to the subscriber's account. Proof of possession and control of two distinct authentication factors is required through secure authentication protocol(s). Approved cryptographic techniques are required at AAL2 and above.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

### 4.2.1 Permitted Authenticator Types

At AAL2, authentication SHALL occur by the use of either a multi-factor authenticator or a combination of two single-factor authenticators. A multi-factor authenticator requires two factors to execute a single authentication event, such as a cryptographically-secure device with an integrated biometric sensor that is required to activate the device. Authenticator requirements are specified in Section 5.

When a multi-factor authenticator is used, any of the following MAY be used:

- Multi-Factor OTP Device (Section 5.1.5)
- Multi-Factor Cryptographic Software (Section 5.1.8)
- Multi-Factor Cryptographic Device (Section 5.1.9)

When a combination of two single-factor authenticators is used, it SHALL include a Memorized Secret authenticator (Section 5.1.1) and one possession-based (i.e., “something you have”) authenticator from the following list:

- Look-Up Secret (Section 5.1.2)
- Out-of-Band Device (Section 5.1.3)
- Single-Factor OTP Device (Section 5.1.4)
- Single-Factor Cryptographic Software (Section 5.1.6)
- Single-Factor Cryptographic Device (Section 5.1.7)

> Note: When biometric authentication meets the requirements in Section 5.2.3, the device has to be authenticated in addition to the biometric — a biometric is recognized as a factor, but not recognized as an authenticator by itself. Therefore, when conducting authentication with a biometric, it is unnecessary to use two authenticators because the associated device serves as “something you have,” while the biometric serves as “something you are.”

### 4.2.2 Authenticator and Verifier Requirements

Cryptographic authenticators used at AAL2 SHALL use approved cryptography. Authenticators procured by government agencies SHALL be validated to meet the requirements of FIPS 140 Level 1. Software-based authenticators that operate within the context of an operating system MAY, where applicable, attempt to detect compromise of the platform in which they are running (e.g., by malware) and SHOULD NOT complete the operation when such a compromise is detected. At least one authenticator used at AAL2 SHALL be replay resistant as described in Section 5.2.8. Authentication at AAL2 SHOULD demonstrate authentication intent from at least one authenticator as discussed in Section 5.2.9.

Communication between the claimant and verifier (the primary channel in the case of an out-of-band authenticator) SHALL be via an authenticated protected channel to provide confidentiality of the authenticator output and resistance to MitM attacks.

Verifiers operated by government agencies at AAL2 SHALL be validated to meet the requirements of FIPS 140 Level 1.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

When a device such as a smartphone is used in the authentication process, the unlocking of that device (typically done using a PIN or biometric) SHALL NOT be considered one of the authentication factors. Generally, it is not possible for a verifier to know that the device had been locked or if the unlock process met the requirements for the relevant authenticator type.

When a biometric factor is used in authentication at AAL2, the performance requirements stated in Section 5.2.3 SHALL be met, and the verifier SHOULD make a determination that the biometric sensor and subsequent processing meet these requirements.

### 4.2.3 Reauthentication

Periodic reauthentication of subscriber sessions SHALL be performed as described in Section 7.2. At AAL2, authentication of the subscriber SHALL be repeated at least once per 12 hours during an extended usage session, regardless of user activity. Reauthentication of the subscriber SHALL be repeated following any period of inactivity lasting 30 minutes or longer. The session SHALL be terminated (i.e., logged out) when either of these time limits is reached.

Reauthentication of a session that has not yet reached its time limit MAY require only a memorized secret or a biometric in conjunction with the still-valid session secret. The verifier MAY prompt the user to cause activity just before the inactivity timeout.

### 4.2.4 Security Controls

The CSP SHALL employ appropriately-tailored security controls from the *moderate* baseline of security controls defined in SP 800-53 or equivalent federal (e.g., FEDRAMP) or industry standard. The CSP SHALL ensure that the minimum assurance-related controls for *moderate-impact* systems or equivalent are satisfied.

### 4.2.5 Records Retention Policy

The CSP shall comply with its respective records retention policies in accordance with applicable laws, regulations, and policies, including any NARA records retention schedules that may apply. If the CSP opts to retain records in the absence of any mandatory requirements, the CSP SHALL conduct a risk management process, including assessments of privacy and security risks to determine how long records should be retained and SHALL inform the subscriber of that retention policy.

## 4.3 Authenticator Assurance Level 3

*This section is normative.*

AAL3 provides very high confidence that the claimant controls authenticator(s) bound to the subscriber's account. Authentication at AAL3 is based on proof of possession of a key through a cryptographic protocol. AAL3 authentication SHALL use a hardware-based authenticator and an authenticator that provides verifier impersonation resistance — the same device MAY fulfill both these requirements. In order to authenticate at AAL3, claimants SHALL prove possession and control of two distinct authentication factors through secure authentication protocol(s). Approved cryptographic techniques are required.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

### 4.3.1 Permitted Authenticator Types

AAL3 authentication SHALL occur by the use of one of a combination of authenticators satisfying the requirements in Section 4.3. Possible combinations are:

- Multi-Factor Cryptographic Device (Section 5.1.9)
- Single-Factor Cryptographic Device (Section 5.1.7) used in conjunction with Memorized Secret (Section 5.1.1)
- Multi-Factor OTP device (software or hardware) (Section 5.1.5) used in conjunction with a Single-Factor Cryptographic Device (Section 5.1.7)
- Multi-Factor OTP Device (hardware only) (Section 5.1.5) used in conjunction with a Single-Factor Cryptographic Software (Section 5.1.6)
- Single-Factor OTP Device (hardware only) (Section 5.1.4) used in conjunction with a Multi-Factor Cryptographic Software Authenticator (Section 5.1.8)
- Single-Factor OTP Device (hardware only) (Section 5.1.4) used in conjunction with a Single-Factor Cryptographic Software Authenticator (Section 5.1.6) and a Memorized Secret (Section 5.1.1)

### 4.3.2 Authenticator and Verifier Requirements

Communication between the claimant and verifier SHALL be via an authenticated protected channel to provide confidentiality of the authenticator output and resistance to MitM attacks. At least one cryptographic device authenticator used at AAL3 SHALL be verifier impersonation resistant as described in Section 5.2.5 and SHALL be replay resistant as described in Section 5.2.8. All authentication and reauthentication processes at AAL3 SHALL demonstrate authentication intent from at least one authenticator as described in Section 5.2.9.

Multi-factor authenticators used at AAL3 SHALL be hardware cryptographic modules validated at FIPS 140 Level 2 or higher overall with at least FIPS 140 Level 3 physical security. Single-factor cryptographic devices used at AAL3 SHALL be validated at FIPS 140 Level 1 or higher overall with at least FIPS 140 Level 3 physical security.

Verifiers at AAL3 SHALL be validated at FIPS 140 Level 1 or higher.

Verifiers at AAL3 SHALL be verifier compromise resistant as described in Section 5.2.7 with respect to at least one authentication factor.

Hardware-based authenticators and verifiers at AAL3 SHOULD resist relevant side-channel (e.g., timing and power-consumption analysis) attacks. Relevant side-channel attacks SHALL be determined by a risk assessment performed by the CSP.

When a device such a smartphone is used in the authentication process — presuming that the device is able to meet the requirements above — the unlocking of that device SHALL NOT be considered to satisfy one of the authentication factors. This is because it is generally not possible for verifier to know that the device had been locked nor whether the unlock process met the requirements for the relevant authenticator type.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

When a biometric factor is used in authentication at AAL3, the verifier SHALL make a determination that the biometric sensor and subsequent processing meet the performance requirements stated in Section 5.2.3.

### 4.3.3 Reauthentication

Periodic reauthentication of subscriber sessions SHALL be performed as described in Section 7.2. At AAL3, authentication of the subscriber SHALL be repeated at least once per 12 hours during an extended usage session, regardless of user activity, as described in Section 7.2. Reauthentication of the subscriber SHALL be repeated following any period of inactivity lasting 15 minutes or longer. Reauthentication SHALL use both authentication factors. The session SHALL be terminated (i.e., logged out) when either of these time limits is reached. The verifier MAY prompt the user to cause activity just before the inactivity timeout.

### 4.3.4 Security Controls

The CSP SHALL employ appropriately-tailored security controls from the *high* baseline of security controls defined in SP 800-53 or an equivalent federal (e.g., FEDRAMP) or industry standard. The CSP SHALL ensure that the minimum assurance-related controls for *high-impact* systems or equivalent are satisfied.

### 4.3.5 Records Retention Policy

The CSP shall comply with its respective records retention policies in accordance with applicable laws, regulations, and policies, including any NARA records retention schedules that may apply. If the CSP opts to retain records in the absence of any mandatory requirements, the CSP SHALL conduct a risk management process, including assessments of privacy and security risks, to determine how long records should be retained and SHALL inform the subscriber of that retention policy.

## 4.4 Privacy Requirements

*This section is normative.*

The CSP SHALL employ appropriately-tailored privacy controls defined in SP 800-53 or equivalent industry standard.

If CSPs process attributes for purposes other than identity proofing, authentication, or attribute assertion (collectively “identity service”), related fraud mitigation, or to comply with law or legal process, CSPs SHALL implement measures to maintain predictability and manageability commensurate with the privacy risk arising from the additional processing. Measures MAY include providing clear notice, obtaining subscriber consent, or enabling selective use or disclosure of attributes. When CSPs use consent measures, CSPs SHALL NOT make consent for the additional processing a condition of the identity service.

Regardless of whether the CSP is an agency or private sector provider, the following requirements apply to an agency offering or using the authentication service:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

- The agency SHALL consult with their Senior Agency Official for Privacy (SAOP) and conduct an analysis to determine whether the collection of PII to issue or maintain authenticators triggers the requirements of the *Privacy Act of 1974* [Privacy Act] (see Section 9.4).
  - The agency SHALL publish a System of Records Notice (SORN) to cover such collections, as applicable.
  - The agency SHALL consult with their SAOP and conduct an analysis to determine whether the collection of PII to issue or maintain authenticators triggers the requirements of the *E-Government Act of 2002* [EGov].
  - The agency SHALL publish a Privacy Impact Assessment (PIA) to cover such collection, as applicable.

## 4.5 Summary of Requirements

*This section is informative.*

Table 4-1 summarizes the requirements for each of the AALs:

**Table 4-1 AAL Summary of Requirements**

| Requirement | AAL1 | AAL2 | AAL3 |
|---|---|---|---|
| **Permitted Authenticator Types** | Memorized Secret;<br>Look-Up Secret;<br>Out-of-Band;<br>SF OTP Device;<br>MF OTP Device;<br>SF Crypto Software;<br>SF Crypto Device;<br>MF Crypto Software;<br>MF Crypto Device | MF OTP Device;<br>MF Crypto Software;<br>MF Crypto Device;<br>or Memorized Secret plus:<br>• Look-Up Secret<br>• Out-of-Band<br>• SF OTP Device<br>• SF Crypto Software<br>• SF Crypto Device | MF Crypto Device;<br>SF Crypto Device plus Memorized Secret;<br>SF OTP Device plus MF Crypto Device or Software;<br>SF OTP Device plus SF Crypto Software plus Memorized Secret |
| **FIPS 140 Verification** | Level 1 (Government agency verifiers) | Level 1 (Government agency authenticators and verifiers) | Level 2 overall (MF authenticators)<br>Level 1 overall (verifiers and SF Crypto Devices)<br>Level 3 physical security (all authenticators) |
| **Reauthentication** | 30 days | 12 hours or 30 minutes inactivity; MAY use one authentication factor | 12 hours or 15 minutes inactivity; SHALL use both authentication factors |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Requirement | AAL1 | AAL2 | AAL3 |
|---|---|---|---|
| **Security Controls** | SP 800-53 Low Baseline (or equivalent) | SP 800-53 Moderate Baseline (or equivalent) | SP 800-53 High Baseline (or equivalent) |
| **MitM Resistance** | Required | Required | Required |
| **Verifier-Impersonation Resistance** | Not required | Not required | Required |
| **Verifier-Compromise Resistance** | Not required | Not required | Required |
| **Replay Resistance** | Not required | Not required | Required |
| **Authentication Intent** | Not required | Recommended | Required |
| **Records Retention Policy** | Required | Required | Required |
| **Privacy Controls** | Required | Required | Required |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 5 Authenticator and Verifier Requirements

*This section is normative.*

This section provides the detailed requirements specific to each type of authenticator. With the exception of reauthentication requirements specified in Section 4 and the requirement for verifier impersonation resistance at AAL3 described in Section 5.2.5, the technical requirements for each of the authenticator types are the same regardless of the AAL at which the authenticator is used.

## 5.1 Requirements by Authenticator Type

### 5.1.1 Memorized Secrets




A Memorized Secret authenticator — commonly referred to as a *password* or, if numeric, a *PIN* — is a secret value intended to be chosen and memorized by the user. Memorized secrets need to be of sufficient complexity and secrecy that it would be impractical for an attacker to guess or otherwise discover the correct secret value. A memorized secret is *something you know*.

#### 5.1.1.1 Memorized Secret Authenticators

Memorized secrets SHALL be at least 8 characters in length if chosen by the subscriber. Memorized secrets chosen randomly by the CSP or verifier SHALL be at least 6 characters in length and MAY be entirely numeric. If the CSP or verifier disallows a chosen memorized secret based on its appearance on a blacklist of compromised values, the subscriber SHALL be required to choose a different memorized secret. No other complexity requirements for memorized secrets SHOULD be imposed. A rationale for this is presented in Appendix A *Strength of Memorized Secrets*.

#### 5.1.1.2 Memorized Secret Verifiers

Verifiers SHALL require subscriber-chosen memorized secrets to be at least 8 characters in length. Verifiers SHOULD permit subscriber-chosen memorized secrets at least 64 characters in length. All printing ASCII [RFC 20] characters as well as the space character SHOULD be acceptable in memorized secrets. Unicode [ISO/ISC 10646] characters SHOULD be accepted as well. To make allowances for likely mistyping, verifiers MAY replace multiple consecutive space characters with a single space character prior to verification, provided that the result is at least 8 characters in length. Truncation of the secret SHALL NOT be performed. For purposes of the above length requirements, each Unicode code point SHALL be counted as a single character.

If Unicode characters are accepted in memorized secrets, the verifier SHOULD apply the Normalization Process for Stabilized Strings using either the NFKC or NFKD normalization defined in Section 12.1 of Unicode Standard Annex 15 [UAX 15]. This process is applied before hashing the byte string representing the memorized secret. Subscribers choosing memorized secrets containing Unicode characters SHOULD be advised that some characters may be represented differently by some endpoints, which can affect their ability to authenticate successfully.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Memorized secrets that are randomly chosen by the CSP (e.g., at enrollment) or by the verifier (e.g., when a user requests a new PIN) SHALL be at least 6 characters in length and SHALL be generated using an approved random bit generator [SP 800-90Ar1].

Memorized secret verifiers SHALL NOT permit the subscriber to store a "hint" that is accessible to an unauthenticated claimant. Verifiers SHALL NOT prompt subscribers to use specific types of information (e.g., "What was the name of your first pet?") when choosing memorized secrets.

When processing requests to establish and change memorized secrets, verifiers SHALL compare the prospective secrets against a list that contains values known to be commonly-used, expected, or compromised. For example, the list MAY include, but is not limited to:

- Passwords obtained from previous breach corpuses.
- Dictionary words.
- Repetitive or sequential characters (e.g. 'aaaaaa', '1234abcd').
- Context-specific words, such as the name of the service, the username, and derivatives thereof.

If the chosen secret is found in the list, the CSP or verifier SHALL advise the subscriber that they need to select a different secret, SHALL provide the reason for rejection, and SHALL require the subscriber to choose a different value.

Verifiers SHOULD offer guidance to the subscriber, such as a password-strength meter [Meters], to assist the user in choosing a strong memorized secret. This is particularly important following the rejection of a memorized secret on the above list as it discourages trivial modification of listed (and likely very weak) memorized secrets [Blacklists].

Verifiers SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber's account as described in Section 5.2.2.

Verifiers SHOULD NOT impose other composition rules (e.g., requiring mixtures of different character types or prohibiting consecutively repeated characters) for memorized secrets. Verifiers SHOULD NOT require memorized secrets to be changed arbitrarily (e.g., periodically). However, verifiers SHALL force a change if there is evidence of compromise of the authenticator.

Verifiers SHOULD permit claimants to use "paste" functionality when entering a memorized secret. This facilitates the use of password managers, which are widely used and in many cases increase the likelihood that users will choose stronger memorized secrets.

In order to assist the claimant in successfully entering a memorized secret, the verifier SHOULD offer an option to display the secret — rather than a series of dots or asterisks — until it is entered. This allows the claimant to verify their entry if they are in a location where their screen is unlikely to be observed. The verifier MAY also permit the user's device to display individual entered characters for a short time after each character is typed to verify correct entry. This is particularly applicable on mobile devices.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

The verifier SHALL use approved encryption and an authenticated protected channel when requesting memorized secrets in order to provide resistance to eavesdropping and MitM attacks.

Verifiers SHALL store memorized secrets in a form that is resistant to offline attacks. Memorized secrets SHALL be salted and hashed using a suitable one-way key derivation function. Key derivation functions take a password, a salt, and a cost factor as inputs then generate a password hash. Their purpose is to make each password guessing trial by an attacker who has obtained a password hash file expensive and therefore the cost of a guessing attack high or prohibitive. Examples of suitable key derivation functions include Password-based Key Derivation Function 2 (PBKDF2) [SP 800-132] and Balloon [BALLOON]. A memory-hard function SHOULD be used because it increases the cost of an attack. The key derivation function SHALL use an approved one-way function such as Keyed Hash Message Authentication Code (HMAC) [FIPS 198-1], any approved hash function in SP 800-107, Secure Hash Algorithm 3 (SHA-3) [FIPS 202], CMAC [SP 800-38B] or Keccak Message Authentication Code (KMAC), Customizable SHAKE (cSHAKE), or ParallelHash [SP 800-185]. The chosen output length of the key derivation function SHOULD be the same as the length of the underlying one-way function output.

The salt SHALL be at least 32 bits in length and be chosen arbitrarily so as to minimize salt value collisions among stored hashes. Both the salt value and the resulting hash SHALL be stored for each subscriber using a memorized secret authenticator.

For PBKDF2, the cost factor is an iteration count: the more times the PBKDF2 function is iterated, the longer it takes to compute the password hash. Therefore, the iteration count SHOULD be as large as verification server performance will allow, typically at least 10,000 iterations.

In addition, verifiers SHOULD perform an additional iteration of a key derivation function using a salt value that is secret and known only to the verifier. This salt value, if used, SHALL be generated by an approved random bit generator [SP 800-90Ar1] and provide at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication). The secret salt value SHALL be stored separately from the hashed memorized secrets (e.g., in a specialized device like a hardware security module). With this additional iteration, brute-force attacks on the hashed memorized secrets are impractical as long as the secret salt value remains secret.

### 5.1.2 Look-Up Secrets



A look-up secret authenticator is a physical or electronic record that stores a set of secrets shared between the claimant and the CSP. The claimant uses the authenticator to look up the appropriate secret(s) needed to respond to a prompt from the verifier. For example, the verifier may ask a claimant to provide a specific subset of the numeric or character strings printed on a card in table format. A common application of look-up secrets is the use of "recovery keys" stored by the subscriber for use in the event another authenticator is lost or malfunctions. A look-up secret is *something you have*.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

#### 5.1.2.1 Look-Up Secret Authenticators

CSPs creating look-up secret authenticators SHALL use an approved random bit generator [SP 800-90Ar1] to generate the list of secrets and SHALL deliver the authenticator securely to the subscriber. Look-up secrets SHALL have at least 20 bits of entropy.

Look-up secrets MAY be distributed by the CSP in person, by postal mail to the subscriber's address of record, or by online distribution. If distributed online, look-up secrets SHALL be distributed over a secure channel in accordance with the post-enrollment binding requirements in Section 6.1.2.

If the authenticator uses look-up secrets sequentially from a list, the subscriber MAY dispose of used secrets, but only after a successful authentication.

#### 5.1.2.2 Look-Up Secret Verifiers

Verifiers of look-up secrets SHALL prompt the claimant for the next secret from their authenticator or for a specific (e.g., numbered) secret. A given secret from an authenticator SHALL be used successfully only once. If the look-up secret is derived from a grid card, each cell of the grid SHALL be used only once.

Verifiers SHALL store look-up secrets in a form that is resistant to offline attacks. Look-up secrets having at least 112 bits of entropy SHALL be hashed with an approved one-way function as described in Section 5.1.1.2. Look-up secrets with fewer than 112 bits of entropy SHALL be salted and hashed using a suitable one-way key derivation function, also described in Section 5.1.1.2. The salt value SHALL be at least 32 in bits in length and arbitrarily chosen so as to minimize salt value collisions among stored hashes. Both the salt value and the resulting hash SHALL be stored for each look-up secret.

For look-up secrets that have less than 64 bits of entropy, the verifier SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber's account as described in Section 5.2.2.

The verifier SHALL use approved encryption and an authenticated protected channel when requesting look-up secrets in order to provide resistance to eavesdropping and MitM attacks.

### 5.1.3 Out-of-Band Devices



An out-of-band authenticator is a physical device that is uniquely addressable and can communicate securely with the verifier over a distinct communications channel, referred to as the secondary channel. The device is possessed and controlled by the claimant and supports private communication over this secondary channel, separate from the primary channel for e-authentication. An out-of-band authenticator is *something you have*.

The out-of-band authenticator can operate in one of the following ways:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

- The claimant transfers a secret received by the out-of-band device via the secondary channel to the verifier using the primary channel. For example, the claimant may receive the secret on their mobile device and type it (typically a 6-digit code) into their authentication session.
- The claimant transfers a secret received via the primary channel to the out-of-band device for transmission to the verifier via the secondary channel. For example, the claimant may view the secret on their authentication session and either type it into an app on their mobile device or use a technology such as a barcode or QR code to effect the transfer.
- The claimant compares secrets received from the primary channel and the secondary channel and confirms the authentication via the secondary channel.

The secret's purpose is to securely bind the authentication operation on the primary and secondary channel. When the response is via the primary communication channel, the secret also establishes the claimant's control of the out-of-band device.

#### 5.1.3.1 Out-of-Band Authenticators

The out-of-band authenticator SHALL establish a separate channel with the verifier in order to retrieve the out-of-band secret or authentication request. This channel is considered to be out-of-band with respect to the primary communication channel (even if it terminates on the same device) provided the device does not leak information from one channel to the other without the authorization of the claimant.

The out-of-band device SHOULD be uniquely addressable and communication over the secondary channel SHALL be encrypted unless sent via the public switched telephone network (PSTN). For additional authenticator requirements specific to the PSTN, see Section 5.1.3.3. Methods that do not prove possession of a specific device, such as voice-over-IP (VOIP) or email, SHALL NOT be used for out-of-band authentication.

The out-of-band authenticator SHALL uniquely authenticate itself in one of the following ways when communicating with the verifier:

- Establish an authenticated protected channel to the verifier using approved cryptography. The key used SHALL be stored in suitably secure storage available to the authenticator application (e.g., keychain storage, TPM, TEE, secure element).
- Authenticate to a public mobile telephone network using a SIM card or equivalent that uniquely identifies the device. This method SHALL only be used if a secret is being sent from the verifier to the out-of-band device via the PSTN (SMS or voice).

If a secret is sent by the verifier to the out-of-band device, the device SHOULD NOT display the authentication secret while it is locked by the owner (i.e., requires an entry of a PIN, passcode, or biometric to view). However, authenticators SHOULD indicate the receipt of an authentication secret on a locked device.

If the out-of-band authenticator sends an approval message over the secondary communication channel — rather than by the claimant transferring a received secret to the primary communication channel — it SHALL do one of the following:

- The authenticator SHALL accept transfer of the secret from the primary channel which it SHALL send to the verifier over the secondary channel to associate the approval with the authentication transaction. The claimant MAY perform the transfer manually or use a technology such as a barcode or QR code to effect the transfer.
- The authenticator SHALL present a secret received via the secondary channel from the verifier and prompt the claimant to verify the consistency of that secret with the primary channel, prior to accepting a yes/no response from the claimant. It SHALL then send that response to the verifier.

#### 5.1.3.2 Out-of-Band Verifiers

For additional verification requirements specific to the PSTN, see Section 5.1.3.3.

If out-of-band verification is to be made using a secure application, such as on a smart phone, the verifier MAY send a push notification to that device. The verifier then waits for the establishment of an authenticated protected channel and verifies the authenticator's identifying key. The verifier SHALL NOT store the identifying key itself, but SHALL use a verification method (e.g., an approved hash function or proof of possession of the identifying key) to uniquely identify the authenticator. Once authenticated, the verifier transmits the authentication secret to the authenticator.

Depending on the type of out-of-band authenticator, one of the following SHALL take place:

- Transfer of secret to primary channel: The verifier MAY signal the device containing the subscriber's authenticator to indicate readiness to authenticate. It SHALL then transmit a random secret to the out-of-band authenticator. The verifier SHALL then wait for the secret to be returned on the primary communication channel.
- Transfer of secret to secondary channel: The verifier SHALL display a random authentication secret to the claimant via the primary channel. It SHALL then wait for the secret to be returned on the secondary channel from the claimant's out-of-band authenticator.
- Verification of secrets by claimant: The verifier SHALL display a random authentication secret to the claimant via the primary channel, and SHALL send the same secret to the out-of-band authenticator via the secondary channel for presentation to the claimant. It SHALL then wait for an approval (or disapproval) message via the secondary channel.

In all cases, the authentication SHALL be considered invalid if not completed within 10 minutes. In order to provide replay resistance as described in Section 5.2.8, verifiers SHALL accept a given authentication secret only once during the validity period.

The verifier SHALL generate random authentication secrets with at least 20 bits of entropy using an approved random bit generator [SP 800-90Ar1]. If the authentication secret has less than 64 bits of entropy, the verifier SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber's account as described in Section 5.2.2.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

#### 5.1.3.3 Authentication using the Public Switched Telephone Network

Use of the PSTN for out-of-band verification is RESTRICTED as described in this section and in Section 5.2.10. If out-of-band verification is to be made using the PSTN, the verifier SHALL verify that the pre-registered telephone number being used is associated with a specific physical device. Changing the pre-registered telephone number is considered to be the binding of a new authenticator and SHALL only occur as described in Section 6.1.2.

Verifiers SHOULD consider risk indicators such as device swap, SIM change, number porting, or other abnormal behavior before using the PSTN to deliver an out-of-band authentication secret.

> Note: Consistent with the restriction of authenticators in Section 5.2.10, NIST may adjust the RESTRICTED status of the PSTN over time based on the evolution of the threat landscape and the technical operation of the PSTN.

### 5.1.4 Single-Factor OTP Device




A single-factor OTP device generates OTPs. This category includes hardware devices and software-based OTP generators installed on devices such as mobile phones. These devices have an embedded secret that is used as the seed for generation of OTPs and does not require activation through a second factor. The OTP is displayed on the device and manually input for transmission to the verifier, thereby proving possession and control of the device. An OTP device may, for example, display 6 characters at a time. A single-factor OTP device is *something you have*.

Single-factor OTP devices are similar to look-up secret authenticators with the exception that the secrets are cryptographically and independently generated by the authenticator and verifier and compared by the verifier. The secret is computed based on a nonce that may be time-based or from a counter on the authenticator and verifier.

#### 5.1.4.1 Single-Factor OTP Authenticators

Single-factor OTP authenticators contain two persistent values. The first is a symmetric key that persists for the device's lifetime. The second is a nonce that is either changed each time the authenticator is used or is based on a real-time clock.

The secret key and its algorithm SHALL provide at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication). The nonce SHALL be of sufficient length to ensure that it is unique for each operation of the device over its lifetime. OTP authenticators — particularly software-based OTP generators — SHOULD discourage and SHALL NOT facilitate the cloning of the secret key onto multiple devices.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

The authenticator output is obtained by using an approved block cipher or hash function to combine the key and nonce in a secure manner. The authenticator output MAY be truncated to as few as 6 decimal digits (approximately 20 bits of entropy).

If the nonce used to generate the authenticator output is based on a real-time clock, the nonce SHALL be changed at least once every 2 minutes. The OTP value associated with a given nonce SHALL be accepted only once.

#### 5.1.4.2 Single-Factor OTP Verifiers

Single-factor OTP verifiers effectively duplicate the process of generating the OTP used by the authenticator. As such, the symmetric keys used by authenticators are also present in the verifier, and SHALL be strongly protected against compromise.

When a single-factor OTP authenticator is being associated with a subscriber account, the verifier or associated CSP SHALL use approved cryptography to either generate and exchange or to obtain the secrets required to duplicate the authenticator output.

The verifier SHALL use approved encryption and an authenticated protected channel when collecting the OTP in order to provide resistance to eavesdropping and MitM attacks. Time-based OTPs [RFC 6238] SHALL have a defined lifetime that is determined by the expected clock drift — in either direction — of the authenticator over its lifetime, plus allowance for network delay and user entry of the OTP. In order to provide replay resistance as described in Section 5.2.8, verifiers SHALL accept a given time-based OTP only once during the validity period.

If the authenticator output has less than 64 bits of entropy, the verifier SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber's account as described in Section 5.2.2.

### 5.1.5 Multi-Factor OTP Devices




A multi-factor OTP device generates OTPs for use in authentication after activation through an additional authentication factor. This includes hardware devices and software-based OTP generators installed on devices such as mobile phones. The second factor of authentication may be achieved through some kind of integral entry pad, an integral biometric (e.g., fingerprint) reader, or a direct computer interface (e.g., USB port). The OTP is displayed on the device and manually input for transmission to the verifier. For example, an OTP device may display 6 characters at a time, thereby proving possession and control of the device. The multi-factor OTP device is *something you have*, and it SHALL be activated by either *something you know* or *something you are*.

#### 5.1.5.1 Multi-Factor OTP Authenticators

Multi-factor OTP authenticators operate in a similar manner to single-factor OTP authenticators (see Section 5.1.4.1), except that they require the entry of either a memorized secret or the use of

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

a biometric to obtain the OTP from the authenticator. Each use of the authenticator SHALL require the input of the additional factor.

In addition to activation information, multi-factor OTP authenticators contain two persistent values. The first is a symmetric key that persists for the device's lifetime. The second is a nonce that is either changed each time the authenticator is used or is based on a real-time clock.

The secret key and its algorithm SHALL provide at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication). The nonce SHALL be of sufficient length to ensure that it is unique for each operation of the device over its lifetime. OTP authenticators — particularly software-based OTP generators — SHOULD discourage and SHALL NOT facilitate the cloning of the secret key onto multiple devices.

The authenticator output is obtained by using an approved block cipher or hash function to combine the key and nonce in a secure manner. The authenticator output MAY be truncated to as few as 6 decimal digits (approximately 20 bits of entropy).

If the nonce used to generate the authenticator output is based on a real-time clock, the nonce SHALL be changed at least once every 2 minutes. The OTP value associated with a given nonce SHALL be accepted only once.

Any memorized secret used by the authenticator for activation SHALL be a randomly-chosen numeric secret at least 6 decimal digits in length or other memorized secret meeting the requirements of Section 5.1.1.2 and SHALL be rate limited as specified in Section 5.2.2. A biometric activation factor SHALL meet the requirements of Section 5.2.3, including limits on the number of consecutive authentication failures.

The unencrypted key and activation secret or biometric sample — and any biometric data derived from the biometric sample such as a probe produced through signal processing — SHALL be zeroized immediately after an OTP has been generated.

#### 5.1.5.2 Multi-Factor OTP Verifiers

Multi-factor OTP verifiers effectively duplicate the process of generating the OTP used by the authenticator, but without the requirement that a second factor be provided. As such, the symmetric keys used by authenticators SHALL be strongly protected against compromise.

When a multi-factor OTP authenticator is being associated with a subscriber account, the verifier or associated CSP SHALL use approved cryptography to either generate and exchange or to obtain the secrets required to duplicate the authenticator output. The verifier or CSP SHALL also establish, via the authenticator source, that the authenticator is a multi-factor device. In the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor, in accordance with Section 5.1.4.

The verifier SHALL use approved encryption and an authenticated protected channel when collecting the OTP in order to provide resistance to eavesdropping and MitM attacks. Time-based OTPs [RFC 6238] SHALL have a defined lifetime that is determined by the expected

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

clock drift — in either direction — of the authenticator over its lifetime, plus allowance for network delay and user entry of the OTP. In order to provide replay resistance as described in Section 5.2.8, verifiers SHALL accept a given time-based OTP only once during the validity period. In the event a claimant's authentication is denied due to duplicate use of an OTP, verifiers MAY warn the claimant in case an attacker has been able to authenticate in advance. Verifiers MAY also warn a subscriber in an existing session of the attempted duplicate use of an OTP.

If the authenticator output or activation secret has less than 64 bits of entropy, the verifier SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber's account as described in Section 5.2.2. A biometric activation factor SHALL meet the requirements of Section 5.2.3, including limits on the number of consecutive authentication failures.

### 5.1.6 Single-Factor Cryptographic Software



A single-factor software cryptographic authenticator is a cryptographic key stored on disk or some other "soft" media. Authentication is accomplished by proving possession and control of the key. The authenticator output is highly dependent on the specific cryptographic protocol, but it is generally some type of signed message. The single-factor software cryptographic authenticator is *something you have*.

#### 5.1.6.1 Single-Factor Cryptographic Software Authenticators

Single-factor software cryptographic authenticators encapsulate one or more secret keys unique to the authenticator. The key SHALL be stored in suitably secure storage available to the authenticator application (e.g., keychain storage, TPM, or TEE if available). The key SHALL be strongly protected against unauthorized disclosure by the use of access controls that limit access to the key to only those software components on the device requiring access. Single-factor cryptographic software authenticators SHOULD discourage and SHALL NOT facilitate the cloning of the secret key onto multiple devices.

#### 5.1.6.2 Single-Factor Cryptographic Software Verifiers

The requirements for a single-factor cryptographic software verifier are identical to those for a single-factor cryptographic device verifier, described in Section 5.1.7.2.

### 5.1.7 Single-Factor Cryptographic Devices



A single-factor cryptographic device is a hardware device that performs cryptographic operations using protected cryptographic key(s) and provides the authenticator output via direct connection to the user endpoint. The device uses embedded symmetric or asymmetric cryptographic keys, and does not require activation through a second factor of authentication. Authentication is accomplished by proving possession of the device via the authentication protocol. The authenticator output is provided by direct connection to the user endpoint and is

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

highly dependent on the specific cryptographic device and protocol, but it is typically some type of signed message. A single-factor cryptographic device is *something you have*.

#### 5.1.7.1 Single-Factor Cryptographic Device Authenticators

Single-factor cryptographic device authenticators encapsulate one or more secret keys unique to the device that SHALL NOT be exportable (i.e., cannot be removed from the device). The authenticator operates by signing a challenge nonce presented through a direct computer interface (e.g., a USB port). Alternatively, the authenticator could be a suitably secure processor integrated with the user endpoint itself (e.g., a hardware TPM). Although cryptographic devices contain software, they differ from cryptographic software authenticators in that all embedded software is under control of the CSP or issuer and that the entire authenticator is subject to all applicable FIPS 140 requirements at the AAL being authenticated.

The secret key and its algorithm SHALL provide at least the minimum security length specified in the latest revision of SP 800-131A (112 bits as of the date of this publication). The challenge nonce SHALL be at least 64 bits in length. Approved cryptography SHALL be used.

Single-factor cryptographic device authenticators SHOULD require a physical input (e.g., the pressing of a button) in order to operate. This provides defense against unintended operation of the device, which might occur if the endpoint to which it is connected is compromised.

#### 5.1.7.2 Single-Factor Cryptographic Device Verifiers

Single-factor cryptographic device verifiers generate a challenge nonce, send it to the corresponding authenticator, and use the authenticator output to verify possession of the device. The authenticator output is highly dependent on the specific cryptographic device and protocol, but it is generally some type of signed message.

The verifier has either symmetric or asymmetric cryptographic keys corresponding to each authenticator. While both types of keys SHALL be protected against modification, symmetric keys SHALL additionally be protected against unauthorized disclosure.

The challenge nonce SHALL be at least 64 bits in length, and SHALL either be unique over the authenticator's lifetime or statistically unique (i.e., generated using an approved random bit generator [SP 800-90Ar1]). The verification operation SHALL use approved cryptography.

### 5.1.8 Multi-Factor Cryptographic Software




A multi-factor software cryptographic authenticator is a cryptographic key stored on disk or some other "soft" media that requires activation through a second factor of authentication. Authentication is accomplished by proving possession and control of the key. The authenticator output is highly dependent on the specific cryptographic protocol, but it is generally some type of signed message. The multi-factor software cryptographic authenticator is *something you have*, and it SHALL be activated by either *something you know* or *something you are*.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

#### 5.1.8.1 Multi-Factor Cryptographic Software Authenticators

Multi-factor software cryptographic authenticators encapsulate one or more secret keys unique to the authenticator and accessible only through the input of an additional factor, either a memorized secret or a biometric. The key SHOULD be stored in suitably secure storage available to the authenticator application (e.g., keychain storage, TPM, TEE). The key SHALL be strongly protected against unauthorized disclosure by the use of access controls that limit access to the key to only those software components on the device requiring access. Multi-factor cryptographic software authenticators SHOULD discourage and SHALL NOT facilitate the cloning of the secret key onto multiple devices.

Each authentication operation using the authenticator SHALL require the input of both factors.

Any memorized secret used by the authenticator for activation SHALL be a randomly-chosen numeric value at least 6 decimal digits in length or other memorized secret meeting the requirements of Section 5.1.1.2 and SHALL be rate limited as specified in Section 5.2.2. A biometric activation factor SHALL meet the requirements of Section 5.2.3, including limits on the number of consecutive authentication failures.

The unencrypted key and activation secret or biometric sample — and any biometric data derived from the biometric sample such as a probe produced through signal processing — SHALL be zeroized immediately after an authentication transaction has taken place.

#### 5.1.8.2 Multi-Factor Cryptographic Software Verifiers

The requirements for a multi-factor cryptographic software verifier are identical to those for a single-factor cryptographic device verifier, described in Section 5.1.7.2. Verification of the output from a multi-factor cryptographic software authenticator proves use of the activation factor.

### 5.1.9 Multi-Factor Cryptographic Devices



A multi-factor cryptographic device is a hardware device that performs cryptographic operations using one or more protected cryptographic keys and requires activation through a second authentication factor. Authentication is accomplished by proving possession of the device and control of the key. The authenticator output is provided by direct connection to the user endpoint and is highly dependent on the specific cryptographic device and protocol, but it is typically some type of signed message. The multi-factor cryptographic device is *something you have*, and it SHALL be activated by either *something you know* or *something you are*.

#### 5.1.9.1 Multi-Factor Cryptographic Device Authenticators

Multi-factor cryptographic device authenticators use tamper-resistant hardware to encapsulate one or more secret keys unique to the authenticator and accessible only through the input of an additional factor, either a memorized secret or a biometric. The authenticator operates by using a private key that was unlocked by the additional factor to sign a challenge nonce presented through a direct computer interface (e.g., a USB port). Alternatively, the authenticator could be a

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

suitably secure processor integrated with the user endpoint itself (e.g., a hardware TPM). Although cryptographic devices contain software, they differ from cryptographic software authenticators in that all embedded software is under control of the CSP or issuer, and that the entire authenticator is subject to any applicable FIPS 140 requirements at the selected AAL.

The secret key and its algorithm SHALL provide at least the minimum security length specified in the latest revision of SP 800-131A (112 bits as of the date of this publication). The challenge nonce SHALL be at least 64 bits in length. Approved cryptography SHALL be used.

Each authentication operation using the authenticator SHOULD require the input of the additional factor. Input of the additional factor MAY be accomplished via either direct input on the device or via a hardware connection (e.g., USB, smartcard).

Any memorized secret used by the authenticator for activation SHALL be a randomly-chosen numeric value at least 6 decimal digits in length or other memorized secret meeting the requirements of Section 5.1.1.2 and SHALL be rate limited as specified in Section 5.2.2. A biometric activation factor SHALL meet the requirements of Section 5.2.3, including limits on the number of consecutive authentication failures.

The unencrypted key and activation secret or biometric sample — and any biometric data derived from the biometric sample such as a probe produced through signal processing — SHALL be zeroized immediately after an authentication transaction has taken place.

#### 5.1.9.2 Multi-Factor Cryptographic Device Verifiers

The requirements for a multi-factor cryptographic device verifier are identical to those for a single-factor cryptographic device verifier, described in Section 5.1.7.2. Verification of the authenticator output from a multi-factor cryptographic device proves use of the activation factor.

## 5.2 General Authenticator Requirements

The following subsections describe general requirements for authenticators.

### 5.2.1 Physical Authenticators

CSPs SHALL provide subscriber instructions on how to appropriately protect the authenticator against theft or loss. The CSP SHALL provide a mechanism to revoke or suspend the authenticator immediately upon notification from subscriber that loss or theft of the authenticator is suspected.

### 5.2.2 Rate Limiting (Throttling)

When required by the authenticator type descriptions in Section 5.1, the verifier SHALL implement controls to protect against online guessing attacks. Unless otherwise specified in the description of a given authenticator, the verifier SHALL limit consecutive failed authentication attempts on a single account to no more than 100.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Additional techniques MAY be used to reduce the likelihood that an attacker will lock the legitimate claimant out as a result of rate limiting. These include:

- Requiring the claimant to complete a CAPTCHA before attempting authentication.
- Requiring the claimant to wait following a failed attempt for a period of time that increases as the account approaches its maximum allowance for consecutive failed attempts (e.g., 30 seconds up to an hour).
- Accepting only authentication requests that come from a white list of IP addresses from which the subscriber has been successfully authenticated before.
- Leveraging other risk-based or adaptive authentication techniques to identify user behavior that falls within, or out of, typical norms. These might, for example, include use of IP address, geolocation, timing of request patterns, or browser metadata.

When the subscriber successfully authenticates, the verifier SHOULD disregard any previous failed attempts for that user from the same IP address.

### 5.2.3 Use of Biometrics

The use of biometrics (*something you are*) in authentication includes both measurement of physical characteristics (e.g., fingerprint, iris, facial characteristics) and behavioral characteristics (e.g., typing cadence). Both classes are considered biometric modalities, although different modalities may differ in the extent to which they establish authentication intent as described in Section 5.2.9.

For a variety of reasons, this document supports only limited use of biometrics for authentication. These reasons include:

- The biometric False Match Rate (FMR) does not provide confidence in the authentication of the subscriber by itself. In addition, FMR does not account for spoofing attacks.
- Biometric comparison is probabilistic, whereas the other authentication factors are deterministic.
- Biometric template protection schemes provide a method for revoking biometric credentials that is comparable to other authentication factors (e.g., PKI certificates and passwords). However, the availability of such solutions is limited, and standards for testing these methods are under development.
- Biometric characteristics do not constitute secrets. They can be obtained online or by taking a picture of someone with a camera phone (e.g., facial images) with or without their knowledge, lifted from objects someone touches (e.g., latent fingerprints), or captured with high resolution images (e.g., iris patterns). While presentation attack detection (PAD) technologies (e.g., liveness detection) can mitigate the risk of these types of attacks, additional trust in the sensor or biometric processing is required to ensure that PAD is operating in accordance with the needs of the CSP and the subscriber.

Therefore, the limited use of biometrics for authentication is supported with the following requirements and guidelines:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Biometrics SHALL be used only as part of multi-factor authentication with a physical authenticator (*something you have*).

An authenticated protected channel between sensor (or an endpoint containing a sensor that resists sensor replacement) and verifier SHALL be established and the sensor or endpoint SHALL be authenticated prior to capturing the biometric sample from the claimant.

The biometric system SHALL operate with an FMR [ISO/IEC 2382-37] of 1 in 1000 or better. This FMR SHALL be achieved under conditions of a conformant attack (i.e., zero-effort impostor attempt) as defined in ISO/IEC 30107-1.

The biometric system SHOULD implement PAD. Testing of the biometric system to be deployed SHOULD demonstrate at least 90% resistance to presentation attacks for each relevant attack type (i.e., species), where resistance is defined as the number of thwarted presentation attacks divided by the number of trial presentation attacks. Testing of presentation attack resistance SHALL be in accordance with Clause 12 of ISO/IEC 30107-3. The PAD decision MAY be made either locally on the claimant's device or by a central verifier.

> Note: PAD is being considered as a mandatory requirement in future editions of this guideline.

The biometric system SHALL allow no more than 5 consecutive failed authentication attempts or 10 consecutive failed attempts if PAD meeting the above requirements is implemented. Once that limit has been reached, the biometric authenticator SHALL either:

- Impose a delay of at least 30 seconds before the next attempt, increasing exponentially with each successive attempt (e.g., 1 minute before the following failed attempt, 2 minutes before the second following attempt), or
- Disable the biometric user authentication and offer another factor (e.g., a different biometric modality or a PIN/Passcode if it is not already a required factor) if such an alternative method is already available.

The verifier SHALL make a determination of sensor and endpoint performance, integrity, and authenticity. Acceptable methods for making this determination include, but are not limited to:

- Authentication of the sensor or endpoint.
- Certification by an approved accreditation authority.
- Runtime interrogation of signed metadata (e.g., attestation) as described in Section 5.2.4.

Biometric comparison can be performed locally on claimant's device or at a central verifier. Since the potential for attacks on a larger scale is greater at central verifiers, local comparison is preferred.

If comparison is performed centrally:

- Use of the biometric as an authentication factor SHALL be limited to one or more specific devices that are identified using approved cryptography. Since the biometric has

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

not yet unlocked the main authentication key, a separate key SHALL be used for identifying the device.

- Biometric revocation, referred to as biometric template protection in ISO/IEC 24745, SHALL be implemented.
- All transmission of biometrics SHALL be over the authenticated protected channel.

Biometric samples collected in the authentication process MAY be used to train comparison algorithms or — with user consent — for other research purposes. Biometric samples and any biometric data derived from the biometric sample such as a probe produced through signal processing SHALL be zeroized immediately after any training or research data has been derived.

Biometrics are also used in some cases to prevent repudiation of enrollment and to verify that the same individual participates in all phases of the enrollment process as described in SP 800-63A.

### 5.2.4 Attestation

An attestation is information conveyed to the verifier regarding a directly-connected authenticator or the endpoint involved in an authentication operation. Information conveyed by attestation MAY include, but is not limited to:

- The provenance (e.g., manufacturer or supplier certification), health, and integrity of the authenticator and endpoint.
- Security features of the authenticator.
- Security and performance characteristics of biometric sensor(s).
- Sensor modality.

If this attestation is signed, it SHALL be signed using a digital signature that provides at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication).

Attestation information MAY be used as part of a verifier's risk-based authentication decision.

### 5.2.5 Verifier Impersonation Resistance

Verifier impersonation attacks, sometimes referred to as "phishing attacks," are attempts by fraudulent verifiers and RPs to fool an unwary claimant into authenticating to an impostor website. In prior versions of SP 800-63, protocols resistant to verifier-impersonation attacks were also referred to as "strongly MitM resistant."

A verifier impersonation-resistant authentication protocol SHALL establish an authenticated protected channel with the verifier. It SHALL then strongly and irreversibly bind a channel identifier that was negotiated in establishing the authenticated protected channel to the authenticator output (e.g., by signing the two values together using a private key controlled by the claimant for which the public key is known to the verifier). The verifier SHALL validate the signature or other information used to prove verifier impersonation resistance. This prevents an impostor verifier, even one that has obtained a certificate representing the actual verifier, from replaying that authentication on a different authenticated protected channel.

Approved cryptographic algorithms SHALL be used to establish verifier impersonation resistance where it is required. Keys used for this purpose SHALL provide at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication).

One example of a verifier impersonation-resistant authentication protocol is client-authenticated TLS, because the client signs the authenticator output along with earlier messages from the protocol that are unique to the particular TLS connection being negotiated.

Authenticators that involve the manual entry of an authenticator output, such as out-of-band and OTP authenticators, SHALL NOT be considered verifier impersonation-resistant because the manual entry does not bind the authenticator output to the specific session being authenticated. In a MitM attack, an impostor verifier could replay the OTP authenticator output to the verifier and successfully authenticate.

### 5.2.6 Verifier-CSP Communications

In situations where the verifier and CSP are separate entities (as shown by the dotted line in SP 800-63-3 Figure 4-1), communications between the verifier and CSP SHALL occur through a mutually-authenticated secure channel (such as a client-authenticated TLS connection) using approved cryptography.

### 5.2.7 Verifier-Compromise Resistance

Use of some types of authenticators requires that the verifier store a copy of the authenticator secret. For example, an OTP authenticator (described in Section 5.1.4) requires that the verifier independently generate the authenticator output for comparison against the value sent by the claimant. Because of the potential for the verifier to be compromised and stored secrets stolen, authentication protocols that do not require the verifier to persistently store secrets that could be used for authentication are considered stronger, and are described herein as being *verifier compromise resistant*. Note that such verifiers are not resistant to all attacks. A verifier could be compromised in a different way, such as being manipulated into always accepting a particular authenticator output.

Verifier compromise resistance can be achieved in different ways, for example:

- Use a cryptographic authenticator that requires the verifier store a public key corresponding to a private key held by the authenticator.
- Store the expected authenticator output in hashed form. This method can be used with some look-up secret authenticators (described in Section 5.1.2), for example.

To be considered verifier compromise resistant, public keys stored by the verifier SHALL be associated with the use of approved cryptographic algorithms and SHALL provide at least the minimum security strength specified in the latest revision of SP 800-131A (112 bits as of the date of this publication).

Other verifier compromise resistant secrets SHALL use approved hash algorithms and the underlying secrets SHALL have at least the minimum security strength specified in the latest

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

revision of SP 800-131A (112 bits as of the date of this publication). Secrets (e.g., memorized secrets) having lower complexity SHALL NOT be considered verifier compromise resistant when hashed because of the potential to defeat the hashing process through dictionary lookup or exhaustive search.

### 5.2.8 Replay Resistance

An authentication process resists replay attacks if it is impractical to achieve a successful authentication by recording and replaying a previous authentication message. Replay resistance is in addition to the replay-resistant nature of authenticated protected channel protocols, since the output could be stolen prior to entry into the protected channel. Protocols that use nonces or challenges to prove the "freshness" of the transaction are resistant to replay attacks since the verifier will easily detect when old protocol messages are replayed since they will not contain the appropriate nonces or timeliness data.

Examples of replay-resistant authenticators are OTP devices, cryptographic authenticators, and look-up secrets.

In contrast, memorized secrets are not considered replay resistant because the authenticator output — the secret itself — is provided for each authentication.

### 5.2.9 Authentication Intent

An authentication process demonstrates intent if it requires the subject to explicitly respond to each authentication or reauthentication request. The goal of authentication intent is to make it more difficult for directly-connected physical authenticators (e.g., multi-factor cryptographic devices) to be used without the subject's knowledge, such as by malware on the endpoint. Authentication intent SHALL be established by the authenticator itself, although multi-factor cryptographic devices MAY establish intent by reentry of the other authentication factor on the endpoint with which the authenticator is used.

Authentication intent MAY be established in a number of ways. Authentication processes that require the subject's intervention (e.g., a claimant entering an authenticator output from an OTP device) establish intent. Cryptographic devices that require user action (e.g., pushing a button or reinsertion) for each authentication or reauthentication operation are also establish intent.

Depending on the modality, presentation of a biometric may or may not establish authentication intent. Presentation of a fingerprint would normally establish intent, while observation of the claimant's face using a camera normally would not by itself. Behavioral biometrics similarly are less likely to establish authentication intent because they do not always require a specific action on the claimant's part.

### 5.2.10 Restricted Authenticators

As threats evolve, authenticators' capability to resist attacks typically degrades. Conversely, some authenticators' performance may improve — for example, when changes to their underlying standards increases their ability to resist particular attacks.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

To account for these changes in authenticator performance, NIST places additional restrictions on authenticator types or specific classes or instantiations of an authenticator type.

The use of a RESTRICTED authenticator requires that the implementing organization assess, understand, and accept the risks associated with that RESTRICTED authenticator and acknowledge that risk will likely increase over time. It is the responsibility of the organization to determine the level of acceptable risk for their system(s) and associated data and to define any methods for mitigating excessive risks. If at any time the organization determines that the risk to any party is unacceptable, then that authenticator SHALL NOT be used.

Furthermore, the risk of an authentication error is typically borne by multiple parties, including the implementing organization, organizations that rely on the authentication decision, and the subscriber. Because the subscriber may be exposed to additional risk when an organization accepts a RESTRICTED authenticator and that the subscriber may have a limited understanding of and ability to control that risk, the CSP SHALL:

1. Offer subscribers at least one alternate authenticator that is not RESTRICTED and can be used to authenticate at the required AAL.
2. Provide meaningful notice to subscribers regarding the security risks of the RESTRICTED authenticator and availability of alternative(s) that are not RESTRICTED.
3. Address any additional risk to subscribers in its risk assessment.
4. Develop a migration plan for the possibility that the RESTRICTED authenticator is no longer acceptable at some point in the future and include this migration plan in its digital identity acceptance statement.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 6 Authenticator Lifecycle Management

*This section is normative.*

A number of events can occur over the lifecycle of a subscriber's authenticator that affect that authenticator's use. These events include binding, loss, theft, unauthorized duplication, expiration, and revocation. This section describes the actions to be taken in response to those events.

## 6.1 Authenticator Binding

*Authenticator binding* refers to the establishment of an association between a specific authenticator and a subscriber's account, enabling the authenticator to be used — possibly in conjunction with other authenticators — to authenticate for that account.

Authenticators SHALL be bound to subscriber accounts by either:

- Issuance by the CSP as part of enrollment; or
- Associating a subscriber-provided authenticator that is acceptable to the CSP.

These guidelines refer to the *binding* rather than the issuance of an authenticator as to accommodate both options.

Throughout the digital identity lifecycle, CSPs SHALL maintain a record of all authenticators that are or have been associated with each identity. The CSP or verifier SHALL maintain the information required for throttling authentication attempts when required, as described in Section 5.2.2. The CSP SHALL also verify the type of user-provided authenticator (e.g., single-factor cryptographic device vs. multi-factor cryptographic device) so verifiers can determine compliance with requirements at each AAL.

The record created by the CSP SHALL contain the date and time the authenticator was bound to the account. The record SHOULD include information about the source of the binding (e.g., IP address, device identifier) of any device associated with the enrollment. If available, the record SHOULD also contain information about the source of unsuccessful authentications attempted with the authenticator.

When any new authenticator is bound to a subscriber account, the CSP SHALL ensure that the binding protocol and the protocol for provisioning the associated key(s) are done at a level of security commensurate with the AAL at which the authenticator will be used. For example, protocols for key provisioning SHALL use authenticated protected channels or be performed in person to protect against man-in-the-middle attacks. Binding of multi-factor authenticators SHALL require multi-factor authentication or equivalent (e.g., association with the session in which identity proofing has been just completed) be used in order to bind the authenticator. The same conditions apply when a key pair is generated by the authenticator and the public key is sent to the CSP.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

### 6.1.1 Binding at Enrollment

The following requirements apply when an authenticator is bound to an identity as a result of a successful identity proofing transaction, as described in SP 800-63A. Since Executive Order 13681 [EO 13681] requires the use of multi-factor authentication for the release of any personal data, it is important that authenticators be bound to subscriber accounts at enrollment, enabling access to personal data, including that established by identity proofing.

The CSP SHALL bind at least one, and SHOULD bind at least two, physical (*something you have*) authenticators to the subscriber's online identity, in addition to a memorized secret or one or more biometrics. Binding of multiple authenticators is preferred in order to recover from the loss or theft of the subscriber's primary authenticator.

While all identifying information is self-asserted at IAL1, preservation of online material or an online reputation makes it undesirable to lose control of an account due to the loss of an authenticator. The second authenticator makes it possible to securely recover from an authenticator loss. For this reason, a CSP SHOULD bind at least two physical authenticators to the subscriber's credential at IAL1 as well.

At IAL2 and above, identifying information is associated with the digital identity and the subscriber has undergone an identity proofing process as described in SP 800-63A. As a result, authenticators at the same AAL as the desired IAL SHALL be bound to the account. For example, if the subscriber has successfully completed proofing at IAL2, then AAL2 or AAL3 authenticators are appropriate to bind to the IAL2 identity. While a CSP MAY bind an AAL1 authenticator to an IAL2 identity, if the subscriber is authenticated at AAL1, the CSP SHALL NOT expose personal information, even if self-asserted, to the subscriber. As stated in the previous paragraph, the availability of additional authenticators provides backup methods for authentication if an authenticator is damaged, lost, or stolen.

If enrollment and binding cannot be completed in a single physical encounter or electronic transaction (i.e., within a single protected session), the following methods SHALL be used to ensure that the same party acts as the applicant throughout the processes:

For remote transactions:

1. The applicant SHALL identify themselves in each new binding transaction by presenting a temporary secret which was either established during a prior transaction, or sent to the applicant's phone number, email address, or postal address of record.
2. Long-term authenticator secrets SHALL only be issued to the applicant within a protected session.

For in-person transactions:

1. The applicant SHALL identify themselves in person by either using a secret as described in remote transaction (1) above, or through use of a biometric that was recorded during a prior encounter.
2. Temporary secrets SHALL NOT be reused.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

3. If the CSP issues long-term authenticator secrets during a physical transaction, then they SHALL be loaded locally onto a physical device that is issued in person to the applicant or delivered in a manner that confirms the address of record.

### 6.1.2 Post-Enrollment Binding

The following subsections describe the binding of an authenticator to a subscriber's account.

#### 6.1.2.1 Binding of an Additional Authenticator at Existing AAL

With the exception of memorized secrets, CSPs and verifiers SHOULD encourage subscribers to maintain at least two valid authenticators of each factor that they will be using. For example, a subscriber who usually uses an OTP device as a physical authenticator MAY also be issued a number of look-up secret authenticators, or register a device for out-of-band authentication, in case the physical authenticator is lost, stolen, or damaged. See Section 6.1.2.3 for more information on replacement of memorized secret authenticators.

Accordingly, CSPs SHOULD permit the binding of additional authenticators to a subscriber's account. Before adding the new authenticator, the CSP SHALL first require the subscriber to authenticate at the AAL (or a higher AAL) at which the new authenticator will be used. When an authenticator is added, the CSP SHOULD send a notification to the subscriber via a mechanism that is independent of the transaction binding the new authenticator (e.g., email to an address previously associated with the subscriber). The CSP MAY limit the number of authenticators that may be bound in this manner.

#### 6.1.2.2 Adding an Additional Factor to a Single-Factor Account

If the subscriber's account has only one authentication factor bound to it (i.e., at IAL1/AAL1) and an additional authenticator of a different authentication factor is to be added, the subscriber MAY request that the account be upgraded to AAL2. The IAL would remain at IAL1.

Before binding the new authenticator, the CSP SHALL require the subscriber to authenticate at AAL1. The CSP SHOULD send a notification of the event to the subscriber via a mechanism independent of the transaction binding the new authenticator (e.g., email to an address previously associated with the subscriber).

#### 6.1.2.3 Replacement of a Lost Authentication Factor

If a subscriber loses all authenticators of a factor necessary to complete multi-factor authentication and has been identity proofed at IAL2 or IAL3, that subscriber SHALL repeat the identity proofing process described in SP 800-63A. An abbreviated proofing process, confirming the binding of the claimant to previously-supplied evidence, MAY be used if the CSP has retained the evidence from the original proofing process pursuant to a privacy risk assessment as described in SP 800-63A Section 4.2. The CSP SHALL require the claimant to authenticate using an authenticator of the remaining factor, if any, to confirm binding to the existing identity. Reestablishment of authentication factors at IAL3 SHALL be done in person, or through a supervised remote process as described in SP 800-63A Section 5.3.3.2, and SHALL verify the biometric collected during the original proofing process.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

The CSP SHOULD send a notification of the event to the subscriber. This MAY be the same notice as is required as part of the proofing process.

Replacement of a lost (i.e., forgotten) memorized secret is problematic because it is very common. Additional "backup" memorized secrets do not mitigate this because they are just as likely to also have been forgotten. If a biometric is bound to the account, the biometric and associated physical authenticator SHOULD be used to establish a new memorized secret.

As an alternative to the above re-proofing process when there is no biometric bound to the account, the CSP MAY bind a new memorized secret with authentication using two physical authenticators, along with a confirmation code that has been sent to one of the subscriber's addresses of record. The confirmation code SHALL consist of at least 6 random alphanumeric characters generated by an approved random bit generator [SP 800-90Ar1]. Those sent to a postal address of record SHALL be valid for a maximum of 7 days but MAY be made valid up to 21 days via an exception process to accommodate addresses outside the direct reach of the U.S. Postal Service. Confirmation codes sent by means other than physical mail SHALL be valid for a maximum of 10 minutes.

### 6.1.3 Binding to a Subscriber-provided Authenticator

A subscriber may already possess authenticators suitable for authentication at a particular AAL. For example, they may have a two-factor authenticator from a social network provider, considered AAL2 and IAL1, and would like to use those credentials at an RP that requires IAL2.

CSPs SHOULD, where practical, accommodate the use of subscriber-provided authenticators in order to relieve the burden to the subscriber of managing a large number of authenticators. Binding of these authenticators SHALL be done as described in Section 6.1.2.1. In situations where the authenticator strength is not self-evident (e.g., between single-factor and multi-factor authenticators of a given type), the CSP SHOULD assume the use of the weaker authenticator unless it is able to establish that the stronger authenticator is in fact being used (e.g., by verification with the issuer or manufacturer of the authenticator).

### 6.1.4 Renewal

The CSP SHOULD bind an updated authenticator an appropriate amount of time before an existing authenticator's expiration. The process for this SHOULD conform closely to the initial authenticator binding process (e.g., confirming address of record). Following successful use of the new authenticator, the CSP MAY revoke the authenticator that it is replacing.

## 6.2 Loss, Theft, Damage, and Unauthorized Duplication

Compromised authenticators include those that have been lost, stolen, or subject to unauthorized duplication. Generally, one must assume that a lost authenticator has been stolen or compromised by someone that is not the legitimate subscriber of the authenticator. Damaged or malfunctioning authenticators are also considered compromised to guard against any possibility of extraction of the authenticator secret. One notable exception is a memorized secret that has been forgotten without other indications of having been compromised, such as having been obtained by an attacker.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Suspension, revocation, or destruction of compromised authenticators SHOULD occur as promptly as practical following detection. Agencies SHOULD establish time limits for this process.

To facilitate secure reporting of the loss, theft, or damage to an authenticator, the CSP SHOULD provide the subscriber with a method of authenticating to the CSP using a backup or alternate authenticator. This backup authenticator SHALL be either a memorized secret or a physical authenticator. Either MAY be used, but only one authentication factor is required to make this report. Alternatively, the subscriber MAY establish an authenticated protected channel to the CSP and verify information collected during the proofing process. The CSP MAY choose to verify an address of record (i.e., email, telephone, postal) and suspend authenticator(s) reported to have been compromised. The suspension SHALL be reversible if the subscriber successfully authenticates to the CSP using a valid (i.e., not suspended) authenticator and requests reactivation of an authenticator suspended in this manner. The CSP MAY set a time limit after which a suspended authenticator can no longer be reactivated.

## 6.3 Expiration

CSPs MAY issue authenticators that expire. If and when an authenticator expires, it SHALL NOT be usable for authentication. When an authentication is attempted using an expired authenticator, the CSP SHOULD give an indication to the subscriber that the authentication failure is due to expiration rather than some other cause.

The CSP SHALL require subscribers to surrender or prove destruction of any physical authenticator containing attribute certificates signed by the CSP as soon as practical after expiration or receipt of a renewed authenticator.

## 6.4 Revocation and Termination

Revocation of an authenticator — sometimes referred to as termination, especially in the context of PIV authenticators — refers to removal of the binding between an authenticator and a credential the CSP maintains.

CSPs SHALL revoke the binding of authenticators promptly when an online identity ceases to exist (e.g., subscriber's death, discovery of a fraudulent subscriber), when requested by the subscriber, or when the CSP determines that the subscriber no longer meets its eligibility requirements.

The CSP SHALL require subscribers to surrender or certify destruction of any physical authenticator containing certified attributes signed by the CSP as soon as practical after revocation or termination takes place. This is necessary to block the use of the authenticator's certified attributes in offline situations between revocation/termination and expiration of the certification.

Further requirements on the termination of PIV authenticators are found in FIPS 201.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 7 Session Management

*This section is normative.*

Once an authentication event has taken place, it is often desirable to allow the subscriber to continue using the application across multiple subsequent interactions without requiring them to repeat the authentication event. This requirement is particularly true for federation scenarios — described in SP 800-63C — where the authentication event necessarily involves several components and parties coordinating across a network.

To facilitate this behavior, a *session* MAY be started in response to an authentication event, and continue the session until such time that it is terminated. The session MAY be terminated for any number of reasons, including but not limited to an inactivity timeout, an explicit logout event, or other means. The session MAY be continued through a reauthentication event — described in Section 7.2 — wherein the user repeats some or all of the initial authentication event, thereby re-establishing the session.

Session management is preferable over continual presentation of credentials as the poor usability of continual presentation often creates incentives for workarounds such as cached unlocking credentials, negating the freshness of the authentication event.

## 7.1 Session Bindings

A session occurs between the software that a subscriber is running — such as a browser, application, or operating system (i.e., the session subject) — and the RP or CSP that the subscriber is accessing (i.e., the session host). A session secret SHALL be shared between the subscriber's software and the service being accessed. This secret binds the two ends of the session, allowing the subscriber to continue using the service over time. The secret SHALL be presented directly by the subscriber's software or possession of the secret SHALL be proven using a cryptographic mechanism.

The secret used for session binding SHALL be generated by the session host in direct response to an authentication event. A session SHOULD inherit the AAL properties of the authentication event which triggered its creation. A session MAY be considered at a lower AAL than the authentication event but SHALL NOT be considered at a higher AAL than the authentication event.

Secrets used for session binding:

1. SHALL be generated by the session host during an interaction, typically immediately following authentication.
2. SHALL be generated by an approved random bit generator [SP 800-90Ar1] and contain at least 64 bits of entropy.
3. SHALL be erased or invalidated by the session subject when the subscriber logs out.
4. SHOULD be erased on the subscriber endpoint when the user logs out or when the secret is deemed to have expired.

5. SHOULD NOT be placed in insecure locations such as HTML5 Local Storage due to the potential exposure of local storage to cross-site scripting (XSS) attacks.
6. SHALL be sent to and received from the device using an authenticated protected channel.
7. SHALL time out and not be accepted after the times specified in Sections 4.1.4, 4.2.4, and 4.3.4, as appropriate for the AAL.
8. SHALL NOT be available to insecure communications between the host and subscriber's endpoint. Authenticated sessions SHALL NOT fall back to an insecure transport, such as from https to http, following authentication.

URLs or POST content SHALL contain a session identifier that SHALL be verified by the RP to ensure that actions taken outside the session do not affect the protected session.

There are several mechanisms for managing a session over time. The following sections give different examples along with additional requirements and considerations particular to each example technology. Additional informative guidance is available in the OWASP *Session Management Cheat Sheet* [OWASP-session].

### 7.1.1 Browser Cookies

Browser cookies are the predominant mechanism by which a session will be created and tracked for a subscriber accessing a service.

Cookies:

1. SHALL be tagged to be accessible only on secure (HTTPS) sessions.
2. SHALL be accessible to the minimum practical set of hostnames and paths.
3. SHOULD be tagged to be inaccessible via JavaScript (HttpOnly).
4. SHOULD be tagged to expire at, or soon after, the session's validity period. This requirement is intended to limit the accumulation of cookies, but SHALL NOT be depended upon to enforce session timeouts.

### 7.1.2 Access Tokens

An access token — such as found in OAuth — is used to allow an application to access a set of services on a subscriber's behalf following an authentication event. The presence of an OAuth access token SHALL NOT be interpreted by the RP as presence of the subscriber, in the absence of other signals. The OAuth access token, and any associated refresh tokens, MAY be valid long after the authentication session has ended and the subscriber has left the application.

### 7.1.3 Device Identification

Other methods of secure device identification — including but not limited to mutual TLS, token binding, or other mechanisms — MAY be used to enact a session between a subscriber and a service.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## 7.2 Reauthentication

Continuity of authenticated sessions SHALL be based upon the possession of a session secret issued by the verifier at the time of authentication and optionally refreshed during the session. The nature of a session depends on the application, including:

1. A web browser session with a “session” cookie, or
2. An instance of a mobile application that retains a session secret.

Session secrets SHALL be non-persistent. That is, they SHALL NOT be retained across a restart of the associated application or a reboot of the host device.

Periodic reauthentication of sessions SHALL be performed to confirm the continued presence of the subscriber at an authenticated session (i.e., that the subscriber has not walked away without logging out).

A session SHALL NOT be extended past the guidelines in Sections 4.1.3, 4.2.3, and 4.3.3 (depending on AAL) based on presentation of the session secret alone. Prior to session expiration, the reauthentication time limit SHALL be extended by prompting the subscriber for the authentication factor(s) specified in Table 7-1.

When a session has been terminated, due to a time-out or other action, the user SHALL be required to establish a new session by authenticating again.

**Table 7-1 - AAL Reauthentication Requirements**

| AAL | Requirement |
|---|---|
| 1 | Presentation of any one factor |
| 2 | Presentation of a memorized secret or biometric |
| 3 | Presentation of all factors |

> Note: At AAL2, a memorized secret or biometric, and not a physical authenticator, is required because the session secret is *something you have*, and an additional authentication factor is required to continue the session.

### 7.2.1 Reauthentication from a Federation or Assertion

When using a federation protocol as described in SP 800-63C, Section 5 to connect the CSP and RP, special considerations apply to session management and reauthentication. The federation protocol communicates an authentication event between the CSP and the RP but establishes no session between them. Since the CSP and RP often employ separate session management technologies, there SHALL NOT be any assumption of correlation between these sessions. Consequently, when an RP session expires and the RP requires reauthentication, it is entirely

possible that the session at the CSP has not expired and that a new assertion could be generated from this session at the CSP without reauthenticating the user.

An RP requiring reauthentication through a federation protocol SHALL — if possible within the protocol — specify the maximum acceptable authentication age to the CSP, and the CSP SHALL reauthenticate the subscriber if they have not been authenticated within that time period. The CSP SHALL communicate the authentication event time to the RP to allow the RP to decide if the assertion is sufficient for reauthentication and to determine the time for the next reauthentication event.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 8 Threats and Security Considerations

*This section is informative.*

## 8.1 Authenticator Threats

An attacker who can gain control of an authenticator will often be able to masquerade as the authenticator's owner. Threats to authenticators can be categorized based on attacks on the types of authentication factors that comprise the authenticator:

- Something you know may be disclosed to an attacker. The attacker might guess a memorized secret. Where the authenticator is a shared secret, the attacker could gain access to the CSP or verifier and obtain the secret value or perform a dictionary attack on a hash of that value. An attacker may observe the entry of a PIN or passcode, find a written record or journal entry of a PIN or passcode, or may install malicious software (e.g., a keyboard logger) to capture the secret. Additionally, an attacker may determine the secret through offline attacks on a password database maintained by the verifier.
- Something you have may be lost, damaged, stolen from the owner, or cloned by an attacker. For example, an attacker who gains access to the owner's computer might copy a software authenticator. A hardware authenticator might be stolen, tampered with, or duplicated. Out-of-band secrets may be intercepted by an attacker and used to authenticate their own session.
- Something you are may be replicated. For example, an attacker may obtain a copy of the subscriber's fingerprint and construct a replica.

This document assumes that the subscriber is not colluding with an attacker who is attempting to falsely authenticate to the verifier. With this assumption in mind, the threats to the authenticator(s) used for digital authentication are listed in Table 8-1, along with some examples.

**Table 8-1 Authenticator Threats**

| Authenticator Threat/Attack | Description | Example |
|---|---|---|
| **Assertion Manufacture or Modification** | The attacker generates a false assertion | Compromised CSP asserts identity of a claimant who has not properly authenticated |
| | The attacker modifies an existing assertion | Compromised proxy that changes AAL of an authentication assertion |
| **Theft** | A physical authenticator is stolen by an Attacker. | A hardware cryptographic device is stolen. |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Authenticator Threat/Attack | Description | Example |
|---|---|---|
| | | An OTP device is stolen. |
| | | A look-up secret authenticator is stolen. |
| | | A cell phone is stolen. |
| **Duplication** | The subscriber's authenticator has been copied with or without their knowledge. | Passwords written on paper are disclosed. |
| | | Passwords stored in an electronic file are copied. |
| | | Software PKI authenticator (private key) copied. |
| | | Look-up secret authenticator copied. |
| | | Counterfeit biometric authenticator manufactured. |
| **Eavesdropping** | The authenticator secret or authenticator output is revealed to the attacker as the subscriber is authenticating. | Memorized secrets are obtained by watching keyboard entry. |
| | | Memorized secrets or authenticator outputs are intercepted by keystroke logging software. |
| | | A PIN is captured from a PIN pad device. |
| | | A hashed password is obtained and used by an attacker for |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Authenticator Threat/Attack | Description | Example |
|---|---|---|
| | | another authentication (pass-the-hash attack). |
| | An out-of-band secret is intercepted by the attacker by compromising the communication channel. | An out-of-band secret is transmitted via unencrypted Wi-Fi and received by the attacker. |
| **Offline Cracking** | The authenticator is exposed using analytical methods outside the authentication mechanism. | A software PKI authenticator is subjected to dictionary attack to identify the correct password to use to decrypt the private key. |
| **Side Channel Attack** | The authenticator secret is exposed using physical characteristics of the authenticator. | A key is extracted by differential power analysis on a hardware cryptographic authenticator. |
| | | A cryptographic authenticator secret is extracted by analysis of the response time of the authenticator over a number of attempts. |
| **Phishing or Pharming** | The authenticator output is captured by fooling the subscriber into thinking the attacker is a verifier or RP. | A password is revealed by subscriber to a website impersonating the verifier. |
| | | A memorized secret is revealed by a bank subscriber in response to an email inquiry from a phisher pretending to represent the bank. |
| | | A memorized secret is revealed by the subscriber at a bogus verifier website reached through DNS spoofing. |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Authenticator Threat/Attack | Description | Example |
|---|---|---|
| **Social Engineering** | The attacker establishes a level of trust with a subscriber in order to convince the subscriber to reveal their authenticator secret or authenticator output. | A memorized secret is revealed by the subscriber to an officemate asking for the password on behalf of the subscriber's boss. |
| | | A memorized secret is revealed by a subscriber in a telephone inquiry from an attacker masquerading as a system administrator. |
| | | An out of band secret sent via SMS is received by an attacker who has convinced the mobile operator to redirect the victim's mobile phone to the attacker. |
| **Online Guessing** | The attacker connects to the verifier online and attempts to guess a valid authenticator output in the context of that verifier. | Online dictionary attacks are used to guess memorized secrets. |
| | | Online guessing is used to guess authenticator outputs for an OTP device registered to a legitimate claimant. |
| **Endpoint Compromise** | Malicious code on the endpoint proxies remote access to a connected authenticator without the subscriber's consent. | A cryptographic authenticator connected to the endpoint is used to authenticate remote attackers. |
| | Malicious code on the endpoint causes authentication to other than the intended verifier. | Authentication is performed on behalf of an attacker rather than the subscriber. |
| | | A malicious app on the endpoint reads an out-of-band secret sent |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Authenticator Threat/Attack | Description | Example |
|---|---|---|
| | | via SMS and the attacker uses the secret to authenticate. |
| | Malicious code on the endpoint compromises a multi-factor software cryptographic authenticator. | Malicious code proxies authentication or exports authenticator keys from the endpoint. |
| **Unauthorized Binding** | An attacker is able to cause an authenticator under their control to be bound to a subscriber's account. | An attacker intercepts an authenticator or provisioning key en route to the subscriber. |

## 8.2 Threat Mitigation Strategies

Related mechanisms that assist in mitigating the threats identified above are summarized in Table 8-2.

**Table 8-2 Mitigating Authenticator Threats**

| Authenticator Threat/Attack | Threat Mitigation | Normative Reference(s) |
|---|---|---|
| **Theft** | Use multi-factor authenticators that need to be activated through a memorized secret or biometric. | 4.2.1, 4.3.1 |
| | Use a combination of authenticators that includes a memorized secret or biometric. | 4.2.1, 4.3.1 |
| **Duplication** | Use authenticators from which it is difficult to extract and duplicate long-term authentication secrets. | 4.2.2, 4.3.2, 5.1.7.1 |
| **Eavesdropping** | Ensure the security of the endpoint, especially with respect to freedom from malware such as key loggers, prior to use. | 4.2.2 |
| | Avoid use of non-trusted wireless networks as unencrypted secondary out-of-band authentication channels. | 5.1.3.1 |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Authenticator Threat/Attack | Threat Mitigation | Normative Reference(s) |
|---|---|---|
| | Authenticate over authenticated protected channels (e.g., observe lock icon in browser window). | 4.1.2, 4.2.2, 4.3.2 |
| | Use authentication protocols that are resistant to replay attacks such as *pass-the-hash*. | 5.2.8 |
| | Use authentication endpoints that employ trusted input and trusted display capabilities. | 5.1.6.1, 5.1.8.1 |
| **Offline Cracking** | Use an authenticator with a high entropy authenticator secret. | 5.1.2.1, 5.1.4.1, 5.1.5.1, 5.1.7.1, 5.1.9.1 |
| | Store memorized secrets in a salted, hashed form, including a keyed hash. | 5.1.1.2, 5.2.7 |
| **Side Channel Attack** | Use authenticator algorithms that are designed to maintain constant power consumption and timing regardless of secret values. | 4.3.2 |
| **Phishing or Pharming** | Use authenticators that provide verifier impersonation resistance. | 5.2.5 |
| **Social Engineering** | Avoid use of authenticators that present a risk of social engineering of third parties such as customer service agents. | 6.1.2.1, 6.1.2.3 |
| **Online Guessing** | Use authenticators that generate high entropy output. | 5.1.2.1, 5.1.7.1, 5.1.9.1 |
| | Use an authenticator that locks up after a number of repeated failed activation attempts. | 5.2.2 |
| **Endpoint Compromise** | Use hardware authenticators that require physical action by the subscriber. | 5.2.9 |
| | Maintain software-based keys in restricted-access storage. | 5.1.3.1, 5.1.6.1, 5.1.8.1 |
| **Unauthorized Binding** | Use MitM-resistant protocols for provisioning of authenticators and associated keys. | 6.1 |

Several other strategies may be applied to mitigate the threats described in Table 8-1:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

- *Multiple factors* make successful attacks more difficult to accomplish. If an attacker needs to both steal a cryptographic authenticator and guess a memorized secret, then the work to discover both factors may be too high.
- *Physical security mechanisms* may be employed to protect a stolen authenticator from duplication. Physical security mechanisms can provide tamper evidence, detection, and response.
- *Requiring the use of long memorized secrets* that don't appear in common dictionaries may force attackers to try every possible value.
- *System and network security controls* may be employed to prevent an attacker from gaining access to a system or installing malicious software.
- *Periodic training* may be performed to ensure subscribers understand when and how to report compromise — or suspicion of compromise — or otherwise recognize patterns of behavior that may signify an attacker attempting to compromise the authentication process.
- *Out of band techniques* may be employed to verify proof of possession of registered devices (e.g., cell phones).

## 8.3 Authenticator Recovery

The weak point in many authentication mechanisms is the process followed when a subscriber loses control of one or more authenticators and needs to replace them. In many cases, the options remaining available to authenticate the subscriber are limited, and economic concerns (e.g., cost of maintaining call centers) motivate the use of inexpensive, and often less secure, backup authentication methods. To the extent that authenticator recovery is human-assisted, there is also the risk of social engineering attacks.

To maintain the integrity of the authentication factors, it is essential that it not be possible to leverage an authentication involving one factor to obtain an authenticator of a different factor. For example, a memorized secret must not be usable to obtain a new list of look-up secrets.

## 8.4 Session Attacks

The above discussion focuses on threats to the authentication event itself, but hijacking attacks on the session following an authentication event can have similar security impacts. The session management guidelines in Section 7 are essential to maintain session integrity against attacks, such as XSS. In addition, it is important to sanitize all information to be displayed [OWASP-XSS-prevention] to ensure that it does not contain executable content. These guidelines also recommend that session secrets be made inaccessible to mobile code in order to provide extra protection against exfiltration of session secrets.

Another post-authentication threat, cross-site request forgery (CSRF), takes advantage of users' tendency to have multiple sessions active at the same time. It is important to embed and verify a session identifier into web requests to prevent the ability for a valid URL or request to be unintentionally or maliciously activated.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 9 Privacy Considerations

*These privacy considerations supplement the guidance in Section 4. This section is informative.*

## 9.1 Privacy Risk Assessment

Sections 4.1.5, 4.2.5, and 4.3.5 require the CSP to conduct a privacy risk assessment for records retention. Such a privacy risk assessment would include:

1. The likelihood that the records retention could create a problem for the subscriber, such as invasiveness or unauthorized access to the information.
2. The impact if such a problem did occur.

CSPs should be able to reasonably justify any response they take to identified privacy risks, including accepting the risk, mitigating the risk, and sharing the risk. The use of subscriber consent is a form of sharing the risk, and therefore appropriate for use only when a subscriber could reasonably be expected to have the capacity to assess and accept the shared risk.

## 9.2 Privacy Controls

Section 4.4 requires CSPs to employ appropriately-tailored privacy controls. SP 800-53 provides a set of privacy controls for CSPs to consider when deploying authentication mechanisms. These controls cover notices, redress, and other important considerations for successful and trustworthy deployments.

## 9.3 Processing Limitation

Section 4.4 requires CSPs to use measures to maintain the objectives of predictability (enabling reliable assumptions by individuals, owners, and operators about PII and its processing by an information system) and manageability (providing the capability for granular administration of PII, including alteration, deletion, and selective disclosure) commensurate with privacy risks that can arise from the processing of attributes for purposes other than identity proofing, authentication, authorization, or attribute assertion, related fraud mitigation, or to comply with law or legal process [NISTIR8062].

CSPs may have various business purposes for processing attributes, including providing non-identity services to subscribers. However, processing attributes for purposes other than the identity service can create privacy risks when individuals are not expecting or comfortable with the additional processing. CSPs can determine appropriate measures commensurate with the privacy risk arising from the additional processing. For example, absent applicable law, regulation or policy, it may not be necessary to get explicit consent when processing attributes to provide non-identity services requested by subscribers, although notices may help subscribers maintain reliable assumptions about the processing (predictability). Other processing of attributes may carry different privacy risks that call for obtaining explicit consent or allowing subscribers more control over the use or disclosure of specific attributes (manageability). Subscriber consent needs to be meaningful; therefore, when CSPs do use consent measures, they cannot make acceptance by the subscriber of additional uses a condition of providing the identity service.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Consult your SAOP if there are questions about whether the proposed processing falls outside the scope of the permitted processing or the appropriate privacy risk mitigation measures.

## 9.4 Agency-Specific Privacy Compliance

Section 4.4 covers specific compliance obligations for federal CSPs. It is critical to involve your agency's SAOP in the earliest stages of digital authentication system development in order to assess and mitigate privacy risks and advise the agency on compliance requirements, such as whether or not the collection of PII to issue or maintain authenticators triggers the *Privacy Act of 1974* [Privacy Act] or the *E-Government Act of 2002* [E-Gov] requirement to conduct a PIA. For example, with respect to centralized maintenance of biometrics, it is likely that the Privacy Act requirements will be triggered and require coverage by either a new or existing Privacy Act system of records due to the collection and maintenance of PII and any other attributes necessary for authentication. The SAOP can similarly assist the agency in determining whether a PIA is required.

These considerations should not be read as a requirement to develop a Privacy Act SORN or PIA for authentication alone. In many cases it will make the most sense to draft a PIA and SORN that encompasses the entire digital authentication process or include the digital authentication process as part of a larger programmatic PIA that discusses the service or benefit to which the agency is establishing online.

Due to the many components of digital authentication, it is important for the SAOP to have an awareness and understanding of each individual component. For example, other privacy artifacts may be applicable to an agency offering or using federated CSP or RP services (e.g., Data Use Agreements, Computer Matching Agreements). The SAOP can assist the agency in determining what additional requirements apply. Moreover, a thorough understanding of the individual components of digital authentication will enable the SAOP to thoroughly assess and mitigate privacy risks either through compliance processes or by other means

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 10 Usability Considerations

*This section is informative.*

ISO/IEC 9241-11 defines usability as the "extent to which a product can be used by specified users to achieve specified goals with effectiveness, efficiency and satisfaction in a specified context of use." This definition focuses on users, their goals, and the context of use as key elements necessary for achieving effectiveness, efficiency, and satisfaction. A holistic approach that accounts for these key elements is necessary to achieve usability.

A user's goal for accessing an information system is to perform an intended task. Authentication is the function that enables this goal. However, from the user's perspective, authentication stands between them and their intended task. Effective design and implementation of authentication makes it easy to do the right thing, hard to do the wrong thing, and easy to recover when the wrong thing happens.

Organizations need to be cognizant of the overall implications of their stakeholders' entire digital authentication ecosystem. Users often employ one or more authenticator, each for a different RP. They then struggle to remember passwords, to recall which authenticator goes with which RP, and to carry multiple physical authentication devices. Evaluating the usability of authentication is critical, as poor usability often results in coping mechanisms and unintended work-arounds that can ultimately degrade the effectiveness of security controls.

Integrating usability into the development process can lead to authentication solutions that are secure and usable while still addressing users' authentication needs and organizations' business goals.

The impact of usability across digital systems needs to be considered as part of the risk assessment when deciding on the appropriate AAL. Authenticators with a higher AAL sometimes offer better usability and should be allowed for use for lower AAL applications.

Leveraging federation for authentication can alleviate many of the usability issues, though such an approach has its own tradeoffs, as discussed in SP 800-63C.

This section provides general usability considerations and possible implementations, but does not recommend specific solutions. The implementations mentioned are examples to encourage innovative technological approaches to address specific usability needs. Furthermore, usability considerations and their implementations are sensitive to many factors that prevent a one-size-fits-all solution. For example, a font size that works in the desktop computing environment may force text to scroll off of a small OTP device screen. Performing a usability evaluation on the selected authenticator is a critical component of implementation. It is important to conduct evaluations with representative users, realistic goals and tasks, and appropriate contexts of use.

**ASSUMPTIONS**

In this section, the term "users" means "claimants" or "subscribers."

Guidelines and considerations are described from the users' perspective.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Accessibility differs from usability and is out of scope for this document. Section 508 was enacted to eliminate barriers in information technology and require federal agencies to make their online public content accessible to people with disabilities. Refer to Section 508 law and standards for accessibility guidance.

## 10.1 Usability Considerations Common to Authenticators

When selecting and implementing an authentication system, consider usability across the entire lifecycle of the selected authenticators (e.g., typical use and intermittent events), while being mindful of the combination of users, their goals, and context of use.

A single authenticator type usually does not suffice for the entire user population. Therefore, whenever possible — based on AAL requirements — CSPs should support alternative authenticator types and allow users to choose based on their needs. Task immediacy, perceived cost benefit tradeoffs, and unfamiliarity with certain authenticators often impact choice. Users tend to choose options that incur the least burden or cost at that moment. For example, if a task requires immediate access to an information system, a user may prefer to create a new account and password rather than select an authenticator requiring more steps. Alternatively, users may choose a federated identity option — approved at the appropriate AAL — if they already have an account with an identity provider. Users may understand some authenticators better than others, and have different levels of trust based on their understanding and experience.

Positive user authentication experiences are integral to the success of an organization achieving desired business outcomes. Therefore, they should strive to consider authenticators from the users' perspective. The overarching authentication usability goal is to minimize user burden and authentication friction (e.g., the number of times a user has to authenticate, the steps involved, and the amount of information he or she has to track). Single sign-on exemplifies one such minimization strategy.

Usability considerations applicable to most authenticators are described below. Subsequent sections describe usability considerations specific to a particular authenticator.

Usability considerations for typical usage of all authenticators include:

- Provide information on the use and maintenance of the authenticator (e.g., what to do if the authenticator is lost or stolen, instructions for use), especially if there are different requirements for first-time use or initialization.
- Authenticator availability should also be considered as users will need to remember to have their authenticator readily available. Consider the need for alternate authentication options to protect against loss, damage, or other negative impacts to the original authenticator.
- Whenever possible, based on AAL requirements, users should be provided with alternate authentication options. This allows users to choose an authenticator based on their context, goals, and tasks (e.g., the frequency and immediacy of the task). Alternate authentication options also help address availability issues that may occur with a particular authenticator.
- Characteristics of user-facing text:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

  - Write user-facing text (e.g., instructions, prompts, notifications, error messages) in plain language for the intended audience. Avoid technical jargon and, typically, write for a 6th to 8th grade literacy level.
  - Consider the legibility of user-facing and user-entered text, including font style, size, color, and contrast with surrounding background. Illegible text contributes to user entry errors. To enhance legibility, consider the use of:
    - High contrast. The highest contrast is black on white.
    - Sans serif fonts for electronic displays. Serif fonts for printed materials.
    - Fonts that clearly distinguish between easily confusable characters (e.g., the capital letter "O" and the number "0").
    - A minimum font size of 12 points as long as the text fits for display on the device.
- User experience during authenticator entry:
  - Offer the option to display text during entry, as masked text entry is error-prone. Once a given character is displayed long enough for the user to see, it can be hidden. Consider the device when determining masking delay time, as it takes longer to enter memorized secrets on mobile devices (e.g., tablets and smartphones) than on traditional desktop computers. Ensure masking delay durations are consistent with user needs.
  - Ensure the time allowed for text entry is adequate (i.e., the entry screen does not time out prematurely). Ensure allowed text entry times are consistent with user needs.
  - Provide clear, meaningful and actionable feedback on entry errors to reduce user confusion and frustration. Significant usability implications arise when users do not know they have entered text incorrectly.
  - Allow at least 10 entry attempts for authenticators requiring the entry of the authenticator output by the user. The longer and more complex the entry text, the greater the likelihood of user entry errors.
  - Provide clear, meaningful feedback on the number of remaining allowed attempts. For rate limiting (i.e., throttling), inform users how long they have to wait until the next attempt to reduce confusion and frustration.
- Minimize the impact of form-factor constraints, such as limited touch and display areas on mobile devices:
  - Larger touch areas improve usability for text entry since typing on small devices is significantly more error prone and time consuming than typing on a full-size keyboard. The smaller the onscreen keyboard, the more difficult it is to type, due to the size of the input mechanism (e.g., a finger) relative to the size of the on-screen target.
  - Follow good user interface and information design for small displays.

Intermittent events include events such as reauthentication, account lock-out, expiration, revocation, damage, loss, theft, and non-functional software.

Usability considerations for intermittent events across authenticator types include:

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

- To prevent users from needing to reauthenticate due to user inactivity, prompt users in order to trigger activity just before (e.g., 2 minutes) an inactivity timeout would otherwise occur.
- Prompt users with adequate time (e.g., 1 hour) to save their work before the fixed periodic reauthentication event required regardless of user activity.
- Clearly communicate how and where to acquire technical assistance. For example, provide users with information such as a link to an online self-service feature, chat sessions or a phone number for help desk support. Ideally, sufficient information can be provided to enable users to recover from intermittent events on their own without outside intervention.

## 10.2 Usability Considerations by Authenticator Type

In addition to the previously described general usability considerations applicable to most authenticators (Section 10.1), the following sections describe other usability considerations specific to particular authenticator types.

### 10.2.1 Memorized Secrets

***Typical Usage***

Users manually input the memorized secret (commonly referred to as a password or PIN).

Usability considerations for typical usage include:

- Memorability of the memorized secret.
  - The likelihood of recall failure increases as there are more items for users to remember. With fewer memorized secrets, users can more easily recall the specific memorized secret needed for a particular RP.
  - The memory burden is greater for a less frequently used password.
- User experience during entry of the memorized secret.
  - Support copy and paste functionality in fields for entering memorized secrets, including passphrases.

***Intermittent Events***

Usability considerations for intermittent events include:

- When users create and change memorized secrets:
  - Clearly communicate information on how to create and change memorized secrets.
  - Clearly communicate memorized secret requirements, as specified in Section 5.1.1.
  - Allow at least 64 characters in length to support the use of passphrases. Encourage users to make memorized secrets as lengthy as they want, using any characters they like (including spaces), thus aiding memorization.
  - Do not impose other composition rules (e.g. mixtures of different character types) on memorized secrets.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

    - Do not require that memorized secrets be changed arbitrarily (e.g., periodically) unless there is a user request or evidence of authenticator compromise. (See Section 5.1.1 for additional information).
- Provide clear, meaningful and actionable feedback when chosen passwords are rejected (e.g., when it appears on a "black list" of unacceptable passwords or has been used previously).

### 10.2.2 Look-Up Secrets

***Typical Usage***

Users use the authenticator — printed or electronic — to look up the appropriate secret(s) needed to respond to a verifier's prompt. For example, a user may be asked to provide a specific subset of the numeric or character strings printed on a card in table format.

Usability considerations for typical usage include:

- User experience during entry of look-up secrets.
    - Consider the prompts' complexities and sizes. The larger the subset of secrets a user is prompted to look up, the greater the usability implications. Both the cognitive workload and physical difficulty for entry should be taken into account when selecting the quantity and complexity of look-up secrets for authentication.

### 10.2.3 Out-of-Band

***Typical Usage***

Out-of-band authentication requires users have access to a primary and secondary communication channel.

Usability considerations for typical usage:

- Notify users of the receipt of a secret on a locked device. However, if the out of band device is locked, authentication to the device should be required to access the secret.
- Depending on the implementation, consider form-factor constraints as they are particularly problematic when users must enter text on mobile devices. Providing larger touch areas will improve usability for entering secrets on mobile devices.
- A better usability option is to offer features that do not require text entry on mobile devices (e.g., a single tap on the screen, or a copy feature so users can copy and paste out-of-band secrets). Providing users such features is particularly helpful when the primary and secondary channels are on the same device. For example, it is difficult for users to transfer the authentication secret on a smartphone because they must switch back and forth—potentially multiple times—between the out of band application and the primary channel.

### 10.2.4 Single-Factor OTP Device

***Typical Usage***

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Users access the OTP generated by the single-factor OTP device. The authenticator output is typically displayed on the device and the user enters it for the verifier.

Usability considerations for typical usage include:

- Authenticator output allows at least one minute between changes, but ideally allows users the full two minutes as specified in Section 5.1.4.1. Users need adequate time to enter the authenticator output (including looking back and forth between the single-factor OTP device and the entry screen).
- Depending on the implementation, the following are additional usability considerations for implementers:
  - If the single-factor OTP device supplies its output via an electronic interface (e.g, USB) this is preferable since users do not have to manually enter the authenticator output. However, if a physical input (e.g., pressing a button) is required to operate, the location of the USB ports could pose usability difficulties. For example, the USB ports of some computers are located on the back of the computer and will be difficult for users to reach.
  - Limited availability of a direct computer interface such as a USB port could pose usability difficulties. For example, the number of USB ports on laptop computers is often very limited. This may force users to unplug other USB peripherals in order to use the single-factor OTP device.

### 10.2.5 Multi-Factor OTP Device

***Typical Usage***

Users access the OTP generated by the multi-factor OTP device through a second authentication factor. The OTP is typically displayed on the device and the user manually enters it for the verifier. The second authentication factor may be achieved through some kind of integral entry pad to enter a memorized secret, an integral biometric (e.g., fingerprint) reader, or a direct computer interface (e.g., USB port). Usability considerations for the additional factor apply as well — see Section 10.2.1 for memorized secrets and Section 10.4 for biometrics used in multi-factor authenticators.

Usability considerations for typical usage include:

- User experience during manual entry of the authenticator output.
  - For time-based OTP, provide a grace period in addition to the time during which the OTP is displayed. Users need adequate time to enter the authenticator output, including looking back and forth between the multi-factor OTP device and the entry screen.
  - Consider form-factor constraints if users must unlock the multi-factor OTP device via an integral entry pad or enter the authenticator output on mobile devices. Typing on small devices is significantly more error prone and time-consuming than typing on a traditional keyboard. The smaller the integral entry pad and onscreen keyboard, the more difficult it is to type. Providing larger touch areas

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

improves usability for unlocking the multi-factor OTP device or entering the authenticator output on mobile devices.
  - Limited availability of a direct computer interface like a USB port could pose usability difficulties. For example, laptop computers often have a limited number of USB ports, which may force users to unplug other USB peripherals to use the multi-factor OTP device.

### 10.2.6 Single-Factor Cryptographic Software

***Typical Usage***

Users authenticate by proving possession and control of the cryptographic software key.

Usability considerations for typical usage include:

- Give cryptographic keys appropriately descriptive names that are meaningful to users since users have to recognize and recall which cryptographic key to use for which authentication task. This prevents users from having to deal with multiple similarly- and ambiguously-named cryptographic keys. Selecting from multiple cryptographic keys on smaller mobile devices may be particularly problematic if the names of the cryptographic keys are shortened due to reduced screen size.

### 10.2.7 Single-Factor Cryptographic Device

***Typical Usage***

Users authenticate by proving possession of the single-factor cryptographic device.

Usability considerations for typical usage include:

- Requiring a physical input (e.g., pressing a button) to operate the single-factor cryptographic device could pose usability difficulties. For example, some USB ports are located on the back of computers, making it difficult for users to reach.
- Limited availability of a direct computer interface like a USB port could pose usability difficulties. For example, laptop computers often have a limited number of USB ports, which may force users to unplug other USB peripherals to use the single-factor cryptographic device.

### 10.2.8 Multi-Factor Cryptographic Software

***Typical Usage***

In order to authenticate, users prove possession and control of the cryptographic key stored on disk or some other "soft" media that requires activation. The activation is through the input of a second authentication factor, either a memorized secret or a biometric. Usability considerations for the additional factor apply as well — see Section 10.2.1 for memorized secrets and Section 10.4 for biometrics used in multi-factor authenticators.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Usability considerations for typical usage include:

- Give cryptographic keys appropriately descriptive names that are meaningful to users since users have to recognize and recall which cryptographic key to use for which authentication task. This prevents users from having to deal with multiple similarly- and ambiguously-named cryptographic keys. Selecting from multiple cryptographic keys on smaller mobile devices may be particularly problematic if the names of the cryptographic keys are shortened due to reduced screen size.

### 10.2.9 Multi-Factor Cryptographic Device

***Typical Usage***

Users authenticate by proving possession of the multi-factor cryptographic device and control of the protected cryptographic key. The device is activated by a second authentication factor, either a memorized secret or a biometric. Usability considerations for the additional factor apply as well — see Section 10.2.1 for memorized secrets and Section 10.4 for biometrics used in multi-factor authenticators.

Usability considerations for typical usage include:

- Do not require users to keep multi-factor cryptographic devices connected following authentication. Users may forget to disconnect the multi-factor cryptographic device when they are done with it (e.g., forgetting a smartcard in the smartcard reader and walking away from the computer).
    - Users need to be informed regarding whether the multi-factor cryptographic device is required to stay connected or not.
- Give cryptographic keys appropriately descriptive names that are meaningful to users since users have to recognize and recall which cryptographic key to use for which authentication task. This prevents users being faced with multiple similarly and ambiguously named cryptographic keys. Selecting from multiple cryptographic keys on smaller mobile devices (such as smartphones) may be particularly problematic if the names of the cryptographic keys are shortened due to reduced screen size.
- Limited availability of a direct computer interface like a USB port could pose usability difficulties. For example, laptop computers often have a limited number of USB ports, which may force users to unplug other USB peripherals to use the multi-factor cryptographic device.

## 10.3 Summary of Usability Considerations

Table 10-1 summarizes the usability considerations for typical usage and intermittent events for each authenticator type. Many of the usability considerations for typical usage apply to most of the authenticator types, as demonstrated in the rows. The table highlights common and divergent usability characteristics across the authenticator types. Each column allows readers to easily identify the usability attributes to address for each authenticator. Depending on users' goals and context of use, certain attributes may be valued over others. Whenever possible, provide alternative authenticator types and allow users to choose between them.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

Multi-factor authenticators (e.g., multi-factor OTP devices, multi-factor cryptographic software, and multi-factor cryptographic devices) also inherit their secondary factor's usability considerations. As biometrics are only allowed as an activation factor in multi-factor authentication solutions, usability considerations for biometrics are not included in Table 10-1 and are discussed in Section 10.4.

**Table 10-1 - Usability Considerations Summary by Authenticator Type**

| Usability Consideration | Memorized secrets | Look-up Secrets | Out of Band | Single Factor OTP Device | Multi-Factor OTP Device | Single Factor Cryptographic Software | Single Factor Cryptographic Device | Multi-Factor Cryptographic Software | Multi-Factor Cryptographic Device |
|---|---|---|---|---|---|---|---|---|---|
| **Typical Usage** | | | | | | | | | |
| Authenticator availability – authenticators readily in user's possession | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Plain language for user facing text (e.g., instructions, prompts, notifications, error messages) | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Legibility of user facing text or text entered by users | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Unmasked text entry | | ◆ | ◆ | ◆ | ◆ | | | | |
| Support text entry – length of 64 characters, copy and paste | ◆ | | | | | | | | |
| Delayed masking during text entry | ◆ | | | | | | | | |
| Adequate time allowed for text entry | ◆ | ◆ | ◆ | ◆ | ◆ | | | | |
| Entry errors – need clear and meaningful feedback | ◆ | ◆ | ◆ | ◆ | ◆ | | | | |
| Minimum of 10 attempts allowed | ◆ | ◆ | ◆ | ◆ | ◆ | | | | |
| Remaining allowed attempts – need clear and meaningful feedback | ◆ | ◆ | ◆ | ◆ | ◆ | | | | |
| Form-factor constraints | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Location and availability of a direct computer interface such as a USB port | | | | ◆ | ◆ | | ◆ | | ◆ |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

| Usability Consideration | Memorized secrets | Look-up Secrets | Out of Band | Single Factor OTP Device | Multi-Factor OTP Device | Single Factor Cryptographic Software | Single Factor Cryptographic Device | Multi-Factor Cryptographic Software | Multi-Factor Cryptographic Device |
|---|---|---|---|---|---|---|---|---|---|
| Physical input required (such as pressing a button) | | | | ◆ | | | ◆ | | |
| Cryptographic keys need for descriptive and meaningful names | | | | | | ◆ | | ◆ | ◆ |
| Complexity and size of the prompts | | ◆ | | | | | | | |
| Authentication to secondary device to access the authentication secret | | | ◆ | | | | | | |
| Continuous hardware connection not required | | | | | | | | | ◆ |
| **Intermittent Events** | | | | | | | | | |
| Reauthentication due to user inactivity | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Fixed periodic reauthentication | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Provisions for technical assistance | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Provisions to create and change memorized secrets | ◆ | | | | | | | | |

## 10.4 Biometrics Usability Considerations

This section provides a high-level overview of general usability considerations for biometrics. A more detailed discussion of biometric usability can be found in *Usability & Biometrics, Ensuring Successful Biometric Systems* NIST Usability.

Although there are other biometric modalities, the following three biometric modalities are more commonly used for authentication: fingerprint, face and iris.

***Typical Usage***

- For all modalities, user familiarity and practice with the device improves performance.
- Device affordances (i.e., properties of a device that allow a user to perform an action), feedback, and clear instructions are critical to a user's success with the biometric device. For example, provide clear instructions on the required actions for liveness detection.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

- Ideally, users can select the modality they are most comfortable with for their second authentication factor. The user population may be more comfortable and familiar with — and accepting of — some biometric modalities than others.
- User experience with biometrics as an activation factor.
    - Provide clear, meaningful feedback on the number of remaining allowed attempts. For example, for rate limiting (i.e., throttling), inform users of the time period they have to wait until next attempt to reduce user confusion and frustration.
- Fingerprint Usability Considerations:
    - Users have to remember which finger(s) they used for initial enrollment.
    - The amount of moisture on the finger(s) affects the sensor's ability for successful capture.
    - Additional factors influencing fingerprint capture quality include age, gender, and occupation (e.g., users handling chemicals or working extensively with their hands may have degraded friction ridges).
- Face Usability Considerations:
    - Users have to remember whether they wore any artifacts (e.g., glasses) during enrollment because it affects facial recognition accuracy.
    - Differences in environmental lighting conditions can affect facial recognition accuracy.
    - Facial expressions affect facial recognition accuracy (e.g., smiling versus neutral expression).
    - Facial poses affect facial recognition accuracy (e.g., looking down or away from the camera).
- Iris Usability Considerations:
    - Wearing colored contacts may affect the iris recognition accuracy.
    - Users who have had eye surgery may need to re-enroll post-surgery.
    - Differences in environmental lighting conditions can affect iris recognition accuracy, especially for certain iris colors.

***Intermittent Events***

As biometrics are only permitted as a second factor for multi-factor authentication, usability considerations for intermittent events with the primary factor still apply. Intermittent events with biometrics use include, but are not limited to, the following, which may affect recognition accuracy:

- If users injure their enrolled finger(s), fingerprint recognition may not work. Fingerprint authentication will be difficult for users with degraded fingerprints.
- The time elapsed between the time of facial recognition for authentication and the time of the initial enrollment can affect recognition accuracy as a user's face changes naturally over time. A user's weight change may also be a factor.
- Iris recognition may not work for people who had eye surgery, unless they re-enroll.

Across all biometric modalities, usability considerations for intermittent events include:

- An alternative authentication method must be available and functioning. In cases where biometrics do not work, allow users to use a memorized secret as an alternative second factor.
- Provisions for technical assistance:
    - Clearly communicate information on how and where to acquire technical assistance. For example, provide users information such as a link to an online self-service feature and a phone number for help desk support. Ideally, provide sufficient information to enable users to recover from intermittent events on their own without outside intervention.
    - Inform users of factors that may affect the sensitivity of the biometric sensor (e.g., cleanliness of the sensor).

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# 11 References

*This section is informative.*

## 11.1 General References

[BALLOON] Boneh, Dan, Corrigan-Gibbs, Henry, and Stuart Schechter. "Balloon Hashing: A Memory-Hard Function Providing Provable Protection Against Sequential Attacks," *Asiacrypt 2016*, October 2016. Available at: https://eprint.iacr.org/2016/027.

[Blacklists] Habib, Hana, Jessica Colnago, William Melicher, Blase Ur, Sean Segreti, Lujo Bauer, Nicolas Christin, and Lorrie Cranor. "Password Creation in the Presence of Blacklists," 2017. Available at: https://www.ndss-symposium.org/wp-content/uploads/2017/09/usec2017_01_3_Habib_paper.pdf.

[Composition] Komanduri, Saranga, Richard Shay, Patrick Gage Kelley, Michelle L Mazurek, Lujo Bauer, Nicolas Christin, Lorrie Faith Cranor, and Serge Egelman. "Of Passwords and People: Measuring the Effect of Password-Composition Policies." In Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, 2595–2604. ACM, 2011. Available at: https://www.ece.cmu.edu/~lbauer/papers/2011/chi2011-passwords.pdf.

[E-Gov] *E-Government Act* [includes FISMA] (P.L. 107-347), December 2002, available at: http://www.gpo.gov/fdsys/pkg/PLAW-107publ347/pdf/PLAW-107publ347.pdf.

[EO 13681] Executive Order 13681, *Improving the Security of Consumer Financial Transactions*, October 17, 2014, available at: https://www.federalregister.gov/d/2014-25439.

[FEDRAMP] General Services Administration, *Federal Risk and Authorization Management Program*, available at: https://www.fedramp.gov/.

[ICAM] National Security Systems and Identity, Credential and Access Management Sub-Committee Focus Group, Federal CIO Council, *ICAM Lexicon*, Version 0.5, March 2011.

[M-03-22] OMB Memorandum M-03-22, *OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002*, September 26, 2003, available at: https://georgewbush-whitehouse.archives.gov/omb/memoranda/m03-22.html.

[M-04-04] OMB Memorandum M-04-04, *E-Authentication Guidance for Federal Agencies*, December 16, 2003, available at: https://georgewbush-whitehouse.archives.gov/omb/memoranda/fy04/m04-04.pdf.

[Meters] de Carné de Carnavalet, Xavier and Mohammad Mannan. "From Very Weak to Very Strong: Analyzing Password-Strength Meters." In Proceedings of the Network and Distributed System Security Symposium (NDSS), 2014. Available at: http://www.internetsociety.org/sites/default/files/06_3_1.pdf.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

[NISTIR8062] NIST Internal Report 8062, *An Introduction to Privacy Engineering and Risk Management in Federal Systems*, January 2017, available at: http://nvlpubs.nist.gov/nistpubs/ir/2017/NIST.IR.8062.pdf.

[NIST Usability] National Institute and Standards and Technology, *Usability & Biometrics, Ensuring Successful Biometric Systems*, June 11, 2008, available at: http://www.nist.gov/customcf/get_pdf.cfm?pub_id=152184.

[OWASP-session] Open Web Application Security Project, *Session Management Cheat Sheet*, available at: https://www.owasp.org/index.php/Session_Management_Cheat_Sheet.

[OWASP-XSS-prevention] Open Web Application Security Project, *XSS (Cross Site Scripting) Prevention Cheat Sheet*, available at: https://www.owasp.org/index.php/XSS_(Cross_Site_Scripting)_Prevention_Cheat_Sheet.

[Persistence] Herley, Cormac, and Paul van Oorschot. "A Research Agenda Acknowledging the Persistence of Passwords," IEEE Security&Privacy Magazine, 2012. Available at: http://research.microsoft.com/apps/pubs/default.aspx?id=154077.

[Privacy Act] *Privacy Act of 1974* (P.L. 93-579), December 1974, available at: https://www.justice.gov/opcl/privacy-act-1974.

[Policies] Weir, Matt, Sudhir Aggarwal, Michael Collins, and Henry Stern. "Testing Metrics for Password Creation Policies by Attacking Large Sets of Revealed Passwords." In Proceedings of the 17th ACM Conference on Computer and Communications Security, 162–175. CCS '10. New York, NY, USA: ACM, 2010. doi:10.1145/1866307.1866327.

[Section 508] Section 508 Law and Related Laws and Policies (January 30, 2017), available at: https://www.section508.gov/content/learn/laws-and-policies.

[Shannon] Shannon, Claude E. "A Mathematical Theory of Communication," *Bell System Technical Journal*, v. 27, pp. 379-423, 623-656, July, October, 1948.

[Strength] Kelley, Patrick Gage, Saranga Komanduri, Michelle L Mazurek, Richard Shay, Timothy Vidas, Lujo Bauer, Nicolas Christin, Lorrie Faith Cranor, and Julio Lopez. "Guess Again (and Again and Again): Measuring Password Strength by Simulating Password-Cracking Algorithms." In Security and Privacy (SP), 2012 IEEE Symposium On, 523–537. IEEE, 2012. Available at: http://ieeexplore.ieee.org/iel5/6233637/6234400/06234434.pdf.

### 11.2 Standards

[BCP 195] Sheffer, Y., Holz, R., and P. Saint-Andre, *Recommendations for Secure Use of Transport Layer Security (TLS) and Datagram Transport Layer Security (DTLS)*, BCP 195, RFC 7525, DOI 10.17487/RFC7525, May 2015, https://doi.org/10.17487/RFC7525.

[ISO 9241-11] International Standards Organization, ISO/IEC 9241-11 *Ergonomic requirements for office work with visual display terminals (VDTs) — Part 11: Guidance on usability*, March 1998, available at: https://www.iso.org/standard/16883.html.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

[ISO/IEC 2382-37] International Standards Organization, *Information technology — Vocabulary — Part 37: Biometrics*, 2017, available at: http://standards.iso.org/ittf/PubliclyAvailableStandards/c066693_ISO_IEC_2382-37_2017.zip.

[ISO/IEC 10646] International Standards Organization, *Universal Coded Character Set*, 2014, available at: http://standards.iso.org/ittf/PubliclyAvailableStandards/c063182_ISO_IEC_10646_2014.zip.

[ISO/IEC 24745] International Standards Organization, *Information technology — Security techniques — Biometric information protection*, 2011, available at: http://www.iso.org/iso/iso_catalogue/catalogue_tc/catalogue_detail.htm?csnumber=52946.

[ISO/IEC 30107-1] International Standards Organization, *Information technology — Biometric presentation attack detection — Part 1: Framework*, 2016, available at: http://standards.iso.org/ittf/PubliclyAvailableStandards/c053227_ISO_IEC_30107-1_2016.zip.

[ISO/IEC 30107-3] International Standards Organization, *Information technology — Biometric presentation attack detection — Part 3: Testing and reporting*, 2017.

[RFC 20] Cerf, V., *ASCII format for network interchange*, STD 80, RFC 20, DOI 10.17487/RFC0020, October 1969, https://doi.org/10.17487/RFC0020.

[RFC 5246] IETF, *The Transport Layer Security (TLS) Protocol Version 1.2*, RFC 5246, DOI 10.17487/RFC5246, August 2008, https://doi.org/10.17487/RFC5246.

[RFC 5280] IETF, *Internet X.509 Public Key Infrastructure Certificate and CRL Profile*, RFC 5280, DOI 10.17487/RFC5280, May 2008, https://doi.org/10.17487/RFC5280.

[RFC 6238] IETF, *TOTP: Time-Based One-Time Password Algorithm*, RFC 6238, DOI 10.17487/RFC6238, https://doi.org/10.17487/RFC6238.

[RFC 6960] IETF, *X.509 Internet Public Key Infrastructure Online Certificate Status Protocol - OCSP*, RFC 6960, DOI 10.17487/RFC6960, https://doi.org/10.17487/RFC6960.

[UAX 15] Unicode Consortium, *Unicode Normalization Forms*, Unicode Standard Annex 15, Version 9.0.0, February 2016, available at: http://www.unicode.org/reports/tr15/.

### 11.3 NIST Special Publications

NIST 800 Series Special Publications are available at: http://csrc.nist.gov/publications/PubsSPs.html. The following publications may be of particular interest to those implementing systems of applications requiring digital authentication.

[SP 800-38B] NIST Special Publication 800-38B, *Recommendation for Block Cipher Modes of Operation: the CMAC Mode for Authentication*, October 2016, https://doi.org/10.6028/NIST.SP.800-38B.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

[SP 800-52] NIST Special Publication 800-52 Revision 1, *Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations*, April 2014, https://doi.org/10.6028/NIST.SP.800-52r1.

[SP 800-53] NIST Special Publication 800-53 Revision 4, *Recommended Security and Privacy Controls for Federal Information Systems and Organizations*, April 2013 (updated January 22, 2015), https://doi.org/10.6028/NIST.SP.800-53r4.

[SP 800-57 Part 1] NIST Special Publication 800-57 Part 1, Revision 4, *Recommendation for Key Management, Part 1: General*, January 2016, https://doi.org/10.6028/NIST.SP.800-57pt1r4.

[SP 800-63-3] NIST Special Publication 800-63-3, *Digital Identity Guidelines*, June 2017, https://doi.org/10.6028/NIST.SP.800-63-3.

[SP 800-63A] NIST Special Publication 800-63A, *Digital Identity Guidelines: Enrollment and Identity Proofing Requirements*, June 2017, https://doi.org/10.6028/NIST.SP.800-63a.

[SP 800-63C] NIST Special Publication 800-63C, *Digital Identity Guidelines: Federation and Assertions*, June 2017, https://doi.org/10.6028/NIST.SP.800-63c.

[SP 800-90Ar1] NIST Special Publication 800-90A Revision 1, *Recommendation for Random Number Generation Using Deterministic Random Bit Generators*, June 2015, https://doi.org/10.6028/NIST.SP.800-90Ar1.

[SP 800-107] NIST Special Publication 800-107 Revision 1, *Recommendation for Applications Using Approved Hash Algorithms*, August 2012, https://doi.org/10.6028/NIST.SP.800-107r1.

[SP 800-131A] NIST Special Publication 800-131A Revision 1, *Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key Lengths*, November 2015, https://doi.org/10.6028/NIST.SP.800-131Ar1.

[SP 800-132] NIST Special Publication 800-132, *Recommendation for Password-Based Key Derivation*, December 2010, https://doi.org/10.6028/NIST.SP.800-132.

[SP 800-185] NIST Special Publication 800-185, *SHA-3 Derived Functions: cSHAKE, KMAC, TupleHash, and ParallelHash*, December 2016, https://doi.org/10.6028/NIST.SP.800-185.

### 11.4 Federal Information Processing Standards

[FIPS 140-2] Federal Information Processing Standard Publication 140-2, *Security Requirements for Cryptographic Modules*, May 25, 2001 (with Change Notices through December 3, 2002), https://doi.org/10.6028/NIST.FIPS.140-2.

[FIPS 198-1] Federal Information Processing Standard Publication 198-1, *The Keyed-Hash Message Authentication Code (HMAC)*, July 2008, https://doi.org/10.6028/NIST.FIPS.198-1.

[FIPS 201] Federal Information Processing Standard Publication 201-2, *Personal Identity Verification (PIV) of Federal Employees and Contractors*, August 2013, https://doi.org/10.6028/NIST.FIPS.201-2.

[FIPS 202] Federal Information Processing Standard Publication 202, *SHA-3 Standard: Permutation-Based Hash and Extendable-Output Functions*, August 2015, https://doi.org/10.6028/NIST.FIPS.202.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

# Appendix A—Strength of Memorized Secrets

*This appendix is informative.*

Throughout this appendix, the word "password" is used for ease of discussion. Where used, it should be interpreted to include passphrases and PINs as well as passwords.

## A.1 Introduction

Despite widespread frustration with the use of passwords from both a usability and security standpoint, they remain a very widely used form of authentication [Persistence]. Humans, however, have only a limited ability to memorize complex, arbitrary secrets, so they often choose passwords that can be easily guessed. To address the resultant security concerns, online services have introduced rules in an effort to increase the complexity of these memorized secrets. The most notable form of these is composition rules, which require the user to choose passwords constructed using a mix of character types, such as at least one digit, uppercase letter, and symbol. However, analyses of breached password databases reveal that the benefit of such rules is not nearly as significant as initially thought [Policies], although the impact on usability and memorability is severe.

Complexity of user-chosen passwords has often been characterized using the information theory concept of entropy [Shannon]. While entropy can be readily calculated for data having deterministic distribution functions, estimating the entropy for user-chosen passwords is difficult and past efforts to do so have not been particularly accurate. For this reason, a different and somewhat simpler approach, based primarily on password length, is presented herein.

Many attacks associated with the use of passwords are not affected by password complexity and length. Keystroke logging, phishing, and social engineering attacks are equally effective on lengthy, complex passwords as simple ones. These attacks are outside the scope of this Appendix.

## A.2 Length

Password length has been found to be a primary factor in characterizing password strength [Strength] [Composition]. Passwords that are too short yield to brute force attacks as well as to dictionary attacks using words and commonly chosen passwords.

The minimum password length that should be required depends to a large extent on the threat model being addressed. Online attacks where the attacker attempts to log in by guessing the password can be mitigated by limiting the rate of login attempts permitted. In order to prevent an attacker (or a persistent claimant with poor typing skills) from easily inflicting a denial-of-service attack on the subscriber by making many incorrect guesses, passwords need to be complex enough that rate limiting does not occur after a modest number of erroneous attempts, but does occur before there is a significant chance of a successful guess.

Offline attacks are sometimes possible when one or more hashed passwords is obtained by the attacker through a database breach. The ability of the attacker to determine one or more users' passwords depends on the way in which the password is stored. Commonly, passwords are salted

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

with a random value and hashed, preferably using a computationally expensive algorithm. Even with such measures, the current ability of attackers to compute many billions of hashes per second with no rate limiting requires passwords intended to resist such attacks to be orders of magnitude more complex than those that are expected to resist only online attacks.

Users should be encouraged to make their passwords as lengthy as they want, within reason. Since the size of a hashed password is independent of its length, there is no reason not to permit the use of lengthy passwords (or pass phrases) if the user wishes. Extremely long passwords (perhaps megabytes in length) could conceivably require excessive processing time to hash, so it is reasonable to have some limit.

### A.3 Complexity

As noted above, composition rules are commonly used in an attempt to increase the difficulty of guessing user-chosen passwords. Research has shown, however, that users respond in very predictable ways to the requirements imposed by composition rules [Policies]. For example, a user that might have chosen "password" as their password would be relatively likely to choose "Password1" if required to include an uppercase letter and a number, or "Password1!" if a symbol is also required.

Users also express frustration when attempts to create complex passwords are rejected by online services. Many services reject passwords with spaces and various special characters. In some cases, the special characters that are not accepted might be an effort to avoid attacks like SQL injection that depend on those characters. But a properly hashed password would not be sent intact to a database in any case, so such precautions are unnecessary. Users should also be able to include space characters to allow the use of phrases. Spaces themselves, however, add little to the complexity of passwords and may introduce usability issues (e.g., the undetected use of two spaces rather than one), so it may be beneficial to remove repeated spaces in typed passwords prior to verification.

Users' password choices are very predictable, so attackers are likely to guess passwords that have been successful in the past. These include dictionary words and passwords from previous breaches, such as the "Password1!" example above. For this reason, it is recommended that passwords chosen by users be compared against a "black list" of unacceptable passwords. This list should include passwords from previous breach corpuses, dictionary words, and specific words (such as the name of the service itself) that users are likely to choose. Since user choice of passwords will also be governed by a minimum length requirement, this dictionary need only include entries meeting that requirement.

Highly complex memorized secrets introduce a new potential vulnerability: they are less likely to be memorable, and it is more likely that they will be written down or stored electronically in an unsafe manner. While these practices are not necessarily vulnerable, statistically some methods of recording such secrets will be. This is an additional motivation not to require excessively long or complex memorized secrets.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-63b

## A.4 Randomly-Chosen Secrets

Another factor that determines the strength of memorized secrets is the process by which they are generated. Secrets that are randomly chosen (in most cases by the verifier or CSP) and are uniformly distributed will be more difficult to guess or brute-force attack than user-chosen secrets meeting the same length and complexity requirements. Accordingly, at LOA2, SP 800-63-2 permitted the use of randomly generated PINs with 6 or more digits while requiring user-chosen memorized secrets to be a minimum of 8 characters long.

As discussed above, the threat model being addressed with memorized secret length requirements includes rate-limited online attacks, but not offline attacks. With this limitation, 6 digit randomly-generated PINs are still considered adequate for memorized secrets.

## A.5 Summary

Length and complexity requirements beyond those recommended here significantly increase the difficulty of memorized secrets and increase user frustration. As a result, users often work around these restrictions in a way that is counterproductive. Furthermore, other mitigations such as blacklists, secure hashed storage, and rate limiting are more effective at preventing modern brute-force attacks. Therefore, no additional complexity requirements are imposed.

# EXHIBIT 8

Check for updates

# NIST Special Publication
# NIST SP 800-63B-4

# Digital Identity Guidelines
## Authentication and Authenticator Management

David Temoshok
James L. Fenton
Yee-Yin Choong
Naomi Lefkovitz
Andrew Regenscheid
Ryan Galluzzo
Justin P. Richer

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-63B-4

NIST NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY
U.S. DEPARTMENT OF COMMERCE

# NIST Special Publication
# NIST SP 800-63B-4

# Digital Identity Guidelines
## Authentication and Authenticator Management

David Temoshok
Naomi Lefkovitz *
Ryan Galluzzo
*Applied Cybersecurity Division*
*Information Technology Laboratory*

Yee-Yin Choong
*Information Access Division*
*Information Technology Laboratory*

Andrew Regenscheid
*Computer Security Division*
*Information Technology Laboratory*

James L. Fenton
*Altmode Networks*

Justin P. Richer
*Bespoke Engineering*

* *Former NIST employee; all work for this publication was done while at NIST.*

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-63B-4

July 2025

U.S. Department of Commerce
*Howard Lutnick, Secretary*

National Institute of Standards and Technology
*Craig Burkhardt, Acting Under Secretary for Standards and Technology and Acting NIST Director*

Certain equipment, instruments, software, or materials, commercial or non-commercial, are identified in this paper in order to specify the experimental procedure adequately. Such identification does not imply recommendation or endorsement of any product or service by NIST, nor does it imply that the materials or equipment identified are necessarily the best available for the purpose.

There may be references in this publication to other publications currently under development by NIST in accordance with its assigned statutory responsibilities. The information in this publication, including concepts and methodologies, may be used by federal agencies even before the completion of such companion publications. Thus, until each publication is completed, current requirements, guidelines, and procedures, where they exist, remain operative. For planning and transition purposes, federal agencies may wish to closely follow the development of these new publications by NIST.

Organizations are encouraged to review all draft publications during public comment periods and provide feedback to NIST. Many NIST cybersecurity publications, other than the ones noted above, are available at https://csrc.nist.gov/publications.

**Authority**

This publication has been developed by NIST in accordance with its statutory responsibilities under the Federal Information Security Modernization Act (FISMA) of 2014, 44 U.S.C. § 3551 et seq., Public Law (P.L.) 113-283. NIST is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems, but such standards and guidelines shall not apply to national security systems without the express approval of appropriate federal officials exercising policy authority over such systems. This guideline is consistent with the requirements of the Office of Management and Budget (OMB) Circular A-130.

Nothing in this publication should be taken to contradict the standards and guidelines made mandatory and binding on federal agencies by the Secretary of Commerce under statutory authority. Nor should these guidelines be interpreted as altering or superseding the existing authorities of the Secretary of Commerce, Director of the OMB, or any other federal official. This publication may be used by nongovernmental organizations on a voluntary basis and is not subject to copyright in the United States. Attribution would, however, be appreciated by NIST.

**NIST Technical Series Policies**

Copyright, Fair Use, and Licensing Statements
NIST Technical Series Publication Identifier Syntax

**Publication History**

Approved by the NIST Editorial Review Board on 2025-05-30.
Supersedes NIST SP 800-63B (June 2017; updated March 2, 2020) https://doi.org/10.6028/NIST.SP.800-63b

**How to Cite this NIST Technical Series Publication**

Temoshok D, Fenton JL, Choong YY, Lefkovitz N, Regenscheid A, Galluzzo R, Richer JP (2025) Digital Identity Guidelines: Authentication and Authenticator Management. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-63B-4. https://doi.org/10.6028/NIST.SP.800-63B-4

**Author ORCID iDs**

David Temoshok: 0000-0001-6195-0331
James L. Fenton: 0000-0002-2344-4291
Yee-Yin Choong: 0000-0002-3889-6047
Naomi Lefkovitz: 0000-0003-3777-3106
Andrew Regenscheid: 0000-0002-3930-527X
Ryan Galluzzo: 0000-0003-0304-4239
Justin P. Richer: 0000-0003-2130-5180

**Contact Information**

mailto:dig-comments@nist.gov

National Institute of Standards and Technology
Attn: Applied Cybersecurity Division, Information Technology Laboratory
100 Bureau Drive (Mail Stop 2000) Gaithersburg, MD 20899-2000

**Additional Information**

Additional information about this publication is available at https://csrc.nist.gov/pubs/sp/800/63/B/4/final, including related content, potential updates, and document history.

**All comments are subject to release under the Freedom of Information Act (FOIA).**

**Abstract**

This guideline focuses on the authentication of subjects who interact with government information systems over networks to establish that a given claimant is a subscriber who has been previously authenticated. The result of the authentication process may be used locally by the system performing the authentication or asserted elsewhere in a federated identity system. This document defines technical requirements for each of the three authentication assurance levels. The guidelines are not intended to constrain the development or use of standards outside of this purpose. This publication supersedes NIST Special Publication (SP) 800-63B.

**Keywords**

authentication; authentication assurance; credential service provider; digital authentication; passwords.

**Reports on Computer Systems Technology**

The Information Technology Laboratory (ITL) at the National Institute of Standards and Technology (NIST) promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of concept implementations, and technical analyses to advance the development and productive use of information technology. ITL's responsibilities include the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security and privacy of other than national security-related information in federal information systems. The Special Publication 800-series reports on ITL's research, guidelines, and outreach efforts in information system security, and its collaborative activities with industry, government, and academic organizations.

**Patent Disclosure Notice**

NOTICE: ITL has requested that holders of patent claims whose use may be required for compliance with the guidance or requirements of this publication disclose such patent claims to ITL. However, holders of patents are not obligated to respond to ITL calls for patents and ITL has not undertaken a patent search in order to identify which, if any, patents may apply to this publication.

As of the date of publication and following call(s) for the identification of patent claims whose use may be required for compliance with the guidance or requirements of this publication, no such patent claims have been identified to ITL.

No representation is made or implied by ITL that licenses are not required to avoid patent infringement in the use of this publication.

## Table of Contents

**1. Introduction** . . . 1
1.1. Notations . . . 2
1.2. Document Structure . . . 3
**2. Authentication Assurance Levels** . . . 4
2.1. Authentication Assurance Level 1 . . . 4
2.1.1. Permitted Authenticator Types . . . 5
2.1.2. Authenticator and Verifier Requirements . . . 5
2.1.3. Reauthentication . . . 5
2.2. Authentication Assurance Level 2 . . . 6
2.2.1. Permitted Authenticator Types . . . 6
2.2.2. Authenticator and Verifier Requirements . . . 7
2.2.3. Reauthentication . . . 7
2.3. Authentication Assurance Level 3 . . . 8
2.3.1. Permitted Authenticator Types . . . 8
2.3.2. Authenticator and Verifier Requirements . . . 8
2.3.3. Reauthentication . . . 9
2.4. General Requirements . . . 9
2.4.1. Security Controls . . . 9
2.4.2. Records Retention Policy . . . 9
2.4.3. Privacy Requirements . . . 9
2.4.4. Redress Requirements . . . 10
2.5. Summary of Requirements . . . 11
**3. Authenticator and Verifier Requirements** . . . 12
3.1. Requirements by Authenticator Type . . . 13
3.1.1. Passwords . . . 13
3.1.2. Look-Up Secrets . . . 17
3.1.3. Out-of-Band Devices . . . 18
3.1.4. Single-Factor OTP . . . 23
3.1.5. Multi-Factor OTPs . . . 25

3.1.6. Single-Factor Cryptographic Authentication . . . 26
3.1.7. Multi-Factor Cryptographic Authentication . . . 27
3.2. General Authenticator Requirements . . . 30
3.2.1. Physical Authenticators . . . 30
3.2.2. Rate Limiting (Throttling) . . . 30
3.2.3. Use of Biometrics . . . 31
3.2.4. Attestation . . . 34
3.2.5. Phishing Resistance . . . 35
3.2.6. Verifier-CSP or IdP Communications . . . 36
3.2.7. Replay Resistance . . . 36
3.2.8. Authentication Intent . . . 37
3.2.9. Restricted Authenticators . . . 37
3.2.10. Activation Secrets . . . 38
3.2.11. Connected Authenticators . . . 39
3.2.12. Random Values . . . 41
3.2.13. Exportability . . . 41
**4. Authenticator Event Management** . . . 43
4.1. Authenticator Binding . . . 43
4.1.1. Binding at Enrollment . . . 44
4.1.2. Post-Enrollment Binding . . . 44
4.1.3. Binding to a Subscriber-Provided Authenticator . . . 46
4.1.4. Renewal . . . 46
4.2. Account Recovery . . . 47
4.2.1. Account Recovery Methods . . . 47
4.2.2. Recovery Requirements by IAL/AAL . . . 49
4.2.3. Account Recovery Notification . . . 50
4.3. Loss, Theft, Damage, and Compromise . . . 50
4.4. Expiration . . . 51
4.5. Invalidation . . . 51
4.6. Account Notifications . . . 51

**5. Session Management** . . . 53
5.1. Session Bindings . . . 53
5.1.1. Browser Cookies . . . 55
5.1.2. Access Tokens . . . 55
5.2. Reauthentication . . . 56
5.3. Session Monitoring . . . 57
**6. Threats and Security Considerations** . . . 58
6.1. Authenticator Threats . . . 58
6.2. Threat Mitigation Strategies . . . 62
6.3. Authenticator Recovery . . . 65
6.4. Session Attacks . . . 65
**7. Privacy Considerations** . . . 66
7.1. Privacy Risk Assessment . . . 66
7.2. Privacy Controls . . . 66
7.3. Use Limitation . . . 66
7.4. Agency-Specific Privacy Compliance . . . 67
**8. Customer Experience Considerations** . . . 68
8.1. Usability . . . 68
8.1.1. Common Usability Considerations for Authenticators . . . 69
8.1.2. Usability Considerations by Authenticator Type . . . 71
8.1.3. Summary of Usability Considerations . . . 76
8.1.4. Usability Considerations for Biometrics . . . 76
8.2. Customer Success Considerations . . . 79
**References** . . . 81
**Appendix A. Strength of Passwords** . . . 87
A.1. Introduction . . . 87
A.2. Length . . . 87
A.3. Complexity . . . 88
A.4. Central vs. Local Verification . . . 89
A.5. Summary . . . 90

**Appendix B. Syncable Authenticators** . . . . . 91
B.1. Introduction . . . . . 91
B.2. Cloning Authentication Keys . . . . . 91
B.3. Implementation Requirements . . . . . 92
B.4. Sharing . . . . . 94
B.5. Example . . . . . 95
B.6. Security Considerations . . . . . 96
**Appendix C. List of Symbols, Abbreviations, and Acronyms** . . . . . 99
**Appendix D. Glossary** . . . . . 102
**Appendix E. Change Log** . . . . . 117

## List of Tables

Table 1. Summary of requirements by AAL . . . . . 11
Table 2. Summary of secrets (non-normative) . . . . . 12
Table 3. Authenticator threats . . . . . 58
Table 4. Mitigating authenticator threats . . . . . 62
Table 5. Syncable authenticator threats, challenges, and mitigations . . . . . 96

## List of Figures

Fig. 1. Transfer of secret to primary device . . . . . 19
Fig. 2. Transfer of secret to out-of-band device . . . . . 19
Fig. 3. Usability considerations by authenticator type . . . . . 77

## Preface

This publication and its companion volumes — [SP800-63], [SP800-63A], and [SP800-63C] — provide technical guidelines for organizations to implement digital identity services.

This document, SP 800-63B, provides requirements to credential service providers (CSPs) for remote user authentication at each of three authentication assurance levels (AALs).

## Acknowledgments

The authors would like to thank their fellow collaborators — Christine Abruzzi, Sarbari Gupta, Connie LaSalle, Diana Proud-Madruga, and Maria Vachino — on the current revision of this special publication, as well as Kerrianne Buchanan, Greg Fiumara, and Evelyn Petrella for their contributions and review. The authors would like to also acknowledge the past contributions of Donna F. Dodson, W. Timothy Polk, Emad A. Nabbus, Paul A. Grassi, Elaine M. Newton, Ray Perlner, William E. Burr, Kristen K. Greene, Mary F. Theofanos, Kaitlin Boeckl, Kat Megas, Ellen Nadeau, Ben Piccarreta, and Danna Gabel O'Rourke.

# 1. Introduction

*This section is informative.*

Authentication is the process of determining the validity of one or more authenticators used to claim a digital identity by establishing that a subject attempting to access a digital service is in control of the secrets used to authenticate. If return visits are applicable to a service, successful authentication provides reasonable risk-based assurance that the subject accessing the service today is the same as the one who previously accessed the service. One-time services (i.e., the *subscriber* will only ever access the service once) do not necessarily require persistent digital authentication nor the issuance of authenticators.

The authentication of *claimants* is central to the process of associating a subscriber with their online activity as recorded in their *subscriber account*, which is maintained by a *credential service provider* (CSP). Authentication is performed by verifying that the claimant controls one or more *authenticators* (called *tokens* in some earlier editions of SP 800-63) associated with a given subscriber account. The authentication process is conducted by a *verifier*, which is a role of the CSP or — in federated authentication — of an *identity provider* (IdP). Upon successful authentication, the verifier asserts the *identifier* for the subscriber to the *relying party* (RP). Optionally, the verifier may assert additional *attributes* to the RP.

This guideline provides recommendations on types of authentication processes, including choices of authenticators, that may be used at various *authentication assurance levels* (AALs). It also provides recommendations on events that may occur during the lifetime of authenticators, including initial issuance, maintenance, and invalidation in the event of loss or theft of the authenticator.

This guideline applies to the digital authentication of subjects to systems over a network. It also requires that verifiers and RPs participating in authentication protocols be authenticated to claimants to assure the identity of the services with which they are authenticating. It does not address the authentication of a person for physical access (e.g., to a building).

This guideline recognizes that subscribers are responsible for protecting their authentication secrets and not disclosing them to others (e.g., credential sharing). The protections at the various AALs are intended to protect against credential theft and are not intended to protect against willful disclosure of credential secrets by a subscriber. In most cases, there are very few technical controls that can detect and prevent such willful collusion and sharing.

AALs categorize the strength of an authentication transaction. Stronger authentication (i.e., a higher AAL) requires malicious actors to have better capabilities and to expend greater resources to successfully subvert the authentication process. Authentication

at higher AALs can effectively reduce the risk of attacks. A high-level summary of the technical requirements for each of the AALs is provided below; see Sec. 2 and Sec. 3 of this document for specific normative requirements.

**Authentication Assurance Level 1**: AAL1 provides basic confidence that the claimant controls an authenticator bound to the subscriber account being authenticated. AAL1 requires only single-factor authentication using a wide range of available authentication technologies. However, it is recommended that applications assessed at AAL1 offer multi-factor authentication options. Successful authentication requires the claimant to prove *possession and control of the authenticator*.

**Authentication Assurance Level 2**: AAL2 provides high confidence that the claimant controls one or more authenticators bound to the subscriber account being authenticated. Proof of the possession and control of two distinct *authentication factors* is required. Applications assessed at AAL2 must offer a *phishing-resistant* authentication (see Sec. 3.2.5) option.

**Authentication Assurance Level 3**: AAL3 provides very high confidence that the claimant controls one or more authenticators bound to the subscriber account being authenticated. Authentication at AAL3 is based on the proof of possession of a key through the use of a public-key cryptographic protocol. AAL3 authentication requires a phishing-resistant authenticator (see Sec. 3.2.5) with a non-exportable authentication key (see Sec. 3.2.13). To authenticate at AAL3, claimants are required to prove possession and control of two distinct authentication factors.

When a *session* has been authenticated at a given AAL and a higher AAL is required, an authentication process may also provide step-up authentication to raise the session's AAL.

## 1.1. Notations

This guideline uses the following typographical conventions in text:

- Specific terms in **CAPITALS** represent normative requirements. When these same terms are not in **CAPITALS**, the term does not represent a normative requirement.
  - The terms "**SHALL**" and "**SHALL NOT**" indicate requirements to be followed strictly in order to conform to the publication and from which no deviation is permitted.
  - The terms "**SHOULD**" and "**SHOULD NOT**" indicate that among several possibilities, one is recommended as particularly suitable without mentioning or excluding others, that a certain course of action is preferred but not necessarily required, or that (in the negative form) a certain possibility or course of action is discouraged but not prohibited.

- The terms “ MAY ” and “ NEED NOT ” indicate a course of action permissible within the limits of the publication.
- The terms “ CAN ” and “ CANNOT ” indicate a possibility and capability — whether material, physical, or causal — or, in the negative, the absence of that possibility or capability.

## 1.2. Document Structure

This document is organized as follows. Each section is labeled as either normative (i.e., mandatory for compliance) or informative (i.e., not mandatory).

- Section 1 introduces the document. This section is *informative*.
- Section 2 describes requirements for AALs. This section is *normative*.
- Section 3 describes authenticator and verifier requirements. This section is *normative*.
- Section 4 describes requirements for authenticator event management. This section is *normative*.
- Section 5 describes requirements for session management. This section is *normative*.
- Section 6 provides security considerations. This section is *informative*.
- Section 7 provides privacy considerations. This section is *informative*.
- Section 8 provides customer experience considerations. This section is *informative*.
- The References section lists publications that are cited in this document. This section is *informative*.
- Appendix A discusses the strength of passwords. This appendix is *informative*.
- Appendix B discusses syncable authenticators. This appendix is *normative*.
- Appendix C contains a selected list of abbreviations used in this document. This appendix is *informative*.
- Appendix D contains a glossary of selected terms used in this document. This appendix is *informative*.
- Appendix E contains a summarized list of changes in this document’s history. This appendix is *informative*.

## 2. Authentication Assurance Levels

*This section is normative.*

To satisfy the requirements of a given AAL and be recognized as a subscriber, a claimant **SHALL** authenticate to an RP (or IdP, as described in [SP800-63C]) with a process whose strength is equal to or greater than the requirements at that level. The authentication process results in an identifier that uniquely identifies the subscriber each time they authenticate to that RP. The identifier **MAY** be pseudonymous. Other attributes that identify the subscriber as a unique subject **MAY** also be provided. Detailed normative requirements for authenticators and verifiers at each AAL are provided in Sec. 3. See [SP800-63] Sec. 3 for details on how to choose the most appropriate AAL.

Personal information collected during and after identity proofing (see [SP800-63A]) **MAY** be made available to the subscriber by the digital identity service through the subscriber account. The release or online availability of any personal information by federal agencies requires multi-factor authentication in accordance with [EO13681]. Therefore, federal agencies **SHALL** select a minimum of AAL2 when personal information is made available online.

At all AALs, indicators of potential fraud, including applicable indicators described in Sec. 5.3, **MAY** be used to lower the risk of misauthentication. For example, authentication from an unexpected geolocation or IP address block (e.g., a cloud service) might prompt the use of additional risk-based controls. CSPs or verifiers **SHALL** assess their use of indicators of potential fraud for efficacy and to identify and mitigate potential negative impacts on their user populations. CSPs or verifiers **SHALL** include fraud indicators in the authentication privacy risk assessment. The use of potential fraud indicators prior to or during the authentication process does not impact or change the AAL of a transaction or substitute for an authentication factor.

Throughout this document, [FIPS140] requirements are satisfied by security technologies, products, and services that utilize implementations of cryptography validated by the Cryptography Module Validation Program [CMVP]. FIPS 140 requirements at a given AAL are often different for authenticators and verifiers, with more stringent requirements generally applying to verifiers. This is in recognition of the practical limitations on the certification of authenticators as well as the broader scope that is often associated with a security breach at a verifier.

### 2.1. Authentication Assurance Level 1

AAL1 provides basic confidence that the claimant controls an authenticator that is bound to the subscriber account. AAL1 requires either single-factor or multi-factor authentication using a wide range of available authentication technologies. Verifiers **SHOULD** make multi-factor authentication options available at AAL1 and encourage their use. Successful authentication requires that the claimant prove possession and control of the authenticator through a secure authentication protocol.

### 2.1.1. Permitted Authenticator Types

AAL1 authentication **SHALL** use any of the following authentication types, which are further defined in Sec. 3:

- Password (Sec. 3.1.1): A memorizable secret typically chosen by the subscriber
- Look-up secret (Sec. 3.1.2): A secret determined by the claimant by looking up a prompted value in a list held by the subscriber
- Out-of-band device (Sec. 3.1.3): A secret sent or received through a separate communication channel with the subscriber
- Single-factor one-time password (OTP) (Sec. 3.1.4): A one-time secret obtained from a device or application held by the subscriber
- Multi-factor OTP (Sec. 3.1.5): A one-time secret obtained from a device or application held by the subscriber that requires activation by a second authentication factor
- Single-factor cryptographic authentication (Sec. 3.1.6): Proof of possession and control via an authentication protocol of a cryptographic key held by the subscriber
- Multi-factor cryptographic authentication (Sec. 3.1.7): Proof of possession and control via an authentication protocol of a cryptographic key held by the subscriber that requires activation by a second authentication factor

### 2.1.2. Authenticator and Verifier Requirements

Authenticators used at AAL1 **SHALL** use *approved cryptography*. In other words, they must use approved algorithms, but the implementation need not be validated under [FIPS140].

Communication between the claimant and verifier **SHALL** occur via one or more *authenticated protected channels*.

Cryptography used by verifiers operated by or on behalf of federal agencies at AAL1 **SHALL** be validated to meet the requirements of [FIPS140] Level 1.

### 2.1.3. Reauthentication

These guidelines provide for two types of timeouts, which are further described in Sec. 5.2:

1. An overall timeout limits the duration of an authenticated session to a specified period following authentication or a previous reauthentication.
2. An inactivity timeout terminates a session that has not had activity from the subscriber for a specified period.

Periodic reauthentication of subscriber sessions **SHALL** be performed, as described in Sec. 5.2. A definite reauthentication overall timeout **SHALL** be established, which **SHOULD** be no more than 30 days at AAL1. An inactivity timeout **MAY** be applied but is not required at AAL1.

## 2.2. Authentication Assurance Level 2

AAL2 provides high confidence that the claimant controls one or more authenticators that are bound to the subscriber account. Proof of possession and control of two distinct authentication factors through the use of secure authentication protocols is required. Approved cryptographic techniques are required.

### 2.2.1. Permitted Authenticator Types

At AAL2, authentication **SHALL** use either a multi-factor authenticator or a combination of two separate authentication factors. A multi-factor authenticator requires two factors to execute a single authentication event, such as a cryptographically secure device with an integrated biometric sensor that is required to activate the device. Authenticator requirements are specified in Sec. 3.

When a multi-factor authenticator is used, any of the following **MAY** be used:

- Multi-factor out-of-band authenticator (Sec. 3.1.3.4)
- Multi-factor OTP (Sec. 3.1.5)
- Multi-factor cryptographic authentication (Sec. 3.1.7)

When a combination of two single-factor authenticators is used, the combination **SHALL** include one *physical authenticator* (i.e., “something you have”) from the following list in conjunction with either a password (Sec. 3.1.1) or a biometric comparison:

- Look-up secret (Sec. 3.1.2)
- Out-of-band device (Sec. 3.1.3)
- Single-factor OTP (Sec. 3.1.4)
- Single-factor cryptographic authentication (Sec. 3.1.6)

> A biometric characteristic is not recognized as an authenticator by itself. Section 3.2.3 requires a physical authenticator to be authenticated along with a biometric comparison. The physical authenticator then serves as "something you have," while the biometric match serves as "something you are." When a biometric comparison is used as an activation factor for a multi-factor authenticator, the authenticator itself serves as the physical authenticator. As noted in that section, local verification of biometric factors (i.e., the use of a multi-factor authenticator with a biometric comparison as an activation factor) is preferred over central biometric factor comparison.

### 2.2.2. Authenticator and Verifier Requirements

Authenticators used at AAL2 **SHALL** use approved cryptography. Cryptographic authenticators procured by federal agencies **SHALL** be validated to meet the requirements of [FIPS140] Level 1. At least one authenticator used at AAL2 **SHALL** be replay-resistant, as described in Sec. 3.2.7. Authentication at AAL2 **SHOULD** demonstrate authentication intent from at least one authenticator, as discussed in Sec. 3.2.8.

Communication between the claimant and verifier **SHALL** occur via one or more authenticated protected channels.

Cryptography used by verifiers operated by or on behalf of federal agencies at AAL2 **SHALL** be validated to meet the requirements of [FIPS140] Level 1 unless otherwise specified.

Verifiers **SHALL** offer at least one phishing-resistant authentication option at AAL2, as described in Sec. 3.2.5. Federal agencies **SHALL** require their staff, contractors, and partners to use phishing-resistant authentication to access federal information systems. In all cases, verifiers **SHOULD** encourage the use of phishing-resistant authentication at AAL2 whenever practical since phishing is a significant threat vector [IC3].

### 2.2.3. Reauthentication

Periodic reauthentication of subscriber sessions **SHALL** be performed, as described in Sec. 5.2. A definite reauthentication overall timeout **SHALL** be established, which **SHOULD** be no more than 24 hours at AAL2. The inactivity timeout **SHOULD** be no more than 1 hour. When the inactivity timeout has occurred but the overall timeout has not yet occurred, the verifier **MAY** allow the subscriber to reauthenticate using only a successful password or biometric comparison in conjunction with the *session secret*, as described in Sec. 5.1.

### 2.3. Authentication Assurance Level 3

AAL3 provides very high confidence that the claimant controls authenticators that are bound to the subscriber account. Authentication at AAL3 is based on the proof of possession of a key through the use of a cryptographic protocol along with either an activation factor or a password. AAL3 authentication requires the use of a cryptographic authenticator with a non-exportable *private key* that provides phishing resistance. Approved cryptographic techniques are required.

#### 2.3.1. Permitted Authenticator Types

AAL3 authentication **SHALL** require one of the following authenticator combinations:

- Multi-factor cryptographic authentication (Sec. 3.1.7)
- Single-factor cryptographic authentication (Sec. 3.1.6) used in conjunction with either a password (Sec. 3.1.1) or a biometric comparison

> A biometric characteristic is not recognized as an authenticator by itself. Section 3.2.3 requires a physical authenticator to be authenticated along with the biometric comparison. The physical authenticator then serves as "something you have," while the biometric match serves as "something you are." When a biometric comparison is used as an activation factor for a multi-factor authenticator, the authenticator itself serves as the physical authenticator. As noted in that section, local verification of biometric factors (i.e., the use of a multi-factor authenticator with a biometric comparison as an activation factor) is preferred over central biometric factor comparison.

#### 2.3.2. Authenticator and Verifier Requirements

Authenticators used at AAL3 **SHALL** use approved cryptography. Communication between the claimant and verifier **SHALL** occur via one or more authenticated protected channels. The cryptographic authenticator used at AAL3 **SHALL** have a non-exportable private key and **SHALL** provide phishing resistance, as described in Sec. 3.2.5. The cryptographic authentication protocol **SHALL** be replay-resistant, as described in Sec. 3.2.7. All authentication and reauthentication processes at AAL3 **SHALL** demonstrate authentication intent from at least one authenticator, as described in Sec. 3.2.8. Cryptographic authenticators used at AAL3 **SHALL** use public-key cryptography to protect the authentication secrets from compromise of the verifier.

Single-factor and multi-factor authenticators used at AAL3 **SHALL** be validated to meet the requirements of [FIPS140] Level 1 or higher overall. As described in Sec. 3.2.12, cryptographic authenticators used at AAL3 are required to provide a hardware-protected, isolated environment to prevent authentication keys from being leaked or

extracted. Since *syncable authenticators* (described in Appendix B) require the private key to be exportable, syncable authenticators **SHALL NOT** be used at AAL3.

Cryptography used by verifiers at AAL3 **SHALL** be validated at [FIPS140] Level 1 or higher.

Hardware-based authenticators and verifiers at AAL3 **SHOULD** resist relevant side-channel (e.g., timing and power-consumption analysis) attacks.

#### 2.3.3. Reauthentication

Periodic reauthentication of subscriber sessions **SHALL** be performed, as described in Sec. 5.2. At AAL3, the overall timeout for reauthentication **SHALL** be no more than 12 hours. The inactivity timeout **SHOULD** be no more than 15 minutes. Unlike AAL2, AAL3 reauthentication requirements are the same as for initial authentication at AAL3.

### 2.4. General Requirements

The following requirements apply to authentication at all AALs.

#### 2.4.1. Security Controls

The verifier **SHALL** employ appropriately tailored security controls from the moderate baseline security controls defined in [SP800-53] or an equivalent federal (e.g., [FEDRAMP]) or industry standard that the organization has chosen for the information systems, applications, and online services that these guidelines are used to protect.

#### 2.4.2. Records Retention Policy

The verifier **SHALL** comply with its respective records retention policies in accordance with applicable laws, regulations, and policies, including any National Archives and Records Administration (NARA) records retention schedules that may apply. If the verifier opts to retain records in the absence of mandatory requirements, the verifier or the CSP or IdP of which it is a part **SHALL** conduct a *risk management* process [NISTRMF], including assessments of privacy and security risks, to determine how long records should be retained and **SHALL** inform the subscriber of that retention policy.

#### 2.4.3. Privacy Requirements

The verifier **SHALL** employ appropriately tailored privacy controls defined in [SP800-53] or an equivalent industry standard.

If CSPs or IdPs process attributes for purposes other than identity services (i.e., identity proofing, authentication, or attribute *assertions*), related fraud mitigation, or compliance with laws or legal processes, they **SHALL** implement measures to maintain predictability and manageability commensurate with the privacy risks that arise from the additional processing. Examples of such measures include providing clear notice, obtaining

subscriber consent, and enabling the selective use or disclosure of attributes. When CSPs or IdPs use consent measures, they **SHALL NOT** make consent for the additional processing a condition of the identity service.

Regardless of whether the CSP or IdP is an agency or private-sector provider, the following requirements apply to federal agencies that offer or use the authentication service:

1. The agency **SHALL** consult with their *Senior Agency Official for Privacy* (SAOP) and conduct an analysis to determine whether the collection of personal information to issue or maintain authenticators triggers the requirements of the *Privacy Act of 1974* [PrivacyAct] (see Sec. 7.4).
2. The agency **SHALL** publish a *System of Records Notice* (SORN) to cover such collections, as applicable.
3. The agency **SHALL** consult with its SAOP and conduct an analysis to determine whether the collection of personal information to issue or maintain authenticators triggers the requirements of the *E-Government Act of 2002* [E-Gov].
4. The agency **SHALL** publish a *Privacy Impact Assessment* (PIA) to cover such collection, as applicable.

#### 2.4.4. Redress Requirements

The verifier and associated CSP or IdP **SHALL** provide mechanisms for the redress of subscriber complaints and problems that arise from subscriber authentication processes, as described in Sec. 5.6 of [SP800-63]. These mechanisms **SHALL** be easy for subscribers to find and use. The CSP or IdP **SHALL** assess the mechanisms for efficacy in resolving complaints or problems.

## 2.5. Summary of Requirements

Table 1 provides a non-normative summary of the requirements for each of the AALs.

**Table 1.** Summary of requirements by AAL

| Requirement | AAL1 | AAL2 | AAL3 |
|---|---|---|---|
| **Permitted Authenticator Types** | * *Any AAL2 or AAL3 authenticator type*<br>* Password<br>* Look-up secret<br>* Out-of-band<br>* SF OTP<br>* SF cryptographic | * MF cryptographic<br>* MF out-of-band<br>* MF OTP<br>* Password or biometric comparison plus:<br>–SF cryptographic<br>–Look-up secret<br>–Out-of-band<br>–SF OTP | * MF cryptographic<br>* SF cryptographic plus:<br>–Password<br>–Biometric comparison |
| **FIPS 140 Validation** (Government Verifiers and Authenticators) | **Verifiers**<br>–Level 1 | **Verifiers**<br>–Level 1<br>**Authenticators**<br>–Level 1 overall | **Verifiers**<br>–Level 1<br>**Authenticators**<br>–Level 1 overall |
| **Reauthentication** (recommended) | 30 days overall | 24 hours overall<br>1 hour inactivity<br>Single factor required | 12 hours overall<br>15 minutes inactivity |
| **Phishing Resistance** | Not required | Recommended;<br>Must be available | Required |
| **Replay Resistance** | Not required | Required | Required |
| **Authentication Intent** | Not required | Recommended | Required |
| **Key Exportability** | Permitted | Permitted | Prohibited |

## 3. Authenticator and Verifier Requirements

*This section is normative.*

This section provides detailed requirements that are specific to each type of authenticator. With the exception of the reauthentication requirements specified in Sec. 2 and the requirement for phishing resistance at AAL3 described in Sec. 3.2.5, the technical requirements for each authenticator type are the same, regardless of the AAL at which the authenticator is used.

In federated applications described in [SP800-63C], the authentication functions of an IdP correspond closely with that of a CSP or verifier. In the discussion below, the requirements associated with a CSP also apply to an IdP.

In many circumstances, subscribers need to share devices that are used in authentication processes, such as a family phone that receives OTPs. In public-facing applications, CSPs **SHOULD NOT** prevent a device from being registered as an authenticator by multiple subscribers. However, they **MAY** establish restrictions to prevent large-scale fraud or misuse (e.g., limiting the total number of subscriber accounts a single device can be registered with).

Authentication, *authenticator binding* (discussed in Sec. 4.1), and session management (discussed in Sec. 5) are based on proof of possession of one or more types of secrets, as shown in Table 2.

**Table 2.** Summary of secrets (non-normative)

| Type of Secret | Purpose | Reference Section |
|---|---|---|
| Password | A subscriber-chosen secret used as an authentication factor | 3.1.1 |
| Look-up secret | A secret issued by a verifier and used only once to prove possession of the secret | 3.1.2 |
| Out-of-band secret | A short-lived secret generated by a verifier and independently sent to a subscriber's device to verify its possession | 3.1.3 |

*Continued on next page*

*Continued from previous page*

| Type of Secret | Purpose | Reference Section |
|---|---|---|
| One-time passcodes (OTP) | A secret generated by an authenticator and used only once to prove possession of the authenticator | 3.1.4, 3.1.5 |
| Activation secret | A password that is used locally as an activation factor for a multi-factor authenticator | 3.2.10 |
| Long-term authenticator secret | A secret embedded in a physical authenticator to allow it to function for authentication | 4.1 |
| Recovery code | A secret issued to the subscriber to allow them to recover an account at which they are no longer able to authenticate | 4.2 |
| Session secret | A secret issued by the verifier at authentication and used to establish the continuity of authenticated sessions | 5.1 |

## 3.1. Requirements by Authenticator Type

The following requirements apply to specific authenticator types.

### 3.1.1. Passwords

A password (sometimes referred to as a *passphrase* or, if numeric, a *personal identification number [PIN]*) is a secret value intended to be chosen and either memorized or recorded by the subscriber. Passwords must be of sufficient effective strength and secrecy that it would be impractical for an attacker to guess or otherwise discover the correct secret value. A password is “something you know.”

The requirements in this section apply to centrally verified passwords that are used as independent authentication factors and sent over an authenticated protected channel to the verifier. Passwords used locally as an activation factor for a multi-factor authenticator (e.g., an unlock PIN) are referred to as *activation secrets* and discussed in Sec. 3.2.10. In contrast to centrally verified passwords, activation secrets (similar to the

unlock passwords or PINs on many devices) are not sent to the verifier and instead used locally to gain access to the authentication secret.

Passwords are not phishing-resistant.

#### 3.1.1.1. Password Authenticators

Passwords **SHALL** either be chosen by the subscriber or assigned randomly by the CSP.

If the CSP disallows a chosen password because it is on a blocklist of commonly used, expected, or compromised values (see Sec. 3.1.1.2), the subscriber **SHALL** be required to choose a different password. Other composition requirements for passwords **SHALL NOT** be imposed. A rationale for this is presented in Appendix A, *Strength of Passwords*.

#### 3.1.1.2. Password Verifiers

The following requirements apply to passwords.

1. Verifiers and CSPs **SHALL** require passwords that are used as a single-factor authentication mechanism to be a minimum of 15 characters in length. Verifiers and CSPs **MAY** allow passwords that are only used as part of multi-factor authentication processes to be shorter but **SHALL** require them to be a minimum of eight characters in length.
2. Verifiers and CSPs **SHOULD** permit a maximum password length of at least 64 characters.
3. Verifiers and CSPs **SHOULD** accept all printing ASCII [RFC20] characters and the space character in passwords.
4. Verifiers and CSPs **SHOULD** accept Unicode [ISO/ISC 10646] characters in passwords. Each Unicode code point **SHALL** be counted as a single character when evaluating password length.
5. Verifiers and CSPs **SHALL NOT** impose other composition rules (e.g., requiring mixtures of different character types) for passwords.
6. Verifiers and CSPs **SHALL NOT** require subscribers to change passwords periodically. However, verifiers **SHALL** force a change if there is evidence that the authenticator has been compromised.
7. Verifiers and CSPs **SHALL NOT** permit the subscriber to store a hint (e.g., a reminder of how the password was created) that is accessible to an unauthenticated claimant.
8. Verifiers and CSPs **SHALL NOT** prompt subscribers to use knowledge-based authentication (KBA) (e.g., “What was the name of your first pet?”) or security questions when choosing passwords.

9. Verifiers **SHALL** request the password to be provided in full (not a subset of it) and **SHALL** verify the entire submitted password (e.g., not truncate it).

If Unicode characters are accepted in passwords, the verifier **SHOULD** apply the normalization process for stabilized strings using the Normalization Form Canonical Composition (NFC) normalization defined in Sec. 12.1 of *Unicode Normalization Forms* [UAX15]. This process is applied before hashing the byte string that represents the password. Subscribers choosing passwords that contain Unicode characters **SHOULD** be advised that some endpoints may represent some characters differently, which would affect their ability to authenticate successfully.

When processing a request to establish or change a password, verifiers **SHALL** compare the prospective secret against a blocklist that contains known commonly used, expected, or compromised passwords. The entire password **SHALL** be subject to comparison, not substrings or words that might be contained therein. For example, the list may include:

- Passwords obtained from previous breach corpuses
- Dictionary words
- Context-specific words, such as the name of the service, the username, and derivatives thereof

If the chosen password is found on the blocklist, the CSP **SHALL** require the subscriber to select a different secret and **SHALL** provide the reason for rejection. Since the blocklist is used to defend against brute-force attacks and unsuccessful attempts are rate-limited, the blocklist **SHOULD** be of sufficient size to prevent subscribers from choosing passwords that attackers are likely to guess before reaching the attempt limit.

> Excessively large blocklists are of little incremental security benefit because the blocklist is used to defend against online attacks, which are already limited by the throttling requirements described in Sec. 3.2.2.

Verifiers **SHALL** offer guidance to the subscriber to help the subscriber choose a strong password. This is particularly important following the rejection of a password on the blocklist as it discourages trivial modifications of listed weak passwords [Blocklists].

Verifiers **SHALL** implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber account, as described in Sec. 3.2.2.

Verifiers **SHALL** allow the use of password managers and autofill functionality. Verifiers **SHOULD** permit claimants to use the “paste” function when entering a password to facilitate password manager use when password autofill APIs are unavailable. Password managers have been shown to increase the likelihood that subscribers will choose

stronger passwords, particularly if the password managers include password generators [Managers].

To help the claimant successfully enter a password, the verifier **SHOULD** offer an option to display the password — rather than a series of dots or asterisks — while it is entered and until it is submitted to the verifier. This allows the claimant to confirm their entry if they are in a location where their screen is unlikely to be observed. The verifier **MAY** also permit the claimant's device to display individual entered characters for a short time after each character is typed to verify the correct entry. This is common on mobile devices.

Verifiers **MAY** make limited allowances for mistyping (e.g., removing leading and trailing whitespace characters before verification, allowing the verification of passwords with differing cases for the leading character) if the password remains at least the required minimum length after such processing and the complexity of the resulting password is not significantly reduced.

Verifiers and CSPs **SHALL** use approved encryption and an authenticated protected channel when requesting passwords.

Verifiers **SHALL** store passwords in a form that is resistant to offline attacks. Passwords **SHALL** be *salted* and hashed using a suitable password hashing scheme. Password hashing schemes take a password, a salt, and a cost factor as inputs and generate a password hash. Their purpose is to make each password guess more expensive for an attacker who has obtained a hashed password file, thereby making the cost of a guessing attack high or prohibitive. The chosen cost factor **SHOULD** be as high as practical without negatively impacting verifier performance. It **SHOULD** be increased over time to account for increases in computing performance. An approved password hashing scheme published in the latest revision of [SP800-132] or updated NIST guidelines on password hashing schemes **SHOULD** be used. The chosen output length of the password verifier, excluding the salt and versioning information, **SHOULD** be the same as the length of the underlying password hashing scheme output.

The salt **SHALL** be at least 32 bits in length and chosen to minimize salt value collisions among stored hashes (i.e., to prevent multiple subscriber accounts from having the same hashed password). Both the salt value and the resulting hash **SHALL** be stored for each password. A reference to the password hashing scheme used, including the cost factor, **SHOULD** be stored for each password to allow migration to new algorithms and work factors.

In addition, verifiers **SHOULD** perform an additional iteration of a keyed hashing or encryption operation using a secret key known only to the verifier. If used, this key value **SHALL** be generated by an approved random bit generator, as described in Sec. 3.2.12. The secret key value **SHALL** be stored separately from the hashed passwords. It **SHOULD** be stored and used within a hardware-protected area, such as a hardware security

module or trusted execution environment (TEE), such as a trusted platform module (TPM). With this additional iteration, brute-force attacks on the hashed passwords are impractical as long as the secret key value remains secret.

### 3.1.2. Look-Up Secrets

A look-up secret authenticator is a physical or electronic record that stores a set of secrets shared between the claimant and the CSP. The claimant uses the authenticator to look up the appropriate secrets needed to respond to a prompt from the verifier. For example, the verifier could ask a claimant to provide a specific subset of the numeric or character strings printed on a card in table format. A typical application of look-up secrets is for one-time saved recovery codes (see Sec. 4.2.1.1) that the subscriber stores for use if another authenticator is lost or malfunctions. A look-up secret is "something you have."

Look-up secrets are not phishing-resistant.

#### 3.1.2.1. Look-Up Secret Authenticators

CSPs that create look-up secret authenticators **SHALL** use an approved random bit generator, as described in Sec. 3.2.12, to generate the list of secrets and **SHALL** deliver the authenticator list securely to the subscriber (e.g., in an in-person session, via an online session, through the postal mail to a contact address). If delivered via an online session, the session **SHALL** be authenticated by the subscriber at AAL2 or higher and **SHALL** deliver the secrets through an authenticated protected channel and in accordance with the post-enrollment binding requirements in Sec. 4.1.2. Look-up secrets **SHALL** be at least six decimal digits (or equivalent) in length. Additional requirements described in Sec. 3.1.2.2 may also apply, depending on their length.

#### 3.1.2.2. Look-Up Secret Verifiers

Verifiers of look-up secrets **SHALL** prompt the claimant for a secret from their authenticator. A secret from a look-up secret authenticator **SHALL** be used successfully only once. If the look-up secret is derived from a grid card, each grid cell **SHOULD** be used only once, which limits the number of authentications that can be accomplished using look-up secrets. A very long list of secrets is potentially required.

Verifiers **SHALL** store look-up secrets in a form that is resistant to offline attacks. All look-up secrets **SHALL** be stored in a hashed form using an approved hashing function.

Look-up secrets **SHALL** be at least six decimal digits (or equivalent) in length, as specified in Sec. 3.1.2.1. Look-up secrets that are shorter than specified lengths have additional verification requirements as follows:

- Look-up secrets that are shorter than the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication)

SHALL be stored in a salted and hashed form using a suitable password hashing scheme, as described in Sec. 3.1.1.2. The salt value SHALL be at least 32 bits in length and arbitrarily chosen to minimize salt value collisions among stored hashes. Both the salt value and the resulting hash SHALL be stored for each look-up secret.

- The verifier SHALL implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber account, as described in Sec. 3.2.2.

The verifier SHALL use approved encryption and an authenticated protected channel when requesting look-up secrets.

### 3.1.3. Out-of-Band Devices

An out-of-band authenticator is a physical device that is uniquely addressable and can communicate securely with the verifier over an independent communications channel, which is referred to as the secondary channel. The device is possessed and controlled by the claimant and supports private communication over this separate secondary channel, which is separate from the primary channel for authentication. An out-of-band authenticator is "something you have." Examples of out-of-band devices include smartphones equipped with applications that allow the verifier to independently communicate with the subscriber or the use of text messaging or audio calls to communicate with the subscriber.

Out-of-band authentication uses a short-term secret generated by the verifier. The secret securely binds the authentication operation on the primary and secondary channels and establishes the claimant's control of the out-of-band device.

Out-of-band authentication is not phishing-resistant.

The out-of-band authenticator can operate in one of the following ways:

- The claimant transfers a secret received by the out-of-band device via the secondary channel to the verifier using the primary channel. For example, the claimant may receive the secret (typically a 6-digit code) on their mobile device and type it into their authentication session. This method is shown in Fig. 1.

- The claimant transfers a secret received via the primary channel to the out-of-band device for transmission to the verifier via the secondary channel. For example, the claimant may view the secret on their authentication session and either type it into an application on their mobile device or use a technology such as a barcode or QR code to effect the transfer. This method is shown in Fig. 2.




**Fig. 1.** Transfer of secret to primary device




**Fig. 2.** Transfer of secret to out-of-band device

> **Note:** A third method of out-of-band authentication compares the secrets received from the primary and secondary channels and requests approval on the secondary channel. This method is no longer considered acceptable because it increases the likelihood that the subscriber would approve an authentication request without actually comparing the secrets as required. This has been observed with "authentication fatigue" attacks in which an attacker generates many out-of-band authentication requests to the subscriber, who might approve one to eliminate the annoyance. For this reason, these guidelines require the transfer of the secret between the out-of-band device and the primary channel to increase assurance that the subject is actively participating in the session with the verifier. Presenting the claimant with a list of secrets to compare is not sufficient to meet this requirement, as the claimant may reasonably guess the secret due to the limited size of the list that can be presented.

#### 3.1.3.1. Out-of-Band Authenticators

The out-of-band authenticator **SHALL** establish a separate channel with the verifier to retrieve the out-of-band secret or authentication request. This channel is considered to be out-of-band with respect to the primary communication channel (even if it terminates on the same device), provided that the device does not leak information from one channel to the other without the claimant's participation.

The out-of-band device **SHOULD** be uniquely addressable by the verifier. Communication over the secondary channel **SHALL** use approved encryption unless sent via the public switched telephone network (PSTN). For additional authenticator requirements that are specific to using the PSTN for out-of-band authentication, see Sec. 3.1.3.3.

Email **SHALL NOT** be used for out-of-band authentication because it may be vulnerable to:

- Access using only a password
- Interception in transit or at intermediate mail servers
- Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing

> Confirmation codes that are sent to validate email addresses or are issued as recovery codes (see Sec. 4.2.1.2) are not authentication processes and not affected by the above prohibition.

The out-of-band authenticator **SHALL** uniquely authenticate itself in one of the following ways when communicating with the verifier:

- Using approved cryptography, establish a mutually authenticated protected channel (e.g., client-authenticated *transport layer security* (TLS) [RFC8446]) with the verifier. Communication between the out-of-band authenticator and the verifier **MAY** use a trusted intermediary service to which each authenticates. The key used to establish the channel **SHALL** be provisioned in a mutually authenticated session during authenticator binding, as described in Sec. 4.1.
- Authenticate to a public mobile telephone network using a SIM card or equivalent secret that uniquely identifies the subscriber. This method **SHALL** only be used if a secret is sent from the verifier to the out-of-band device via the PSTN (i.e., SMS or voice) or an encrypted instant messaging service.
- Use a wired connection to the PSTN that the verifier can call and dictate the out-of-band secret. For the purposes of this definition, "wired connection" includes services such as cable providers that offer PSTN services through other wired media and fiber via analog telephone adapters.

For single-factor out-of-band authenticators, if a secret is sent by the verifier to the out-of-band device, the device **SHOULD NOT** display the authentication secret while it is locked by the owner. Rather, the device **SHOULD** require the presentation and verification of a PIN, passcode, or biometric characteristic to view the secret. However, authenticators **SHOULD** indicate the receipt of an authentication secret on a locked device.

If the out-of-band authenticator requests approval over the secondary communication channel rather than by presenting a secret that the claimant transfers to the primary communication channel, it **SHALL** accept a transfer of the secret from the primary channel and send it to the verifier over the secondary channel to associate the approval with the authentication transaction. The claimant **MAY** perform the transfer manually or with the assistance of a representation, such as a barcode or quick response (QR) code.

#### 3.1.3.2. Out-of-Band Verifiers

The verifier waits for an authenticated protected channel to be established with the out-of-band authenticator and verifies its identifying key. The verifier **SHALL NOT** store the identifying key itself but **SHALL** use a verification method (e.g., an approved hash function or proof of possession of the identifying key) to uniquely identify the authenticator. Once authenticated, the verifier transmits the authentication secret to the authenticator. The connection with the out-of-band authenticator **MAY** be either manually initiated or prompted by a mechanism, such as a push notification.

Depending on the type of out-of-band authenticator, one of the following **SHALL** take place:

- **Transfer of the secret from the secondary to the primary channel**. As shown in Fig. 1, the verifier **MAY** signal the device that contains the subscriber's

authenticator to indicate a readiness to authenticate. It **SHALL** then transmit a random secret to the out-of-band authenticator and wait for the secret to be returned via the primary communication channel.

- **Transfer of the secret from the primary to the secondary channel**. As shown in Fig. 2, the verifier **SHALL** transmit a random authentication secret to the claimant via the primary channel. It **SHALL** then wait for the secret to be returned via the secondary channel from the claimant's out-of-band authenticator. The verifier **MAY** additionally display an address, such as a phone number or VoIP address, for the claimant to use in addressing its response to the verifier.

In all cases, the authentication **SHALL** be considered invalid unless completed within 10 minutes. Verifiers **SHALL** accept a given authentication secret as valid only once during the validity period to provide *replay resistance*, as described in Sec. 3.2.7.

The verifier **SHALL** generate random authentication secrets that are at least six decimal digits (or equivalent) in length using an approved random bit generator as described in Sec. 3.2.12. If the authentication secret is less than 64 bits long, the verifier **SHALL** implement a rate-limiting mechanism that effectively limits the total number of consecutive failed authentication attempts that can be made on the subscriber account as described in Sec. 3.2.2. Generating a new authentication secret **SHALL NOT** reset the failed authentication count.

Out-of-band verifiers that send a push notification to a subscriber device **SHOULD** implement a reasonable limit on the rate or total number of push notifications that will be sent since the last successful authentication.

For additional verification requirements that are specific to the PSTN, see Sec. 3.1.3.3.

#### 3.1.3.3. Authentication Using the Public Switched Telephone Network

Use of the PSTN for out-of-band verification is *restricted* as described in this section and **SHALL** satisfy the requirements of Sec. 3.2.9. Setting or changing the pre-registered telephone number is considered to be the binding of a new authenticator and **SHALL** only occur as described in Sec. 4.1.2.

Some subscribers may be unable to use PSTN to deliver out-of-band authentication secrets in areas with limited telephone coverage, particularly without mobile phone service. Accordingly, verifiers **SHALL** ensure that alternative authenticator types are available to all subscribers and **SHOULD** remind subscribers of this limitation of PSTN out-of-band authenticators before binding one or more devices controlled by the subscriber.

Verifiers **SHOULD** consider risk indicators (e.g., device swap, SIM change, number porting, other abnormal behavior) before using the PSTN to deliver an out-of-band authentication secret.

> Consistent with the discussion of *restricted authenticators* in Sec. 3.2.9, NIST may adjust the restricted status of out-of-band authentication using the PSTN based on the evolution of the threat landscape and the technical operation of the PSTN.

#### 3.1.3.4. Multi-Factor Out-of-Band Authenticators

Multi-factor out-of-band authenticators operate similarly to single-factor out-of-band authenticators (see Sec. 3.1.3.1). However, they require the presentation and verification of an activation factor (i.e., a password or a biometric characteristic) before allowing the claimant to complete the authentication transaction (i.e., before accessing or entering the authentication secret as appropriate for the authentication flow being used). Each use of the authenticator **SHALL** require the presentation of the activation factor.

Authenticator activation secrets **SHALL** meet the requirements of Sec. 3.2.10. A biometric activation factor **SHALL** meet the requirements of Sec. 3.2.3, including limits on the number of consecutive authentication failures. The password or biometric sample used for activation and any biometric data derived from the biometric sample (e.g., a fingerprint image and feature locations produced by a fingerprint feature extractor) **SHALL** be erased immediately after an authentication operation.

### 3.1.4. Single-Factor OTP

A single-factor OTP generates one-time passwords (OTPs). This category includes hardware devices and software-based OTP generators that are installed on devices such as mobile phones. These authenticators have an embedded secret that is used as the seed for generating OTPs and do not require activation through a second factor. The OTP is displayed on the authenticator and manually input for transmission to the verifier, thereby proving possession and control of the authenticator. A single-factor OTP authenticator is "something you have."

Single-factor OTPs are similar to look-up secret authenticators except that the secrets are cryptographically and independently generated by the authenticator and the verifier and compared by the verifier. The secret is computed based on a nonce that may be time-based or from a counter on the authenticator and verifier.

OTP authentication is not phishing-resistant. [FIPS140] validation of OTP authenticators and verifiers is not required.

#### 3.1.4.1. Single-Factor OTP Authenticators

Single-factor OTP authenticators and verifiers contain two persistent values: 1) a symmetric key that persists for the authenticator's lifetime and 2) a nonce that is either changed each time the authenticator is used or is based on a real-time clock.

The secret key and its algorithm **SHALL** provide at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication). The nonce **SHALL** be of sufficient length to ensure that it is unique for each operation of the authenticator over its lifetime. If a subscriber needs to change the device on which a software-based OTP authenticator resides, they **SHOULD** bind the authenticator application on the new device to their subscriber account, as described in Sec. 4.1.2, and invalidate the authenticator application that will no longer be used. Alternatively, the subscriber **MAY** export the secret key and store it in a *sync fabric* that meets the requirements in Appendix B.2 and then retrieve the key with their new device.

The authenticator output is obtained using an approved block cipher or hash function to securely combine the key and nonce. In coordination with the verifier, the authenticator **MAY** truncate its output to as few as six decimal digits (or an equivalent representation).

If the nonce used to generate the authenticator output is based on a real-time clock, the nonce **SHALL** be changed at least once every two minutes.

#### 3.1.4.2. Single-Factor OTP Verifiers

Single-factor OTP verifiers effectively duplicate the process of generating the OTP used by the authenticator. As such, the symmetric keys used by authenticators are also present in the verifier and **SHALL** be strongly protected against unauthorized disclosure by access controls that limit access to the keys to only those software components that require access.

When binding a single-factor OTP authenticator to a subscriber account, the verifier or associated CSP **SHALL** use approved cryptography for key establishment to generate and exchange keys or to obtain the secrets required to duplicate the authenticator output.

The verifier **SHALL** use approved encryption and an authenticated protected channel when collecting the OTP. Verifiers **SHALL** accept a given OTP only once while it is valid to provide replay resistance, as described in Sec. 3.2.7. If a claimant's authentication is denied due to the duplicate use of an OTP, verifiers **MAY** warn the claimant if an attacker has been able to authenticate in advance. Verifiers **MAY** also warn a subscriber in an existing session of the attempted duplicate use of an OTP.

Time-based OTPs [TOTP] **SHALL** have a defined lifetime that is determined by the expected clock drift in either direction of the authenticator over its lifetime plus an allowance for network delay and claimant entry of the OTP.

The verifier **SHOULD** implement or, if the authenticator output is less than 64 bits in length, **SHALL** implement a rate-limiting mechanism that effectively limits the number of failed authentication attempts that can be made on the subscriber account, as described in Sec. 3.2.2.

### 3.1.5. Multi-Factor OTPs

A multi-factor OTP generates one-time passwords for authentication following the input of an activation factor. This includes hardware devices and software-based OTP generators that are installed on mobile phones and similar devices. The second authentication factor may be provided through an integral entry pad, an integral biometric (e.g., fingerprint) reader, or a direct computer interface (e.g., universal serial bus [USB] port). The OTP is displayed on the authenticator and manually input for transmission to the verifier. The multi-factor OTP authenticator is "something you have" activated by either "something you know" or "something you are."

OTP authentication is not phishing-resistant. [FIPS140] validation of OTP authenticators and verifiers is not required.

#### 3.1.5.1. Multi-Factor OTP Authenticators

Multi-factor OTP authenticators operate similarly to single-factor OTP authenticators (see Sec. 3.1.4.1), except they require the presentation and verification of an activation factor (i.e., a password or a biometric characteristic) to obtain the OTP from the authenticator. Each use of the authenticator **SHALL** require the input of the activation factor.

In addition to activation information, multi-factor OTP authenticators and verifiers contain two persistent values: 1) a symmetric key that persists for the authenticator's lifetime and 2) a nonce that is either changed each time the authenticator is used or based on a real-time clock.

The secret key and its algorithm **SHALL** provide at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication). The nonce **SHALL** be of sufficient length to ensure that it is unique for each operation of the authenticator over its lifetime. If a subscriber needs to change the device on which a software-based OTP authenticator resides, they **SHOULD** bind the authenticator application on the new device to their subscriber account, as described in Sec. 4.1.2, and invalidate the authenticator application that will no longer be used. Alternatively, the subscriber **MAY** export the secret key and store it in a sync fabric that meets the requirements in Appendix B.2 and retrieve the key with their new device.

The authenticator output is obtained using an approved cryptography block cipher or hash function to securely combine the key and nonce. In coordination with the verifier, the authenticator **MAY** truncate its output to as few as six decimal digits or equivalent.

If the nonce used to generate the authenticator output is based on a real-time clock, the nonce **SHALL** be changed at least once every two minutes.

Authenticator activation secrets **SHALL** meet the requirements of Sec. 3.2.10. A biometric activation factor **SHALL** meet the requirements of Sec. 3.2.3, including limits on the number of consecutive authentication failures. The unencrypted key and

activation secret or biometric sample and any biometric data derived from the biometric sample (e.g., a fingerprint image and feature locations produced by a fingerprint feature extractor) **SHALL** be erased immediately after an OTP has been generated.

#### 3.1.5.2. Multi-Factor OTP Verifiers

Multi-factor OTP verifiers effectively duplicate the process of generating the OTP used by the authenticator without requiring a second authentication factor. As such, the symmetric keys used by authenticators **SHALL** be strongly protected against unauthorized disclosure by access controls that limit access to the keys to only those software components that require access.

When binding a multi-factor OTP authenticator to a subscriber account, the verifier or associated CSP **SHALL** use approved cryptography for key establishment to generate and exchange keys or to obtain the secrets required to duplicate the authenticator output.

The verifier **SHALL** use approved encryption and an authenticated protected channel when collecting the OTP. Verifiers **SHALL** accept a given OTP only once while it is valid to provide replay resistance, as described in Sec. 3.2.7. If a claimant's authentication is denied due to the duplicate use of an OTP, verifiers **MAY** warn the claimant if an attacker has been able to authenticate in advance. Verifiers **MAY** also warn a subscriber in an existing session of the attempted duplicate use of an OTP.

Time-based OTPs [TOTP] **SHALL** have a defined lifetime that is determined by the expected clock drift in either direction of the authenticator over its lifetime plus an allowance for network delay and claimant entry of the OTP.

The verifier **SHALL** implement a rate-limiting mechanism that effectively limits the number of consecutive failed authentication attempts that can be made on the subscriber account, as required by Sec. 3.2.10.

### 3.1.6. Single-Factor Cryptographic Authentication

Single-factor cryptographic authentication is accomplished by proving the possession and control of a cryptographic key via an authentication protocol. Depending on the strength of authentication required, the authentication key may be stored in a manner that is accessible to the endpoint associated with the authenticator or in a separate, directly connected processor or device. The authenticator output is highly dependent on the specific cryptographic protocol used but is generally some type of signed message. A single-factor cryptographic authenticator is "something you have." Single-factor cryptographic authenticators used at AAL3 **SHALL** use public-key cryptography to protect the authentication secrets from compromise of the verifier.

Cryptographic authentication is phishing-resistant if it meets the additional requirements in Sec. 3.2.5.

#### 3.1.6.1. Single-Factor Cryptographic Authenticators

Single-factor cryptographic authenticators encapsulate one or more authentication keys. Authentication keys are described as either exportable (see Sec. 3.2.13) or non-exportable. Exportable authentication keys (usable at AAL2 or below) **SHOULD** be stored in appropriate storage that is available to the authenticator (e.g., keychain storage). If they are accessible to the endpoint being authenticated, exportable authentication keys **SHALL** be strongly protected against unauthorized disclosure with access controls that limit access to the key to only those software components that require access. Non-exportable authentication keys (usable at AAL3 or below) **SHALL** be stored in an isolated execution environment that is protected by hardware or in a separate processor with a controlled interface to the central processing unit of the user endpoint.

Some cryptographic authenticators, referred to as syncable authenticators, can manage their authentication keys using a sync fabric (e.g., a cloud provider). Additional requirements for using syncable authenticators are in Appendix B.

External (i.e., non-embedded) cryptographic authenticators **SHALL** meet the requirements for connected authenticators in Sec. 3.2.11.

As required by Sec. 2.3.2, single-factor cryptographic authenticators that are being used at AAL3 must meet the authentication intent requirements of Sec. 3.2.8.

#### 3.1.6.2. Single-Factor Cryptographic Verifiers

Single-factor cryptographic verifiers generate a challenge nonce, send it to the corresponding authenticator, and use the authenticator output to verify possession of the authenticator. The authenticator output is highly dependent on the specific cryptographic authenticator and protocol used but is generally some type of signed message.

The verifier has a public cryptographic key that corresponds to each authenticator. While both types of keys **SHALL** be protected against modification, symmetric keys **SHALL** additionally be protected against unauthorized disclosure by access controls that limit access to the key to only those software components that require access.

The authentication key and its algorithm **SHALL** provide at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication). The challenge nonce **SHALL** be at least 64 bits in length and **SHALL** either be unique over the authenticator's lifetime or statistically unique (i.e., generated using an approved random bit generator, as described in Sec. 3.2.12). The verification operation **SHALL** use approved cryptography.

### 3.1.7. Multi-Factor Cryptographic Authentication

Multi-factor cryptographic authentication uses an authentication protocol to prove possession and control of an authentication key that requires activation through a

second authentication factor. Depending on the strength of authentication needed, the authentication key may be stored in a manner that is accessible to the endpoint being authenticated or in a separate, directly connected processor or device. The authenticator output is highly dependent on the specific cryptographic protocol used but is generally some type of signed message. A multi-factor cryptographic authenticator is "something you have" and is activated by an activation factor that represents either "something you know" or "something you are." Multi-factor cryptographic authenticators used at AAL3 **SHALL** use public-key cryptography to protect the authentication secrets from compromise of the verifier.

Cryptographic authentication is phishing-resistant if it meets the additional requirements in Sec. 3.2.5.

#### 3.1.7.1. Multi-Factor Cryptographic Authenticators

Multi-factor cryptographic authenticators encapsulate one or more authentication keys that **SHALL** only be accessible through the presentation and verification of an activation factor (i.e., a password or a biometric characteristic). Non-exportable authentication keys, suitable for use at AAL3, **SHALL** be stored in an isolated execution environment that is protected by hardware or in a separate processor with a controlled interface to the central processing unit of the user endpoint. Exportable authentication keys (usable at AAL2 or below) **SHOULD** be stored in appropriate storage that is available to the authenticator (e.g., keychain storage). If accessible to the endpoint being authenticated, authentication keys **SHALL** be strongly protected against unauthorized disclosure by using access controls that limit access to the authentication keys to only those software components that require access.

External (non-embedded) cryptographic authenticators **SHALL** meet the requirements for connected authenticators in Sec. 3.2.11. Each authentication event **SHALL** require input and verification of the local activation factor. Authenticator activation secrets **SHALL** meet the requirements of Sec. 3.2.10. A biometric activation factor **SHALL** meet the requirements of Sec. 3.2.3, including limits on the number of consecutive authentication failures. The activation secret or biometric sample and any biometric data derived from the biometric sample (e.g., a fingerprint image and feature locations produced by a fingerprint feature extractor) **SHALL** be erased after an authentication transaction.

#### 3.1.7.2. Multi-Factor Cryptographic Verifiers

The requirements for a multi-factor cryptographic verifier are identical to those for a single-factor cryptographic verifier, as described in Sec. 3.1.6.2. Some multi-factor authenticators include flags to indicate whether an activation factor was used. If such a flag is present and indicates that an activation factor was not used, the authentication

**SHALL** be treated as single-factor. Otherwise, verification of the output from a multi-factor cryptographic authenticator indicates that the activation factor was used.

#### 3.1.7.3. Usage With Subscriber-Controlled Wallets

A specific form of multi-factor cryptographic authentication is a subscriber-controlled wallet on the subscriber's device, as described in Sec. 5 of [SP800-63C]. After the claimant first unlocks the wallet using an activation factor, the authentication process uses a federation protocol, as detailed in [SP800-63C]. The assertion contents and presentation requirements of the federation protocol provide the security characteristics required of cryptographic authenticators. As such, subscriber-controlled wallets on the subscriber's device can be considered multi-factor authenticators through the activation factor and the presentation and validation of an assertion generated by the wallet.

> Cloud-hosted wallets are not considered cryptographic multi-factor authenticators because access is maintained through authentication over the internet rather than locally. All authentication information from hosted wallets is treated as an assertion, as addressed in Sec. 5 of [SP800-63C].

Access to the private key **SHALL** require an activation factor. Authenticator activation secrets **SHALL** meet the requirements of Sec. 3.2.10. Biometric activation factors **SHALL** meet the requirements of Sec. 3.2.3, including limits on the number of consecutive authentication failures. The password or biometric sample used for activation and any biometric data derived from the biometric sample **SHALL** be erased immediately after an authentication transaction.

Authentication processes using subscriber-controlled wallets **SHALL** be used with a federation process as detailed in Sec. 5 of [SP800-63C]. Signed audience-restricted assertions that are generated by subscriber-controlled wallets are considered phishing-resistant because they prevent an assertion presented to an impostor RP from being used by the legitimate one. Assertions that lack a valid signature from the wallet or an audience restriction **SHALL NOT** be considered phishing-resistant. Assertions **SHALL** also include sufficient information to determine the nature of the activation method used to activate the wallet.

#### 3.1.7.4. Syncable Authenticators

Some cryptographic authenticators allow the subscriber to copy (i.e., clone) the authentication secret to additional devices, usually via a sync fabric. This eases the burden for subscribers who want to use additional devices to authenticate. Specific requirements for syncable authenticators and the sync fabric are given in Appendix B.

### 3.2. General Authenticator Requirements

The following requirements apply to all types of authentication.

#### 3.2.1. Physical Authenticators

CSPs **SHALL** provide subscriber instructions for appropriately protecting the authenticator against theft or loss. The CSP **SHALL** provide a mechanism to invalidate[1] the authenticator immediately upon notification from a subscriber that the authenticator's loss, theft, or compromise is suspected.

Possession and control of a physical authenticator are based on proof of possession of a secret associated with the authenticator. When an embedded secret (typically a certificate and associated private key) is in the endpoint, its "device identity" can be considered a physical authenticator. However, this requires a secure authentication protocol that is appropriate for the AAL being authenticated. Browser cookies do not satisfy this requirement except as short-term secrets for session maintenance (not authentication), as described in Sec. 5.1.1.

#### 3.2.2. Rate Limiting (Throttling)

When required by the authenticator type descriptions in Sec. 3.1, the verifier **SHALL** implement controls to protect against *online guessing attacks*. Unless otherwise specified in the description of a given authenticator, the verifier **SHALL** limit consecutive failed authentication attempts using a specific authenticator on a single subscriber account to no more than 100 by disabling that authenticator. If more than one authenticator is involved with an excessive number of authentication attempts (e.g., single-factor cryptographic authenticator and centrally verified password), both authenticators **SHALL** be disabled. Authenticators that have been disabled **SHALL** be required to rebind to the subscriber account, as described in Sec. 4.1, to be usable in the future.

> The limit of 100 attempts is an upper bound, and agencies **MAY** impose lower limits. The limit of 100 was chosen to balance the likelihood of a correct guess (e.g., 100 attempts against a six-digit decimal OTP authenticator output) versus the potential need for account recovery when the limit is exceeded.

Additional techniques **MAY** be used to reduce the likelihood that an attacker will lock the legitimate claimant out due to rate limiting. These include:

- Requiring the claimant to complete a bot detection and mitigation challenge before attempting authentication

[1] Invalidation can take several forms, including the revocation of a *public-key infrastructure (PKI)*-based authenticator and removal from the subscriber account.

- Requiring the claimant to wait after a failed attempt for a period of time that increases as the subscriber account approaches its maximum allowance for consecutive failed attempts (e.g., 30 seconds up to an hour)
- Leveraging other risk-based or adaptive authentication techniques to identify claimant behaviors that fall within or outside of typical norms (e.g., the use of the claimant's IP address, geolocation, timing of request patterns, or browser metadata)

When the subscriber successfully authenticates, the verifier **SHOULD** disregard any previous failed attempts for the authenticators used in the successful authentication.

Following successful authentication at a given AAL, the verifier **SHOULD** reset the retry count of the authenticators that were used. If this is provided, the maximum AAL of the authenticator being reset **SHALL** not exceed the AAL of the session from which it is being reset. If the subscriber cannot authenticate at the required AAL, the account recovery procedures in Sec. 4.2 **SHALL** be used.

### 3.2.3. Use of Biometrics

Biometrics is the automated recognition of individuals based on their biological and behavioral characteristics, such as fingerprints, voice patterns, facial features, keystroke patterns, angle of holding a smart phone, screen pressure, typing speed, mouse movements, or gait. Such characteristics have multiple modalities that may differ in the extent to which they establish authentication intent, as described in Sec. 3.2.8.

Biometric comparisons are based on a measurement from the biometric sensor (e.g., camera, fingerprint reader). This measurement is subject to noise and presentation variations that require setting an acceptance threshold based on the differences between the measured biometric and the reference against which it is being compared. Due to these factors, there is some probability that a comparison will not result in a match, which is referred to as a false non-match rate (FNMR). Similarly, there is a probability that an impostor comparison will result in a match, referred to as a false match rate (FMR). A high-quality biometric system has both a very low FMR and FNMR. The chosen threshold usually emphasizes a low FMR to maximize security since false non-matches can often be mitigated by repeating the measurement or using an alternative authentication method.

For a variety of reasons, this document supports only a limited use of biometrics for authentication. These reasons include:

- The biometric FMR does not provide sufficient confidence in the subscriber's authentication by itself because it does not account for active impersonation attacks.
- Biometric comparison is probabilistic, whereas the other authentication factors are deterministic.

- Biometric template protection schemes provide a method for revoking biometric characteristics that are comparable to other authentication factors (e.g., PKI certificates, passwords). However, the availability of such solutions is limited.
- Biometric characteristics do not constitute secrets. They can often be obtained online or otherwise without consent. A facial image can be obtained by taking a picture; latent fingerprints can be obtained from objects someone touches; and iris patterns can be captured with high-resolution cameras. While presentation attack detection (PAD) technologies can mitigate the risks of these types of attacks, additional trust in the sensor or biometric processing is required to ensure that PAD is operating in accordance with the needs of the CSP and the subscriber.
- The use of biometric characteristics, especially when stored for central verification, introduces new privacy concerns, which are discussed further in Sec. 7.

Therefore, the limited use of biometrics for authentication is supported with specific requirements and guidelines.

Biometrics **SHALL** only be used as part of multi-factor authentication with a physical authenticator (i.e., "something you have"). The biometric characteristic **SHALL** be presented and compared for each authentication operation. An alternative non-biometric authentication option **SHALL** always be provided to the subscriber. Biometric data **SHALL** be treated and secured as sensitive personal information.

#### 3.2.3.1. Biometric Accuracy

The biometric system **SHALL** operate with an FMR [ISO/IEC2382-37] of one in 10000 or better for all demographic groups. Demographic categories to be considered **SHALL** include sex and skin tone when these factors affect biometric performance. This FMR **SHALL** be achieved under the conditions of a conformant attack (i.e., zero-effort impostor attempt), as defined in [ISO/IEC30107-1]. The biometric system **SHOULD** demonstrate a false non-match rate (FNMR) of less than 5 %. Biometric performance **SHALL** be tested in accordance with [ISO/IEC19795-1]. The biometric system **SHALL** be configured with a fixed threshold; it is not feasible to change the threshold for each demographic.

#### 3.2.3.2. Presentation Attack Detection

The biometric system **SHOULD** implement PAD for iris and fingerprint modalities and **SHALL** implement PAD for facial recognition. Biometric comparison based on voice **SHALL NOT** be used. Testing the biometric system for deployment **SHOULD** demonstrate an impostor attack presentation accept rate (IAPAR) of less than 0.07. Presentation attack resistance **SHOULD** be tested in accordance with Clause 13 of [ISO/IEC30107-3] following security evaluation methodologies in [ISO/IEC19792] or [ISO/IEC19989-1] and [ISO/IEC19989-3]. The PAD decision **MAY** be made either locally on the claimant's device or by a central verifier.

#### 3.2.3.3. Injection Attack Detection

The biometric system **SHALL** allow no more than five consecutive failed authentication attempts or 10 consecutive failed attempts if PAD is implemented and meets the above requirements. Once that limit has been reached, the biometric authenticator **SHALL** impose a delay of at least 30 seconds before each subsequent attempt with an overall limit of no more than 50 consecutive failed authentication attempts or 100 if PAD is implemented due to the mitigation of presentation attacks. Once the overall limit is reached, the biometric system **SHALL** disable biometric authentication and offer another factor (e.g., a different biometric modality or an activation secret if it is not a required factor) if such an alternative method is already available. These limits are upper bounds, and agencies **MAY** make risk-based decisions to impose lower limits.

The verifier **SHOULD** determine the performance and integrity of the sensor and its associated endpoint. This increases the likelihood of detecting injection attacks due to compromised endpoints, sensor emulators, and similar threats. Acceptable methods for making this determination include:

- Use of a known sensor, as determined by sensor authentication
- First- or third-party testing against biometric performance standards
- Runtime interrogation of signed metadata (e.g., attestation), as described in Sec. 3.2.4

Biometric comparison can be performed locally on a device being used by the claimant or at a central verifier. Since the potential for attacks on a larger scale is greater at central verifiers, comparison **SHOULD** be performed locally.

The presentation of a biometric factor for authenticator activation **SHALL** be a separate operation from unlocking the host device (e.g., smartphone). However, the same activation factor used to unlock the host device **MAY** be used in the authentication operation. Agencies **MAY** lower this requirement for authenticators that are managed by or on behalf of the CSP (e.g., via mobile device management) and constrained to have short agency-determined inactivity timeouts and biometric systems that meet the above requirements.

If the comparison is performed centrally:

- The sensor or endpoint **SHALL** be authenticated before capturing the biometric sample from the claimant. The verifier **MAY** limit the use of the centrally stored biometric template to particular sensors or sensor classes (e.g., sensor manufacturers or models).
- Appropriate controls (e.g., encryption and access controls) for sensitive personal information **SHALL** be implemented.

- An authenticated protected channel between the sensor (or an endpoint containing a sensor that resists sensor replacement) and the verifier **SHALL** be established. All transmission of biometric information **SHALL** be conducted over that authenticated protected channel.

#### 3.2.3.4. Use of Biometric Samples

Biometric samples collected in the authentication process **MAY** be used locally within the authenticator or verifier performing the biometric comparison to update the templates for the purpose of compensating for changes in subscriber characteristics or — with explicit subscriber consent — other research purposes. The biometric samples and any other biometric data derived from them **SHALL** be erased immediately after any adaptation or research data has been derived. A limit on the allowable time for adaptation **SHALL** be established and enforced by the authenticator or the CSP.

### 3.2.4. Attestation

The CSP needs to have a reliable basis for evaluating the characteristics of the authenticator, such as the inclusion of a signed attestation. An attestation is information conveyed to the CSP, generally when an authenticator is bound, regarding that connected authenticator or the endpoint involved in an authentication operation. Information conveyed by attestation **MAY** include but is not limited to:

- The provenance (e.g., manufacturer or supplier certification), health, and integrity of the authenticator and endpoint
- Security features of the authenticator
- Security and performance characteristics of biometric sensors
- Sensor modality
- Properties of the authentication key

Attestations **SHALL** be signed using a digital signature that provides at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication).

Verifiers in federal enterprise systems[2] **SHOULD** use attestation features to verify the capabilities and sources of authenticators. In other applications, attestation information **MAY** be used as part of a verifier's risk-based authentication decisions.

[2] Federal enterprise systems include those considered in scope for PIV guidance, such as government contractors, government employees, and mission partners. It does not include government-to-consumer or public-facing use cases.

#### 3.2.5. Phishing Resistance

Phishing attacks, previously referred to in SP 800-63B as "verifier impersonation," are attempts by fraudulent verifiers and RPs to fool an unwary claimant into presenting an authenticator to an impostor. In some prior versions of SP 800-63, protocols that are resistant to phishing attacks were also referred to as "strongly MitM-resistant."

In this document, phishing resistance is the ability of the authentication protocol to prevent the disclosure of authentication secrets and valid authenticator outputs to an impostor verifier (i.e., an attacker fraudulently posing as the verifier) without relying on the vigilance of the claimant. How the claimant is directed to the impostor verifier is not relevant. For example, regardless of whether the claimant was directed there via search engine optimization or prompted by email, it is considered to be a phishing attack.

Approved cryptographic algorithms **SHALL** be used to establish phishing resistance where required. Keys used for this purpose **SHALL** provide at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication).

Phishing resistance requires single- or multi-factor cryptographic authentication. Authenticators that involve the manual entry of an authenticator output (e.g., out-of-band and OTP authenticators) **SHALL NOT** be considered phishing-resistant because the manual entry does not bind the authenticator output to the specific session being authenticated. For example, an impostor verifier could relay an authenticator output to the verifier and successfully authenticate.

Two methods of phishing resistance are recognized: channel binding and verifier name binding. Channel binding is considered more secure than verifier name binding because it is not vulnerable to the misissuance or misappropriation of verifier certificates, but both methods satisfy the requirements for phishing resistance.

##### 3.2.5.1. Channel Binding

An authentication protocol with channel binding **SHALL** establish an authenticated protected channel with the verifier. The protocol **SHALL** then strongly and irreversibly bind a channel identifier negotiated in establishing the authenticated protected channel to the authenticator output (e.g., by signing the two values together using a private key controlled by the claimant for which the public key is known to the verifier). The verifier **SHALL** validate the signature or other information used to prove phishing resistance. This prevents an impostor verifier — even one that has obtained a certificate that represents the actual verifier — from successfully relaying that authentication on a different authenticated protected channel.

An example of a phishing-resistant authentication protocol that uses channel binding is client-authenticated TLS [RFC8446] in which the client signs the authenticator output along with earlier messages from the protocol that are unique to the particular TLS

connection being negotiated. Personal identity verification (PIV) and common access card (CAC) cards, which use client-authenticated TLS, provide phishing resistance through channel binding.

#### 3.2.5.2. Verifier Name Binding

An authentication protocol with verifier name binding **SHALL** establish an authenticated protected channel with the verifier. The protocol **SHALL** then generate an authenticator output that is cryptographically bound to a verifier identifier that is authenticated as part of the protocol. In the case of DNS identifiers, the verifier identifier **SHALL** be either the authenticated hostname of the verifier or a parent domain that is at least one level below the public suffix [PSL] associated with that hostname. The binding **MAY** be established by choosing an associated authenticator secret, deriving an authenticator secret using the verifier identifier, cryptographically signing the authenticator output with the verifier identifier, or using similar cryptographically secure means.

WebAuthn [WebAuthn], which is used by authenticators that implement the Fast Identity Online 2 (FIDO2) specifications [FIDO2], is an example of a standard that provides phishing resistance through verifier name binding by choosing an authenticator secret based on the authenticated domain name of the verifier.

### 3.2.6. Verifier-CSP or IdP Communications

If the verifier and CSP or IdP are separate entities (as shown by the dotted line in Fig. 3 of [SP800-63]), communications between the verifier and CSP or IdP **SHALL** occur through a mutually authenticated protected channel (e.g., a client-authenticated TLS connection) using approved cryptography.

### 3.2.7. Replay Resistance

An authentication process resists *replay attacks* if it is impractical to achieve a successful authentication by recording and replaying a previous authentication message. Replay resistance is in addition to the replay-resistant nature of authenticated protected channel protocols since the output could be stolen before entry into the protected channel. Protocols that use nonces or challenges to prove the “freshness” of the transaction are resistant to replay attacks since the verifier will easily detect when old protocol messages are replayed because they will not contain the appropriate nonces or timeliness data. Examples of replay-resistant authenticators include OTP authenticators, cryptographic authenticators, and look-up secrets.

In contrast, passwords are not considered replay-resistant because the same authenticator output (i.e., the password itself) is provided for each authentication.

### 3.2.8. Authentication Intent

An authentication process demonstrates intent if it requires the claimant to respond explicitly to each authentication or reauthentication request. The goal of authentication intent is to make it more difficult for authenticators (e.g., multi-factor cryptographic authenticators) to be used without the claimant's knowledge, such as by malware on the endpoint. The authenticator itself **SHALL** establish authentication intent. Multi-factor authenticators **MAY** establish intent by reentry of the activation factor for the authenticator.

Authentication intent **MAY** be established in several ways. Authentication processes that require the claimant's intervention can be used to prove intent (e.g., a claimant entering an authenticator output from an OTP authenticator). Cryptographic authenticators that require claimant action for each authentication or reauthentication operation can also be used to establish intent (e.g., by pushing a button or reinsertion).

The presentation of biometric characteristics does not always establish authentication intent. For example, using a front-facing camera on a mobile phone to capture a face biometric does not necessarily constitute intent, as it can be reasonably expected to capture a face image while the device is used for other non-authentication purposes. In these scenarios, an explicit mechanism (e.g., tapping a software or physical button) **SHALL** be provided to establish authentication intent.

### 3.2.9. Restricted Authenticators

As threats evolve, authenticators' ability to resist attacks typically degrades. Conversely, the performance of some authenticators may improve, such as when changes to their underlying standards increase their ability to resist particular attacks.

To account for these changes in authenticator performance, NIST places additional restrictions on authenticator types or specific classes or instantiations of an authenticator type. Although they represent a less secure approach to multi-factor authentication, *restricted authenticators* remain necessary for some government-to-public applications. At the time of publication of these guidelines, there is one restricted authenticator: the use of the PSTN for out-of-band authentication, as described in Sec. 3.1.3.3.

The acceptance of a restricted authenticator requires the implementing organization to assess, understand, and accept the risks associated with that authenticator and acknowledge that risks will likely increase over time. It is the RP's responsibility to determine the level of acceptable risk for their systems and associated data, define any methods for mitigating excessive risks, and communicate those determinations to the verifier. If the RP determines that the risk to any party is unacceptable, the restricted authenticator **SHALL NOT** be used, and an alternative authenticator type **SHALL** be used.

Furthermore, the risk of an authentication error is typically borne by multiple parties, including the implementing organization, organizations that rely on the authentication decision, and the subscriber. Because the subscriber may be exposed to additional risks when an organization accepts a restricted authenticator and the subscriber may have a limited understanding of and ability to control those risks, the CSP **SHALL** do all of the following:

1. Offer subscribers at least one alternative authenticator that is not restricted and can be used to authenticate at the required AAL
2. Provide subscribers with meaningful notice regarding the restricted authenticator's security risks and the availability of unrestricted alternatives
3. Address any additional risks to subscribers and RPs in its risk assessment
4. Develop a migration plan for the possibility that the restricted authenticator will not be acceptable in the future and include this migration plan in its Digital Identity Acceptance Statement (see Sec. 3.4.4 of [SP800-63])

### 3.2.10. Activation Secrets

A password used locally as an activation factor for a multi-factor authenticator is referred to as an *activation secret*. An activation secret is used to obtain access to a stored authentication key. In all cases, the activation secret **SHALL** remain within the authenticator and its associated user endpoint.

Authenticators that use activation secrets **SHALL** require the secrets to be at least four characters in length and **SHOULD** require the secrets to be at least six characters in length. Activation secrets **MAY** be entirely numeric (i.e., a PIN). Otherwise, all printing ASCII [RFC20] characters, the space character, and Unicode [ISO/ISC 10646] characters **SHOULD** be permitted in activation secrets. The authenticator or its management tools **SHOULD** implement a blocklist to discourage subscribers from selecting commonly used activation secrets (e.g., 123456).

The authenticator or verifier **SHALL** implement a retry-limiting mechanism that limits the number of consecutive failed activation attempts using the authenticator to no more than 10. If an incorrect activation secret entry causes the authenticator to provide an invalid output to the central verifier, the verifier **MAY** implement this retry-limiting mechanism. Otherwise, retry limiting **SHALL** be implemented in the authenticator. Once the limit of attempts is reached, the authenticator **SHALL** be disabled, and a different authenticator **SHALL** be required for authentication.

For authenticators that are usable at AAL3, verification of activation secrets **SHALL** be performed in a hardware-protected environment (e.g., a secure element, TPM, or TEE). At AAL2, if a hardware-protected environment is not used, the authenticator **SHALL** use the activation secret to derive a key used to decrypt the authentication key.

Submitting the activation factor **SHALL** be a separate operation from unlocking the host device (e.g., smartphone). However, the same activation factor used to unlock the host device **MAY** be used in the authentication operation. Agencies **MAY** relax this requirement for authenticators that are managed by or on behalf of the CSP (e.g., via mobile device management), are constrained to have short agency-determined inactivity timeouts, and use device activation factors that meet the corresponding requirements in this section.

### 3.2.11. Connected Authenticators

Cryptographic authenticators require a trustworthy connection between the authenticator and the endpoint being authenticated that provides resistance to eavesdropping, injection, and relay attacks. This connection **SHALL** be made using a wired connection (e.g., USB or direct connection with a smartcard), a wireless technology, or a hybrid of those technologies, including network connections.

Approved cryptography **SHALL** be used for all cases in which cryptographic operations are required. All communication of authentication data between authenticators and endpoints **SHALL** occur directly between those devices or through an authenticated protected channel between the authenticator and endpoint.

#### 3.2.11.1. Wired Connections

Wired connections, including those with embedded authenticators, **MAY** be assumed to be trustworthy because their attack surface is minimal. Claimants **SHOULD** be advised to use trusted hardware (e.g., cables, adapters) to ensure that they have not been compromised.

#### 3.2.11.2. Wireless Connections

Wireless authenticator connections are potentially vulnerable to threats, including eavesdropping, injection, and relay attacks. Wireless connections include technologies that function in the absence of a physical connection, such as radio frequency (e.g., Bluetooth and NFC), optical, and acoustic technologies.

The potential for such attacks on wireless connections depends on the technology's effective range. To minimize the attack surface for threats to the authenticator-endpoint connection, the authentication process **SHALL** require physical proximity between the authenticator and endpoint by establishing a wireless connection with a range of no more than 240 meters.[3]

Wireless connections **SHALL** establish a key for encrypted communication between the authenticator and endpoint in one of the following ways:

---

[3]The limit of 240 meters was chosen based on the maximum expected range of a Bluetooth connection.

1. Through a temporary wired connection between the devices.
2. Through an association process that is similar to a pairing process but does not require a persistent relationship between devices to establish a key for encrypted communication between the authenticator and endpoint. The association process **SHALL** employ a pairing code[4] or other shared secret between the devices. Either the authenticator or endpoint **SHALL** have a pairing code that **MAY** be printed on the device. The pairing code **SHALL** be at least six decimal digits (or equivalent) in length. It **SHALL** be conveyed between the devices by manual entry or using a QR code or similar representation that is optically communicated.

When using a wireless technology with an effective range of less than 1 meter (e.g., NFC), any activation secret transmitted from the endpoint to the authenticator **SHALL** be encrypted using a key that is established between the devices. An authenticated connection **SHOULD** be used. A pairing code **SHALL** be used if the authenticator is configured to require authenticated pairing.

> Encrypting only the activation secret and not the entire authentication transaction may expose sensitive information (e.g., the identity of the RP), although this would require the attacker to be very close to the subscriber. Special care should be taken with authenticators that contain personal information but do not require authenticated pairing. Encryption **SHOULD** be used to protect that information against eavesdropping attacks.

Network connections and wireless technologies with an effective range of 1 meter or more (e.g., Bluetooth Low Energy [BLE]) **SHALL** use an authenticated protected channel between the authenticator and endpoint. The entire authentication transaction **SHALL** be encrypted.

The key established by the association process may be either temporary (i.e., valid for a limited number of transactions or time-limited) or persistent. A mechanism for endpoints to remove persistent keys **SHALL** be provided.

An example of a wireless connection with an authenticator is the virtual contact interface specified in [SP800-73pt2].

#### 3.2.11.3. Hybrid Connections

Hybrid connections use a combination of technologies to establish a secure connection between the authenticator and endpoint via a network tunnel service. A visual representation (e.g., QR code) is used to support key establishment between the

[4] As used in this section, the term *pairing code* does not imply that a persistent pairing process (e.g., Bluetooth) is necessarily used.

authenticator and endpoint, which is supplemented by a wireless technology (e.g., Bluetooth LE) to require physical proximity between the parties when the association is made. The requirement for physical proximity of the authenticator reduces the potential for phishing attacks that might otherwise associate the authenticator with an attacker endpoint.

Hybrid connections (e.g., hybrid transports specified by the CTAP2.2 protocol [FIDO2]) **SHALL** be established between authenticators and endpoints in one of the following ways:

1. By communicating initial keying information and the identity of the tunnel service to be used via a displayed QR code or similar visual representation coupled with the receipt by the endpoint of wireless data containing the additional information required to establish the tunnel connection. The wireless data **SHALL** be conveyed over a technology with a maximum effective range of no more than 240 meters.
2. Through cached keying and tunnel information retained by the authenticator and endpoint from a previous authentication transaction.

A mechanism for endpoints to remove cached associations with authenticators **SHALL** be provided.

### 3.2.12. Random Values

Random values are extensively used in authentication processes in a variety of roles (e.g., nonces, authentication secrets). Unless otherwise specified, random values that reference this section **SHALL** be generated by an approved random bit generator [RBG][5] that provides at least the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication).

### 3.2.13. Exportability

Exportability is the ability of an authenticator to replicate, share, or store its authentication keys outside of the protected boundary of the authenticator (e.g., copying it to another authenticator, backing up a key to a separate storage location). Generally, authentication keys are considered exportable unless the authenticator generates, stores, and uses the keys in a protected hardware environment that prevents software from accessing the keys, such as in a security coprocessor (e.g., TPM) or a dedicated device (e.g., a security key). This is intended to prevent software on the endpoint from copying or leaking the authentication secret. Non-exportable authentication keys are considered more secure, and accordingly, non-exportable cryptographic keys are required at AAL3. The authentication keys on syncable authenticators are inherently exportable (see Appendix B).

[5] Detailed information on generating random values may be found in [SP800-90A], [SP800-90B], and [SP800-90C].

To be considered non-exportable, an authenticator **SHALL** either be a separate piece of hardware or an embedded processor or execution environment (e.g., secure element, TEE, TPM). These hardware authenticators and embedded processors are separate from a host processor, such as the CPU on a laptop or mobile device. A non-exportable authenticator **SHALL** be designed to prohibit the export of the authentication secret to the host processor and **SHALL NOT** be capable of being reprogrammed by the host processor to allow the secret to be extracted. The authenticator is subject to applicable [FIPS140] requirements. Organizations **SHOULD** employ authenticators that have undergone independent security testing, such as authenticators validated to [FIPS140] security level 2 overall with level 3 physical security[6] or evaluated against relevant Common Criteria Protection Profiles.

[6]In this case, the FIPS 140 evaluation would satisfy the minimum [FIPS140] security level 1 validation requirement for authenticators procured by federal agencies.

## 4. Authenticator Event Management

*This section is normative.*

Events can occur over the lifetime of a subscriber's authenticator and affect its use. These events include binding, maintenance, loss, theft, compromise, unauthorized duplication, expiration, and revocation. This section describes the actions to be taken in response to those events.

### 4.1. Authenticator Binding

*Authenticator binding* refers to establishing an association between a specific authenticator and a subscriber account to enable the authenticator to authenticate for that subscriber account, possibly in conjunction with other authenticators.

Authenticators **SHALL** be bound to subscriber accounts by either:

- Being issued by the CSP as part of enrollment or
- Using a subscriber-provided authenticator that is acceptable to the CSP.

The SP 800-63 suite of guidelines refers to the *binding* rather than the issuance of authenticators to accommodate both options.

Throughout the lifetime of a digital identity, CSPs **SHALL** maintain a record of all authenticators that are bound to each subscriber account. The CSP **SHALL** determine the characteristics of the authenticator being bound (e.g., single-factor versus multi-factor, phishing-resistant or not) so that verifiers can assess compliance with the requirements at each AAL. This determination **MAY** be based on strong evidence (e.g., authenticator attestation), direct information from having issued the authenticator, or typical characteristics of authenticator implementations (e.g., whether a user verification bit is set by [WebAuthn]).

The CSP **SHALL** also maintain other state information that is required to meet the authenticator verification requirements. For example, the throttling of authentication attempts described in Sec. 3.2.2 requires the CSP or verifier to maintain state information on recent failed authentication attempts, except for activation factors verified at the authenticator.

The record created by the CSP **SHALL** contain the date and time of significant authenticator life cycle events (e.g., binding to the subscriber account, renewal, update, expiration). The record **SHOULD** include information about the source of the binding (e.g., IP address, device identifier) of any device associated with the event.

As part of the binding process, the CSP **MAY** require additional information about the new authenticator or its associated endpoint to determine whether it is suitable for the requested AAL.

#### 4.1.1. Binding at Enrollment

Binding at the time of enrollment is considered to be part of the enrollment process and is discussed in [SP800-63A].

#### 4.1.2. Post-Enrollment Binding

##### 4.1.2.1. Binding an Additional Authenticator

To minimize the need for account recovery, CSPs and verifiers **SHOULD** encourage subscribers to maintain at least two separate means of authentication. For example, a subscriber who usually uses an OTP authenticator as a physical authenticator **MAY** also be issued look-up secret authenticators or register a device for out-of-band authentication to be used if the physical authenticator is lost, stolen, or damaged. See Sec. 4.2 for more information on replacing passwords.

Accordingly, CSPs **SHALL** permit the binding of multiple authenticators to a subscriber account. When any new authenticator is bound to a subscriber account, the CSP **SHALL** ensure that the process requires authentication at either the maximum AAL currently available in the subscriber account or the maximum AAL at which the new authenticator will be used, whichever is lower. For example, binding an authenticator that is suitable for use at AAL2 requires authentication at AAL2 unless the subscriber account currently has only AAL1 authentication capabilities. When an authenticator is added, the CSP **SHALL** notify the subscriber via a mechanism independent of the transaction binding the new authenticator, as described in Sec. 4.6.

##### 4.1.2.2. Binding Across Endpoints

It may be necessary for a subscriber to bind an authenticator to a subscriber account using a device that is different from the authenticated endpoint (i.e., the endpoint for the session being authenticated). This process is typically used when adding authenticators that are embedded in a new endpoint or when connectivity limitations prevent the newly bound authenticator from being connected to an authenticated endpoint.

The binding process **SHALL** proceed in one of the following ways:

- An endpoint that has authenticated to the CSP requests a binding code from the CSP. The binding code is input into the endpoint associated with the new authenticator and sent to the CSP.
- The endpoint associated with the new authenticator obtains a binding code from the CSP. The binding code is input to an authenticated endpoint and sent to the CSP.

In addition to the requirements in Sec. 4.1.2.1 and Sec. 4.2, the following requirements **SHALL** apply when binding an external authenticator:

- An authenticated protected channel **SHALL** be established by the endpoint associated with the new authenticator and the CSP.
- The subscriber **MAY** be prompted to enter an identifier by which the CSP knows them on the endpoint associated with the new authenticator.
- The CSP **SHALL** generate a *binding code* using an approved random bit generator, as described in Sec. 3.2.12 and send it to either the new authenticator endpoint or the authenticated endpoint approving the binding. The binding code **SHALL** be at least 40 bits in length if it is used with an identifier that was entered in the previous step. Otherwise, a binding code of at least 112 bits in length **SHALL** be required.
- The subscriber **SHALL** transfer the binding code to the other endpoint. This transfer **SHALL** either be manual or via a local out-of-band method (e.g., QR code). The binding code **SHALL NOT** be communicated over any insecure channel (e.g., email).
- The binding code **SHALL** be usable only once and **SHALL** be valid for a maximum of 10 minutes.
- Following the binding of the new authenticator (or issuance of a certificate, in the case of PKI-based authenticators), the CSP **SHOULD** encourage the subscriber to authenticate with the new authenticator to confirm that the process has been completed successfully.
- The CSP **SHALL** provide clear instructions on what the subscriber should do in the event of an authenticator binding mishap (e.g., making a button available to be pressed or a contact address to be used to allow a misbound authenticator to be quickly invalidated), as appropriate. This **MAY** be provided in the authenticated session in addition to the binding notification described in Sec. 4.6.

The binding of an external authenticator may introduce risks due to the potential for the subscriber to be tricked into using a binding code by an attacker or supplying a binding code to an attacker. In some cases, representations (e.g., QR codes) obtained from a trusted source (e.g., an authenticated session, especially when that authentication is phishing-resistant) are considered to be more robust against such attacks because they typically contain the URL of the CSP in addition to the binding code. As a result, there is less potential for the subscriber to be fooled into entering a binding code at a phishing site.

#### 4.1.3. Binding to a Subscriber-Provided Authenticator

A subscriber may already possess authenticators that are suitable for authentication at a particular AAL. For example, the subscriber may have their own multi-factor authenticator and would like to use that authenticator at a verifier that requires AAL2.

CSPs **SHOULD**, where practical, accommodate subscriber-provided authenticators to relieve the burden on the subscriber of managing many authenticators. The binding of these authenticators **SHALL** be done as described in Sec. 4.1.2.

As part of this process, CSPs will need to establish the capabilities and characteristics of the subscriber-provided authenticator that they wish to accept to determine its suitability for the use case and the intended AAL. The level of assurance that the CSP requires in the fidelity of these authenticator attributes **MAY** vary depending on the use case and threat environment. Some authenticators, such as those based on the WebAuthn standard [WebAuthn], provide metadata about the authenticator during the binding or authentication process that can be used by the CSP to inform its decisions. This metadata, for example, could indicate whether an authenticator uses an activation factor to function as a multi-factor authenticator. Similarly, some subscriber-controlled wallets will also offer metadata about its functions, including information about the mechanisms used to unlock the wallet. CSPs **SHOULD** consider this metadata when choosing how to support a subscriber-provided authenticator. In many cases, such information will not be available, and CSPs **SHOULD** evaluate the characteristics of commercially available authenticators that are likely to be used by their subscribers and make determinations about what authenticators they will accept. The types of authenticators accepted by the CSP **SHALL** be documented in the CSP practice statement.

In some high assurance use cases, CSPs may desire additional confidence in the attributes of the authenticators registered by their subscribers. Some authenticators support attestation features that can be used to determine the capabilities and manufacturers of specific authenticators. However, such attestation features are not widely available in authenticators that are likely to be used by public users. The lack of support for attestations **SHOULD NOT** block the use of authenticators for broad public-facing applications.

#### 4.1.4. Renewal

The subscriber **SHOULD** bind a new or updated authenticator before an existing authenticator's expiration. The process for this **SHOULD** conform closely to the binding process for an additional authenticator, as described in Sec. 4.1.2. The CSP **MAY** periodically take other actions (e.g., confirming contact addresses) as a part of the renewal process or separately. Following the successful use of the replacement authenticator, the CSP **SHOULD** invalidate the expiring authenticator.

## 4.2. Account Recovery

*Account recovery* is when a subscriber recovers from losing control of the authenticators that are needed to authenticate at a desired AAL. This may be accomplished by repeating portions of the identity proofing process, using a prearranged recovery contact, or presenting one or more recovery codes, perhaps in conjunction with using an authenticator that is still available to the subscriber bound to their subscriber account. Once this is completed, the subscriber can bind one or more new authenticators to their subscriber account. An account recovery event always causes one or more notifications to be sent to the subscriber to help detect the fraudulent use of account recovery.

Account recovery differs from authentication in several ways. Since account recovery is expected to be invoked infrequently, it is generally less convenient than authentication and — depending on the situation and recovery methods offered by the CSP — may involve extended waiting times.

> Replacement of a forgotten password where the subscriber can authenticate with one or more other authenticators is considered to be the binding of a new authenticator (see Sec. 4.1.2.1) rather than account recovery.

### 4.2.1. Account Recovery Methods

Four general classes of account recovery methods are recognized:

- Saved recovery codes
- Issued recovery codes
- Use of recovery contacts
- Repeated identity proofing

CSPs **SHALL** support one or more of these and **MAY** support an application-specific method (e.g., interaction with a CSP agent) to recover a subscriber account. The use of alternative methods **SHALL** be based on a risk analysis and documented by the CSP.

#### 4.2.1.1. Saved Recovery Codes

At enrollment, a CSP that supports this recovery option **SHOULD** issue a recovery code to the subscriber. The recovery code **SHALL** include at least 64 bits from an approved random bit generator. The saved recovery code may be presented as numeric or a printable ASCII representation (e.g., Base64) for manual entry or as a machine-readable optical label (e.g., QR code) that contains the recovery code. At any point following enrollment, the subscriber **MAY** request a replacement recovery code. The issuance of a replacement recovery code **SHALL** result in an account recovery notification, as described in Sec. 4.6.

Saved recovery codes are intended to be maintained offline (e.g., printed or written down) and stored securely by the subscriber for future use. The verification of saved recovery codes **SHALL** be subject to the throttling requirements in Sec. 3.2.2. Saved recovery codes **SHALL** be stored in the subscriber account in hashed form using an approved one-way function, as described in Sec. 3.1.1.2. Following the use of a saved recovery code, the CSP **SHALL** invalidate that recovery code and **SHALL** issue a new saved recovery code to the subscriber.

#### 4.2.1.2. Issued Recovery Codes

CSPs that support this option allow the subscriber to maintain one or more recovery addresses (e.g., postal, email, text message, voice). When recovery is required, a recovery code will be sent to a claimant-chosen address. The issued recovery code **SHALL** include at least six decimal digits (or equivalent) from an approved random bit generator, as described in Sec. 3.2.12. The issued recovery code may be presented as a numeric or a printable ASCII representation (e.g., Base64) for manual entry, a secure (e.g., https) link with a representation of the recovery code, or a machine-readable optical label (e.g., QR code) that contains the recovery code.

Issued recovery codes **SHALL** be valid for at most:

- 21 days when sent to a postal address within the contiguous United States
- 30 days when sent to a postal address outside of the contiguous United States
- 10 minutes when sent via text message or voice
- 24 hours when sent to an email address

The verification of issued recovery codes **SHALL** be subject to the throttling requirements in Sec. 3.2.2.

When establishing recovery addresses other than those validated or verified as part of the identity proofing process, the address **SHALL** be verified. To verify an address, the CSP **SHALL** send a confirmation code with the same characteristics as a recovery code to the newly established recovery address. A recovery address **SHALL** be established only after the subscriber provides the correct confirmation code to the CSP. CSPs **SHALL** allow the subscriber to establish at least two recovery addresses.

#### 4.2.1.3. Recovery Contacts

CSPs that support the use of recovery contacts **SHALL** allow the subscriber to specify one or more addresses of trusted associates to receive issued recovery codes. The requirements for recovery contacts are very similar to those for issued recovery codes with the following exceptions:

- The validity time for recovery codes sent to recovery contacts **MAY** be extended by 24 hours (e.g., valid for no more than 24 hours and 10 minutes if sent via text messaging) to provide additional time for the recovery contact to communicate the recovery code to the subscriber.
- Confirmation of the recovery code address **MAY** also be extended by 24 hours to allow the recovery contact to send the confirmation code to the subscriber for entry.

If the CSP supports the use of recovery contacts, the CSP **SHALL** provide methods for subscribers to view and manage recovery contacts. CSPs **SHOULD** send a reminder annually to subscribers to review their list of recovery contacts.

#### 4.2.1.4. Repeated Identity Proofing

When the subscriber account has been identity-proofed at a minimum of *identity assurance level 1 (IAL1)*, CSPs **SHOULD** support account recovery by repeating a portion of the identity proofing process. The CSP **SHALL** repeat the necessary steps of identity proofing consistent with the level of initial identity proofing and **SHALL** confirm that the claimant's identity is consistent with the previously established account. If the CSP has retained a biometric sample from the user or a copy of the evidence used during the initial proofing that is of sufficient quality and resolution, the CSP **MAY** repeat only the verification portion of the identity proofing process, as described in [SP800-63A].

### 4.2.2. Recovery Requirements by IAL/AAL

Different recovery methods apply, depending on the IAL and the maximum AAL associated with the subscriber account.

#### 4.2.2.1. Recovery Without Identity Proofing

When subscribers have not been identity-proofed, a reproofing option is not available to support account recovery. The recovery of such subscriber accounts **SHALL** require the successful use of a saved recovery code, issued recovery code, or recovery contact.

Since identity proofing requires issuing authenticators that are sufficient for multi-factor authentication to allow the subscriber to access personal information about themselves, subscriber accounts that can authenticate at a maximum of AAL1 are without identity proofing.

#### 4.2.2.2. Recovery at AAL2

To recover an account that can authenticate at a maximum of AAL2, the CSP **SHALL** require the subscriber to complete one of the following:

- Two recovery codes obtained using different methods from the set (i.e., saved, issued, and recovery contacts)

- One recovery code from the set (i.e., saved, issued, and recovery contacts) plus authentication with a single-factor authenticator that is bound to the subscriber account
- Repeated identity proofing (provided that the subscriber account has been identity-proofed)

#### 4.2.2.3. Recovery at AAL3

If an account that can authenticate at AAL3 has been identity-proofed at IAL1 or IAL2, the requirements are the same as those for recovery at AAL2.

If an account that can authenticate at AAL3 has been identity-proofed at IAL3, the CSP **SHALL** successfully perform a successful biometric comparison against the biometric characteristic collected during an initial on-site attended identity proofing session, as described in [SP800-63A]. The CSP **MAY** also require the presentation of the evidence used in the initial identity proofing process.

### 4.2.3. Account Recovery Notification

In all cases, account recovery **SHALL** cause a notification to be sent to the subscriber or their designee, as described in Sec. 4.6.

## 4.3. Loss, Theft, Damage, and Compromise

Compromised authenticators include those that have been lost, stolen, or subject to unauthorized duplication or that have activation factors that are no longer in the subscriber's control. Generally, one must assume that a lost authenticator has been stolen or compromised by someone other than the legitimate holder of the authenticator. Damaged or malfunctioning authenticators are also considered compromised to guard against any possibility of the extraction of the authenticator's secret.

The CSP **SHALL** suspend, invalidate, or destroy compromised authenticators from the subscriber's account promptly following compromise detection. Organizations **SHOULD** establish time limits for this process.

To facilitate the secure reporting of an authenticator's loss, theft, damage, or compromise, the CSP **SHOULD** provide the subscriber with a method of authenticating using a backup or alternate authenticator. This backup authenticator **SHALL** be a password or a physical authenticator. Either could be used, but only one authentication factor is required to make this report. Alternatively, the subscriber **MAY** establish an authenticated protected channel for the CSP to verify the information collected during identity proofing. The CSP **MAY** choose to verify a contact address (i.e., the email address, telephone number, or postal address) and suspend or invalidate authenticators that are reported to have been compromised.

CSPs **MAY** support the temporary suspension of authenticators that are suspected of possible compromise. If suspension is supported, it **SHOULD** be reversed after the subscriber successfully authenticates to the CSP using a valid (i.e., not suspended) authenticator and requests reactivation of the suspended authenticator. The CSP **MAY** set a time limit after which a suspended authenticator can no longer be reactivated.

### 4.4. Expiration

CSPs **MAY** bind authenticators that expire to subscriber accounts. When an authenticator expires, it **SHALL NOT** be usable for authentication. When an authentication is attempted using an expired authenticator, the CSP **SHOULD** indicate to the subscriber that the authentication failure is due to expiration rather than some other cause.

The CSP **SHOULD** retrieve any authenticator that contains personal information or provide for its erasure or destruction promptly following expiration.

The replacement of expired authenticators **SHALL** conform to the binding process for an additional authenticator, as described in Sec. 4.1.2.

### 4.5. Invalidation

The invalidation of an authenticator (sometimes referred to as revocation or termination) is the removal of the binding between the authenticator and a subscriber account.

CSPs **SHALL** promptly invalidate authenticators when a subscriber account ceases to exist (e.g., subscriber’s death, the discovery of a fraudulent subscriber), when requested by the subscriber, when the authenticator is compromised, or when the CSP determines that the subscriber no longer meets its eligibility requirements. The CSP **SHALL** make a risk-based determination of the authenticity of invalidation requests from the subscriber. The consequences of not invalidating a compromised authenticator are usually more significant than the denial-of-service potential of invalidating one in error.

The CSP **SHOULD** retrieve any authenticator that contains personal information or provide for its erasure or destruction promptly following invalidation. The CSP **SHOULD** notify the subscriber when an authenticator is invalidated, as described in Sec. 4.6.

Further requirements on the invalidation of PIV authenticators are found in [FIPS201].

### 4.6. Account Notifications

Certain subscriber account events (e.g., the binding of an authenticator, account recovery) require the subscriber or someone designated by them to be independently notified. These notifications help the subscriber detect possible fraud associated with their subscriber account.

Events that require notification **SHALL** cause a notification to be sent to the notification addresses stored in the subscriber account. Notification addresses may be any means by which the subscriber can be reliably contacted, such as:

- Postal address
- Email address
- Address (e.g., telephone number) to which a text message or voice message may be sent
- Reference to the subscriber in a push notification service

CSPs **SHALL** support at least two notification addresses per subscriber account. For subscriber accounts that have undergone identity proofing, at least one address **SHALL** have been validated during the identity proofing process. The CSP **SHOULD** allow subscribers with authentication at AAL2 or higher (or at AAL1 if that is the highest AAL available for the subscriber account) to update their notification addresses. The CSP **SHOULD** encourage the subscriber to maintain multiple notification addresses to improve the likelihood of contacting them if a contact address changes.

Notifications **SHALL** be sent to all notification addresses except postal addresses. However, notifications **SHALL** be sent to postal addresses if no other form of notification address is stored in the subscriber account or if the notification is for account recovery at AAL3. Account recovery notifications **SHALL** also be sent to a postal address if the only other notification address in the subscriber account is the address to which an issued recovery code was sent.

The notification **SHALL** provide clear instructions, including contact information, in case the recipient repudiates the event associated with the notification.

## 5. Session Management

*This section is normative.*

Once an authentication event has occurred, it is often desirable to allow the subscriber to continue using the application across multiple subsequent interactions without requiring them to repeat the authentication event. This is particularly the case with federation scenarios (see [SP800-63C]) in which the authentication event necessarily involves the coordination of several components and parties across a network.

To facilitate this behavior, a *session* **MAY** be started in response to an authentication event and continue until it is terminated. The session **MAY** be terminated for any number of reasons, including an inactivity timeout or an explicit logout event. The session **MAY** be extended through a reauthentication event (see Sec. 5.2) in which the subscriber repeats some of the initial authentication process or performs a full authentication, thereby reestablishing the authenticated session.

Session management is preferable to the continual presentation of credentials, as the poor usability of continual presentation often creates incentives for workarounds (e.g., caching activation factors), thereby negating authentication intent and obscuring the freshness of the authentication event.

### 5.1. Session Bindings

A session occurs between the software (i.e., the session subject) that a subscriber is running (e.g., browser, application, operating system) and the RP or CSP that the subscriber is accessing (i.e., the session host). A session secret **SHALL** be shared between the subscriber's software and the accessed service. This secret binds the two ends of the session and allows the subscriber to continue using the service over time. The secret **SHALL** be directly presented by the subscriber's software, or possession of the secret **SHALL** be proven using a cryptographic mechanism.

The continuity of authenticated sessions **SHALL** be based on the possession of a session secret that is issued by the session host at the time of authentication and optionally refreshed during the session. The nature of a session depends on the application, such as:

- A web browser session with a "session" cookie
- An instance of a mobile application that retains a session secret

Session secrets that are used as bearer tokens for session management **SHOULD NOT** be persistent (i.e., retained across a restart of the associated application or a reboot of the host device) because they are tied to specific sessions that a restart or reboot would end. Cookies and similar "remember my browser" features **SHALL NOT** be used instead of authentication except as provided for reauthentication at AAL2 in Sec. 2.2.3 when the inactivity limit has been exceeded but the time limit has not.

Some technologies (e.g., the emerging device bound session credentials specification [DBSC]) mitigate the risk of theft of session secrets by using cryptographic protocols that prove the possession of a session secret rather than using them as bearer tokens. These technologies might additionally store and use these session secrets in protected keystores to reduce the risk of exfiltration by malware. Session secrets used with such proof of possession techniques **MAY** persist. However, RPs and CSPs **SHALL** ensure that the session lifetime limits described in Sec. 2.2.3 are enforced even when a knowledge of the session secret is demonstrated.

The secret used for session binding **SHALL** be generated by the session host in direct response to an authentication event. A session **SHOULD** inherit the AAL properties of the authentication event that triggered its creation. A session **MAY** be considered at a lower AAL than the authentication event but **SHALL NOT** be considered at a higher AAL than the authentication event.

The secrets used for session binding **SHALL** meet all of the following requirements:

1. Secrets are established during or immediately following authentication.
2. Secrets are established using input from an approved random bit generator, as described in Sec. 3.2.12, and are at least 64 bits in length.
3. Secrets are erased or invalidated by the session subject when the subscriber logs out.
4. Secrets are either transferred from the session host to the RP or CSP via an authenticated protected channel or derived from keys that are established as part of establishing a valid, mutually authenticated protected channel.
5. Secrets will time out and are not accepted after the times specified in Sec. 2.1.3, Sec. 2.2.3, and Sec. 2.3.3, as appropriate for the AAL.
6. Secrets are unavailable to intermediaries between the host and the subscriber's endpoint.

In addition, the secrets used for session binding **SHOULD** be erased on the subscriber endpoint when they log out or when the secret is deemed to have expired. They **SHOULD NOT** be placed in insecure locations (e.g., HTML5 Local Storage) due to the potential exposure of local storage to cross-site scripting (XSS) attacks.

Following authentication, authenticated sessions **SHALL NOT** fall back to an insecure transport (e.g., from https to http).

POST/PUT content **SHALL** contain a session identifier that the RP **SHALL** verify to protect against cross-site request forgery (CSRF).

Several mechanisms exist for managing a session over time. The following sections give different examples, additional requirements, and considerations for each

example technology. Additional informative guidance is available in the Open Worldwide Application Security Project (OWASP) *Session Management Cheat Sheet* [OWASP-session].

Sessions **SHOULD** provide a readily accessible mechanism for subscribers to terminate (i.e., log off) their session when their interaction is complete. Session logoff gives the subscriber additional confidence and control over the security of their session, particularly if the endpoint might be accessible to others.

### 5.1.1. Browser Cookies

Browser cookies are the predominant mechanism by which a session is created and tracked when a subscriber accesses a service. Cookies are not authenticators but are suitable as short-term secrets for the duration of a session.

Cookies used for session maintenance:

1. **SHALL** be tagged to be accessible only on secure (i.e., HTTPS) sessions.
2. **SHALL** be accessible to the minimum practical hostnames and paths.
3. **SHOULD** be tagged as inaccessible via JavaScript (i.e., HttpOnly).
4. **SHOULD** be tagged to expire at or soon after the session's validity period. This requirement is intended to limit the accumulation of cookies but **SHALL NOT** be relied upon to enforce session timeouts.
5. **SHOULD** have the "__Host-" prefix and set "Path=/".
6. **SHOULD** set "SameSite=Lax" or "SameSite=Strict".
7. **SHOULD** contain only an opaque string (e.g., a session identifier) and **SHALL NOT** contain cleartext personal information.

### 5.1.2. Access Tokens

An access token (e.g., OAuth [RFC6749]) is used to allow an application to access a set of services on a subscriber's behalf following an authentication event. The RP **SHALL NOT** interpret the presence of an access token as an indicator of the subscriber's presence in the absence of other signals. The access token and any associated refresh tokens could be valid long after the authentication session has ended and the subscriber has left the application.

### 5.2. Reauthentication

The periodic reauthentication of sessions **SHALL** be performed to confirm the subscriber's continued presence at an authenticated session (e.g., that the subscriber has not walked away without logging out).

Session management uses two types of timeouts. An *overall timeout* limits the duration of an authenticated session to a specific period following authentication or a previous reauthentication. An *inactivity timeout* terminates a session without activity from the subscriber for a specific period. For both types of timeouts, the RP **MAY** alert the subscriber that the session is about to be terminated and allow the subscriber to make the session active or reauthenticate as appropriate before the session expires. When either timeout expires, the session **SHALL** be terminated. Session activity **SHALL** reset the inactivity timeout, and successful reauthentication during a session **SHALL** reset both timeouts.

The overall and inactivity timeout expiration limits depend on several factors, including the AAL of the session, the environment in which the session is conducted (e.g., whether the subscriber is in a restricted area), the type of endpoint being used (e.g., mobile application, web-based), whether the endpoint is a managed device,[7] and the nature of the application itself. The limits **MAY** also be extended when higher security session maintenance technologies (e.g., device-bound mechanisms) are used. Agencies **SHALL** establish and document the inactivity and overall time limits being enforced in a system security plan, such as that described in [SP800-39]. Detailed requirements for each AAL are given in Sec. 2.1.3, Sec. 2.2.3, and Sec. 2.3.3.

Special considerations apply to session management and reauthentication when using a federation protocol and IdP to authenticate at the RP, as described in [SP800-63C]. The federation protocol communicates an authentication event at the IdP to the RP using an assertion, and the RP then begins an authenticated session based on the successful validation of this assertion. Since the IdP and RP manage sessions separately from each other and the federation protocol does not connect the session management between the IdP and RP, the termination of the subscriber's sessions at an IdP and RP are independent of each other. Likewise, the subscriber's sessions at multiple different RPs are established and terminated independently of each other.

Consequently, when an RP session expires and the RP requires reauthentication, it is possible that the session at the IdP has not expired and that a new assertion could be generated from this session at the IdP without explicitly reauthenticating the subscriber. The IdP can communicate the time and details of the authentication event to the RP, but the RP **SHALL** be authoritative as to whether the reauthentication requirements have

[7] Managed devices include personal computers, laptops, mobile devices, virtual machines, or infrastructure components that are equipped with a management agent that allows information technology staff to discover, maintain, and control them.

been met. Section 4.7 of [SP800-63C] provides additional details and requirements for session management within a federation context.

### 5.3. Session Monitoring

Session monitoring (sometimes called *continuous authentication*) is the ongoing evaluation of session characteristics to detect possible fraud during a session. Session monitoring **MAY** be performed by the RP in coordination with the CSP or IdP and associated verifier as a risk reduction measure. When potential fraud is detected during a session, the RP **SHOULD** act in conjunction with the CSP, IdP, or verifier to reauthenticate, terminate the session, or notify appropriate support personnel. Session characteristics that **MAY** be evaluated include:

- Usage patterns, velocity, and timing
- Behavioral biometric characteristics (e.g., typing cadence)
- Device and browser characteristics (e.g., accepted languages)
- Geolocation
- IP address characteristics (e.g., whether the IP address is in a block known for abuse)

Most of these characteristics have privacy implications. Collection, the storage of expected subscriber characteristics, and the processing of session characteristics **SHALL** be included in the privacy risk assessment described in Sec. 7.

Session monitoring **MAY** be facilitated by the use of shared signaling between the RP and CSP or IdP, as described in [SP800-63C].

## 6. Threats and Security Considerations

*This section is informative.*

### 6.1. Authenticator Threats

An attacker who can gain control of an authenticator will often be able to masquerade as the authenticator's owner. Threats to authenticators can be categorized based on attacks on the types of authentication factors that comprise the authenticator:

- "Something you know" may be disclosed to an attacker. For example, the attacker may guess a password. If the authenticator is a shared secret, the attacker could access the CSP or verifier and obtain the secret value or perform a dictionary attack on a hash of that value. An attacker may observe the entry of a PIN or passcode, find a written record or journal entry of a PIN or passcode, or install malicious software (e.g., a keyboard logger) to capture the secret. Additionally, an attacker may determine the secret through offline attacks on a password database maintained by the verifier.
- "Something you have" may be lost, damaged, stolen from the owner, or cloned by an attacker. For example, an attacker who gains access to the owner's computer may copy a software authenticator. A hardware authenticator may be stolen, tampered with, or duplicated. Out-of-band secrets may be intercepted by an attacker and used to authenticate their own session. A subscriber may be *socially engineered* to provide access to secrets without intentional collusion.
- "Something you are" may be replicated, or a false match may occur. For example, an attacker may obtain a copy of the subscriber's fingerprint and construct a replica.

Subscribers sometimes intentionally collude with attackers, and virtually nothing can be done from an authentication perspective to prevent these attacks. With this caveat in mind, threats to the authenticators used for digital authentication are listed in Table 3 along with some examples.

**Table 3.** Authenticator threats

| Authenticator Threat/Attack | Description | Examples |
|---|---|---|
| **Theft** | An attacker steals a physical authenticator. | A hardware cryptographic authenticator is stolen. |
| | | An OTP authenticator is stolen. |
| | | A look-up secret authenticator is stolen. |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Description | Examples |
|---|---|---|
| | | A cell phone is stolen. |
| **Duplication** | The subscriber’s authenticator has been copied with or without their knowledge. | Passwords written on paper are disclosed. |
| | | Passwords stored in an electronic file are copied. |
| | | A vulnerability in an insufficiently secure password manager is exploited. |
| | | A software PKI authenticator (i.e., private key) is copied. |
| | | A look-up secret authenticator is copied. |
| | | A counterfeit biometric authenticator is manufactured. |
| | | Exportable cryptographic keys are obtained from a device or cloud-based sync fabric. |
| **Eavesdropping** | The attacker observes the authenticator secret or authenticator output as the subscriber is authenticating. | Passwords are obtained by watching keyboard entries. |
| | | Passwords or authenticator outputs are intercepted by keystroke logging software. |
| | | A PIN is captured from a PIN pad device. |
| | | A hashed password is obtained and used by an attacker for another authentication. |
| | The attacker intercepts an out-of-band secret by compromising the communication channel. | An out-of-band secret is transmitted via unencrypted Wi-Fi and received by the attacker. |
| **Offline Cracking** | The authenticator is exposed using analytical methods outside of the authentication mechanism. | A software PKI authenticator is subjected to a dictionary attack to identify the correct password to decrypt the private key. |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Description | Examples |
|---|---|---|
| **Side-Channel Attack** | The authenticator's secret is exposed using the physical characteristics of the authenticator. | A key is extracted by differential power analysis on a hardware cryptographic authenticator. |
| | | A cryptographic authenticator secret is extracted by analyzing the authenticator's response time over several attempts. |
| **Phishing or Pharming** | The authenticator output is captured by fooling the claimant into thinking that the attacker is a verifier or RP. | A claimant reveals a password to a website impersonating the verifier. |
| | | A password is revealed by a bank subscriber in response to an email inquiry from a phisher pretending to represent the bank. |
| | | A password is revealed by the claimant at a bogus verifier website reached through DNS spoofing. |
| **Social Engineering** | The attacker establishes a level of trust with a subscriber to convince them to reveal their authenticator secret or authenticator output. | A password is revealed by the subscriber to an officemate asking for the password on behalf of the subscriber's boss. |
| | | A password is revealed by a subscriber in a telephone inquiry from an attacker masquerading as a system administrator. |
| | | An attacker who has convinced the mobile operator to redirect the victim's mobile phone to them receives an out-of-band secret sent via SMS. |
| **Authentication Fatigue** | An attacker causes repeated authentication requests to be sent to the subscriber in an effort to get them to approve. | A subscriber approves a fraudulent push-based authentication request to stop repeated requests. |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Description | Examples |
|---|---|---|
| **Online Guessing** | The attacker connects to the verifier online and attempts to guess a valid authenticator output in the context of that verifier. | Online dictionary attacks are used to guess passwords. |
| | | Online guessing is used to guess authenticator outputs for an OTP authenticator that is registered to a legitimate subscriber. |
| **Endpoint Compromise** | Malicious code on the endpoint proxies allows remote access to a connected authenticator without the subscriber’s consent. | A cryptographic authenticator connected to the endpoint is used to authenticate remote attackers. |
| | Malicious code on the endpoint causes authentication to other than the intended verifier. | Authentication is performed on behalf of an attacker rather than the subscriber. |
| | | A malicious app on the endpoint reads an out-of-band secret sent via SMS, and the attacker uses the secret to authenticate. |
| | Malicious code on the endpoint compromises a multi-factor software cryptographic authenticator. | Malicious code proxies authenticate or export authenticator keys from the endpoint. |
| **Unauthorized Binding** | An attacker causes an authenticator under their control to be bound to a subscriber account. | An attacker intercepts an authenticator or provisioning key en route to the subscriber. |
| **Latent Keys** | A decommissioned device retains authentication keys. | A device (e.g., laptop computer) is sold without recognition that device-based authentication keys are present and could be used by a new owner. |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Description | Examples |
|---|---|---|
| **Proliferation of Keys** | Transferring device-based authentication keys between devices increases the attack surface. | A subscriber copies authentication keys to many devices, possibly some that are not under their direct control, and loses track of where the keys are stored. |
| **Key Transfer Security** | Authentication keys are transferred between devices through an insufficiently secure cloud service. | Access to a cloud service that stores authentication keys requires only single-factor authentication. |
| | | Keys are made available to others through a URL sent via email. |
| **Untrusted Devices** | Authentication keys are resident on a device that provides insufficient protection. | Keys are transferred to an insecure device via the sync fabric. |
| **Insider Threats** | A trusted insider proves to be untrustworthy. | An insider with access to the CSP (e.g., customer support representative) colludes with an attacker to give access to subscriber accounts. |

## 6.2. Threat Mitigation Strategies

Table 4 summarizes related mechanisms that assist in mitigating the threats described in Table 3.

**Table 4.** Mitigating authenticator threats

| Authenticator Threat/Attack | Threat Mitigation Mechanisms | Normative Reference Sections |
|---|---|---|
| **Theft** | Use multi-factor authenticators that must be activated through a password or biometric. | 2.2.1, 2.3.1 |
| | Use a combination of authenticators that includes a password or biometric. | 2.2.1, 2.3.1 |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Threat Mitigation Mechanisms | Normative Reference Sections |
|---|---|---|
| **Duplication** | Use authenticators from which it is difficult to extract and duplicate long-term authentication secrets. | 2.2.2, 2.3.2, 3.1.6.1 |
| | Enforce AAL2 requirements for access to sync fabrics that contain exported authentication keys, and only allow them to be imported into trusted devices. | 3.1.7.1 |
| **Eavesdropping** | Ensure the endpoint's security before use, especially with respect to freedom from malware (e.g., key loggers). | 2.2.2 |
| | Avoid using unauthenticated and unencrypted communication channels to send out-of-band authenticator secrets. | 3.1.3.1 |
| | Authenticate over authenticated protected channels (e.g., observe the lock icon in the browser window). | 2.1.2, 2.2.2, 2.3.2 |
| | Use authentication protocols that are resistant to replay attacks (e.g., *pass-the-hash*). | 3.2.7 |
| | Use authentication endpoints that employ trusted input and display capabilities. | 3.1.6.1, 3.1.7.1 |
| **Offline Cracking** | Use an authenticator with a high entropy authenticator secret. | 3.1.2.1, 3.1.4.1, 3.1.5.1, 3.1.6.1, 3.1.7.1 |
| | Store centrally verified passwords in a salted, hashed form, including a keyed hash. | 3.1.1.1.2 |
| **Side-Channel Attack** | Use authenticator algorithms that maintain constant power consumption and timing, regardless of secret values. | 2.3.2 |
| **Phishing or Pharming** | Use authenticators that provide phishing resistance. | 3.2.5 |

*Continued on next page*

*Continued from previous page*

| Authenticator Threat/Attack | Threat Mitigation Mechanisms | Normative Reference Sections |
|---|---|---|
| **Social Engineering** | Avoid using authenticators that present a social engineering risk to third parties (e.g., customer service agents). | 4.1.2.1, 4.2 |
| **Authentication Fatigue** | Require the transfer of an authentication secret for OOB authentication rather than approval. | 3.1.3 |
| **Online Guessing** | Use authenticators that generate high-entropy output. | 3.1.2.1, 3.1.6.1, 3.1.7.1 |
| | Use an authenticator that locks after repeated failed activation attempts. | 3.2.2 |
| **Endpoint Compromise** | Use hardware authenticators that require physical action by the claimant. | 3.2.8 |
| | Maintain software-based keys in storage with restricted access. | 3.1.3.1, 3.1.6.1, 3.1.7.1, 3.2.13 |
| **Unauthorized Binding** | Provision authenticators and associated keys using authenticated protected channels or in person. | 4.1 |
| **Latent Keys** | Ensure the secure disposal of equipment that contains device-based authentication keys. | 4.4, 4.5 |
| | In federal enterprise applications, limit the transfer of keys to organizationally managed or trusted devices. | B.2 |
| **Key Transfer Security** | Encourage or require subscribers to use cloud services that have been approved for key storage and transfer. | B.2 |

Several other strategies may be applied to mitigate the threats described in Table 4:

- *Multiple factors* make successful attacks more difficult to accomplish. If an attacker must steal a cryptographic authenticator and guess a password, then the work to discover both factors may be too high.

- *Physical security mechanisms* may be employed to protect a stolen authenticator from duplication. Physical security mechanisms can provide tamper evidence, detection, and response.
- *Requiring long passwords* that do not appear in common dictionaries may force attackers to try every possible value.
- *System and network security controls* may be employed to prevent an attacker from gaining access to a system or installing malicious software.
- *Periodic training* may be performed to ensure that subscribers understand when and how to report a compromise or a suspicion of compromise and to recognize patterns of behavior that may signify that an attacker is attempting to compromise the authentication process.
- *Out-of-band techniques* may be employed to verify the proof of possession of registered devices (e.g., cell phones).

## 6.3. Authenticator Recovery

The weak point in many authentication mechanisms is the process followed when a subscriber loses control of one or more authenticators and needs to replace them. In many cases, the options for authenticating the subscriber are limited, and economic concerns (e.g., the cost of maintaining call centers) motivate the use of inexpensive and often less secure backup authentication methods. To the extent that authenticator recovery is human-assisted, social engineering attacks also pose risks.

To maintain the integrity of the authentication factors, it is essential that one authentication factor cannot be leveraged to obtain an authenticator of a different factor. For example, a password must not be usable to obtain a new list of look-up secrets.

## 6.4. Session Attacks

Hijacking attacks on the session following an authentication event can have similar security impacts. The session management guidelines in Sec. 5 are essential to maintaining session integrity against attacks (e.g., XSS). It is also important to sanitize all information to be displayed [OWASP-XSS-prevention] to ensure that it does not contain executable content. These guidelines recommend that session secrets be made inaccessible to mobile code to provide extra protection against the exfiltration of session secrets.

Another post-authentication threat is CSRF, which takes advantage of users' tendency to have multiple sessions active simultaneously. It is essential to embed and verify a session identifier for web requests to prevent a valid URL or request from being unintentionally or maliciously activated.

# 7. Privacy Considerations

*This section is informative.*

## 7.1. Privacy Risk Assessment

The authentication requirements in Sec. 2 and the optional session monitoring guidelines in Sec. 5.3 require the CSP to conduct a privacy risk assessment for records retention. Such a privacy risk assessment would include evaluating:

- The likelihood that the records retention could create a privacy problem for the subscriber, such as loss of trust
- The impact if such a problem did occur

CSPs should be able to reasonably justify any response to identified privacy risks, including accepting, mitigating, and sharing the risk. Subscriber consent is a form of sharing the risk and is, therefore, only appropriate when a subscriber could reasonably be expected to have the capacity to assess and accept the shared risk.

## 7.2. Privacy Controls

Section 2.4.3 requires CSPs to employ appropriately tailored privacy controls. [SP800-53] provides a set of privacy controls for CSPs to consider when deploying authentication mechanisms, including notices, redress, and other important considerations for successful and trustworthy deployments.

## 7.3. Use Limitation

Section 2.4.3 requires CSPs to maintain the objectives of predictability (i.e., enabling reliable assumptions by individuals, owners, and operators about personal information and its processing by an information system) and manageability (providing the capability for the granular administration of personal information, including alteration, deletion, and selective disclosure) commensurate with privacy risks that can arise from processing attributes for purposes other than identity proofing, authentication, authorization, attribute assertion, or related fraud mitigation or compliance with laws or legal processes [NISTIR8062].

CSPs may have various business purposes for processing attributes, including providing non-identity services to subscribers. However, processing attributes for purposes other than those specified at collection can create privacy risks. CSPs can identify appropriate measures that are commensurate with the privacy risks that arise from additional processing. For example, absent applicable laws, regulations, or policies, obtaining consent may not be necessary when processing attributes to provide non-identity services requested by subscribers. However, notices may help subscribers maintain reliable assumptions about the processing (i.e., predictability). Other

processing of attributes may carry different privacy risks that call for obtaining consent or allowing subscribers more control over the use or disclosure of specific attributes (i.e., manageability). Subscriber consent must be meaningful. Therefore, as stated in Sec. 2.4.3, when CSPs use consent measures, the subscriber's acceptance of additional uses shall not be a condition of providing authentication services.

Consult the SAOP if there are questions about whether the proposed processing falls outside of the scope of the permitted processing or appropriate privacy risk mitigation measures.

### 7.4. Agency-Specific Privacy Compliance

Section 2.4.3 describes specific compliance obligations for federal CSPs. It is critical to involve the SAOP in the earliest stages of digital authentication system development to assess and mitigate privacy risks and advise the agency on compliance requirements, such as whether or not the collection of personal information to issue or maintain authenticators triggers the *Privacy Act of 1974* [PrivacyAct] or the *E-Government Act of 2002* [E-Gov] requirement to conduct a PIA. For example, concerning the centralized maintenance of biometrics, Privacy Act requirements will likely be triggered and require coverage by a new or existing Privacy Act SORN due to the collection and maintenance of personal information and any other attributes that are necessary for authentication. The SAOP can similarly assist the agency in determining whether a PIA is required. These considerations should not be read as a requirement to develop a Privacy Act SORN or PIA for authentication alone. In many instances, a PIA and SORN can encompass the entire digital identity process or include the digital authentication process as part of a larger programmatic PIA that discusses the online services or benefits that the agency is establishing.

Due to the many components of digital authentication, the SAOP needs to be aware of and understand each component. For example, other privacy artifacts may apply to an agency that offers or uses federated CSP or RP services (e.g., Data Use Agreements, Computer Matching Agreements). The SAOP can assist the agency in determining what additional requirements apply. Moreover, a thorough understanding of the individual components of digital authentication will enable the SAOP to assess and mitigate privacy risks through compliance processes or other means.

## 8. Customer Experience Considerations

*This section is informative.*

To align with the standard terminology of user-centered design, customer experience, and usability, the term "user" is used throughout this section to refer to the human party. In most cases, the user in question will be the subject in the role of applicant, claimant, or subscriber. Customer experience sits at the nexus of usability, accessibility, and optionality. Considering user needs allows organizations to provide responsive and secure identity solutions while minimizing unnecessary friction and frustration.

### 8.1. Usability

[ISO/IEC9241-11] defines usability as the "extent to which a system, product, or service can be used by specified users to achieve specified goals with effectiveness, efficiency, and satisfaction in a specified context of use." This definition focuses on users, their goals, and the contexts of use as the key elements necessary for achieving effectiveness, efficiency, satisfaction, and usability.

A user's goal when accessing an information system is to perform an intended task. Authentication is the function that enables this goal. However, from the user's perspective, authentication stands between them and their intended task. Effective design and implementation of the authentication process makes it easy to do the right thing, hard to do the wrong thing, and easy to recover if the wrong thing happens.

Organizations need to be cognizant of the overall implications of their stakeholders' entire digital authentication ecosystem. Users often employ multiple authenticators, each for a different RP. They then struggle to remember passwords, recall which authenticator goes with which RP, and carry multiple physical authentication devices. Evaluating the usability of authentication is critical, as poor usability often results in coping mechanisms and unintended workarounds that can ultimately degrade the effectiveness of security controls.

Integrating usability into the development process can lead to authentication solutions that are secure and usable while still addressing users' authentication needs and organizations' business goals. The impacts of usability across digital systems needs to be considered as part of the risk assessment when deciding on the appropriate AAL. Authenticators with a higher AAL sometimes offer better usability and should be allowed for use with lower AAL applications.

Leveraging federation for authentication can alleviate many usability issues, though such an approach has its trade-offs, as discussed in [SP800-63C].

This section provides general usability considerations and possible implementations but does not recommend specific solutions. The implementations mentioned are examples that encourage innovative technological approaches to address specific usability

needs. Furthermore, usability considerations and their implementations are sensitive to many factors that prevent a one-size-fits-all solution. For example, a font size that works in a desktop computing environment may force text to scroll off of a small OTP authenticator screen. Performing a usability evaluation on the selected authenticator is a critical component of implementation. It is important to conduct evaluations with representative users, set realistic goals and tasks, and identify appropriate contexts of use.

Guidelines and considerations are described from the users' perspective.

Section 508 of the Rehabilitation Act of 1973 [Section508] was enacted to eliminate barriers in information technology and require federal agencies to make electronic and information technology accessible to people with disabilities. While these guidelines do not directly assert requirements from Section 508, identity service providers are expected to comply with Section 508 provisions. Beyond compliance with Section 508, federal agencies and their service providers are generally expected to design services and systems with the experiences of people with disabilities in mind to ensure that accessibility is prioritized throughout identity system life cycles.

#### 8.1.1. Common Usability Considerations for Authenticators

When selecting and implementing an authentication system, consider usability across the entire lifetime of the selected authenticators (e.g., their typical use and intermittent events) while being mindful of users, their goals, and their contexts of use.

A single authenticator type does not usually suffice for the entire user population. Therefore, whenever possible and based on AAL requirements, CSPs should support alternative authenticator types and allow users to choose the type that best meets their needs. Task immediacy, perceived cost-benefit trade-offs, and unfamiliarity with certain authenticators often impact choices. Users tend to choose options that incur the least burden or cost at that moment. For example, if a task requires immediate access to an information system, a user may prefer to create a new subscriber account and password rather than select an authenticator that requires more steps. Alternatively, users may choose a federated identity option that is approved at the appropriate IAL, AAL, and *federation assurance level* (FAL) if they already have a subscriber account with an identity provider. Users may understand some authenticators better than others and have different levels of trust based on their understanding and experience.

Positive user authentication experiences are integral to achieving desired business outcomes. Therefore, organizations should strive to consider authenticators from the users' perspective. The overarching authentication usability goal is to minimize user burden and authentication friction (e.g., the number of times a user has to authenticate, the steps involved, the amount of information they have to track). *Single sign-on* (SSO) exemplifies one such minimization strategy.

Usability considerations that are applicable to most authenticators include the following:

- Provide information on the use and maintenance of the authenticator (e.g., what to do if the authenticator is lost or stolen) and instructions for use, especially if there are different requirements for first-time use or initialization.
- Users will need to remember to have their authenticator readily available. Consider the need for alternative authentication options to protect against loss, damage, or other negative impacts on the original authenticator and the potential loss of battery power, if applicable.
- Alternative authentication options based on AAL requirements allow users to choose an authenticator based on their context, goals, and tasks (e.g., the frequency and immediacy of the task). Alternative authentication options also help address availability issues that may occur with a particular authenticator.
- Consider the characteristics of user-facing text:
  - Write user-facing text (e.g., instructions, prompts, notifications, error messages) in plain language for the intended audience. Avoid technical jargon, and write for the audience's expected literacy level.
  - Consider the legibility of user-facing and user-entered text, including font style, size, color, and contrast with the surrounding background. Illegible text contributes to user entry errors. To enhance legibility, consider the use of:
    - High contrast (i.e., black on white)
    - Sans serif fonts for electronic displays and serif fonts for printed materials
    - Fonts that clearly distinguish between characters that are easily confused (e.g., the capital letter "O" and the number zero "0")
    - A minimum font size of 12 points as long as the text fits for display on the device
  - Avoid using icons (e.g., padlocks or shields) that might be confused with security indicators in browsers.
- Consider user experience during authenticator entry:
  - Offer the option to display text during entry, as masked text entry is error-prone. Once a given character is displayed long enough for the user to see, it can be hidden. Consider the device when determining masking delay time, as it takes longer to enter passwords on mobile devices (e.g., tablets and smartphones) than on traditional desktop computers. Ensure that masking delay durations are consistent with user needs.
  - Ensure that the time allowed for text entry is adequate (i.e., the entry screen does not time out prematurely). Ensure that the allowed text entry times are consistent with user needs.

  - Provide clear, meaningful, and actionable feedback on entry errors to reduce user confusion and frustration. Significant usability implications arise when users have no way of knowing that they have entered text incorrectly.
  - Allow at least 10 entry attempts for authenticators that require the entry of the authenticator output by the user. The longer and more complex the entry text, the greater the likelihood of user entry errors.
  - Provide clear, meaningful feedback on the number of remaining allowed attempts. For rate limiting (i.e., throttling), inform users how long they have to wait until the next attempt.
- Minimize the impact of form-factor constraints, such as limited touch and display areas on mobile devices:
  - Larger touch areas improve usability for text entry since typing on small devices is significantly more error-prone and time-consuming than typing on a full-size keyboard due to the size of the input mechanism (e.g., a finger) relative to the size of the on-screen target.
  - Follow good user interface and information design for small displays.

Usability considerations for intermittent events (e.g., reauthentication, subscriber account lockout, expiration, revocation, damage, loss, theft, non-functional software) across authenticator types include the following:

- Prompt users to perform some activity just before (e.g., two minutes before) an inactivity timeout would otherwise occur.
- Prompt users to save their work before a fixed reauthentication timeout occurs, regardless of user activity.
- Clearly communicate how and where to acquire technical assistance (e.g., provide users with a link to an online self-service feature, chat sessions, or a phone number for help desk support). Ideally, sufficient information can be provided to enable users to recover from intermittent events on their own without outside intervention.
- Provide an accessible means for the subscriber to end their session (i.e., logoff).

Subsequent sections describe usability considerations specific to a particular authenticator.

#### 8.1.2. Usability Considerations by Authenticator Type

The following sections describe other usability considerations that are specific to particular authenticator types.

#### 8.1.2.1. Passwords

***Typical Usage***

Users often manually input the password (sometimes referred to as a passphrase or PIN). Alternatively, they may use a password manager to select a secure password and maintain distinct passwords for each authenticated service. The use of distinct passwords is important to avoid "password stuffing" attacks in which an attacker uses a compromised password from one site to access the user's account on other sites. Agencies should carefully evaluate password managers before making recommendations or mandates to confirm that they meet expectations for secure implementation.

Usability considerations for typical usage without a password manager include:

- Memorability of the password
  - The likelihood of a recall failure increases if there are more items for users to remember. With fewer passwords, users can more easily recall the specific password needed for a particular RP.
  - The memory burden is greater for a less frequently used password.

Usability considerations for typical usage with a password manager include:

- Ease of entry
  - Support autofill functionality to allow for the safe retrieval of secrets from password managers.
  - Support copy and paste functionality in fields for entering passwords, including passphrases.

***Intermittent Events***

Usability considerations for intermittent events include:

- When users create and change passwords
  - Clearly communicate information on how to create and change passwords.
  - Clearly communicate password requirements, as specified in Sec. 3.1.1.
  - Allow at least 64 characters in length to support the use of passphrases. Encourage users to make passwords as lengthy as they want and use any characters that they like (including spaces) to aid memorization. Ensure that user interfaces support sufficient password lengths.
  - Do not impose other composition rules (e.g., mixtures of different character types) on passwords.

  - Do not require that passwords be changed arbitrarily (e.g., periodically) unless there is a user request or evidence of authenticator compromise (see Sec. 3.1.1).

- Provide clear, meaningful, and actionable feedback when chosen passwords are rejected (e.g., when it appears on a "blocklist" of unacceptable passwords or has been used previously).

#### 8.1.2.2. Look-Up Secrets

***Typical Usage***

Subscribers use a printed or electronic authenticator to look up the appropriate secrets needed to respond to a verifier's prompt. For example, a user may be asked to provide a specific subset of the numeric or character strings printed on a card in table format.

Usability considerations for typical usage include the following:

- User experience during entry of look-up secrets
  - Consider the complexity and size of the prompts. There are greater usability implications with larger subsets of secrets that a user is prompted to look up. Both the cognitive workload and physical difficulty for entry should be considered.

#### 8.1.2.3. Out-of-Band

***Typical Usage***

Out-of-band authentication requires that users have access to a primary and secondary communication channel.

Usability considerations for typical usage include the following:

- Notify users of the receipt of a secret on a lockable device. If the out-of-band device is locked, authentication to the device should be required to access the secret.
- Depending on the implementation, consider form-factor constraints, which are particularly problematic when users must enter text on mobile devices. Providing larger touch areas will improve usability for entering secrets on mobile devices.
- Consider offering features that do not require text entry on mobile devices (e.g., a copy and paste feature), which are particularly helpful when the primary and secondary channels are on the same device. For example, it is difficult for users to transfer the authentication secret manually using a smartphone because they must switch back and forth — potentially multiple times — between the out-of-band application and the primary channel.

- Messages and notifications to out-of-band devices should contain contextual information for the user, such as the name of the service being accessed.
- Out-of-band messages should be delivered in a consistent manner and style to help the subscriber identify potentially suspicious authentication requests.

#### 8.1.2.4. Single-Factor OTP

***Typical Usage***

Users access the OTP generated by the single-factor OTP authenticator. The authenticator output is typically displayed on the authenticator, and the user enters it during the session being authenticated.

Usability considerations for typical usage include the following:

- Authenticator output allows at least one minute between changes but ideally allows users two full minutes, as specified in Sec. 3.1.4.1. Users need adequate time to enter the authenticator output, including looking back and forth between the single-factor OTP authenticator and the entry screen.

#### 8.1.2.5. Multi-Factor OTP

***Typical Usage***

Users access the OTP generated by the multi-factor OTP authenticator through a second authentication factor. The OTP is typically displayed on the device, and the user manually enters it during the session being authenticated. The second authentication factor may be achieved through some kind of integral entry pad to enter a password or an integral biometric (e.g., fingerprint) reader. Usability considerations for the additional factor also apply (see Sec. 8.1.2.1 for passwords and Sec. 8.1.4 for biometrics used in multi-factor authenticators).

Usability considerations for typical usage include:

- User experience during manual entry of the authenticator output
  - For time-based OTPs, provide a grace period in addition to the time during which the OTP is displayed. Users need adequate time to enter the authenticator output, including looking back and forth between the multi-factor OTP authenticator and the entry screen.
  - Consider form-factor constraints if users must unlock the multi-factor OTP authenticator via an integral entry pad or enter the authenticator output on mobile devices. Typing on small devices is significantly more error-prone and time-consuming than typing on a traditional keyboard. Providing larger touch areas improves usability for unlocking the multi-factor OTP authenticator or entering the authenticator output on mobile devices.

#### 8.1.2.6. Single-Factor Cryptographic Authenticator

***Typical Usage***

Users authenticate by proving possession and control of the cryptographic key.

Usability considerations for typical usage include the following:

- Give cryptographic keys appropriately descriptive names that are meaningful to users so that they can recognize and recall which cryptographic key to use for which authentication task. This prevents users from having to deal with multiple similarly and ambiguously named cryptographic keys. Requiring the user to select from multiple cryptographic keys on smaller mobile devices may be particularly problematic if the names of the cryptographic keys are shortened due to reduced screen sizes.
- Requiring a physical input (e.g., pressing a button) to operate a single-factor cryptographic authenticator could pose usability difficulties. For example, some USB ports are located on the back of computers, making it difficult for users to reach the port.
- For connected authenticators, the limited availability of a direct computer interface (e.g., USB port) could pose usability difficulties. For example, laptop computers often have a limited number of USB ports, which may force users to unplug other USB peripherals to use the authenticator.

#### 8.1.2.7. Multi-Factor Cryptographic Authenticator

***Typical Usage***

To authenticate, users prove possession and control of the cryptographic key and control of the activation factor. Usability considerations for the additional factor also apply (see Sec. 8.1.2.1 for passwords and Sec. 8.1.4 for biometrics used as activation factors).

Usability considerations for typical usage include the following:

- Give cryptographic keys appropriately descriptive names that are meaningful to users so that they can recognize and recall which cryptographic key to use for which authentication task. This prevents users from having to deal with multiple similarly and ambiguously named cryptographic keys. Selecting from multiple cryptographic keys on smaller mobile devices may be particularly problematic if the names of the cryptographic keys are shortened due to reduced screen sizes.
- Do not require users to keep external multi-factor cryptographic authenticators connected following authentication. Users may forget to disconnect the authenticator when they are done with it (e.g., forgetting a smartcard in the smartcard reader and walking away from the computer).

- Users need to be informed about whether the authenticator is required to stay connected or not.

- For connected authenticators, the limited availability of a direct computer interface (e.g., USB port) could pose usability difficulties. For example, laptop computers often have a limited number of USB ports, which may force users to unplug other USB peripherals to use the authenticator.

### 8.1.3. Summary of Usability Considerations

Figure 3 summarizes the usability considerations for typical usage and intermittent events for each authenticator type. Many of the usability considerations for typical usage apply to most of the authenticator types, as demonstrated in the rows. The table highlights common and divergent usability characteristics across the authenticator types. Each column allows readers to easily identify the usability attributes to address for each authenticator. Depending on the users' goals and context of use, certain attributes may be valued over others. Whenever possible, provide alternative authenticator types, and allow users to choose between them.

Multi-factor authenticators (e.g., multi-factor OTPs) also inherit their activation factor's usability considerations. As biometrics are only allowed as an activation factor in multi-factor authentication solutions, usability considerations for biometrics are not included in Fig. 3 and are discussed in Sec. 8.1.4.

### 8.1.4. Usability Considerations for Biometrics

This section provides a high-level overview of general usability considerations for biometrics. A more detailed discussion of biometric usability can be found in *Usability & Biometrics*, *Ensuring Successful Biometric Systems* [UsabilityBiometrics].

User familiarity and practice with the device improve performance for all modalities. Device affordances (i.e., properties of a device that allow a user to perform an action), feedback, and clear instructions are critical to a user's success with the biometric device. For example, provide clear instructions on the required actions for liveness detection. Ideally, users can select the modality that they are most comfortable with for their second authentication factor. Various user populations may be more comfortable, familiar with, and accepting of some biometric modalities than others. Provide meaningful feedback on the number of remaining allowed attempts. For example, for rate limiting (i.e., throttling), inform users of the time period they have to wait until their next attempt.

***Typical Usage***

The three biometric modalities that are most commonly used for authentication are fingerprint, facial comparison, and iris comparison.

| Usability Considerations | Passwords | Look-Up Secrets | Out-of-Band Devices | Single-Factor OTP | Multi-Factor OTP | Single-Factor Cryptographic | Multi-Factor Cryptographic |
|---|---|---|---|---|---|---|---|
| **Typical Usage** | | | | | | | |
| Authenticator availability - authenticators readily in user's possession | • | • | • | • | • | • | • |
| Plain language for user-facing text (e.g., instructions, prompts, notifications, error messages) | • | • | • | • | • | • | • |
| Legibility of user-facing text or text entered by users | • | • | • | • | • | • | • |
| Unmasked text entry | | • | • | • | • | | |
| Support text entry - length of 64 characters, copy and paste | • | | | | | | |
| Delayed masking during text entry | • | | | | | | |
| Adequate time allowed for text entry | • | • | • | • | • | | |
| Entry errors - Need clear and meaningful feedback | • | • | • | • | • | | |
| Minimum of 10 attempts allowed | • | • | • | • | • | | |
| Remaining allowed attempts - need clear and meaningful feedback | • | • | • | • | • | | |
| Form factor constraints | • | • | • | • | • | • | • |
| Location and availability of a direct computer interface, such as a USB port | | | | | | • | • |
| Physical input required (such as pressing a button) | | | | | | • | |
| Cryptographic keys need for descriptive and meaningful names | | | | | | • | • |
| Complexity and size of the prompts | | • | | | | | |
| Authentication to secondary device to access the authentication secret | | | • | | | | |
| Continuous hardware connection not required | | | | | | | • |
| **Intermittent Events** | | | | | | | |
| Reauthentication due to user inactivity | • | • | • | • | • | • | • |
| Fixed periodic reauthentication | • | • | • | • | • | • | • |
| Provisions for technical assistance | • | • | • | • | • | • | • |
| Provisions to create and change passwords | • | | | | | | |

**Fig. 3.** Usability considerations by authenticator type

- Fingerprint usability considerations:
  - Users have to remember which fingers they used for initial enrollment.
  - The amount of moisture on the finger affects the sensor's ability for successful capture.
  - Additional factors that influence fingerprint capture quality include age, sex, and occupation (e.g., users who handle chemicals or work extensively with their hands may have degraded friction ridges).
- Facial comparison usability considerations:
  - Users have to remember whether they wore any artifacts (e.g., glasses) during enrollment, which affects facial recognition accuracy.
  - Differences in environmental lighting conditions may affect facial recognition accuracy.
  - Facial expressions affect facial recognition accuracy (e.g., smiling versus a neutral expression).
  - Facial poses affect facial recognition accuracy (e.g., looking down or away from the camera).
- Iris comparison usability considerations:
  - Wearing colored contacts may affect iris recognition accuracy.
  - Users who have had eye surgery may need to re-enroll after surgery.
  - Differences in environmental lighting conditions may affect iris recognition accuracy, especially for certain iris colors.

***Intermittent Events***

Since biometrics are only permitted as a second factor for multi-factor authentication, usability considerations for intermittent events with the primary factor still apply. Intermittent events that may affect recognition accuracy using biometrics include:

- Degraded fingerprints or finger injuries
- Dirty, dry, or wet hands
- Wearing gloves or a mask
- Natural facial or weight changes over time
- Eye surgery

Across all biometric modalities, usability considerations for intermittent events include the following:

- An alternative authentication method must be readily available and clearly communicated. Users should never be required to attempt biometric authentication and should be permitted to use a password as an alternative second factor.
- There should be provisions for technical assistance:
  - Clearly communicate information on how and where to acquire technical assistance. For example, provide users with a link to an online self-service feature or a phone number for help desk support. Ideally, provide sufficient information to enable users to recover from intermittent events on their own without outside intervention.
  - Inform users of factors that may affect the sensitivity of the biometric sensor (e.g., cleanliness of the sensor).

## 8.2. Customer Success Considerations

A primary aspect of customer experience is anticipating the needs of the user population and offering authenticator options that are suitable for that population. Some examples of authenticator suitability problems are:

- SMS-based out-of-band authentication may not be usable for subscribers in rural areas without mobile phone service.
- OTP authenticators may be difficult to read for subscribers with vision issues.
- Out-of-band authentication secrets sent via a voice telephone call may be difficult to understand for subscribers with hearing issues.
- Some facial matching algorithms may not perform equally well for all user populations.
- Some subscribers may have conditions that interfere with fingerprint collection, such as missing fingers, degraded fingerprints (e.g., from working with chemicals or extensively using their hands), or dexterity problems.
- The cost of hardware-based authenticators may be beyond the means of some subscribers.
- Accurate manual entry of passwords may be difficult for subscribers with mobility and dexterity-related physical disabilities.
- Certain authenticator types may be challenging for subscribers with intellectual, developmental, learning, or neurocognitive difficulties.
- Lower-income subscribers are less likely to have up-to-date devices that are required by some authentication modes.
- Subscribers with less technological skill may need help to enter OTP codes from one device to another.

- The small form factor of some authenticators may pose challenges for certain users, such as senior citizens and individuals with dexterity challenges.

While CSPs are required to mitigate common and expected problems in this area, it is not feasible to anticipate all potential customer experience problems, which will vary for different applications. Accordingly, CSPs need to provide mechanisms for subscribers to report challenges with authentication requirements and advise them on potential alternative authentication strategies.

## References

*This section is informative.*

**[Blocklists]** Habib H, Colnago J, Melicher W, Ur B, Segreti S, Bauer L, Christin N, Cranor L (2017) Password Creation in the Presence of Blacklists. *Proceedings 2017 Workshop on Usable Security* (Internet Society, San Diego, CA). https://doi.org/10.14722/usec.2017.23043

**[CMVP]** National Institute of Standards and Technology (2025), *Cryptographic Module Validation Program*. Available at https://csrc.nist.gov/Projects/Cryptographic-Module-Validation-Program

**[Composition]** Komanduri S, Shay R, Kelley PG, Mazurek ML, Bauer L, Christin N, Cranor LF, Egelman S (2011) Of Passwords and People: Measuring the Effect of Password-Composition Policies. *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (ACM, New York, NY), pp 2595–2604. Available at https://www.ece.cmu.edu/~lbauer/papers/2011/chi2011-passwords.pdf

**[DBSC]** W3C (2025) *Device Bound Session Credentials*. Available at https://github.com/w3c/webappsec-dbsc

**[E-Gov]** E-Government Act of 2002, P.L. 107-347, 116 Stat. 2899, 44 U.S.C. § 101 (2002). Available at https://www.gpo.gov/fdsys/pkg/PLAW-107publ347/pdf/PLAW-107publ347.pdf

**[EO13681]** Obama B (2014) Improving the Security of Consumer Financial Transactions. (The White House, Washington, DC), Executive Order 13681, October 17, 2014. Available at https://www.federalregister.gov/d/2014-25439

**[FEDRAMP]** General Services Administration (2022), *How to Become FedRAMP Authorized*. Available at https://www.fedramp.gov/

**[FIDO2]** Bradley J, Jones MB, Kumar A, Lindemann R, Verrept J, Waite D (2025) Client to Authenticator Protocol (CTAP). (FIDO Alliance, Beaverton, OR). Available at https://fidoalliance.org/specs/fido-v2.2-ps-20250228/fido-client-to-authenticator-protocol-v2.2-ps-20250228.html

**[FIPS140]** National Institute of Standards and Technology (2019) Security Requirements for Cryptographic Modules. (U.S. Department of Commerce, Washington, DC), Federal Information Processing Standards Publication (FIPS) 140-3. https://doi.org/10.6028/NIST.FIPS.140-3

**[FIPS201]** National Institute of Standards and Technology (2022) Personal Identity Verification (PIV) of Federal Employees and Contractors. (U.S. Department of Commerce, Washington, DC), Federal Information Processing Standards Publication (FIPS) 201-3. https://doi.org/10.6028/NIST.FIPS.201-3

**[FISMA]** Federal Information Security Modernization Act of 2014, Pub. L. 113-283, 128 Stat. 3073. Available at https://www.govinfo.gov/app/details/PLAW-113publ283

**[IC3]** Federal Bureau of Investigation (2024) *Annual Reports - Internet Crime Complaint Center (IC3)*. Available at https://www.ic3.gov/AnnualReport/Reports/

**[ISO/IEC2382-37]** International Standards Organization (2022) *Information technology — Vocabulary — Part 37: Biometrics* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/73514.html

**[ISO/IEC9241-11]** International Standards Organization (2018) *ISO/IEC 9241-11 Ergonomics of human-system interaction – Part 11: Usability: Definitions and concepts* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/63500.html

**[ISO/IEC10646]** International Standards Organization (2020) *Information technology — Universal coded character set (UCS)* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/76835.html

**[ISO/IEC19792]** International Standards Organization (2009) *Information technology — Security techniques — Security evaluation of biometrics* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/51521.html

**[ISO/IEC19795-1]** International Standards Organization (2021) *Information technology - Biometric performance testing and reporting Part 1: Principles and framework* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/73515.html

**[ISO/IEC19989-1]** International Standards Organization (2020) *Information security — Criteria and methodology for security evaluation of biometric systems — Part 1: Framework* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/72402.html

**[ISO/IEC19989-3]** International Standards Organization (2020) *Information security — Criteria and methodology for security evaluation of biometric systems — Part 3: Presentation attack detection* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/73721.html

**[ISO/IEC30107-1]** International Standards Organization (2023) *Information technology — Biometric presentation attack detection — Part 1: Framework* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/83828.html

**[ISO/IEC30107-3]** International Standards Organization (2023) *Information technology — Biometric presentation attack detection — Part 3: Testing and reporting* (ISO, Geneva, Switzerland). Available at https://www.iso.org/standard/79520.html

**[Managers]** Lyastani SG, Schilling M, Fahl S, Backes M, Bugiel S (2018) Better managed than memorized? Studying the Impact of Managers on Password Strength and Reuse. *27th USENIX Security Symposium (USENIX Security 18)* (USENIX Association, Baltimore,

MD), pp 203–220. Available at https://www.usenix.org/conference/usenixsecurity18/presentation/lyastani

**[NISTIR8062]** Brooks S, Garcia M, Lefkovitz N, Lightman S, Nadeau E (2017) An Introduction to Privacy Engineering and Risk Management in Federal Systems. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Interagency or Internal Report (IR) NIST IR 8062, January 2017. https://doi.org/10.6028/NIST.IR.8062

**[NISTRMF]** Joint Task Force (2018) Risk Management Framework for Information Systems and Organizations: A System Life Cycle Approach for Security and Privacy. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-37r2. https://doi.org/10.6028/NIST.SP.800-37r2

**[OWASP-session]** Open Web Application Security Project (2021) *Session Management Cheat Sheet*. Available at https://cheatsheetseries.owasp.org/cheatsheets/Session_Management_Cheat_Sheet.html

**[OWASP-XSS-prevention]** Open Web Application Security Project (2021) *XSS (Cross Site Scripting) Prevention Cheat Sheet*. Available at https://cheatsheetseries.owasp.org/cheatsheets/Cross_Site_Scripting_Prevention_Cheat_Sheet.html

**[Persistence]** Herley C, Van Oorschot P (2012) A Research Agenda Acknowledging the Persistence of Passwords. *IEEE Security & Privacy Magazine*, (IEEE, Garden Grove, CA) 10(1):28–36. https://doi.org/10.1109/MSP.2011.150

**[Policies]** Weir M, Aggarwal S, Collins M, Stern H (2010) Testing Metrics for Password Creation Policies by Attacking Large Sets of Revealed Passwords. *Proceedings of the 17th ACM Conference on Computer and Communications Security, CCS '10*, (ACM, New York, NY, USA), pp 162–175. https://doi.org/10.1145/1866307.1866327

**[PrivacyAct]** Privacy Act of 1974, Pub. L. 93-579, 5 U.S.C. § 552a, 88 Stat. 1896 (1974). Available at https://www.govinfo.gov/content/pkg/USCODE-2020-title5/pdf/USCODE-2020-title5-partI-chap5-subchapII-sec552a.pdf

**[PSL]** Mozilla Foundation (2022) *Public Suffix List*. Available at https://publicsuffix.org/list/

**[RBG]** National Institute of Standards and Technology (2023) *Random Bit Generation*. Available at https://csrc.nist.gov/projects/random-bit-generation

**[RFC20]** Cerf V (1969) ASCII format for network interchange. (Internet Engineering Task Force (IETF)), IETF Request for Comments (RFC) 20. https://doi.org/10.17487/RFC0020

**[RFC5280]** Cooper D, Santesson S, Farrell S, Boeyen S, Housley R, Polk W (2008) Internet X.509 Public Key Infrastructure Certification and Certificate Revocation List (CRL) Profile. (Internet Engineering Task Force (IETF)), IETF Request for Comments (RFC) 5280. https://doi.org/10.17487/RFC5280

**[RFC6749]** Hardt D (2012) The OAuth 2.0 Authorization Framework. (Internet Engineering Task Force (IETF)), IETF Request for Comments (RFC) 6749. https://doi.org/10.17487/RFC6749

**[RFC8446]** Rescorla E (2018) The Transport Layer Security (TLS) Protocol Version 1.3. (Internet Engineering Task Force (IETF)), IETF Request for Comments (RFC) 8446. https://doi.org/10.17487/RFC8446

**[RFC9325]** Sheffer Y, Saint-Andre P, Fossati T (2022) Recommendations for Secure Use of Transport Layer Security (TLS) and Datagram Transport Layer Security (DTLS). (Internet Engineering Task Force (IETF)), IETF Request for Comments (RFC) 9325. https://doi.org/10.17487/RFC9325

**[Section508]** General Services Administration (2022) *IT Accessibility Laws and Policies*. Available at https://www.section508.gov/manage/laws-and-policies/

**[Shannon]** Shannon CE (1948) A Mathematical Theory of Communication. *Bell System Technical Journal* 27(3):379–423. https://doi.org/10.1002/j.1538-7305.1948.tb01338.x

**[SP800-39]** Joint Task Force (2011) Managing Information Security Risk. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-39. https://doi.org/10.6028/NIST.SP.800-39

**[SP800-52]** McKay K, Cooper D (2019) Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations. (National Institute of Standards and Technology), NIST Special Publication (SP) NIST SP 800-52r2. https://doi.org/10.6028/NIST.SP.800-52r2

**[SP800-53]** Joint Task Force (2020) Security and Privacy Controls for Information Systems and Organizations. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-53r5, Includes updates as of December 10, 2020. https://doi.org/10.6028/NIST.SP.800-53r5

**[SP800-57Part1]** Barker EB (2020) Recommendation for Key Management: Part 1 – General. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-57pt1r5. https://doi.org/10.6028/NIST.SP.800-57pt1r5

**[SP800-63]** Temoshok D, Galluzzo R, LaSalle C, Lefkovitz N, Regenscheid A, Choong YY, Proud-Madruga D, Gupta S (2025) Digital Identity Guidelines. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-63-4. https://doi.org/10.6028/NIST.SP.800-63-4

**[SP800-63A]** Temoshok D, Abruzzi C, Choong YY, Fenton JL, Galluzzo R, LaSalle C, Lefkovitz N, Regenscheid A, Vachino M (2025) Digital Identity Guidelines: Identity Proofing and Enrollment. (National Institute of Standards and Technology, Gaithersburg,

MD), NIST Special Publication (SP) NIST SP 800-63A-4. https://doi.org/10.6028/NIST.SP.800-63A-4

**[SP800-63C]** Temoshok D, Richer JP, Choong YY, Fenton JL, Lefkovitz N, Regenscheid A, Galluzzo R (2025) Digital Identity Guidelines: Federation and Assertions. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-63C-4. https://doi.org/10.6028/NIST.SP.800-63C-4

**[SP800-73pt2]** Ferraiolo H, Mehta K, Francomacaro S, Chandramouli R, Gupta S (2024) Interfaces for Personal Identity Verification: Part 2 – PIV Card Application Card Command Interface. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-73pt2-5. https://doi.org/10.6028/NIST.SP.800-73pt2-5

**[SP800-90A]** Barker E, Kelsey J (2015) Recommendation for Random Number Generation Using Deterministic Random Bit Generators. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-90Ar1. https://doi.org/10.6028/NIST.SP.800-90Ar1

**[SP800-90B]** Turan MS, Barker E, Kelsey J, McKay K, Baish M, Boyle M (2018) Recommendation for the Entropy Sources Used for Random Bit Generation. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-90B. https://doi.org/10.6028/NIST.SP.800-90B

**[SP800-90C]** Barker E, Kelsey J, McKay K, Roginsky A, Turan MS (2024) Recommendation for Random Bit Generator (RBG) Constructions. (National Institute of Standards and Technology, Gaithersburg, MD), Draft NIST Special Publication (SP) NIST SP 800-90C. https://doi.org/10.6028/NIST.SP.800-90C.4pd

**[SP800-131A]** Barker E, Roginsky A (2019) Transitioning the Use of Cryptographic Algorithms and Key Lengths. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-131Ar2. https://doi.org/10.6028/NIST.SP.800-131Ar2

**[SP800-132]** Turan M, Barker E, Burr W, Chen L (2010) Recommendation for Password-Based Key Derivation. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-132. https://doi.org/10.6028/NIST.SP.800-132

**[SP800-157]** Ferraiolo H, Regenscheid AR, Fenton J (2023) Guidelines for Derived Personal Identity Verification (PIV) Credentials. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) NIST SP 800-157r1 ipd (initial public draft). https://doi.org/10.6028/NIST.SP.800-157r1.ipd

**[Strength]** Kelley PG, Komanduri S, Mazurek ML, Shay R, Vidas T, Bauer L, Christin N, Cranor LF, Lopez J (2012) Guess again (and again and again): Measuring password

strength by simulating password-cracking algorithms. *2012 IEEE Symposium On Security and Privacy (SP)*, pp 523–537. Available at http://ieeexplore.ieee.org/iel5/6233637/6234400/06234434.pdf

**[TOTP]** M'Raihi D, Machani S, Pei M, Rydell J (2011) TOTP: Time-Based One-Time Password Algorithm. (Internet Engineering Task Force, Reston, VA), RFC 6238. https://doi.org/10.17487/RFC6238

**[UsabilityBiometrics]** National Institute of Standards and Technology (2008) Usability & Biometrics: Ensuring Successful Biometric Systems. (National Institute of Standards and Technology, Gaithersburg, MD). Available at https://www.nist.gov/system/files/usability_and_biometrics_final2.pdf

**[UAX15]** Whistler K (2022) Unicode Normalization Forms. (The Unicode Consortium, South San Francisco, CA), Unicode Standard Annex 15, Version 15.0.0, Rev. 53. Available at https://www.unicode.org/reports/tr15/

**[WebAuthn]** Hodges J, Jones JC, Jones MB, Kumar A, Lundberg E (2021) Web Authentication: An API for accessing Public Key Credentials - Level 2. (World Wide Web Consortium, Cambridge, MA). Available at https://www.w3.org/TR/2021/REC-webauthn-2-20210408/

# Appendix A. Strength of Passwords

*This appendix is informative.*

This appendix uses the word "password" for ease of discussion. Where used, it should be interpreted to include passphrases and PINs.

## A.1. Introduction

Passwords are a widely used form of authentication despite concerns about their use from both a usability and security standpoint [Persistence]. Humans have a limited ability to memorize complex, arbitrary secrets, so they often choose passwords that can be easily guessed. To address the resultant security concerns, online services have introduced rules that increase the effective strength of these passwords. The most notable form is composition rules, which require users to choose passwords that are constructed using a mix of character types (e.g., at least one digit, uppercase letter, and symbol). However, analyses of breached password databases reveal that the benefit of such rules is less significant than initially thought [Policies], and the impacts on usability and memorability are severe.

The effective strength of user-chosen passwords has often been characterized using the information theory concept of entropy [Shannon]. While entropy can be readily calculated for data with deterministic distribution functions, estimating entropy for user-chosen passwords is challenging. For this reason, a different and somewhat more straightforward approach based primarily on password length is presented herein. The use of passphrases (i.e., passwords with multiple words) is often an effective way to create a longer password.

Many attacks associated with passwords are not affected by password complexity and length. Keystroke logging, phishing, and social engineering attacks are equally effective on lengthy and complex passwords as they are on simple ones. These attacks are outside of the scope of this Appendix.

## A.2. Length

Password length is a primary factor in characterizing password strength [Strength] [Composition]. Passwords that are too short yield to brute-force attacks and dictionary attacks. The minimum password length required depends on the threat model being addressed. Online attacks in which the attacker attempts to log in by guessing the password can be mitigated by limiting the permitted login attempt rate. To prevent an attacker (or a persistent claimant with poor typing skills) from quickly inflicting a denial-of-service attack on the subscriber by making many incorrect guesses, passwords need to be complex enough that a reasonable number of attempts can be permitted with a low probability of a successful guess, and rate limiting, as described in Sec. 3.2.2 can be applied before there is a significant chance of a successful guess.

Offline attacks are possible when the attacker obtains one or more hashed passwords through a database breach. The ability of the attacker to determine one or more users' passwords depends on how the password is stored. Commonly, passwords are salted with a random value and hashed, preferably using a computationally expensive algorithm. Even with such measures, the current ability of attackers to compute many billions of hashes per second in an offline environment that is not subject to rate limiting requires passwords to be orders of magnitude more complex than those expected to resist only online attacks.

Users should be encouraged to make their passwords as long as they want within reason. Since the size of a hashed password is independent of its length, there is no reason to prohibit the use of lengthy passwords (or passphrases) if the user wishes. However, extremely long passwords (perhaps megabytes long) could require excessive processing time to hash, so it is reasonable to have some limit.

### A.3. Complexity

Composition rules are commonly used in an attempt to increase the difficulty of guessing user-chosen passwords. However, research has shown that users respond in very predictable ways to the requirements imposed by composition rules [Policies]. For example, a user who might have chosen "password" as their password would be relatively likely to choose "Password1" if required to include an uppercase letter and a number or "Password1!" if a symbol is also required.

Users also express frustration when online services reject their attempts to create complex passwords. Many services reject passwords with spaces and various special characters. Characters that are not accepted are sometimes the result of an effort to avoid attacks that depend on those characters (e.g., SQL injection). However, an unhashed password would not be sent intact to a database, so such precautions are unnecessary. Users should also be able to include space characters to allow the use of phrases. Repeated space characters add little to the effective strength of passwords and may introduce usability issues (e.g., the undetected use of two spaces rather than one), so removing repeated spaces in typed passwords may be beneficial if initial verification fails.

Since users' password choices are often predictable, attackers are likely to guess passwords that have previously proven successful. These include dictionary words and passwords from previous breaches, such as the "Password1!" example above. For this reason, passwords chosen by users should be compared against a blocklist of unacceptable passwords. This list should include passwords from previous breach corpuses, dictionary words used as passwords, and specific words (e.g., the name of the service itself) that users are likely to choose. Since a minimum length requirement will also govern the user's choice of passwords, this dictionary only needs to include entries that meet that requirement. As noted in Sec. 3.1.1.2, it is not beneficial for the

blocklist to be excessively large or comprehensive, since its primary purpose is to prevent the use of very common passwords that might be guessed in an online attack before throttling restrictions take effect. An excessively large blocklist will likely frustrate users who attempt to choose a memorable password.

Highly complex passwords introduce a new potential vulnerability: they are less likely to be memorable and more likely to be written down or stored electronically in an unsafe manner. While these practices are not necessarily vulnerable, some methods of recording such secrets will be. This is an additional motivation for not requiring excessively long or complex passwords.

### A.4. Central vs. Local Verification

While passwords that are used as a separate authentication factor are often centrally verified by the CSP's verifier, those that are used as an activation factor for a multi-factor authenticator are either verified locally by the authenticator or used to derive the authenticator output, which will be incorrect if the wrong activation factor is used. Both of these situations are referred to as "local verification."

The attack surfaces and vulnerabilities for central and local verification are very different. Accordingly, the requirements for centrally verified passwords differ from those verified locally. Centrally verified passwords require the verifier (i.e., an online resource) to store salted and iteratively hashed verification secrets for all of the subscribers' passwords. Although the salting and hashing process increases the computational effort to determine the passwords from the hashes, the verifier is an attractive target for attackers, particularly those interested in compromising an arbitrary subscriber rather than a specific one.

Local verifiers do not have the same concerns with large-scale attacks on a central online verifier but depend on the physical security of the authenticator and the integrity of its associated endpoint. To the extent that the authenticator stores the activation factor, that factor must be protected against physical and *side-channel* (e.g., power and timing analysis) attacks on the authenticator. When the activation factor is entered through the associated endpoint, the endpoint needs to be free of malware (e.g., key-logging software). Since such threats are less dependent on the length and complexity of the password, these requirements are relaxed for local verification.

Online password-guessing attacks are a similar threat to centrally and locally verified passwords. Throttling is the primary defense against online attacks and can be particularly challenging for local verifiers because of the limited ability of some authenticators to securely store information about unsuccessful attempts. Throttling of local activation factors can be done in one of two ways. The authenticator itself could handle the throttling by keeping count of invalid activation attempts or, when activated incorrectly, the authenticator could produce an invalid authenticator output that will be rejected and throttled by the verifier.

### A.5. Summary

Length and complexity requirements beyond those recommended here significantly increase user frustration and the difficulty of using passwords. As a result, users often work around these restrictions counterproductively. Other mitigations (e.g., blocklists, secure hashed storage, machine-generated random passwords, rate limiting) are more effective at preventing modern brute-force attacks, so no additional password requirements are imposed.

# Appendix B. Syncable Authenticators

*This appendix is normative.*

## B.1. Introduction

The ability to "sync" authenticators — specifically to copy (i.e., clone) their authentication secrets to the cloud and thence to additional authenticators — is a relatively new development in authentication. This appendix provides additional guidelines on the use of syncable authenticators.

## B.2. Cloning Authentication Keys

In some cases, authentication keys may be stored in a sync fabric (e.g., cloud storage). This allows the keys to be backed up and transferred to other devices. The following requirements apply to keys that are managed in this manner:

- All keys **SHALL** be generated using approved cryptography.
- Authentication keys that are cloned or exported from a device to a sync fabric **SHALL** only be stored in an encrypted form using a key with the minimum security strength specified in the latest revision of [SP800-131A] (i.e., 112 bits as of the date of this publication). These keys **SHOULD** be encrypted using a method that employs a user-controlled secret.
- All authentication transactions **SHALL** perform private-key operations on the local device using cryptographic keys that are generated on-device or recovered from the sync fabric.
- Authentication keys stored in the sync fabric **SHALL** be protected by access control mechanisms such that only the authenticated user can access their authentication keys in the sync fabric.
- User access to authentication keys in the sync fabric **SHALL** be protected by AAL2-equivalent MFA to preserve the integrity of the authentication protocols using the synced keys.
- These general requirements and any other agency-specific requirements for using syncable authenticators **SHALL** be documented and communicated, including on public-facing websites and digital service policies, where applicable.
- Authenticators that enable the use of syncable authentication keys **SHOULD** provide a user interface (UI) that allows subscribers to view the services for which they have created a syncable authentication key, whether that key has been synced, and where that key has been synced. The UI **SHALL NOT** expose the authentication key itself.

The following additional requirements apply to federal enterprise[8] use of syncable authenticators:

- Federal enterprise authentication keys **SHALL** be stored in sync fabrics that have achieved Federal Information Security Modernization Act (FISMA) [FISMA] moderate protections or equivalent.
- Devices (e.g., mobile phones, laptops, tablets) that generate, store, and sync authenticators containing federal enterprise authentication keys **SHALL** be protected by mobile device management software or other device configuration controls that prevent the syncing or sharing of keys to unauthorized devices or sync fabrics.
- Access to the sync fabric **SHALL** be controlled by agency-managed accounts (e.g., a central identity and access management solution, platform-based managed account) to maintain federal enterprise control over the authentication key's life cycle.
- Authenticators that generate authentication keys **SHOULD** support attestation features that can be used to verify the capabilities and sources of the authenticator (e.g., enterprise attestation).

These controls specifically support syncing and should be considered additive to the existing multi-factor cryptographic authenticator requirements and AAL2 requirements, including [FIPS140] validation.

> Syncing authentication keys inherently means that the key can be exported. Authentication at AAL2 may be supported subject to the above requirements. However, syncing violates the non-exportability requirements of AAL3. Similar protocols using keys not stored in an exportable manner that meet the other requirements of AAL3 may be used.

### B.3. Implementation Requirements

Many syncable authenticators are built on W3C's [WebAuthn] specification, which provides a common data structure, a challenge-response cryptographic protocol, and an API for leveraging public-key credentials. The specification is flexible and adaptive, meaning that not all deployments of WebAuthn credentials will meet the requirements of federal agencies for implementation.

The specification has a series of flags that the RP application can request from the authenticator to provide additional context for the authentication event and determine

[8] Federal enterprise systems include those considered in scope for PIV guidance, such as government contractors, government employees, and mission partners. It does not include government-to-consumer or public-facing use cases.

whether it meets the RP's access policies. This section describes certain flags in the WebAuthn specification that federal agencies acting as RPs should understand and interrogate when building their syncable authenticator implementations to align with AAL2 guidelines.

The following requirements apply to WebAuthn Level 3 flags:

**User Present (UP)**
The User Present flag indicates that a "presence" test confirmed that the user has interacted with the authenticator (e.g., tapping a hardware token inserted into a USB port). This supports authentication intent, as described in Sec. 3.2.8. Verifiers **SHOULD** confirm that the User Present flag has been set.

**User Verified (UV)**
The User Verified flag indicates that the authenticator has locally authenticated the user using one of the available "user verification" methods. Verifiers **SHALL** indicate that UV is preferred and **SHALL** inspect responses to confirm the value of the UV flag. This indicates whether the authenticator can be treated as a multi-factor cryptographic authenticator. If the user is not verified, agencies **SHALL** treat the authenticator as a single-factor cryptographic authenticator. A further extension to the WebAuthn Level 3 specification (see Sec. 10.3 of [WebAuthn]) provides additional data on verification methods if agencies seek to gain context on the local authentication event.

**Backup Eligible**
The Backup Eligible flag indicates whether the authenticator can be synced to a different device (i.e., whether the key can be stored elsewhere). It is important to note that just because an authenticator *can* be synced does not mean that it *has* been synced. Verifiers **MAY** use this flag to establish policies that restrict the use of syncable authenticators. This flag is necessary to distinguish authenticators that are device-bound from those that may be cloned to more than one device.

**Backup State**
The Backup State flag indicates whether an authenticator *has* been synced to a different device. Verifiers **MAY** use this flag to establish restrictions on authenticators that are synced to other devices. Agencies **SHOULD NOT** condition acceptance based on this flag for public-facing applications due to user experience concerns.

In addition to the flags specified above, agencies may wish to gain additional information on the origins and capabilities of the syncable authenticators that they choose to implement and accept. Within the context of WebAuthn, some authenticators support attestation features that can be used to determine the capabilities and manufacturers of

specific authenticators. For federal enterprise use cases, agencies **SHOULD** implement attestation capabilities based on the functionality offered by their platform providers. This would take the form of a manufacturer attestation in which the RP requests identifying information about the authenticator.

The unavailability of attestations **SHOULD NOT** block the use of syncable authenticators for broad public-facing applications. Due to the limited availability of attestations in consumer products, requiring their use is likely to divert users to less secure authentication options that are vulnerable to phishing (e.g., PSTN-based out-of-band authentication). While authentication transaction metadata (e.g., the User Verified flag indicating the use of a local activation factor) is available in WebAuthn responses, attestation can provide stronger assurance of the characteristics of the authenticator used in a transaction. RPs **SHOULD** use attestation to determine the level of confidence they have in a syncable authenticator when attestations are available.

When the RP receives flag and attestation data, the authenticator may provide information that is incomplete or inconsistent with access to a resource. Agencies **SHALL** evaluate the use cases for syncable authenticators and determine the appropriate access policy decisions that they intend to make based on the returned information.

### B.4. Sharing

Cybersecurity guidelines have historically cautioned against sharing authenticators between users. Rather, different users are expected to maintain their own unique authenticators. Despite this, authenticator and password sharing occurs within some user groups and applications to allow individuals to share access to a digital account.

As indicated in Table 5, some syncable authenticator implementations have embraced this user behavior and established methods for sharing authentication keys between different users. Further, some implementations actively encourage sharing syncable authenticators as a convenient and more secure alternative to sharing passwords for common services.

For enterprise use cases, concerns over sharing keys can be effectively mitigated using device management techniques that limit the ability for keys to be moved off of approved devices or sync fabrics. However, similar mitigations are not currently available for public-facing use cases, leaving RPs dependent on the sharing models adopted by syncable authenticator providers. Owners of public-facing applications should be aware of the risks associated with shared authenticators. When interacting with the public, agencies have limited visibility into which specific authenticators are being employed by their users and should assume that all syncable authenticators may be subject to sharing. While many sharing models have substantial controls that minimize risks (e.g., requiring close proximity between devices to allow sharing), other implementations are less restrictive.

The risk of sharing posed by this new class of authenticators is not unique. It applies to all authenticator types, some of which are weaker than syncable authenticators. Any authenticator can be shared by a user who is determined to share it. Users can actively share passwords, OTPs, out-of-band authenticators, and even push-based authentication events that allow a designee (whether formal or not) to authenticate on behalf of an end user.

Agencies determine which authenticators they will accept for their applications based on the specific risks, threats, and usability considerations they face. Syncable authenticators may be offered as a new option for applications that seek to implement up to AAL2. The trade-offs of this technology should be balanced with expected outcomes for security, privacy, and user experience.

## B.5. Example

A common use of syncable authenticators is in an AAL2 authentication transaction. The following items summarize how WebAuthn syncable authenticators satisfy aspects of AAL2 requirements:

**Phishing resistance (recommended, required for federal enterprise)**

**Achieved**: Properly configured syncable authenticators create a unique public or private key pair whose use is constrained to the domain in which it was created (i.e., the key can only be used with a specific website or RP). This prevents a falsified web page from being able to capture and reuse an authenticator output.

**Replay resistance (required)**

**Achieved**: Syncable authenticators prevent replay resistance (i.e., prevention of reuse in future transactions) through a random nonce that is incorporated into each authentication transaction.

**Authentication intent (required)**

**Achieved**: Syncable authenticators require users to present an activation factor (i.e., activation secret, biometric characteristic) to initiate the cryptographic authentication protocol. This serves as authentication intent, as the event cannot proceed without the user’s active participation.

**Multi-factor (required)**

**Achieved**: The User Verified flag value indicates whether a local authentication mechanism (i.e., an activation factor) was used to complete the transaction. Without user verification, the verifier prompts for an additional authentication factor as part of the transaction.

If the subscriber provides their own authenticator, the verifier may have limited visibility into the features and capabilities of the sync fabric and the devices to which the user

may sync their authentication keys. In this scenario, the verifier SHOULD leverage additional risk indicators or trust signals that may be available from the transaction, device, or sync fabric to increase confidence in the authentication event.

Syncable authenticators are not unique in this respect. Any subscriber-provided authenticator is subject to the same risks as syncable authenticators, including OTP authenticators and nearly all out-of-band authenticators. It is important for CSPs and IdPs to assess each type of authenticator that they offer at each assurance level and determine which are acceptable based on their users and transaction types.

### B.6. Security Considerations

Syncable authenticators present distinct threats and challenges that agencies should evaluate before implementation or deployment, as shown in Table 5.

**Table 5.** Syncable authenticator threats, challenges, and mitigations

| Threat or Challenge | Description | Mitigations |
|---|---|---|
| **Unauthorized key use or loss of control** | Some syncable authenticator deployments support sharing authentication keys to devices that belong to other users who can then misuse the key. | Enforce enterprise device management features or managed profiles that prevent synced keys from being shared. |
| | | Provide mechanisms for users to view keys, key statuses, and whether/where keys have been shared. |
| | | Educate users about the risks of unauthorized key use through existing awareness and training mechanisms. |
| **Sync fabric compromise** | To support key syncing, most implementations clone keys to a sync fabric (i.e., a cloud-based service connected to multiple devices associated with an account). | Store only encrypted key material. |

*Continued on next page*

*Continued from previous page*

| Threat or Challenge | Description | Mitigations |
|---|---|---|
| | | Implement sync fabric access controls that prevent anyone other than the authenticated user from accessing the authentication key. |
| | | Evaluate cloud services for baseline security features (e.g., FISMA moderate protections or comparable). |
| | | Leverage hardware security modules to protect encrypted keys. |
| **Unauthorized access to sync fabric and recovery** | Synced keys are accessible via cloud-based account recovery processes, which represent a potential weakness to the authenticators. | Implement authentication recovery processes that are consistent with SP 800-63B. |
| | | Restrict recovery capabilities for federal enterprise keys through device management or managed account capabilities. |
| | | Bind multiple authenticators at AAL2 and above to support recovery. |
| | | Require AAL2 authentication to add any new authenticators for user access to the sync fabric. |
| | | Only use synced keys as a derived authenticator in federal enterprise scenarios [SP800-157]. |
| | | Notify the user of any recovery activities. |

*Continued on next page*

*Continued from previous page*

| Threat or Challenge | Description | Mitigations |
|---|---|---|
| | | Leverage a user-controlled secret (i.e., something not known to the sync fabric provider) to encrypt and recover keys. |
| **Revocation** | Since syncable authenticators use RP-specific keys, the ability to centrally revoke access based on those keys is challenging. For example, with traditional PKI, CRLs can be used centrally to revoke access. A similar process is not available for syncable authenticators or any FIDO WebAuthn-based credentials. | Implement a central identity management (IDM) account for users to manage authenticators and remove them from the "home agency" account if they are compromised or expired. |
| | | Leverage SSO and federation to limit the number of RP-specific keys that will need to be revoked in an incident. |
| | | Establish policies and tools to request that users periodically review keys for validity and currency. |

## Appendix C. List of Symbols, Abbreviations, and Acronyms

**AAL**
Authentication Assurance Level

**ASCII**
American Standard Code for Information Interchange

**CAC**
Common Access Card

**CSP**
Credential Service Provider

**CSRF**
Cross-Site Request Forgery

**DNS**
Domain Name System

**FEDRAMP**
Federal Risk and Authorization Management Program

**FIPS**
Federal Information Processing Standards

**FMR**
False Match Rate

**FNMR**
False Non-Match Rate

**IAL**
Identity Assurance Level

**IdP**
Identity Provider

**KBA**
Knowledge-Based Authentication

**MAC**
Message Authentication Code

**MF**
Multi-Factor

**MFA**
Multi-Factor Authentication

**NARA**
National Archives and Records Administration

**NFC (communications protocol)**
Near-Field Communication

**OTP**
One-Time Password

**OWASP**
Open Worldwide Application Security Project

**PAD**
Presentation Attack Detection

**PIA**
Privacy Impact Assessment

**PIN**
Personal Identification Number

**PIV**
Personal Identity Verification

**PKI**
Public-Key Infrastructure

**PSTN**
Public Switched Telephone Network

**QR**
Quick Response

**RP**
Relying Party

**SAOP**
Senior Agency Official for Privacy

**SF**
Single-Factor

**SMS**
Short Message Service

**SORN**
System of Records Notice

**SSO**
Single Sign-On

**TEE**
Trusted Execution Environment

**TLS**
Transport Layer Security

**TPM**
Trusted Platform Module

**USB**
Universal Serial Bus

**VOIP**
Voice-Over-IP

**XSS**
Cross-Site Scripting

## Appendix D. Glossary

*This section is informative.*

A wide variety of terms are used in the realm of digital identity. While many definitions are consistent with earlier versions of SP 800-63, some have changed in this revision. Many of these terms lack a single, consistent definition, warranting careful attention to how the terms are defined here.

**account recovery**
The ability to regain ownership of a *subscriber account* and its associated information and privileges.

**activation**
The process of inputting an *activation factor* into a *multi-factor authenticator* to enable its use for *authentication*.

**activation factor**
An additional *authentication factor* that is used to enable successful *authentication* with a *multi-factor authenticator*.

**activation secret**
A *password* that is used locally as an *activation factor* for a *multi-factor authenticator*.

**applicant**
A *subject* undergoing the processes of *identity proofing* and *enrollment*.

**approved cryptography**
An encryption algorithm, *hash function*, random bit generator, or similar technique that is *Federal Information Processing Standards* (FIPS)-approved or NIST-recommended. Approved algorithms and techniques are either specified or adopted in a FIPS or NIST recommendation.

**assertion**
A statement from an *IdP* to an *RP* that contains information about an authentication event for a *subscriber*. Assertions can also contain identity *attributes* for the subscriber in the form of attribute values, derived attribute values, and attribute bundles.

**asymmetric keys**
Two related *cryptographic keys* comprised of a *public key* and a *private key* that are used to perform complementary operations, such as encryption and decryption or signature verification and generation.

**attestation**
Information conveyed to the *CSP*, generally at the time that an *authenticator* is bound, to describe the characteristics of a connected authenticator or the *endpoint* involved in an authentication operation.

**attribute**
A quality or characteristic ascribed to someone or something. An identity attribute is an attribute about the identity of a *subscriber* (e.g., name, date of birth, address).

**attribute validation**
The process or act of confirming that a set of *attributes* are accurate and associated with a real-life identity. See *validation*.

**authenticate**
See *authentication*.

**authenticated protected channel**
An encrypted communication channel that uses *approved cryptography* in which the connection initiator (client) has *authenticated* the recipient (server). Authenticated protected channels are encrypted to provide confidentiality and protection against active intermediaries and are frequently used in the user *authentication* process. *Transport Layer Security* (TLS) and Datagram Transport Layer Security (DTLS) [RFC9325] are examples of authenticated protected channels in which the certificate presented by the recipient is verified by the initiator. Unless otherwise specified, authenticated protected channels do not require the server to authenticate the client. Authentication of the server is often accomplished through a certificate chain that leads to a trusted root rather than individually with each server.

**authenticated session**
See *protected session*.

**authentication**
The process by which a *claimant* proves possession and control of one or more *authenticators* bound to a *subscriber account* to demonstrate that they are the *subscriber* associated with that account.

**authentication assurance level (AAL)**
A category that describes the strength of the *authentication* process.

**authentication factor**
The three types of authentication factors are *something you know*, *something you have*, and *something you are*. Every *authenticator* has one or more authentication factors.

**authentication intent**
The process of confirming the *claimant's* intent to *authenticate* or reauthenticate by requiring user intervention in the authentication flow. Some *authenticators* (e.g., OTPs) establish authentication intent as part of their operation. Others require a specific step to establish intent, such as pressing a button. Authentication intent is a countermeasure against malware at the *endpoint* as a proxy for authenticating an attacker without the *subscriber*'s knowledge.

**authentication key**
A private or symmetric key used by an authenticator to generate the authenticator output.

**authentication protocol**
A defined sequence of messages between a *claimant* and a *verifier* that demonstrates that the claimant has possession and control of one or more valid *authenticators* to establish their identity and, optionally, demonstrates that the claimant is communicating with the intended verifier.

**authentication secret**
A generic term for any secret value that is used to verify the *subscriber* in an *authentication protocol*. These are further divided into *short-term authentication secrets*, which are only useful to an attacker for a limited period of time, and *long-term authentication secrets*, which allow an attacker to impersonate the subscriber until they are manually reset. The *authenticator* secret is the canonical example of a long-term authentication secret, while the *authenticator output* — if it is different from the authenticator secret — is usually a short-term authentication secret.

**authenticator**
Something that the *subscriber* possesses and controls (e.g., a *cryptographic module* or *password*) and that is used to *authenticate* a *claimant's* identity. See *authenticator type* and *multi-factor authenticator*.

**authenticator binding**
The establishment of an association between a specific *authenticator* and a *subscriber account* that allows the *authenticator* to authenticate the *subscriber* associated with the account, possibly in conjunction with other authenticators.

**authenticator output**
The output value generated by an *authenticator*. The ability to generate valid authenticator outputs on demand proves that the *claimant* possesses and controls the authenticator. Protocol messages sent to the *verifier* depend on the authenticator output, but they may or may not explicitly contain it.

**authenticator type**
A category of *authenticators* with common characteristics, such as the types of *authentication factors* they provide and the mechanisms by which they operate.

**authenticity**
The property that data originated from its purported source.

**authorize**
A decision to grant access, typically automated by evaluating a *subject*'s *attributes*.

**biometric sample**
An analog or digital representation of biometric characteristics prior to biometric feature extraction, such as a record that contains a fingerprint image.

**biometrics**
Automated recognition of individuals based on their biological or behavioral characteristics. Biological characteristics include but are not limited to fingerprints, palm prints, facial features, iris and retina patterns, voice prints, and vein patterns. Behavioral characteristics include keystroke cadence, the angle of holding a smartphone, screen pressure, typing speed, mouse or mobile phone movements, and gyroscope position, among others.

**blocklist**
A documented list of specific elements that are blocked, per policy decision. This concept has historically been known as a "blacklist."

**challenge-response protocol**
An *authentication protocol* in which the *verifier* sends the *claimant* a challenge (e.g., a random value or *nonce*) that the claimant combines with a secret (e.g., by hashing the challenge and a *shared secret* together or by applying a *private-key* operation to the challenge) to generate a response that is sent to the verifier. The verifier can independently verify the response generated by the claimant (e.g., by recomputing the hash of the challenge and the shared secret and comparing it to the response or performing a public-key operation on the response) and establish that the claimant possesses and controls the secret.

**claimant**
A *subject* whose identity is to be verified using one or more *authentication protocols*.

**claimed identity**
An *applicant's* declaration of unvalidated and unverified personal *attributes*.

**credential**
An object or data structure that authoritatively binds an identity — via an *identifier* — and (optionally) additional *attributes* to at least one *authenticator* that is possessed and controlled by a *subscriber*. A credential is issued, stored, and maintained by the *CSP*. Copies of information from the credential can be possessed by the subscriber, typically in the form of one or more digital certificates that are often contained in an authenticator along with their associated *private keys*.

**credential service provider (CSP)**
A trusted entity whose functions include *identity proofing applicants* to the identity service and registering *authenticators* to *subscriber accounts*. A CSP may be an independent third party.

**cross-site request forgery (CSRF)**
An attack in which a *subscriber* who is currently *authenticated* to an *RP* and connected through a secure session browses an attacker's website, causing the subscriber to unknowingly invoke unwanted actions at the RP. For example, if a bank website is vulnerable to a CSRF attack, it may be possible for a subscriber to unintentionally *authorize* a large money transfer by clicking on a malicious link in an email while a connection to the bank is open in another browser window.

**cross-site scripting (XSS)**
A vulnerability that allows attackers to inject malicious code into an otherwise benign website. These scripts acquire the permissions of scripts that are generated by the target website to compromise the confidentiality and integrity of data transfers between the website and clients. Websites are vulnerable if they display user-supplied data from requests or forms without sanitizing the data so that it is not executable.

**cryptographic authenticator**
An *authenticator* that proves possession of an *authentication secret* through direct communication with a *verifier* through a cryptographic *authentication protocol*.

**cryptographic key**
A value used to control cryptographic operations, such as decryption, encryption, signature generation, or signature verification. For the purposes of these guidelines, key requirements shall meet the minimum requirements stated in Table 2 of [SP800-57Part1]. See *asymmetric keys* or *symmetric keys*.

**cryptographic module**
A set of hardware, software, or firmware that implements approved security functions, including cryptographic algorithms and key generation.

**digital authentication**
The process of establishing confidence in user identities that are digitally presented to a system. In previous editions of SP 800-63, this was referred to as "electronic authentication."

**digital identity**
An *attribute* or set of attributes that uniquely describes a *subject* within a given context.

**digital signature**
An *asymmetric key* operation in which the *private key* is used to digitally sign data, and the *public key* is used to verify the signature. Digital signatures provide *authenticity* protection, integrity protection, and *non-repudiation* support but not confidentiality or *replay attack* protection.

**digital transaction**
A discrete digital event between a user and a system that supports a business or programmatic purpose.

**endpoint**
Any device that is used to access a *digital identity* on a *network*, such as laptops, desktops, mobile phones, tablets, servers, Internet of Things devices, and virtual environments.

**enrollment**
The process through which a *CSP/IdP* provides a successfully identity-proofed *applicant* with a *subscriber account* and binds *authenticators* to grant persistent access.

**entropy**
The amount of uncertainty that an attacker faces to determine the value of a secret. Entropy is usually stated in bits. A value with *n* bits of entropy has the same degree of uncertainty as a uniformly distributed *n*-bit random value.

**factor**
See *authentication factor*.

**Federal Information Processing Standards (FIPS)**
Standards for adoption and use by federal departments and agencies that are developed by NIST, a part of the U.S. Department of Commerce. FIPS address topics in information technology to achieve common levels of quality, security, and interoperability. FIPS documents are available online on the FIPS home page: https://www.nist.gov/itl/fips.cfm.

**federation**
A process that allows for the conveyance of identity and *authentication* information across a set of *networked* systems.

**federation assurance level (FAL)**
A category that describes the process used in a *federation transaction* to communicate *authentication* events and subscriber *attributes* to an *RP*.

**hash function**
A function that maps a bit string of arbitrary length to a fixed-length bit string. Approved hash functions satisfy the following properties:

1. One-way — It is computationally infeasible to find any input that maps to any pre-specified output.
2. Collision-resistant — It is computationally infeasible to find any two distinct inputs that map to the same output.

**identifier**
A data object that is associated with a single, unique entity (e.g., individual, device, or *session*) within a given context and is never assigned to any other entity within that context.

**identity**
See *digital identity*.

**identity assurance level (IAL)**
A category that conveys the degree of confidence that the *subject*'s *claimed identity* is their real identity.

**identity evidence**
Information or documentation that supports the real-world existence of the *claimed identity*. Identity evidence may be physical (e.g., a driver's license) or digital (e.g., a mobile driver's license or digital *assertion*). Evidence must support both *validation* (i.e., confirming *authenticity* and accuracy) and *verification* (i.e., confirming that the *applicant* is the true owner of the evidence).

**identity proofing**
The processes used to collect, validate, and verify information about a *subject* to establish assurance in the subject's *claimed identity*.

**identity provider (IdP)**
The party in a *federation transaction* that creates an *assertion* for the *subscriber* and transmits the assertion to the *RP*.

**injection attack**
An attack in which an attacker supplies untrusted *biometric* information or media into a program or process. For example, this could include injecting a falsified image of *identity evidence*, a forged video of a user, or a morphed image to defeat evidence validation technology or biometric and visual comparisons for user verification.

**manageability**
Providing the capability for the granular administration of *personal information*, including alteration, deletion, and selective disclosure. [NISTIR8062]

**memorized secret**
See *password*.

**message authentication code (MAC)**
A cryptographic checksum on data that uses a *symmetric key* to detect both accidental and intentional modifications of the data. MACs provide *authenticity* and integrity protection but not *non-repudiation* protection.

**mobile code**
Executable code that is normally transferred from its source to another computer system for execution. This transfer is often through the *network* (e.g., JavaScript embedded in a web page) but may transfer through physical media as well.

**multi-factor authentication (MFA)**
An authentication system that requires more than one distinct type of *authentication factor* for successful authentication. MFA can be performed using a *multi-factor authenticator* or by combining *single-factor* authenticators that provide different types of factors.

**multi-factor authenticator**
An *authenticator* that provides more than one distinct *authentication factor*, such as a cryptographic authentication device with an integrated biometric sensor that is required to activate the device.

**network**
An open communications medium, typically the internet, used to transport messages between the *claimant* and other parties. Unless otherwise stated, networks are assumed to be open and subject to active (e.g., impersonation, *session* hijacking) and passive (e.g., eavesdropping) attacks at any point between the parties (e.g., claimant, *verifier*, *CSP*, *RP*).

**nonce**
A value used in security protocols that is never repeated with the same key. For example, nonces used as challenges in *challenge-response authentication protocols* must not be repeated until *authentication keys* are changed. Otherwise, there is a possibility of a *replay attack*. Using a nonce as a challenge is a different requirement than a random challenge because a nonce is not necessarily unpredictable.

**non-repudiation**
The capability to protect against an individual falsely denying having performed a particular transaction.

**offline attack**
An attack in which the attacker obtains some data (e.g., by eavesdropping on an authentication transaction or by penetrating a system and stealing security files) that the attacker is able to analyze in a system of their own choosing.

**online attack**
An attack against an *authentication protocol* in which the attacker either assumes the role of a *claimant* with a genuine *verifier* or actively alters the authentication channel.

**online guessing attack**
An attack in which an attacker performs repeated logon trials by guessing possible values of the *authenticator* output.

**passphrase**
A *password* that consists of a sequence of words or other text that a *claimant* uses to *authenticate* their identity. A passphrase is similar to a password in usage but is generally longer for added security.

**password**
A type of *authenticator* consisting of a character string that is intended to be memorized or memorable by the *subscriber* to permit the *claimant* to demonstrate *something they know* as part of an authentication process. Passwords were referred to as *memorized secrets* in the initial release of SP 800-63B.

**personal identification number (PIN)**
A *password* that typically consists of only decimal digits.

**personal information**
Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual.

**pharming**
An attack in which an attacker causes the *subscriber* to be redirected to a fraudulent website, typically a fraudulent *verifier*/*RP* in the context of authentication. This could cause the subscriber to reveal sensitive information (e.g., a password) to the attacker, download harmful software, or contribute to a fraudulent act. This may be accomplished by corrupting an infrastructure service (e.g., the DNS) or the subscriber's endpoint.

**phishing**
An attack in which the *subscriber* is lured (usually through an email) to interact with a counterfeit *verifier*/*RP* and tricked into revealing information that can be used to masquerade as that subscriber to the real verifier/RP.

**phishing resistance**
The ability of the *authentication protocol* to prevent the disclosure of *authentication secrets* and valid *authenticator* outputs to an impostor *verifier* without reliance on the vigilance of the *claimant*.

**physical authenticator**
An *authenticator* that the *claimant* proves possession of as part of an authentication process.

**possession and control of an authenticator**
The ability to activate and use the *authenticator* in an *authentication protocol*.

**predictability**
Enabling reliable assumptions by individuals, owners, and operators about *personal information* and its *processing* by an information system. [NISTIR8062]

**presentation attack**
Presentation to the biometric data capture subsystem with the goal of interfering with the operation of the biometric system.

**presentation attack detection (PAD)**
Automated determination of a *presentation attack*. A subset of presentation attack determination methods (i.e., liveness detection) involves the measurement and analysis of anatomical characteristics or voluntary or involuntary reactions to determine whether a *biometric sample* is being captured from a living *subject* that is present at the point of capture.

**Privacy Impact Assessment (PIA)**
A method of analyzing how *personal information* is collected, used, shared, and maintained. PIAs are used to identify and mitigate privacy risks throughout the

development life cycle of a program or system. They also help ensure that handling information conforms to legal, regulatory, and policy requirements regarding privacy.

**private key**
A cryptographic key used with a public-key cryptographic algorithm that is uniquely associated with an entity and is not made public. In an asymmetric-key (public-key) cryptosystem, the private key has a corresponding *public key*. Depending on the algorithm, the private key may be used to:

1. Compute the corresponding public key,
2. Compute a digital signature that may be verified by the corresponding public key,
3. Decrypt keys that were encrypted by the corresponding public key, or
4. Compute a shared secret during a key-agreement transaction.

**protected session**
A *session* in which messages between two participants are encrypted and integrity is protected using a set of *shared secrets* called “session keys.” A protected session is said to be *authenticated* if one participant proves possession of one or more *authenticators* in addition to the session keys and if the other party can verify the identity associated with the authenticators during the session. If both participants are authenticated, the protected session is said to be *mutually authenticated*.

**pseudonym**
A name other than a legal name.

**pseudonymous identifier**
A meaningless but unique *identifier* that does not allow the *RP* to infer anything regarding the *subscriber* but that does permit the RP to associate multiple interactions with a single subscriber.

**public key**
A cryptographic key used with a public-key cryptographic algorithm that is uniquely associated with an entity and that may be made public. In an asymmetric-key (public-key) cryptosystem, the public key has a corresponding *private key*. The public key may be known by anyone and, depending on the algorithm, may be used to:

1. Verify a digital signature that was generated using the corresponding private key,
2. Encrypt keys that can be decrypted using the corresponding private key, or
3. Compute a shared secret during a key-agreement transaction.

**public-key certificate**
A digital document issued and digitally signed by the *private key* of a certificate authority that binds an *identifier* to a subscriber's *public key*. The certificate indicates that the *subscriber* identified in the certificate has sole control of and access to the *private key*. See also [RFC5280].

**public-key infrastructure (PKI)**
A set of policies, processes, server platforms, software, and workstations used to administer certificates and public-private key pairs, including the ability to issue, maintain, and revoke *public-key certificates*.

**reauthentication**
The process of confirming the *subscriber*'s continued presence and intent to be *authenticated* during an extended usage *session*.

**relying party (RP)**
An entity that relies on a *verifier*'s *assertion* of a *subscriber*'s identity, typically to process a transaction or grant access to information or a system.

**remote**
A process or transaction that is conducted through connected devices over a *network* rather than in person.

**replay attack**
An attack in which the attacker is able to replay previously captured messages between a legitimate *claimant* and a *verifier* to masquerade as that claimant to the verifier or vice versa.

**replay resistance**
The property of an authentication process to resist *replay attacks*, typically by the use of an *authenticator* output that is only valid for a specific authentication.

**restricted authenticator**
An *authenticator* type, class, or instantiation that has additional risk of false acceptance associated with its use and is therefore subject to additional requirements.

**risk assessment**
The process of identifying, estimating, and prioritizing risks to organizational operations (i.e., mission, functions, image, reputation), organizational assets, individuals, and other organizations that result from the operation of a system. A risk assessment is part of *risk management*, incorporates threat and vulnerability analyses, and considers mitigations provided by security *controls* that are planned or in place. It is synonymous with "risk analysis."

**risk management**
The program and supporting processes that manage information security risk to organizational operations (i.e., mission, functions, image, reputation), organizational assets, individuals, and other organizations and that include (i) establishing the context for risk-related activities, (ii) assessing risk, (iii) responding to risk once determined, and (iv) monitoring risk over time.

**salt**
A non-secret value used in a cryptographic process, usually to ensure that the results of computations for one instance cannot be reused by an attacker.

**Senior Agency Official for Privacy (SAOP)**
Person responsible for ensuring that an agency complies with privacy requirements, manages privacy risks, and considers the privacy impacts of all agency actions and policies that involve *personal information*.

**session**
A persistent interaction between a *subscriber* and an *endpoint*, either an *RP* or a *CSP*. A session begins with an authentication event and ends with a session termination event. A session is bound by the use of a session secret that the subscriber's software (e.g., browser, application, OS) can present to the RP to prove association of the session with the authentication event.

**session hijack attack**
An attack in which the attacker is able to insert themselves between a *claimant* and a *verifier* after a successful authentication exchange between the latter two parties. The attacker is able to pose as a *subscriber* to the verifier or vice versa to control *session* data exchange. Sessions between the claimant and the *RP* can be similarly compromised.

**shared secret**
A secret used in authentication that is known to the *subscriber* and the *verifier*.

**side-channel attack**
An attack enabled by the leakage of information from a physical cryptosystem. Characteristics that could be exploited in a side-channel attack include timing, power consumption, electromagnetic emissions, and acoustic emissions.

**single-factor**
A characteristic of an authentication system or an *authenticator* that requires only one *authentication factor* (i.e., something you know, something you have, or something you are) for successful authentication.

**single sign-on (SSO)**
An authentication process by which one account and its *authenticators* are used to access multiple applications in a seamless manner, generally implemented with a *federation protocol*.

**social engineering**
The act of deceiving an individual into revealing sensitive information, obtaining unauthorized access, or committing fraud by associating with the individual to gain confidence and trust.

**subject**
A person, organization, device, hardware, *network*, software, or service. In these guidelines, a subject is a *natural person*.

**subscriber**
An individual enrolled in the *CSP* identity service.

**subscriber account**
An account established by the *CSP* for each *subscriber* enrolled in its identity service that contains information about the subscriber and a record of any *authenticators* registered to the subscriber.

**symmetric key**
A *cryptographic key* used to perform both the cryptographic operation and its inverse (e.g., to encrypt and decrypt or to create a *message authentication code* and verify the code).

**sync fabric**
Any on-premises, cloud-based, or hybrid service used to store, transmit, or manage *authentication keys* generated by syncable *authenticators* that are not local to the user's device.

**syncable authenticators**
Software or hardware cryptographic *authenticators* that allow *authentication keys* to be cloned and exported to other storage to sync those keys to other authenticators (i.e., devices).

**system of record (SOR)**
A collection of records that contain information about individuals and are under the control of an agency. The records can be retrieved by the individual's name, an identifying number, a symbol, or other *identifier*.

**System of Records Notice (SORN)**
A notice that federal agencies publish in the Federal Register to describe their *system of record*.

**token**
See *authenticator*.

**transaction**
See *digital transaction*.

**Transport Layer Security (TLS)**
An authentication and security protocol that is widely implemented in browsers and web servers. TLS provides confidentiality, certificate-based authentication of the receiving (server) endpoint, and certificate-based authentication of the originating (client) endpoint. TLS is specified in [RFC8446] and [SP800-52].

**usability**
The extent to which a product can be used by specified users to achieve specified goals with effectiveness, efficiency, and satisfaction in a specified context of use. [ISO/IEC9241-11]

**validation**
The process or act of checking and confirming that the evidence and *attributes* supplied by an *applicant* are authentic, accurate, and associated with a real-life identity. See *attribute validation*.

**verification**
The process or act of confirming that the *applicant* undergoing *identity proofing* holds the claimed real-life identity represented by the validated identity *attributes* and associated evidence. Synonymous with *identity verification*.

**verifier**
An entity that confirms the *claimant's* identity by verifying the claimant's possession and control of one or more *authenticators* using an *authentication protocol*. To do this, the verifier needs to confirm the binding of the authenticators with the *subscriber account* and check that the subscriber account is active.

**verifier impersonation**
See *phishing*.

## Appendix E. Change Log

*This appendix is informative.*

This appendix provides an overview of the changes made to SP 800-63B since its initial release.

- Removes Purpose, Definitions, and Abbreviations numbered sections and renumbers sections accordingly. The section numbers referenced below are the new section numbers.
- Changes the name of *memorized secrets* to *passwords*
- Section 2: Describes the use of fraud indicators rather than pre-authentication checks
- Section 2.3.2: Reduces required FIPS 140 validation level for authenticators at AAL3
- Section 2.3.2: Requires a non-exportable cryptographic authenticator rather than a hardware-based authenticator at AAL3
- Section 3.1.1.2: Increases the minimum length of passwords used as a single authentication factor
- Section 3.1.3: Disallows the comparison of secrets from primary and secondary channel for out-of-band authentication
- Section 3.1.3.1: Removes the prohibition on the use of VoIP phone numbers for out-of-band authentication
- Section 3.1.3.4: Recognizes multi-factor out-of-band authenticators that require an activation factor
- Section 3.1.4 and Sec. 3.1.5: Removes “devices” from the authenticator name to recognize OTP applications
- Section 3.1.6 and Sec. 3.1.7: Removes “software” and “device” distinction from the authenticator name and refers to them as “authenticator characteristics”
- Section 3.1.7.3: Adds requirements for authentication using subscriber-controlled wallets
- Section 3.1.7.4 and Appendix B: Adds requirements for syncable authenticators
- Section 3.2.3: Updates biometric performance requirements and metrics
- Section 3.2.3.2: Requires PAD for facial recognition and prohibits biometric comparison based on voice
- Section 3.2.5: Adds a definition and updates requirements for phishing-resistant authenticators

- Section 3.2.10: Establishes separate requirements for locally verified memorized secrets known as *activation secrets*
- Section 3.2.11: Adds requirements for authenticators that are connected via wireless technologies, such as NFC and Bluetooth
- Section 3.2.11.3: Recognizes hybrid connections as a class of connected authenticators
- Section 3.2.12: Centralizes the requirements for random values used throughout the document
- Section 3.2.13: Adds a new section on requirements for the non-exportability of authenticator secrets
- Section deleted: Removes verifier compromise resistance as a distinctly named requirement because it is generally a characteristic of the chosen authenticator type
- Section 4: Renames section to "Authenticator Event Management"
- Section 4.1.1: Moves binding at enrollment to SP 800-63A
- Section 4.1.2.1: Generalizes binding an additional authenticator to all AALs
- Section 4.1.2.2: Adds requirements for binding authenticators that are not connected to an endpoint
- Section 4.2: Revises the requirements and methods for account recovery
- Section 4.6: Revises the requirements for notifications sent to subscribers
- Section 5.1: Recognizes the use of device-bound session credentials
- Section 5.1.1: Adds requirements for browser cookies used for session maintenance
- Section 5.2: Revises reauthentication requirements to define the overall structure of reauthentication here and specify timeout values in the AAL requirements
- Section 5.3: Adds guidelines for the use of session monitoring (continuous authentication)

# EXHIBIT 9

FOLEY

FOLEY & LARDNER LLP

ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
414.297.5518
awronski@foley.com EMAIL

CLIENT/MATTER NUMBER
ClientNumber-MatterNumber

June 26, 2019

**VIA ECF and Electronic Mail**
Honorable Marilyn J. Horan
Joseph F. Weis, Jr. United States Courthouse
700 Grant Street, Courtroom 8A, Room 8170
Pittsburgh, PA 15219

**Re: Bessemer System FCU v. Fiserv Solutions, LLC, et al., Case No. 19-CV-624 (MJH)**

Dear Judge Horan:

I write briefly on behalf of Fiserv Solutions, LLC and Fiserv Inc. ("Defendants") in advance of this afternoon's status call to address Bessemer's Motion for a Temporary Restraining Order and a Preliminary Injunction. I apologize for the informality of this correspondence, but Defendants thought it helpful to apprise the Court of the positions they will take on the motion before that call and time did not permit a more fulsome response.

In summary, the motion is an unfortunate and unnecessary imposition on the parties and the Court. The parties have had extensive correspondence on these issues over the last several weeks, and Defendants believe that these issues have been resolved or substantially resolved. Defendants have been diligent and prompt in responding to Bessemer's requests, despite the aggressive litigation posture in which they are consistently made. Notwithstanding these communications (including communications between counsel on separate matters relating to this case), Bessemer filed the motion without a meet and confer conference and without informing Defendants of the specific issues raised in the motion. (Indeed, the motion does not conform to this Court's November 2018 Standing Order requiring a statement as to whether the motion was discussed with the other parties and reciting their positions on the requested relief.)

Defendants have been and remain willing to engage in a meet and confer process and believe that any remaining issues are technical ones that are best resolved by the parties, not their lawyers or the Court. Defendants request that Court direct the parties to meet and confer and hold the motion in abeyance pending those efforts. If the meet and confer does not resolve the remaining issues, Defendants request that the Court set a typical briefing schedule to resolve the motion. There simply is no urgency here – and certainly none necessitating entry of a temporary restraining order on an emergency and expedited basis.

FOLEY

FOLEY & LARDNER LLP



Despite the length of Bessemer's brief and Ms. Peterson's declaration (which reads like a brief), Bessemer has raised only four discrete issues, each of which has been resolved or substantially resolved, as follows:

1. **Credit Reporting Information:** Ms. Peterson's declaration asserts that Defendants have refused to provide reports of credit reporting information sent to Experian. (Peterson Decl., ¶¶ 83-91.) Defendants provided all of that information to Bessemer's new processing vendor, CompuSource, on June 14, 2019. Defendants' counsel specifically informed Bessemer's counsel of that fact by letter dated that same day. Bessemer does not appear to dispute that it has this information, and Defendants are unaware of any unresolved issue here. Ms. Peterson makes no mention of this in her declaration and Bessemer did not meet and confer on the issue before filing the motion. (There was an initial dispute arising out of Bessemer's refusal to pay for the programming necessary to generate the requested reports. Ultimately, to avoid needless issues, Defendants provided the reports while reserving their right to pursue payment at a later time.) If there is a continuing issue here, Defendants are unaware of it.

2. **eFichency Records**. Here, too, a dispute arose about whether Bessemer would pay the fees and expenses that the parties' Master Agreement requires. Again, in the interests of resolving any dispute and avoiding needless escalation, Defendants agreed to provide a complete set of these records to Bessemer. A hard drive with the data was delivered to Bessemer on June 24, 2019 (this past Monday). Bessemer admits that it received the hard drive but claims that the password Defendants provided does not work. ***Bessemer never informed Defendants that it was having trouble with the password until the motion was filed.*** Not only did Bessemer not meet and confer on the issue, it didn't even pick up the phone and ask for help. Defendants indisputably sent the records and obviously intended that Bessemer have access. Defendants will work with Bessemer to resolve the password issue and, in an abundance of caution, are loading another copy of the data onto a separate drive that can be delivered by the end of the week. If there is an issue here (and Fiserv Solutions' technical manager would testify that he checked the password and it was fully operable), it is a technical, not a legal, one. ***More importantly, Bessemer has had continuous online access to all of these reports and data since its deconversion in early June. Defendants' records reflect clearly that Bessemer personnel have been accessing the eFichency data in this way regularly.*** Any claim that Defendants are "denying access" to this data is simply false.

3. **Debit Card Opt-In Information.** Defendants provided what they believed Bessemer to be requesting in the original deconversion files delivered to CompuSource nearly a month ago. In a June 24, 2019 email, Defendants' counsel directed Bessemer to the specific fields in the deconversion files where this information can be found (ACT file, card 1, position 78). ***Defendants heard nothing further on the subject until Bessemer filed its motion.*** Here, again, Bessemer failed to meet and confer or to make a good faith effort to resolve the issue. Bessemer's motion suggests that there is some misunderstanding between the parties as to what specifically Bessemer wants (and perhaps as to whether Defendants have that information). The record is clear,

however, that Defendants have been prompt and responsive in trying to address Bessemer's requests. Bessemer, in contrast, never told Defendants that the information provided on June 24, 2019 was not what Bessemer is looking for. Here, too, we have a technical issue best resolved between the parties and their technical consultants, not their lawyers.

**4. Security Measures.** On June 12, 2019, Bessemer made certain demands with respect to the security measures in place for Bessemer's records and data that remain in Defendants' possession. (It is important to understand that Fiserv Solutions has copies of these records and data in its own records. During the deconversion process, these files were provided to Bessemer's new vendor which has been operating Bessemer's platform since early June. Bessemer and CompuSource use and access Bessemer's data every day to run the credit union.)

Defendants promptly responded by letter dated June 14, 2019 and specifically informed Bessemer that: ***"All Charlotte core data, all eFichency records, all Bill Pay payment data, and all personal data (member number, debit card number, and social security number) in the Virtual Branch database are and have been stored in an encrypted state in the production databases. Additionally, Fiserv Solutions has undertaken to extract into a separate encrypted file and remove from the database all of Bessemer's Virtual Branch data. None of Bessemer's data is accessible through the internet."*** In short, Defendants informed Bessemer that the "security measures" demanded in its motion are already in place. Despite subsequent communication and correspondence between counsel, Bessemer never took the position that these security measures are not in place, that these security measures are inadequate, or that additional security measures are required. Putting aside that the parties' respective obligations with respect to data security are entirely a contractual matter under the Master Agreement, Defendants have already put in place all of the security measures that Bessemer has requested. There are no security issues to be resolved through the motion and, if Bessemer thinks there are, it chose to file the motion without a good faith meet and confer effort to resolve them without involving the Court.

Each of the four issues that Bessemer raised in its motion have been promptly addressed by the Defendants and either fully or substantially resolved. Any remaining issues are technical in nature and could (and should) be resolved directly between the parties. There simply was no need for the motion to be filed at all, much less without a good faith effort to meet and confer.

Finally, there is simply no urgency here. This dispute dates back to at least January 2018. The "security" issues that Bessemer alleges (and which Defendants dispute) occurred (if at all) at least nine months ago (and some years ago). This action was initially filed in state court (without a complaint) in ***April 2018*** and sat idle for nearly a year. Bessemer filed its complaint on ***April 26, 2019*** and did not then seek a temporary restraining order or injunctive relief. Defendants are at a loss to understand what "emergency" required Bessemer to file an expedited motion and eschew any meet and confer efforts. Clearly, Bessemer perceives some tactical advantage to this

FOLEY

FOLEY & LARDNER LLP



approach. Perhaps Bessemer hopes for an early merits ruling before discovery, or simply wants to wave the threat of "contempt" around as the parties litigate their claims and counterclaims. Whatever the motivation, Bessemer's tactics are an unnecessary and unfortunate imposition on the Court and the Defendants, because there are no emergency issues here.

For these reasons, Defendants suggest that the Court direct the parties to meet and confer in a good faith attempt to resolve what remains of these issues. If the parties report back that they have been unable to resolve them, the Court should give Defendants an opportunity to respond fully with a brief and their own declarations before considering the motion. Given the clear lack of any emergency here, the motion should be briefed and heard on an ordinary motion schedule.

Defendants regret the need to impose on the Court on short notice, but the timing here was not of their choosing. Defendants appreciate the Court's time and consideration.

Very truly yours,

***Andrew J. Wronski***

Andrew J. Wronski

# EXHIBIT 10

# Joanne Sebby

Joanne Sebby

Chief Risk Officer

Joanne Sebby is Chief Risk Officer at Fiserv, Inc., overseeing the strategic development and execution of the company's enterprise and operational risk management programs in partnership with the company's business leaders.

Sebby has more than 20 years of risk management experience. Prior to being named Chief Risk Officer she served as Chief Audit Executive at Fiserv, and held the same position at First Data prior to its combination with Fiserv in 2019. As Chief Audit Executive, Sebby oversaw a team providing independent, risk-based, and objective assurance and consulting activities to add value and improve the company's operations.

Sebby held several additional risk management positions during her tenure with First Data, with a significant focus on integrating regional practices into global programs. These positions included three years as vice president of Enterprise Security, Risk and Compliance, leading security professionals across North America and Europe to create and enforce policies and standards through ongoing internal risk assessments, the facilitation of external assessments and consulting services. She also served as a liaison to the Federal Financial Institutions Examination Council (FFIEC).

Prior to joining First Data, Sebby served as an Audit Manager at Deloitte where she was responsible for audits in multiple industries. Sebby holds a bachelor's degree from Buena Vista University. She is a Certified Public Accountant and Certified Information Security Manager.

# EXHIBIT 11

JOURNAL REPORTS

# The Hidden Emotional Toll on Victims of Data Breaches

We all know there's a potential financial impact when a company's data is hacked. But victims' suffering goes far beyond that.

*By Cassandra Cross and Thomas J. Holt*

November 25, 2025, 2:00 pm EST

Data breaches have become so common that a basic formula has emerged for how organizations usually respond: advise customers to change their passwords, offer free credit monitoring, and suggest that customers remain vigilant for any signs of identity theft. And if identity theft does happen, there's an established process to recover any monetary losses.

All of that is helpful, but it only addresses a breach's potential financial impact on victims. What if we're missing a range of impacts on other facets of people's lives?

Our research suggests we are.

We surveyed 552 Australian victims of data breaches. While financial impacts were reported by 29% of the respondents, many more—50%—reported emotional harm. Nearly one-third said a breach had affected their physical well-being. And nearly a quarter said their relationships were negatively affected.

## Our digital lives

None of this should be surprising. Major parts of our lives have been digitized: sensitive health data, including diagnoses and medical procedures; private images like photos or medical X-rays; sexual preferences expressed as part of a dating profile. The exposure of information like this can make people anxious about how it could affect their lives, including possibly the loss of a partner or a job.

As a result, some victims report a constant level of uncertainty and anxiety in the wake of a breach: What if today is the day my data is used in a bogus transaction? What if today is the day I'm targeted by scammers using my personal information to make

themselves seem legitimate? What if today is the day that I am exposed to family and friends?

But while it may not be surprising, few people have recognized the emotional toll that breaches take on people. The question is: What do we do about it?

The first step is to simply acknowledge it. That alone should help victims better understand what they are going through, and alert therapists that it's an issue that may need to be addressed.

## Who pays?

Having said that, the complexity and cost of compensating perhaps millions of people for nonfinancial damages from a breach are enormous. But victims of other personal crimes are offered a range of support services to assist with recovery. Data-breach victims should be no different. For instance, counseling and psychological support could be offered for those struggling with emotional or mental-health effects of exposure.

The practicalities of providing such support are beyond the scope of our study. But we can think of some possibilities.

For one thing, breached organizations could cover at least part of the costs. It is likely that not all victims would seek these services, and there could be qualifiers for reimbursement, such as a doctor recommending therapeutic services. Financial support for therapeutic services could be built into cyber insurance policies, though that would likely raise premiums.

On the other side, victims' insurers could recognize breaches as a potential source of mental or physical harm that requires medical intervention for some people and provide coverage for treatment costs. And there are many government and nonprofit providers of victim services that could help.

**Cassandra Cross** is a professor in the School of Justice, Queensland University of Technology, Australia. **Thomas J. Holt** is a professor in the School of Criminal Justice and the director of the Center for Cybercrime Investigation and Training at Michigan State University. They can be reached at reports@wsj.com.

# EXHIBIT 12

NERKO

**Charles J. Nerko**
*Managing Partner*
518.363.9100
cnerko@nerko.com

May 19, 2026

**VIA CERTIFIED MAIL RRR AND EMAIL**

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Attn: Andrew J. Wronski, Esq.

Fiserv Solutions, LLC & Fiserv, Inc.
600 N. Vel R. Phillips Ave.
Milwaukee, WI 53203
Attn: Adam Rosman, Esq.
Chief Administrative Officer & Chief Legal Officer

**Re: Marshall Community Credit Union**
**Notice of Breach & Intent to Seek Temporary Restraining Order**

Dear Counsel:

We are litigation counsel to Marshall Community Credit Union ("MCCU") in connection with its claims against Fiserv Solutions, LLC ("Fiserv Solutions") and its affiliates, including Fiserv, Inc. (collectively, "Fiserv").

While our client's investigation is ongoing, we understand that Fiserv is storing MCCU's confidential information on insecure websites. These websites lack proper authentication and security controls to prevent unauthorized disclosure of confidential information. A recent risk assessment conducted by the credit union revealed that:

- Client360, where the credit union submits support tickets, requires only username, password, and an email-based one-time passcode to log in. Proper multi-factor authentication is not in place.

- Corillian does not require multi-factor authentication before individuals are authenticated to engage in high-risk transactions, including viewing member account and transactional history, and transferring funds out of accounts.

- The credit union's mobile application also does not require multi-factor authentication. Like Corillian, the mobile application permits individuals to engage in high-risk transactions, including viewing member account and transactional history, and transferring funds out of accounts.

- Multi-factor authentication has not been implemented in at least the following additional portals that store extraordinarily sensitive credit union and member information: Portico, Nautilus Essentials, Portico Reporting Analytics, Wisdom Accounting, WireXchange, Loancierge, and Deposit Essentials.

These security failures provide easy access to hackers, presenting profound risks to the credit union. Fiserv's ongoing failure to properly secure the credit union's information and systems is reckless and grossly negligent, and exposes the credit union and its members to wide-ranging, irreparable harm.

The Federal Financial Institutions Examination Council ("FFIEC") deems the single-factor authentication process used by Fiserv inadequate for safeguarding MCCU's high-risk transactions and confidential information. *See* Federal Financial Institutions Examination Council, "Authentication and Access to Financial Institution Services and Systems," at 6 https://www.ffiec.gov/press/pdf/Authentication-and-Access-to-Financial-Institution-Services-and-Systems.pdf ("Attacks against systems and users protected with single-factor authentication often lead to unauthorized access resulting in data theft or destruction, adverse impacts from ransomware, customer account fraud, and identity theft. Accordingly, use of single-factor authentication as the only control mechanism has shown to be inadequate against these threats.").

Other federal guidance confirms that the authentication process used by Fiserv is a "low security method of authentication" that "provides attackers an easy way to gain access to the system." *See* U.S. Cybersecurity & Infrastructure Security Agency (CISA), "Capacity Enhancement Guide: Implementing Strong Authentication" at 2 https://www.cisa.gov/sites/default/files/publications/CISA_CEG_Implementing_Strong_Authentication_508_1.pdf (noting a study of multi-factor authentication found that it "blocked 100 percent of automated bots, 99 percent of bulk phishing attacks, and 66 percent of targeted attacks"). Even where multi-factor authentication is implemented, the FFIEC recognizes that it must be deployed in conjunction with other layered security controls to be truly effective. *See* Federal Financial Institutions Examination Council, "Authentication and Access to Financial Institution Services and Systems," at 4 https://www.ffiec.gov/press/pdf/Authentication-and-Access-to-Financial-Institution-Services-and-Systems.pdf ("Various standard-setting organizations and other cybersecurity resources have identified MFA, *in conjunction with other layered security controls*, to be an effective practice to secure against financial loss and data compromise caused by various threats." (emphasis added)).

Fiserv's reliance on an email-based passcode challenge as "multi-factor authentication" is expressly prohibited under the controlling federal standards. The FFIEC's *Authentication and Access to Financial Institution Services and Systems* adopts the NIST *Digital Identity Guidelines*, SP 800-63B, which could not be clearer: "Methods that do not prove possession of a specific device, such as voice-over-IP (VOIP) or email, SHALL NOT be used for out-of-band authentication." NIST SP 800-63B § 5.1.3.1, https://pages.nist.gov/800-63-3/sp800-63b.html. NIST further requires that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

Under these standards, an email code is not "multi-factor" in any respect. It is an expressly barred method that does not—and cannot—prove possession of a specific device, and is deemed single-factor by definition. For Fiserv to present such a method as "multi-factor" misrepresents its true nature and ignores the federal prohibition on using email for out-of-band authentication.

These security deficiencies not only violate widely accepted federal standards, but also constitute material breaches of Fiserv's contractual and other obligations to MCCU. As a result, MCCU asserts the following claims:

1. Fiserv Solutions breached Section 3(b) of the Master Agreement by failing to use the same care and discretion to avoid disclosure of MCCU's information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law.

2. Fiserv Solutions breached Section 4(a) of the Master Agreement, by failing to implement and maintain an appropriate information security program that, among other things, protects the security and confidentiality of MCCU's member information and protects against unauthorized access to or use of such information that could result in substantial harm and inconvenience to any MCCU member. Fiserv has also failed to take appropriate actions to address incidents of unauthorized access to MCCU's sensitive customer information, including by failing to properly notify MCCU of such incidents.

3. Fiserv Solutions breached Section 6(a)(iii) of the Master Agreement, under which Fiserv Solutions warranted that it will comply with all regulatory requirements. Fiserv did not comply with all such requirements.

4. Fiserv Solutions breached the services warranties in Section 4(e) of the ASP Services Exhibit to the Master Agreement, including the warranties of conformity to specifications and due care.

5. Fiserv violated Section 6 of the Fiserv Privacy Notice by failing to implement appropriate security measures to prevent unauthorized access, use, and disclosure of personal data.

6. Fiserv Solutions violated the implied covenant of good faith and fair dealing by, among other things, issuing invoices for services not performed, failing to provide necessary and commercially reasonable security for a federally regulated credit union, and exposing MCCU to far greater harm beyond what was bargained for and well outside commercially reasonable norms.

The foregoing constitutes material breaches of Fiserv's obligations that are incapable of a cure. MCCU has also identified other problems with Fiserv's performance and submitted support tickets and other communications to Fiserv which have not yet been addressed; these prior communications are incorporated into this notice of breach by reference.

MCCU demands that Fiserv immediately remediate these security problems and properly safeguard MCCU's information, cooperate with MCCU in investigating the security breaches, fully compensate MCCU for all damages and its attorneys' fees, and cooperate in returning MCCU's information in a reasonably usable form and in effectuating the orderly termination of the Master Agreement and transition of services to MCCU's successor vendor.

MCCU also demands that Fiserv produce all records required to be produced under the Master Agreement, including Sections 4(a), 4(b), 10(b), and ASP Services Exhibit to the Master Agreement Sections 4(d), 4(h), and 6(c). In accordance with 12 C.F.R. Part 748, Appendix A, MCCU further demands that Fiserv provide audits, summaries of test results, and other equivalent evaluations of Fiserv's security. The requested records to be produced must include logs and forensic reports of logins to all web and application-based portals provided for or containing MCCU's information, including those identifying any specific MCCU members or employees whose accounts or information were placed at risk of compromise. If any systems

previously did not require multi-factor authentication but have since been adjusted to require multi-factor authentication, those other systems should also be included in Fiserv's audit response. This request is made in good faith, is reasonable in scope, and tracks the audit rights Fiserv granted to MCCU under the Master Agreement. The Master Agreement unambiguously authorizes the credit union to obtain the categories of records identified here; MCCU has asserted reasonable grounds that Fiserv failed to perform invoiced services and has failed to safeguard MCCU's confidential information; and nothing in the Master Agreement limits the credit union's right to request and review the requested materials. Indeed, the requested records are necessary for the credit union to discharge its obligations under federal law. *See* 12 C.F.R. Part 748, Appendix A, III.D.3 ("Where indicated by the credit union's risk assessment, [a credit union should] monitor its service providers to confirm that they have satisfied their obligations as required by paragraph D.2. [i.e., to safeguard credit union member information]. As part of this monitoring, a credit union should review audits, summaries of test results, or other equivalent evaluations of its service providers."). Please provide these records promptly.

**If Fiserv does not agree to a consent injunction by 5:00 E.T. on May 26, 2026 confirming that it will comply with these demands, MCCU will seek a temporary restraining order, preliminary injunction, and order compelling Fiserv to produce expedited discovery at the U.S. District Court for the Western District of Michigan to prevent irreparable harm to the credit union and its members, and without further notice to Fiserv.** We further request that Fiserv notify us before changing or modifying any systems or their availability.

## Preservation Notice

Circumstances have arisen that may foreseeably give rise to legal claims being asserted against Fiserv. As a result, Fiserv must preserve all documents, things, and electronically stored information that may be potentially relevant. In addition, Fiserv must take reasonable steps to preserve all documents, things, and electronically stored information that are not in Fiserv's possession or custody, but are in Fiserv's control, such as materials in the possession of its affiliates and subcontractors.

Without limitation, the following items require preservation:

1. The relationship between MCCU and Fiserv.
2. Security vulnerabilities and data security incidents at Fiserv.
3. Fiserv's security controls and any related testing of those controls.
4. Fiserv's information security, backup, disaster recovery, and business continuity plans and policies.
5. Complaints and government investigations regarding Fiserv.
6. All audits and assessments of Fiserv's security, including any gaps and remediation recommendations.
7. All decisions to upgrade or not upgrade Fiserv's security controls.
8. All system event logs for systems storing MCCU's information, and any server-level monitoring of activity on said websites and applications.

9. Any applicable insurance coverage, including applications for insurance where Fiserv disclosed information pertaining to its security policies and practices.

To ensure proper preservation, take all necessary steps to ensure that the materials are preserved intact and without modification. For example, you should: (a) suspend your data destruction and backup tape recycling policies; (b) retain software, hardware, information, or other things required to access or view the materials (e.g., identification codes, passwords, access codes, decryption applications, decompression software, reconstruction software, manuals, and user instructions); (c) take special action to preserve archived or deleted ESI, ESI stored in databases, computer or network logs, and metadata (e.g., a file's creation date, access date, and author); and (d) implement a legal hold and issue legal hold notices to individuals with potentially relevant materials to advise them of their obligations. If preserving these materials is unreasonable, overly burdensome, or unfeasible, take immediate steps to preserve them and contact us promptly to evaluate alternative measures.

If any potentially relevant materials are in another individual or entity's possession, custody, or control, we request that you secure the preservation of such materials, or alternatively, contact us to discuss how we may work together to secure the other individual or entity's cooperation.

By sending you this letter, our client is not currently taking any position as to whether the materials we have requested you preserve or furnish would be deemed in our client's possession, custody, or control. Our client requests you cooperate by preserving and furnishing the requested materials, even if they are not in our client's possession, custody, or control.

These preservation obligations apply until the relevant materials are returned to or produced to our client, and this preservation notice should not be construed to authorize further retention of our client's materials.

Your obligation to preserve potentially relevant materials is mandated by law, not merely by this letter. Therefore, your duties extend beyond the instructions in this letter. If you fail to preserve materials as required by law, you may be subject to sanctions for spoliation of evidence. Our client will rely on this letter in Court as notice of your preservation obligations.

## Reservation of Rights

This notice, along with any action taken in connection with it, is without prejudice to any of MCCU's, or any other affected party's rights, powers, privileges, remedies, and defenses, whether currently existing or arising in the future. All such rights and remedies are expressly reserved, including the right to terminate, rescind, or challenge any agreement.

No actions taken by MCCU or other affected parties, including ongoing payments or temporary use of services, imply consent, acceptance, ratification, or waive any legal rights or claims. Ongoing payments and temporary use of services are involuntary and dictated by the absence of practical alternatives because Fiserv still controls MCCU's systems and has custody of information required for MCCU to function.

MCCU further provides notice that no individual is authorized to bind the credit union to any obligation or waiver involving Fiserv unless the proposed terms are first submitted to the undersigned counsel and subsequently executed in physical, nonelectronic form by the credit union's Chief Executive Officer.

* * * * *

While we are authorized to take all appropriate actions to zealously protect MCCU's interests, we hope that this matter can be amicably resolved. Please direct further communications to me and my colleagues John C. Cleary and Walter E. Swearingen at cnerko@nerko.com, jcleary@nerko.com, and wswearingen@nerko.com, as well as our co-counsel, David L. Hecht, Lori G. Feldman and Kristen Nelson of Hecht Partners LLP at dhecht@hechtpartners.com, lfeldman@hechtpartners.com and knelson@hechtpartners.com and Chuck Holzman and Michael Krempa of Holzman Law, PLLC at cholzman@holzmanlaw.com and mkrempa@holzmanlaw.com.

A copy of this notice has been sent to Fiserv's in-house counsel, in accordance with the Master Agreement's notice requirements.

We look forward to your prompt response on these significant issues.

Very truly yours,

*s/Charles J. Nerko*

Charles J. Nerko

# EXHIBIT 13

FOLEY

FOLEY & LARDNER LLP

777 E WISCONSIN AVE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
FOLEY.COM

WRITER'S DIRECT LINE
414.297.5518
awronski@foley.com

May 26, 2026

Via Email

Charles J. Nerko
NERKO PLLC
1178 Broadway, 3rd Floor
New York, NY 10001
cnerko@nerko.com

**RE: Marshall Community Credit Union**

Dear Charles:

We are in receipt of your May 19, 2026, correspondence to Fiserv Solutions, LLC ("Fiserv Solutions") and Fiserv, Inc. related to the Master Agreement between Fiserv Solutions and Marshall Community Credit Union ("Marshall CCU").

Your letter threatened that Marshall CCU would pursue a temporary restraining order and preliminary injunction without further notice should Fiserv Solutions not comply with a litany of demands by 5:00 E.T. today, including (i) remediating alleged (but unidentified) security problems, (ii) cooperating with Educational FCU in investigating (likewise unidentified) "security breaches," (iii) assisting Marshall CCU in transitioning to a (yet again unidentified) successor vendor, (vi) compensating Marshall CCU for unspecified damages and attorneys' fees, and (v) providing Marshall CCU with various audits or evaluations associated with Fiserv Solutions' data-security measures and invoicing under the Master Agreement.

Your letter is the first time, to our knowledge, that Marshall CCU has raised concerns regarding the security of the products and services it receives from Fiserv Solutions. Fiserv Solutions is willing to meet with Marshall CCU to discuss security protections and configurations, but the threats of litigation and the deadline demanded for a response are neither reasonable nor productive.

As you know, there is no basis for injunctive or other relief here—you have employed this tactic under nearly identical circumstances twice and your TRO motions were promptly denied. Fiserv Solutions has not breached any obligations under the Master Agreement and, other than cursory assertions, your letter details none. The security controls that Fiserv Solutions provides to Marshall CCU with respect to the products and services identified in your letter comply with the Master Agreement and all laws and regulations applicable to Fiserv Solutions. Notably, Marshall CCU does not identify any supposed data security incident in connection with the products and services identified in your letter, and we are not aware of any such incident.

Given that your letter demanded a response within 4 business days, Fiserv Solutions has not completed its investigation of the security configurations in place for Marshall CCU with respect to each of the products identified in your letter. Fiserv Solutions will supplement this letter once that investigation is complete. In the interim, we refer you and your client to the information

provided below regarding the available product security measures for all but one of the products set forth in your May 19, correspondence.[1] This information was provided in Fiserv Solutions' August 28, 2025 letter to you and the product documentation that was provided to you and Mr. Swearingen on April 8, 2026.

- **Fiserv Solutions' Member-Facing Products**
  - **Corillian (Online Banking) Log-in**
    - Security Measures: Fiserv Solutions' SecureNow product is required for all credit unions that use Corillian. SecureNow results in multi-factor authentication (through delivery of OTPs) for Corillian log-in as frequently as the credit union desires, including at each log-in attempt.
  - **Mobiliti (Mobile Banking) Log-in**
    - Security Measures: Fiserv Solutions' SecureNow product is available to all credit unions that use the Mobiliti mobile banking product, and it has been available for several years. Implementation of SecureNow results in multi-factor authentication (through delivery of OTPs) for Mobiliti log-in as frequently as the credit union desires, including at each log-in attempt.
- **Fiserv Solutions' Credit Union-Facing Products**
  - **Portico**
    - Security Measures: Credit union employees can only access information Portico through a desktop application installed on a designated teller workstation. Credit unions can choose whether to authenticate through email delivery of one-time passcodes ("OTP") or time-based one-time passwords ("TOTP") via an authentication application. The TOTP option has been available for Portico users since June 2025. IP whitelisting is also available on this product.
  - **Portico Reporting Analytics**
    - Security Measures: Credit union employees can only access information stored in Portico Reporting Analytics after logging into the Reporting Analytics portal. Credit unions can choose whether to authenticate through email delivery of one-time passcodes ("OTP") or time-based one-time passwords ("TOTP") via an authentication application. The TOTP option has been available for Portico Reporting Analytics users since November 2025. IP whitelisting is also available on this product.

---

[1] Fiserv Solutions is reviewing the WireXchange configurations available to Marshall CCU and will supplement this letter with that information in due course.

- **Loancierge**
  - Security Measures: Credit union employees can only access information stored in Loancierge after logging into the Loancierge portal. Credit unions can choose whether to authenticate through email delivery of one-time passcodes ("OTP") or time-based one-time passwords ("TOTP") via an authentication application. The TOTP option has been available for Loancierge users since February 2026. IP whitelisting is also available on this product.
- **Client360**
  - Security Measures: Credit union employees can only access information reflected or stored in Client360 after logging into the Client360 portal. Client360's log-in process utilizes multi-factor authentication (through delivery of OTPs). Though Credit union employees may temporarily disable this feature by choosing the "trust this browser" option after successfully logging into the Client360 portal, Fiserv Solutions is happy to work with Marshall CCU to further explain this feature, so that the credit union may instruct its employees on whether to use this option. Fiserv Solutions is also happy to work with Marshall CCU to explain how to restrict access and monitor access to any PII stored in Client360. IP whitelisting is also available for this product.
- **Originate (Deposit Essentials).**
  - Security Measures: Credit union employees can only access information stored in Originate after logging into the Originate product. Originates' log-in process utilizes multi-factor authentication (through delivery of OTPs). IP whitelisting is also available on this product.
- **Nautilus Essentials**
  - Security Measures: Credit union employees can only access information stored in Nautilus after logging into the Nautilus Essentials portal or through Portico (discussed above). Nautilus Essentials' log-in process utilizes multi-factor authentication (through delivery of OTPs). IP whitelisting and PII masking are available on this product.
- **Wisdom Accounting**
  - Security Measures: Security Measures: Wisdom Accounting Suite is a product that allows credit unions to create financial accounting documents such as general ledger and accounts payable schedules. There is no sensitive member or credit union information stored within Wisdom Accounting Suite. Nevertheless, Wisdom Accounting Suite's log-in process utilizes multi-factor authentication (through delivery of OTPs).

The false assertions in your letter raise significant concerns. Your letter claims that multi-factor authentication has not been implemented on Portico, Portico Reporting Analytics, and

FOLEY
FOLEY & LARDNER LLP



Loancierge. You know, and your client should know, that is untrue. The documentation provided to you on April 8, 2026 confirms that TOTP through authenticator applications has been available for Portico since June 2025, for Portico Reporting Analytics since December 2025, and for Loancierge since February 2026. This documentation was made available to Marshall CCU at the time TOTP was announced for each product and a simple review of its settings within these products would reveal the same reality. In the *Self-Help* action (in which you were counsel of record for the plaintiff), the plaintiff was ordered to admit that Portico and Portico Reporting Analytics utilize TOTP as an authentication method, and to pay attorneys' fees and costs due, in part, to plaintiff's refusal to admit those facts before being compelled to do so. *See Self-Help Credit Union v. Fiserv Solutions, LLC, et al.*, Apr. 30, 2026 Text Order, Case No. 1:25-cv-01112-TDS-LPA (M.D.N.C.). Your persistence in advancing factually baseless claims is troubling and, to the extent you intend to make the same allegations on behalf of Marshall CCU in litigation, inconsistent with your obligations under Rule 11.

With respect to your demand for various audits or evaluations, Fiserv Solutions has previously tendered to you on August 28, 2025, the summary of its written information security plan for the applicable products and services the credit union received under the Master Agreement. Such summary of Fiserv Solutions' information security plan shall hereby be considered tendered to Marshall CCU pursuant to § 4(b) (information security plan to be provided within 30 days of receipt). Fiserv Solutions will soon be providing additional documents responsive to Marshall CCU's audit request.

Fiserv Solutions is reviewing Marshall CCU's request for "invoice substantiation." Please note, however, that Fiserv Solutions is not obligated to provide (and will not provide) information in response to Marshall CCU's unspecified demand for "invoice substantiation" unless and until Marshall CCU identifies the specific products and services for which it believes it was improperly invoiced and charged. Fiserv Solutions is only obligated to provide information in response to a "reasonable request" by Marshall CCU. *See* Master Agreement, § 10(c). A blanket request in the absence of any specified issue or concern is not a good faith request. To the extent that Marshall CCU seeks substantiation with respect to a particular service, product or issue, it should make that request clear and Fiserv Solutions will respond in due course.

Fiserv Solutions and Fiserv, Inc. hereby expressly reserve all rights and remedies.

Very truly yours,

***/s/ Andrew J. Wronski***

Andrew J. Wronski

cc: John Cleary
Walter Swearingen
David Hecht
Lori Feldman
Kristen Nelson
Chuck Holzman
Michael Krempa